CASE No. 08-CV-01286-VM
(consolidated with Case Nos. 08-CV-01815 and 08-CV-01286)

# IN THE UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

COMPANIA INTERNACIONAL FINANCIERA, S.A,
COUDREE GLOBAL EQUITIES FUND,
STANDARD BANK OF LONDON, AND
LEONARDO CAPITAL FUND SPC, *ET AL.*,

*Appellants,*

v.

CALPINE CORPORATION, *ET AL.*,

*Debtors-Appellees.*

On Appeal from the United States Bankruptcy Court
For the Southern District of New York

*In re Calpine Corporation, et al.,*
Case No. 05-60200 (BRL) (Jointly Administered)

## DECLARATION OF BARRY FOLSE IN SUPPORT OF DEBTORS-APPELLEES RESPONSE TO APPELLANTS' OPENING BRIEFS

Barry Folse, being duly sworn, deposes and states:

1.      I am a managing director in the Case Management Services business unit at AP Services, LLC ("APS"), which is serving as crisis managers for the debtors Calpine Corporation, et al. (collectively, "Calpine" or "Debtors") in the above-captioned chapter 11 cases (the "Chapter 11 Cases").   Before joining APS, I obtained a bachelor's degree in business administration with concentrations in statistical methods and computer science from Louisiana State University in 1986.

2.    APS maintains offices at 2000 Town Center, Suite 2400, Southfield, Michigan 48075 and 2100 McKinney Ave., Suite 800, Dallas, Texas 75201. APS specializes in, among other things, assisting financially troubled companies in preparing their schedules and statements, reviewing their proofs of claim, assisting in the claims objection and reconciliation process, setting appropriate distribution reserves, and making distributions to holders of claims and interests. APS is an affiliate of AlixPartners LLC, a nationally recognized restructuring and turnaround advisory and consulting firm.

3.    Since joining APS, I have assisted various chapter 11 debtors, including Fleming Companies, Hayes-Lemmerz International, Regal Cinemas, Exide Technologies, DirectTV Latin America, Genuity, Cable & Wireless, Communication Dynamics, Inc., and Levitt & Son, LLC.

4.    On March 28, 2006, the Bankruptcy Court entered an order authorizing the Debtors to retain APS as their crisis managers in the Chapter 11 Cases. (A true and copy of the Bankruptcy Court's order is attached as Exhibit A.)

5.    The Debtors retained APS to advise and assist the Debtors with their chapter 11 reorganization. During its representation of the Debtors, APS professionals became very familiar with the Debtors' business operations, capital structure, financing arrangements, and other material obligations. After the effective date of the Debtors' confirmed plan of reorganization, APS has continued to assist the reorganized Debtors with, among other things, the claims reconciliation and objection process, setting appropriate distribution reserves, and making distributions to holders of claims and interests.

6.    I am familiar with both the Debtors' Sixth Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code (the "Calpine Plan"), confirmed in

2

the Chapter 11 Cases, and the implementation of the Calpine Plan's provisions by the reorganized Debtor. (A true and copy of the Bankruptcy Court's order is attached as Exhibit B.)

## STEPS TAKEN TO IMPLEMENT
## THE PLAN OF REORGANIZATION

7.    The carefully-negotiated Calpine Plan includes a large number of provisions that had far-reaching consequences. Among other things, the Calpine Plan:

- permitted reorganized Calpine to access a $7.3 billion new credit facility, *see* Plan, Art. IV § B.1;

- provided for the issuance of 500 million shares of new Calpine common stock, *see id.* § B.2;

- provided for the issuance of 48.5 million of new Calpine warrants, *see id.* § B.3;

- vested assets, property, and claims in the reorganized Debtors free from encumbrances, *see id.* § H;

- canceled debt and equity securities and related obligations, *see id.* § I;

- permitted the Debtors to assume and reject numerous contracts and leases, *see id.*, Art. V §§ A, A.1-A.7, B, C; and

- discharged claims and terminated interests, *see id.*, Art. VIII § A.

8.    The Bankruptcy Court confirmed the Calpine Plan on December 19, 2007. (A true and correct copy of the Bankruptcy Court's Confirmation Order is attached as Exhibit C.)

9.    Following entry of the Bankruptcy Court's confirmation order, the Debtors undertook all the steps necessary to implement the plan of reorganization, including, for example, resolving outstanding claims, obtaining NYSE and the DTC approvals to relist Calpine stock, coordinating with the indentured trustees to effect distributions to the beneficial owners of claims, modeling the waterfall effect of the plan to calculate the distribution reserves and

imputed share price, and ensuring that the effects of the various entered-into settlements were implemented in the distribution.

10.    The Calpine Plan became effective on January 31, 2008.

11.    On the effective date, the reorganized Debtors emerged from chapter 11 protection and began conducting business as New Calpine.

**CONSUMMATION OF
THE PLAN OF REORGANIZATION**

12.    Upon becoming effective, the Calpine Plan immediately had the following effects:

- it discharged more than $12 billion of Calpine's debt held by over 2,600 creditors;

- it cancelled all outstanding shares of old common stock in Calpine Corporation and certificates evidencing Calpine's pre-petition bond debt;

- it disbanded the existing official committees of unsecured creditors and equity security holders (except for certain limited purposes); and

- it established certain corporate governance procedures for reorganized Calpine Corporation, including the appointment of a new board of directors and restatement of the charter and bylaws, and the implementation of registration rights.

13.    After the Plan went effective on January 31, Calpine closed on a $7.3 billion exit financing facility, and used $3.88 billion of the funds from the exit facility to pay off its debtor in possession financing facility.

14.    In addition, Calpine made wire transfers to satisfy various secured and administrative claims pursuant to the terms of the Plan, including:

- approximately $66 million to the holders of first lien secured debt;

- approximately $3.9 billion to holders of second lien secured debt;

4

- approximately $16 million to holders of other secured claims;
- approximately $15 million to holders of administrative claims; and
- approximately $20 million to holders of unsecured convenience class claims.

15.    Through March 25, 2008, Calpine had issued approximately 417 million shares (more than 86% of the 485 million shares of new Calpine common stock available to Calpine's creditors) to thousands of creditors, including new Calpine shareholders who agreed to settle their claims in reliance on the settled $18.95 billion total enterprise value.

16.    Calpine has also reserved 9.7 million shares for distribution for the benefit of certain holders of unsecured bonds pending resolution of an inter-creditor dispute, which is now subject to litigation pending in the Supreme Court of the State of New York, New York County.

17.    On February 7, shares of new Calpine common stock began "regular way" trading on the New York Stock Exchange under the ticker symbol "CPN." Between February 7 and March 25, myriad investors — including employees, individuals, and institutional investors — have bought and sold more than 107 million shares of new Calpine common stock.

18.    On February 28, Calpine issued approximately 48.5 million warrants to purchase shares of new Calpine common stock to holders of old Calpine common stock (including each of the Objecting Shareholders). Calpine warrants are trading "over-the-counter" under the ticker symbol "CPNCW.PK." Between February 28 and March 25, approximately 4 million warrants to purchase shares of new Calpine common stock were bought and sold.

19.    As a result of the foregoing, substantially all of the property of old Calpine proposed to be transferred has been transferred, and all equity interests in old Calpine proposed to be cancelled under the plan have been cancelled.

20.    New Calpine has assumed all ordinary course business operations and the property addressed in the plan. Substantially all of the distributions contemplated under the plan have been made.

## IRREPARABLE HARM WOULD RESULT
## IF THE RELIEF SOUGHT BY APPELLANTS WAS GRANTED

21.    If the Court were to grant the relief requested by the Appellants, including ordering the Bankruptcy Court to reopen confirmation, significant harm would be imposed upon the reorganized Debtors, their creditors, and countless other third parties.

22.    An incalculable number of transactions have occurred in reliance on the Calpine Plan. In addition to the stock of New Calpine trading in the public market, parties have engaged in many other acts, transactions, releases, and settlements in reliance on the effectiveness of the plan and each of its provisions, the discharge of billions of dollars of debt, and the restructuring of the reorganized Debtors' management, business, and capital structure.

23.    The relief requested by Appellants, particularly with regard to the request that Calpine issue and reserve 300,000,000 shares for future distribution, would cause the unraveling of numerous complex, interrelated transactions, and it also would likely result in the collapse of the Calpine Plan. Under the Plan, the provisions are deemed to be "nonseverable and mutually dependent." Plan, Art. XII, § L. Accordingly, modifying any of the provisions (such as those impacting distribution of new shares) could cause the entire plan to unravel and force the reorganized Debtors back into chapter 11. In addition, overturning the plan and reopening confirmation could force the Debtors into a situation of having to renegotiate their valuable exit financing in a vastly different, and more constricted, credit market.

6

24.    The relief sought by the Appellants would also require the Bankruptcy Court to order the return of distributions made to potentially thousands of third parties under the Plan. The distributions discussed above — the billions in payments in cash and stock to creditors and the millions of shares and warrants distributed, among other transactions — would have to be tracked down, cancelled, and unwound. Because shares and warrants have already been actively traded, it is difficult to conceive how such unwinding could effectively occur.

25.    Moreover, issuing hundreds of millions of new shares would dilute the value of the shares that already have been issued to creditors and subsequently traded on open markets. The issuance of new shares also would impact the value of the warrants that have been issued to former shareholders of the company.

26.    In addition, if the Plan were overturned and confirmation proceedings reopened, the viability and effectiveness of numerous contracts, settlements, leases, and the like that have been formed since the Plan was consummated would be called into doubt. Termination of such contracts would inevitably create controversy, harm Calpine's reputation, and/or result in litigation.

27.    Moreover, confirmation and implementation of the plan served as a catalyst for completing distributions by Calpine's Canadian subsidiaries, which had filed for relief under the Companies' Creditors Arrangement Act in the Court of Queen's Bench in Calgary, Alberta, Canada.

28.    In particular, ultimate distributions to the Canadian Debtors' stakeholders were dependent upon the fact that certain of the Canadian creditors would be paid in full from the U.S. estate pursuant to the confirmed plan. *See* 28th Report of the Monitor, Ernst & Young, Inc., www.ey.com/ca/calpinecanada (January 10, 2008). (A true and correct copy of this report is

7

attached as Exhibit D.)  In addition, distributions to Canadian stakeholders were calculated using the settled total enterprise value.

29.    On January 15, 2008, the Canadian Debtors obtained specific approval of certain distributions to creditors that were dependent upon implementation of the confirmed Calpine Plan.  *See* 29th Report of the Monitor, Ernst & Young, Inc., www.ey.com/ca/calpinecanada (February 6, 2008).  (A true and correct copy of this report is attached as Exhibit E.)  And, on February 8, 2008, the Canadian Debtors, relying on the fact that those distributions had been made, applied for and obtained an order terminating the Canadian proceedings.  (A true and correct copy of the order is attached as Exhibit F).

30.    Ultimately, given the many harms Appellants' requested relief could impose if granted, the requested relief would threaten Calpine's ability to successfully emerge from the reorganization process as a healthy ongoing enterprise.  Requiring a new confirmation process could well result in the reinstatement of billions in debt, result in breaches of business arrangements, result in lost revenues, and create a crisis of confidence for shareholders, creditors, customers, vendors, and employees that may be unrecoverable.

Dated:  March 27, 2008
Dallas, TX

Barry Folse

8

# EXHIBIT A

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) |
| | ) |
| | ) Chapter 11 |
| Calpine Corporation, <u>et al.</u>, | ) |
| | ) Case No. 05-60200 (BRL) |
| Debtors. | ) Jointly Administered |
| | ) |

## FINAL ORDER UNDER SECTIONS 327(a) AND 328(a) OF THE BANKRUPTCY CODE AUTHORIZING THE EMPLOYMENT AND RETENTION OF AP SERVICES, LLC AS CRISIS MANAGERS TO THE DEBTORS

Upon the application (the "Application")[1] of the above-captioned debtors (collectively, the "Debtors") for an order authorizing the employment and retention of AP Services, LLC ("APS") as crisis managers to the Debtors and upon the Declaration of Lisa J. Donahue (the "Donahue Declaration") in support of the Application; it appearing that the relief requested is in the best interest of the Debtors' estates, their creditors and other parties in interest; it appearing that the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; it appearing that this proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); it appearing that venue of this proceeding and this Application in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409; notice of this Application and the opportunity for a hearing on this Application was appropriate under the particular circumstances and that no other or further notice need by given; and after due deliberation and sufficient cause appearing therefor, it is hereby ORDERED

1.      The Application is approved on a final basis.

---

[1]      Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Application.

2.    APS is found to be a "disinterested person" within the meaning of section 101(14) of title 11 of the United States Code (the "Bankruptcy Code").

3.    The Debtors are hereby authorized, pursuant to sections 327(a) and 328(a) of the Bankruptcy Code, to employ and retain, under a general retainer, upon the terms and for the purposes set forth in the Application and the First Amended Engagement Letter, APS as crisis managers to the Debtors in these Chapter 11 Cases on a final basis effective as of the Petition Date.

4.    APS shall be compensated for its services and reimbursed for any related expenses (other than any expenses that may be incurred by APS in obtaining an opinion of outside counsel in connection with the provision of services to, or for the benefit of, the Debtors) in accordance with the Application, the First Amended Engagement Letter, and this Final Order, in accordance with the procedures set forth in sections 330 and 331 of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, guidelines established by this Court, the United States Trustee Guidelines, and the orders of this Court.

5.    APS shall apply the retainer it is currently holding from the Debtors to satisfy postpetition fees and expenses which are due and payable in accordance with the terms and conditions of this Order before requesting additional payments from the Debtors.

6.    Notwithstanding anything to the contrary in the Bankruptcy Code, the Bankruptcy Rules, the Local Rules of this Court, any orders of this Court or any guidelines regarding submission and approval of fee applications, APS and its professionals shall only be required to maintain time records for services rendered postpetition in half-hour (.5) increments.

7.    The United States Trustee and the Official Committee of Unsecured Creditors retain all rights to object to APS's interim and final fee applications (including expense

reimbursement) on all grounds including but not limited to the reasonableness standard provided for in section 330 of the Bankruptcy Code.

8.    All requests of APS for payment of indemnity pursuant to the Engagement Letter shall be made by means of an application (interim or final as the case may be) and shall be subject to review by the Court to ensure that payment of such indemnity conforms to the terms of the Engagement Letter and is reasonable based upon the circumstances of the litigation or settlement in respect of which indemnity is sought, provided, however, that in no event shall APS be indemnified in the case of its own bad-faith, self-dealing, breach of fiduciary duty (if any), gross negligence or willful misconduct.

9.    In no event shall APS be indemnified if the Debtor or a representative of the estate, asserts a claim for, and a court determines by final order that such claim arose out of, APS's own bad-faith, self-dealing, breach of fiduciary duty (if any), gross negligence, or willful misconduct.

10.    In the event that APS seeks reimbursement for attorneys' fees from the Debtors pursuant to the Engagement Letter, the invoices and supporting time records from such attorneys shall be included in APS's own applications (both interim and final) and such invoices and time records shall be subject to the United States Trustee's guidelines for compensation and reimbursement of expenses and the approval of the Bankruptcy Court under the standards of sections 330 and 331 of the Bankruptcy Code without regard to whether such attorney has been retained under section 327 of the Bankruptcy Code and without regard to whether such attorneys' services satisfy section 330(a)(3)(C) of the Bankruptcy Code.

11.    The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Final Order in accordance with the Application.

12.     The terms and conditions of this Final Order shall be immediately effective and enforceable upon its entry.

13.     To the extent that any term of this Final Order is inconsistent with the Engagement Letter or Application, the terms of this Final Order shall govern.

14.     The requirement set forth in Rule 9013-1(b) of the Local Bankruptcy Rules for the Southern District of New York that any motion or other request for relief be accompanied by a memorandum of law is hereby deemed satisfied by the contents of the Application or otherwise waived.

15.     The Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Final Order.

16.     To the extent that this Final Order is inconsistent with any prior order or pleading with respect to the Application in these cases or the Engagement Letter, the terms of this Final Order shall govern.

Dated: New York, New York
      March 27, 2006                     /s/Burton R. Lifland
                                           United States Bankruptcy Judge

K&E 11037758.3

# EXHIBIT B

KIRKLAND & ELLIS LLP
Citigroup Center
153 East 53rd Street
New York, NY  10022-4611
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900
Richard M. Cieri (RC 6062)
Marc Kieselstein (admitted pro hac vice)
David R. Seligman (admitted pro hac vice)
Edward O. Sassower (ES 5823)
James J. Mazza, Jr. (admitted pro hac vice)
Chad J. Husnick (admitted pro hac vice)

Counsel for the Debtors and Debtors in Possession

## UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| **IN RE:** | ) **CHAPTER 11** |
|  | ) |
| **CALPINE CORPORATION, ET AL.,** | ) **CASE NO. 05-60200 (BRL)** |
|  | ) **JOINTLY ADMINISTERED** |
| **DEBTORS.** | ) |
|  | ) |

## DEBTORS' SIXTH AMENDED JOINT PLAN OF REORGANIZATION
## PURSUANT TO CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE

Dated:  December 19, 2007

## TABLE OF CONTENTS

Page

INTRODUCTION.................................................................................................................1

ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION,
      COMPUTATION OF TIME, AND GOVERNING LAW ............................................1
    A.    Defined Terms ........................................................................................1
    B.    Rules of Interpretation and Computation of Time:..............................31
    C.    Reference to Monetary Figures.............................................................32
    D.    Reference to the Debtors or Reorganized Debtors ...............................32

ARTICLE II. ADMINISTRATIVE AND PRIORITY CLAIMS...........................................32
    A.    DIP Facility Claims...............................................................................32
    B.    Administrative Claims ..........................................................................32
    C.    Priority Tax Claims...............................................................................32

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND
      INTERESTS ...............................................................................................32
    A.    Classification of Claims and Interests..................................................32
    B.    Treatment of Classes of Claims and Interests......................................33
    C.    Class Voting Rights ..............................................................................42
    D.    Acceptance or Rejection of the Plan .....................................................43

ARTICLE IV. PROVISIONS FOR IMPLEMENTATION OF THE PLAN .........................44
    A.    Substantive Consolidation ....................................................................44
    B.    Sources of Consideration for Plan Distributions .................................45
    C.    Section 1145 Exemption ......................................................................45
    D.    Listing Rights .......................................................................................46
    E.    Restrictions on Resale of Securities to Protect Net Operating Losses...................46
    F.    Issuance and Distribution of the New Calpine Plan Securities.............................46
    G.    Corporate Existence .............................................................................46
    H.    Vesting of Assets in the Reorganized Debtors .....................................46
    I.    Cancellation of Debt and Equity Securities and Related Obligations ..................47
    J.    Restructuring Transactions ...................................................................48
    K.    Post-Confirmation Property Sales.........................................................48
    L.    Corporate Action...................................................................................49
    M.    Certificate of Incorporation and Bylaws...............................................49
    N.    Effectuating Documents, Further Transactions ....................................49
    O.    Exemption from Certain Transfer Taxes and Recording Fees..............................50
    P.    Directors and Officers of Reorganized Calpine.....................................50
    Q.    Directors and Officers of Reorganized Debtors Other Than Calpine...................50
    R.    Employee and Retiree Benefits.............................................................51
    S.    Management and Director Equity Incentive Plan ..................................51
    T.    Creation of Professional Fee Escrow Account ......................................52
    U.    Preservation of Rights of Action...........................................................52

**TABLE OF CONTENTS (cont'd)**

V.    Rights of Action Against Pipelines.........................................................53

**ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
LEASES .........................................................................................................53**
A.    Assumption and Rejection of Executory Contracts and Unexpired Leases ..........53
B.    Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.........56
C.    Executory Contracts and Unexpired Leases Relating to Projects to be Sold
or Surrendered...........................................................................................57
D.    Preexisting Obligations to the Debtors Under Executory Contracts and
Unexpired Leases.......................................................................................58
E.    Claims Based on Rejection or Repudiation of Executory Contracts and
Unexpired Leases.......................................................................................58
F.    Intercompany Contracts, Contracts, and Leases Entered Into After the
Petition Date.............................................................................................58
G.    Guarantees Issued or Reinstated After the Petition Date.......................................59
H.    Modification of Executory Contracts and Unexpired Leases Containing
Equity Ownership Restrictions .................................................................59
I.    Modifications, Amendments, Supplements, Restatements, or Other
Agreements ...............................................................................................59
J.    Reservation of Rights................................................................................59
K.    Nonoccurrence of Effective Date.............................................................60

**ARTICLE VI. PROCEDURES FOR RESOLVING DISPUTED CLAIMS AND
INTERESTS .................................................................................................60**
A.    Allowance of Claims and Interests ...........................................................60
B.    Claims and Interests Administration Responsibilities ...............................60
C.    Estimation of Claims and Interests ...........................................................60
D.    Adjustment to Claims and Interests Without Objection ............................61
E.    Time to File Objections to Claims .............................................................61
F.    Disallowance of Claims or Interests ..........................................................61
G.    Offer of Judgment .....................................................................................62
H.    Amendments to Claims..............................................................................63

**ARTICLE VII. PROVISIONS GOVERNING DISTRIBUTIONS .........................................63**
A.    Total Enterprise Value for Purposes of Distributions Under the Plan and
the New Calpine Stock Reserve.................................................................63
B.    Distributions on Account of Claims and Interests Allowed as of the
Effective Date ...........................................................................................63
C.    Distributions on Account of Claims Allowed After the Effective Date .............63
D.    Delivery of Distributions ..........................................................................66
E.    Claims Paid or Payable by Third Parties ..................................................70
F.    Treatment of Interests ...............................................................................71

**ARTICLE VIII. EFFECT OF CONFIRMATION OF THE PLAN........................................71**
A.    Discharge of Claims and Termination of Interests .................................71
B.    Subordinated Claims..................................................................................72

# TABLE OF CONTENTS (cont'd)

C.    Compromise and Settlement of Claims and Controversies ....................................72
D.    **Releases by the Debtors**........................................................................................72
E.    **Exculpation**..........................................................................................................73
F.    **Releases by Holders of Claims and Interests**....................................................73
G.    **Injunction**............................................................................................................74
H.    Protection Against Discriminatory Treatment .......................................................75
I.    **Setoffs**.................................................................................................................75
J.    **Recoupment** ........................................................................................................76
K.    **Release of Liens** ..................................................................................................76
L.    Document Retention ...............................................................................................77
M.    Reimbursement or Contribution ............................................................................77

**ARTICLE IX. ALLOWANCE AND PAYMENT OF CERTAIN
ADMINISTRATIVE CLAIMS**................................................................................**77**
A.    Professional Claims ...............................................................................................77
B.    Other Administrative Claims .................................................................................79

**ARTICLE X. CONDITIONS PRECEDENT TO CONFIRMATION AND
CONSUMMATION OF THE PLAN** ........................................................................**80**
A.    Conditions to Confirmation ...................................................................................80
B.    Conditions Precedent to Consummation................................................................80
C.    Waiver of Conditions Precedent ............................................................................81
D.    Effect of Non-Occurrence of Conditions to Consummation .................................81
E.    Satisfaction of Conditions Precedent to Confirmation .........................................81

**ARTICLE XI. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE
PLAN**..........................................................................................................................**81**
A.    Modification and Amendments...............................................................................81
B.    Effect of Confirmation on Modifications ..............................................................82
C.    Revocation or Withdrawal of Plan ........................................................................82

**ARTICLE XII. RETENTION OF JURISDICTION**....................................................**82**

**ARTICLE XIII. MISCELLANEOUS PROVISIONS** ....................................................**84**
A.    Immediate Binding Effect......................................................................................84
B.    Additional Documents ...........................................................................................85
C.    Payment of Statutory Fees.....................................................................................85
D.    Dissolution of Committees ....................................................................................85
E.    Reservation of Rights.............................................................................................85
F.    Successors and Assigns..........................................................................................86
G.    Service of Documents ............................................................................................86
H.    Term of Injunctions or Stays.................................................................................87
I.    Entire Agreement ...................................................................................................87
J.    Governing Law .......................................................................................................87
K.    Exhibits ..................................................................................................................88
L.    Nonseverability of Plan Provisions........................................................................88

## TABLE OF CONTENTS (cont'd)

M.    Closing of Chapter 11 Cases ................................................................88
N.    **Waiver or Estoppel** ..........................................................................88
O.    Conflicts .............................................................................................89

iv

**INTRODUCTION**

Calpine Corporation and the other debtors in the above-captioned chapter 11 cases (collectively, the "Debtors") propose the following sixth amended joint plan of reorganization (the "Plan") for the resolution of outstanding creditor claims against, and equity interests in, the Debtors pursuant to title 11 of the United States Code, 11 U.S.C. §§ 101–1532. Capitalized terms used in the Plan and not otherwise defined shall have the meanings ascribed to such terms in ARTICLE I.A of the Plan. Reference is made to the Disclosure Statement, Filed contemporaneously with the Plan, for a discussion of the Debtors' history, businesses, assets, results of operations, and projections of future operations, as well as a summary and description of the Plan and certain related matters. The Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code.

ALL HOLDERS OF CLAIMS AND INTERESTS ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. THE PLAN PROVIDES FOR SUBSTANTIVE CONSOLIDATION OF ALL OF THE ESTATES FOR ALL PURPOSES ASSOCIATED WITH CONFIRMATION AND CONSUMMATION.

**ARTICLE I.**
**DEFINED TERMS, RULES OF INTERPRETATION,**
**COMPUTATION OF TIME, AND GOVERNING LAW**

A.    Defined Terms:  As used in the Plan, the capitalized terms below have the following meanings, except as expressly provided or unless the context otherwise requires. Any term used but not defined in the Plan, but that is used in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules.

1.    4.0% Convertible Senior Notes Due 2006:  The $1,200,000,000 4.0% Convertible Senior Notes due December 26, 2006, issued by Calpine pursuant to that certain Indenture, dated as of August 10, 2000, between Calpine and Wilmington Trust Company, as trustee, as supplemented by the First Supplemental Indenture, dated as of September 28, 2000.

2.    4.75% Convertible Senior Notes Due 2023:  The $900,000,000 4.75% Convertible Senior Notes due November 15, 2023, issued by Calpine pursuant to that certain Amended and Restated Indenture, dated as of March 12, 2004, between Calpine and Wilmington Trust Company, as trustee.

3.    6.00% Contingent Convertible Notes Due 2014:  The $736,000,000 6.00% Contingent Convertible Notes due September 30, 2014, issued by Calpine pursuant to that certain Indenture, dated as of August 10, 2000, between Calpine and Wilmington Trust Company, as trustee, as supplemented by the Second Supplemental Indenture, dated as of September 30, 2004.

4.    7.625% Senior Notes Due 2006:  The $250,000,000 7.625% Senior Notes due April 15, 2006, issued by Calpine pursuant to that certain Indenture, dated as of March 29, 1999, between Calpine and The Bank of New York, as trustee, as supplemented by the First

Supplemental Indenture, dated as of July 31, 2000, and the Second Supplemental Indenture, dated as of April 26, 2004.

5. <u>7.75% Contingent Convertible Notes Due 2015</u>: The $650,000,000 7.75% Contingent Convertible Notes Due June 1, 2015, issued by Calpine pursuant to that certain Indenture, dated as of August 10, 2000, between Calpine and Wilmington Trust Company, as trustee, as supplemented by the Third Supplemental Indenture, dated as of June 23, 2005.

6. <u>7.75% Senior Notes Due 2009</u>: The $350,000,000 7.75% Senior Notes due April 15, 2009, issued by Calpine pursuant to that certain Indenture, dated as of March 29, 1999, between Calpine and The Bank of New York, as trustee, as supplemented by the First Supplemental Indenture, dated as of July 31, 2000, and the Second Supplemental Indenture, dated as of April 26, 2004.

7. <u>7.875% Senior Notes Due 2008</u>: The $400,000,000 7.875% Senior Notes due April 1, 2008, issued by Calpine pursuant to that certain Indenture, dated as of March 31, 1998, between Calpine and The Bank of New York, as trustee, as supplemented by the First Supplemental Indenture, dated as of July 24, 1998, the Second Supplemental Indenture, dated as of July 31, 2000, and the Third Supplemental Indenture, dated as of April 26, 2004.

8. <u>8.5% Second Priority Senior Secured Notes Due 2010</u>: The $1,150,000,000 8.5% Second Priority Senior Secured Notes due July 15, 2010, issued by Calpine pursuant to that certain Indenture dated as of July 16, 2003, between Calpine and Wilmington Trust Company, as trustee.

9. <u>8.5% Senior Notes Due 2011</u>: The $850,000,000 8.5% Senior Notes due February 15, 2011, issued by Calpine pursuant to that certain Indenture, dated as of August 10, 2000, between Calpine and Wilmington Trust Company, as trustee, as supplemented by the First Supplemental Indenture, dated as of September 28, 2000.

10. <u>8.625% Senior Notes Due 2010</u>: The $750,000,000 8.625% Senior Notes due August 15, 2010, issued by Calpine pursuant to that certain Indenture, dated as of August 10, 2000, between Calpine and Wilmington Trust Company, as trustee.

11. <u>8.75% Second Priority Senior Secured Notes Due 2013</u>: The $900,000,000 Second Priority 8.75% Senior Secured Notes due July 15, 2013, issued by Calpine pursuant to that certain Indenture dated as of July 16, 2003, between Calpine and Wilmington Trust Company, as trustee.

12. <u>8.75% Senior Notes Due 2007</u>: The $275,000,000 8.75% Senior Notes due July 15, 2007, issued by Calpine pursuant to that certain Indenture, dated as of July 8, 1997, between Calpine and The Bank of New York, as trustee, as supplemented by the First Supplemental Indenture, dated as of September 10, 1997, the Second Supplemental Indenture, dated as of July 31, 2000, and the Third Supplemental Indenture, dated as of April 26, 2004.

13. <u>9.625% First Priority Senior Secured Notes Due 2014</u>: The $785,000,000 9.625% First Priority Senior Secured Notes due September 30, 2014, issued by Calpine pursuant to that

2

certain Indenture, dated as of September 30, 2004, between Calpine and Wilmington Trust Company, as trustee.

14.  9.875% Second Priority Senior Secured Notes Due 2011:  The $400,000,000 9.875% Second Priority Senior Secured Notes due December 1, 2011, issued by Calpine pursuant to that certain Indenture, dated as of November 18, 2003, between Calpine and Wilmington Trust Company, as trustee.

15.  10.5% Senior Notes Due 2006:  The $180,000,000 10.5% Senior Notes due May 15, 2006, issued by Calpine pursuant to that certain Indenture, dated as of May 16, 1996, between Calpine and U.S. Bank National Association, as successor trustee, as supplemented by the First Supplemental Indenture, dated as of August 1, 2000 and the Second Supplemental Indenture, dated as of April 26, 2004.

16.  Accrued Professional Compensation:  At any given moment, all accrued fees and expenses (including success fees) for services rendered by all Professionals through and including the Effective Date, to the extent such fees and expenses have not been paid and regardless of whether a fee application has been Filed for such fees and expenses.  To the extent there is a Final Order denying some or all of a Professional's fees or expenses, such denied amounts shall no longer be considered Accrued Professional Compensation.

17.  Ad Hoc Committee Of 6.0% Convertible Noteholders:  That certain ad hoc committee of Holders of 6.00% Contingent Convertible Notes Due 2014 whose members are Aristeia Capital, L.L.C., Aurelius Capital Management, LP, Drawbridge Special Opportunities Advisors LLC, Harbinger Capital Partners, Luminus Management, LLC, Ore Hill Hub Fund Ltd., Nisswa Master Fund Ltd., Pines Edge Value Investors Ltd., Pines Edge Value Investors L.P., Silver Sands Fund LLC, Stark Master Fund Ltd. and 3V Capital Management, LLC.

18.  Ad Hoc Committee Of 7.75% Convertible Noteholders:  That certain ad hoc committee of Holders of 7.75% Contingent Convertible Notes Due 2015 whose members are Harbinger Capital Partners Master Fund I, Ltd. Harbinger Capital Partners Special Situations Fund L.P., Dillon Read U.S. Finance L.P., Dillon Read Financial Products Trading Ltd., and R6 Capital Management, L.P.

19.  Administrative Agents:  In their capacity as such, the administrative agent and its predecessors for the Second Priority Senior Secured Term Loan Due 2007.

20.  Administrative Claim:  A Claim for costs and expenses of administration pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including:  (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors (such as wages, salaries, or commissions for services, and payments for goods and other services and leased premises); (b) compensation for legal, financial advisory, accounting, and other services and reimbursement of expenses Allowed pursuant to sections 328, 330(a), or 331 of the Bankruptcy Code or otherwise for the period commencing on the Petition Date and ending on the Effective Date; (c) all fees and charges assessed against the Estates pursuant to chapter 123 of the Judicial Code; and (d) all requests for compensation or expense reimbursement for making a

substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4), and (5) of the Bankruptcy Code.

21.    <u>Administrative Claim Bar Date</u>:  The deadline for filing requests for payment of Administrative Claims, which shall be thirty days after the Effective Date, unless otherwise ordered by the Bankruptcy Court, except with respect to Professional Claims, which shall be subject to the provisions of ARTICLE IX; <u>provided</u>, <u>however</u>, that pursuant to section 503(b)(1)(D) of the Bankruptcy Code, to be considered timely filed for the purposes of the Administrative Claim Bar Date, the Texas Taxing Authority and the Louisiana Department of Revenue need not File a Claim or request payment to have an Allowed Administrative Claim for certain taxes, fines, penalties, and reductions in credit described in section 503(b)(1)(B) and (C) of the Bankruptcy Code.

22.    <u>Affidavit of Publication</u>:  An affidavit of a representative or agent of a publisher of a periodical certifying that notice has been served through publication in the publisher's periodical.

23.    <u>Affiliate</u>:  Excluding any Canadian Debtor: (a) an Entity that directly or indirectly owns, controls, or holds with power to vote, twenty percent or more of the outstanding voting securities of any of the Debtors, other than an Entity that holds such securities (i) in a fiduciary or agency capacity without sole discretionary power to vote such securities or (ii) solely to secure a debt, if such Entity has not in fact exercised such power to vote; (b) a corporation twenty percent or more of whose outstanding voting securities are directly or indirectly owned, controlled, or held with power to vote, by any of the Debtors, or by an Entity that directly or indirectly owns, controls, or holds with power to vote, twenty percent or more of the outstanding voting securities of any of the Debtors, other than an Entity that holds such securities (i) in a fiduciary or agency capacity without sole discretionary power to vote such securities or (ii) solely to secure a debt, if such Entity has not in fact exercised such power to vote; (c) an Entity whose business is operated under a lease or operating agreement by any of the Debtors, or an Entity substantially all of whose property is operated under an operating agreement with any of the Debtors; (d) an Entity that operates the business or substantially all of the property of any of the Debtors under a lease or operating agreement; or (e) the Debtors' domestic and non-domestic, wholly-owned, direct and indirect subsidiaries that have not commenced cases under chapter 11 of the Bankruptcy Code.

24.    <u>Agnews Project</u>:  That certain leased 28.5 megawatt combined cycle cogeneration facility, along with certain related equipment, located in Santa Clara County, California.

25.    <u>Allowed</u>:  With respect to Claims and Interests:  (a) any Claim or Interest, proof of which is timely Filed by the applicable Bar Date (or that by the Bankruptcy Code or Final Order is not or shall not be required to be Filed); (b) any Claim or Interest that is listed in the Schedules as of the Effective Date as not disputed, not contingent, and not unliquidated, and for which no Proof of Claim or Interest has been timely Filed; or (c) any Claim Allowed pursuant to the Plan; <u>provided</u>, <u>however</u>, that with respect to any Claim or Interest described in clauses (a) or (b) above, such Claim or Interest shall be considered Allowed only if and to the extent that (x) with respect to any Unsecured Convenience Class Claim, no objection to Allowance thereof has been interposed on or prior to the Effective Date, (y) with respect to any Claim or Interest

that is not an Unsecured Convenience Class Claim, no objection to the Allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or (z) such an objection is so interposed and the Claim or Interest shall have been Allowed for distribution purposes only by a Final Order; provided further, however, that the Claims and Interests described in clauses (a) and (b) above shall not include any (i) Claim or Interest on account of an option, warrant, or contractual rights to purchase or acquire an Equity Security (the term "option" in this clause (i) does not include a right to convert a debt Security into an Equity Security) that is not exercised by the Voting Deadline and (ii) Interest held by or for the benefit of Calpine, including those Interests held pursuant to the DB Share Lending Agreement. Except as otherwise specified in the Plan or a Bankruptcy Court order, the amount of an Allowed Claim shall not include interest on such Claim from and after the Petition Date. For purposes of determining the amount of an Allowed Claim, there shall be deducted therefrom an amount equal to the amount of any Claim that the Debtors may hold against the Holder thereof, to the extent such Claim may be offset, recouped, or otherwise reduced under applicable law. Any Claim or Interest that has been or is hereafter listed in the Schedules as disputed, contingent, or unliquidated, and for which no Proof of Claim or Interest has been timely Filed, is not considered Allowed and shall be expunged without further action by the Reorganized Debtors and without any further notice to or action, order, or approval of the Bankruptcy Court.

26.  ASM, Hain, And Sierra Group Claims:  Those certain claims of ASM Capital, Hain Capital Group, L.L.C., and Sierra Liquidity Fund L.L.C. that are identified in Exhibits A, B, and C to the motion, dated November 28, 2007, entitled *Motion of Hain Capital, L.L.C., Sierra Liquidity Fund, LLC, and ASM Capital Pursuant to Article III.B.12.c of the Debtors' Fourth Amended Joint Plan of Reorganization for Contract or State Law Interest* [Docket No. 6746].

27.  Assumed July 1 California Energy Commission Agreement:  That certain Grant Agreement (GEO-04-005) between Calpine Corporation and the California Energy Commission, dated July 1, 2004.

28.  Assumed July 14 California Energy Commission Agreement:  That certain Grant Agreement (GEO-04-003) between Calpine Corporation and the California Energy Commission, dated July 14, 2004.

29.  Ballot or Ballots:  The ballots upon which Holders of Impaired Claims or Interests entitled to vote shall cast their vote to accept or reject the Plan.

30.  Bankruptcy Code:  Title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as applicable to the Chapter 11 Cases.

31.  Bankruptcy Court:  The United States Bankruptcy Court for the Southern District of New York or any other court having jurisdiction over the Chapter 11 Cases.

32.  Bankruptcy Rules:  The Federal Rules of Bankruptcy Procedure as applicable to the Chapter 11 Cases, promulgated pursuant to section 2075 of the Judicial Code and the general, local, and chambers rules and orders of the Bankruptcy Court.

33.    <u>Bar Date</u>:   August 1, 2006, except as otherwise provided in the Plan or by Bankruptcy Court order.

34.    <u>Beneficial Holder</u>:   The Entity holding the beneficial interest in a Claim or Interest.

35.    <u>Bethpage Claims</u>:   Claims under the Bethpage Notes and the First Lien Financing Agreements (as such term is defined in the Bethpage First Lien Credit Agreement) and the Second Lien Financing Agreements (as such term is defined in the Bethpage Second Lien Credit Agreement), including the Bethpage Credit Agreements.

36.    <u>Bethpage Credit Agreements</u>:   The Bethpage First Lien Credit Agreement and the Bethpage Second Lien Credit Agreement.

37.    <u>Bethpage First Lien Credit Agreement</u>:   The First Lien Credit Agreement, dated as of June 30, 2005, by and among Bethpage Energy Center 3, LLC, the lenders referred to therein, Calyon New York Branch, the lenders for the letters of credit, and Wilmington Trust Company, as First Lien Collateral Agent and Administrative Agent (as amended, modified or supplemented from time to time).

38.    <u>Bethpage Notes</u>:   The First Lien Notes and First Lien Related Expenses Notes (as such terms are defined in the Bethpage First Lien Credit Agreement), and the Second Lien Notes and Second Lien Related Expenses Notes (as such terms are defined in the Bethpage Second Lien Credit Agreement).

39.    <u>Bethpage Second Lien Credit Agreement</u>:   Second Lien Credit Agreement, dated as of June 30, 2005, by and among Bethpage Energy Center 3, LLC, the lenders referred to therein, and Wilmington Trust Company, as Second Lien Collateral Agent and Administrative Agent (as amended modified, or supplemented from time to time).

40.    <u>BIT Holdings Claim</u>:   That certain Allowed Claim of BIT Holdings 56, Inc. against Calpine as provided for in the order, dated August 8, 2007, entitled *Second Supplemental Order Granting Debtors' Sixteenth Omnibus Objection to Proofs of Claim (Claims to Be Adjusted, Wrong Debtor Claims to Be Adjusted, Duplicative Claims, Anticipatory Claims, No Liability Claims, Amended/Replaced Claims, Unliquidated Claims and Assumed Contract Claims) as Set Forth Herein* [Docket No. 5581], which Claim is classified in Class C-7.

41.    <u>Board Selection Term Sheet</u>:   That certain Term Sheet Regarding Selection of Post-Emergence Board of Directors of Reorganized Calpine Corporation, dated as of June 27, 2007, by and among the Debtors and the Creditors' Committee.

42.    <u>Business Day</u>:   Any day, other than a Saturday, Sunday, or Legal Holiday.

43.    <u>CalGen</u>:   Calpine Generating Company, LLC, a Delaware limited liability company.

44.    <u>CalGen 11.5% Third Priority Secured Notes Due 2011</u>:   The $150,000,000 11.5% Third Priority Secured Notes due April 4, 2011, issued by CalGen and CalGen Finance pursuant

to that certain Third Priority Indenture, dated as of March 23, 2004, among CalGen, CalGen Finance, and Wilmington Trust Company FSB, as third priority trustee.

45.     CalGen Amended and Restated Credit Agreement:  The $200,000,000 Amended and Restated Credit Agreement, dated as of March 23, 2004, among CalGen, the guarantors party thereto, the lenders party thereto, The Bank of Nova Scotia, as administrative agent, L/C bank, as lead arranger and sole bookrunner, Bayerische Landesbank, Cayman Islands Branch, as arranger and co-syndication agent, Credit Lyonnais, New York Branch, as arranger and co-syndication agent, ING Capital LLC, as arranger and co-syndication agent, Toronto Dominion (Texas) Inc., as arranger and co-syndication agent, and Union Bank of California, N.A., as arranger and co-syndication agent.

46.     CalGen Collateral Agent:  Wilmington Trust Company, solely in its capacity as collateral agent under that certain Collateral Trust and Intercreditor Agreement, dated March 23, 2004.

47.     CalGen Debt Repayment Order:  That certain Bankruptcy Court order entitled *Order Authorizing Debtors to Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d) and 364(e)* [Docket No. 3972].

48.     CalGen Finance:  CalGen Finance Corporation, a Delaware corporation.

49.     CalGen First Priority Secured Floating Rate Notes Due 2009:  The $235,000,000 First Priority Secured Floating Rate Notes due April 1, 2009, issued by CalGen and CalGen Finance pursuant to that certain First Priority Indenture, dated as of March 23, 2004, between CalGen, CalGen Finance, and Wilmington Trust Company FSB, as first priority trustee.

50.     CalGen First Priority Secured Institutional Term Loans Due 2009:  The $600,000,000 First Priority Secured Institutional Term Loans due April 1, 2009, issued by CalGen pursuant to that certain Credit and Guarantee Agreement, dated as of March 23, 2004, between CalGen, the guarantor subsidiaries of CalGen listed therein, Morgan Stanley Senior Funding, Inc., as administrative agent, sole lead arranger, and sole bookrunner, and the various lenders named therein.

51.     CalGen Lenders:  The holders of the CalGen Secured Debt.

52.     CalGen Makewhole Claim:  Any Makewhole Claim on account of the CalGen Second Priority Secured Floating Rate Notes Due 2010, the CalGen Second Priority Secured Term Loans Due 2010, the CalGen 11.5% Third Priority Secured Notes Due 2011, and the CalGen Third Priority Secured Floating Rate Notes Due 2011 (which may include (a) Allowed Claims for prepayment damages or premiums, (b) Allowed Claims for fees and expenses, (c) Allowed Claims for postpetition interest at the default contract rate, including interest on interest, and (d) the CalGen Third Priority Indenture Trustee's Allowed Claims against the Debtors under section 12.02 of the CalGen Third Priority Indenture, for amounts, if any, the CalGen Third Priority Indenture Trustee is required to remit to Holders of CalGen Secured Debt (other than Holders of CalGen Third Priority Secured Floating Rate Notes Due 2011) as a result of alleged intercreditor obligations).

53. <u>CalGen Second Priority Secured Floating Rate Notes Due 2010</u>: The $640,000,000 Second Priority Secured Floating Rate Notes due April 1, 2010, issued by CalGen and CalGen Finance pursuant to that certain Second Priority Indenture, dated as of March 23, 2004, between CalGen, CalGen Finance, and Wilmington Trust Company FSB, as second priority trustee.

54. <u>CalGen Second Priority Secured Term Loans Due 2010</u>: The $100,000,000 Second Priority Second Term Loans due April 1, 2010, issued by CalGen pursuant to that certain Credit and Guarantee Agreement, dated as of March 23, 2004, among CalGen, the guarantor subsidiaries of CalGen listed therein, Morgan Stanley Senior Funding, Inc., as administrative agent, sole lead arranger, and sole bookrunner, and the various lenders named therein.

55. <u>CalGen Secured Debt</u>: The series of first, second, and third lien financings, and a revolving loan consisting of: the CalGen First Priority Secured Floating Rate Notes Due 2009, the CalGen First Priority Secured Institutional Term Loans Due 2009, the CalGen Second Priority Secured Floating Rate Notes Due 2010, the CalGen Second Priority Secured Term Loans Due 2010, the CalGen Third Priority Secured Floating Rate Notes Due 2011, and the CalGen 11 1/2% Third Priority Secured Notes Due 2011.

56. <u>CalGen Third Priority Indenture</u>: That certain Third Priority Indenture, dated as of March 23, 2004, among CalGen, CalGen Finance, and Wilmington Trust Company FSB, as third priority trustee.

57. <u>CalGen Third Priority Indenture Trustee</u>: Manufacturers and Traders Trust Company, as successor indenture trustee under the CalGen Third Priority Indenture.

58. <u>CalGen Third Priority Secured Floating Rate Notes Due 2011</u>: The $680,000,000 Third Priority Secured Floating Rate Notes due April 1, 2011, issued by CalGen and CalGen Finance pursuant to the CalGen Third Priority Indenture.

59. <u>CalGen Unsecured Makewhole Claim</u>: Any Makewhole Claim on account of the CalGen Amended and Restated Credit Agreement, the CalGen First Priority Secured Floating Rate Notes Due 2009, and the CalGen First Priority Secured Institutional Term Loans Due 2009.

60. <u>Calpine</u>: Calpine Corporation, a Delaware corporation.

61. <u>Canadian Bar Date</u>: August 1, 2006, unless otherwise set in the CCAA Proceedings.

62. <u>Canadian Court</u>: The Court of Queen's Bench in Calgary, Alberta, Canada.

63. <u>Canadian Debtor</u>: Any CCAA Applicant or CCAA Party.

64. <u>Canadian Guarantee Claim</u>: Any Claim (except ULC1 Settlement Claims and Subordinated Debt Securities Claims) based on a Debtor's guarantee of a Canadian Debtor's debt that is not satisfied in full in the CCAA Proceedings, including the Canadian Re-Toll Claim.

65.    <u>Canadian Intercompany Claim</u>:  A Claim by a Canadian Debtor or a Canadian affiliate of the Debtors.

66.    <u>Canadian Re-Toll Claim</u>:    The Claim of Calpine Power LP based on the repudiation of that certain tolling agreement between Calpine Energy Services Canada Partnership and Calgary Energy Centre Limited Partnership, dated August 29, 2002, that is the subject of: (a) Proof of Claim number 5390 in the Chapter 11 Cases; (b) claim numbers 5-031, 7-009 and 8-011 in the CCAA Proceedings; and (c) an action in the Canadian Court entitled *In the Matter of Calpine Canada Energy Limited, Calpine Canada Power Ltd., Calpine Canada Energy Finance ULC, Calpine Energy Services Canada Ltd., Calpine Canada Resources Company, Calpine Canada Power Services Ltd., Calpine Canada Energy Finance II ULC, Calpine Natural Gas Services Limited and 3094479 Nova Scotia Company*, Action No. 0501-17864.

67.    <u>Cash</u>:  Cash and cash equivalents.

68.    <u>Cash Collateral Order</u>:  The Bankruptcy Court order entitled, *Second Amended Order Authorizing Use of Cash Collateral and Granting Adequate Protection*, entered in the Chapter 11 Cases on February 24, 2006 [Docket No. 881].

69.    <u>Cause of Action</u>:  Any claim, cause of action, controversy, demand, right, action, Lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license, and franchise of any kind or character whatsoever, known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law.  Cause of Action also includes: (a) any right of setoff, counterclaim, or recoupment and any claim on contracts or for breaches of duties imposed by law or in equity; (b) the right to object to Claims or Interests; (c) any claim pursuant to sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress, and usury and any other defenses set forth in section 558 of the Bankruptcy Code; (e) any state law fraudulent transfer claim; (f) any claim or cause of action of any kind against any Released or Exculpated Party based in whole or in part upon acts or omissions occurring prior to or after the Petition Date; and (g) any claim listed in the Plan Supplement.

70.    <u>CBA</u>:  Any collective bargaining agreement as defined under section 1113 of the Bankruptcy Code to which one or more of the Debtors is a party.

71.    <u>CCAA</u>:  Companies' Creditors Arrangement Act (Canada).

72.    <u>CCAA Applicant</u>:  Each of Calpine Canada Energy Limited, Calpine Canada Power Ltd., Calpine Canada Energy Finance ULC, Calpine Energy Services Canada Ltd., Calpine Canada Resources Company, Calpine Canada Power Services Ltd., Calpine Canada Energy Finance II ULC, Calpine Natural Gas Services Limited, and 3094479 Nova Scotia Company.

73.     <u>CCAA Party</u>:  Each of Calpine Energy Services Canada Partnership, Calpine Canada Natural Gas Partnership, and Calpine Canadian Saltend Limited Partnership.

74.     <u>CCAA Proceedings</u>:  The proceedings initiated by the Canadian Debtors in the Canadian Court pursuant to the provisions of the CCAA, with action number 0501-17964, filed on December 20, 2005.

75.     <u>CCAA Settlement</u>:  That certain Settlement Agreement, which is incorporated by reference as though fully set forth herein, dated as of July 24, 2007, among Calpine, the Canadian Debtors, and the ULC1 Indenture Trustee, as approved by the Bankruptcy Court pursuant to that certain *Order Granting Debtors' Motion for an Order Pursuant to 11 U.S.C. §§ 105(a) and 363(b) and Bankruptcy Rule 9019(a) to Approve a Settlement with the Calpine Canadian Debtors*, entered in the Chapter 11 Cases on July 27, 2007 [Docket No. 5422], and by the Canadian Court pursuant to that certain *Order (Canada/U.S. Global Settlement Order)*, entered in the CCAA Proceedings on July 27, 2007.

76.     <u>Certificate</u>:  Any instrument evidencing a Claim or an Interest.

77.     <u>Chapter 11 Cases</u>:  The chapter 11 bankruptcy cases Filed by the Debtors on the Petition Date in the Bankruptcy Court, with case numbers 05-06199 through 05-60218, 05-60221 through 05-60278, 05-60281 through 05-60363, 05-60365 through 05-60401, 05-60403 through 05-60441, 05-60443 through 05-60456, 05-60458 through 05-60460, 05-60463 through 05-60468, 05-60476, 05-60477, 06-10026 through 06-10032, 06-10034, 06-10039, 06-10197, 06-10198, 06-10939, and 07-12967.

78.     <u>Claim</u>:  Any: (a) claim as defined in section 101(5) of the Bankruptcy Code against a Debtor and (b) with respect to ARTICLES VIII.D, E, F, and G, any claim as defined in section 101(5) of the Bankruptcy Code against the applicable Entities referenced therein.

79.     <u>Claims and Solicitation Agent</u>:  Kurtzman Carson Consultants LLC, located at 2335 Alaska Avenue, El Segundo, California 90245, (888) 249-2792, retained as the Debtors' claims and solicitation agent by order dated December 22, 2005, entitled *Order Pursuant to 28 U.S.C. § 155(c) and Local Rule 5075-1 of the Local Rules for the Southern District of New York, Authorizing and Approving the Retention of Kurtzman Carson Consultants LLC as Notices, Claims and Balloting Agent to the Debtors* [Docket No. 59].

80.     <u>Claims Register</u>:  The official register of Claims and Interests maintained by the Claims and Solicitation Agent.

81.     <u>Class</u>:  A class of Holders of Claims or Interests as set forth in the Plan.

82.     <u>CM/ECF</u>:  The Bankruptcy Court's Case Management and Electronic Case Filing system, which can be accessed at https://ecf.nysb.uscourts.gov/cgi-bin/login.pl.

83.     <u>Collateral Trust Agreement</u>:  The Collateral Trust Agreement dated as of July 16, 2003 among Calpine, Quintana Minerals (USA), Inc., JOQ Canada, Inc., QCH, The Bank of Nova Scotia, as Agent under the Credit Agreement, Wilmington Trust Company, as Trustee under the 2007 Indenture, Wilmington Trust Company, as Trustee under the 2010 Indenture,

Wilmington Trust Company, as Trustee under the 2013 Indenture, Goldman Sachs Credit Partners L.P., as Administrative Agent under the Term Loan Agreement and The Bank of New York, as Collateral Trustee, as amended or supplemented.

84.    <u>Collateral Trustee</u>:  In its capacity as such, the collateral trustee and its predecessors under the Collateral Trust Agreement.

85.    <u>Confirmation</u>:  The entry of the Confirmation Order, subject to all conditions specified in ARTICLE X having been satisfied or waived pursuant to ARTICLE X.

86.    <u>Confirmation Date</u>:  The date upon which the Confirmation Order is entered by the Bankruptcy Court on its docket, within the meaning of Bankruptcy Rules 5003 and 9021.

87.    <u>Confirmation Hearing</u>: The hearing at which the Confirmation Order is first considered by the Bankruptcy Court.

88.    <u>Confirmation Hearing Notice</u>:  The notice approved in the Solicitation Procedures Order that sets forth in detail the voting and objection deadlines with respect to the Plan.

89.    <u>Confirmation Order</u>:  The order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

90.    <u>Consummation</u>:  The occurrence of the Effective Date.

91.    <u>Creditor</u>:  A Holder of a Claim.

92.    <u>Creditors' Committee</u>:  The Official Committee of Unsecured Creditors appointed in the Chapter 11 Cases.

93.    <u>Credit Suisse Claim</u>:  That certain claim of Credit Suisse Cayman Islands Branch, formerly known as Credit Suisse First Boston, Allowed by the order, dated July 11, 2007, entitled *Fourth Supplemental Order Granting the Debtors' Tenth Omnibus Objection to Proofs of Claim (No Liability Claims, Claims to Be Adjusted, Wrong Debtor Claims to Be Adjusted, Assumed Contract Claims, Anticipatory Claims, Amended/Replaced Claims and Insufficient Support Claims) as Set Forth Herein* [Docket No. 5251], which Claim is classified in Class C-8.

94.    <u>Cure</u>:  The distribution in the ordinary course of business following the Effective Date of Cash, or such other property as may be ordered by the Bankruptcy Court or agreed upon by the parties (which shall include the Creditors' Committee), in an amount equal to all unpaid monetary obligations under applicable law (including, to the extent provided for under the applicable assumed contract or unexpired lease, postpetition interest at the contract rate as agreed between the parties (which shall include the Creditors' Committee) or determined by the Bankruptcy Court) or such lesser amount as may be agreed upon by the parties, under an executory contract or unexpired lease assumed pursuant to section 365 of the Bankruptcy Code, to the extent such obligations are enforceable under the Bankruptcy Code and applicable non-bankruptcy law.

95.    <u>Cure Bar Date</u>:  The deadline for filing requests for payment of Cure, which shall be the later of: (a) thirty days after the Effective Date or (b) thirty days after the assumption of the applicable executory contract or unexpired lease, unless otherwise ordered by the Bankruptcy Court or agreed to by the Debtors and the counterparty to the applicable executory contract or unexpired lease.

96.    <u>DB Share Lending Agreement</u>:  That certain Share Lending Agreement, dated as of September 28, 2004, by and among, Calpine Corporation, Deutsche Bank AG London, and Deutsche Bank Securities Inc.

97.    <u>Debtor</u>:  Each of the following Entities: Calpine Corporation; Amelia Energy Center, LP; Anacapa Land Company, LLC; Anderson Springs Energy Company; Androscoggin Energy, Inc.; Auburndale Peaker Energy Center, LLC; Augusta Development Company, LLC; Aviation Funding Corp.; Baytown Energy Center, LP; Baytown Power GP, LLC; Baytown Power, LP; Bellingham Cogen, Inc.; Bethpage Energy Center 3, LLC; Bethpage Fuel Management Inc.; Blue Heron Energy Center LLC; Blue Spruce Holdings, LLC; Broad River Energy LLC; Broad River Holding, LLC; CalGen Equipment Finance Company, LLC; CalGen Equipment Finance Holdings, LLC; CalGen Expansion Company, LLC; CalGen Finance Corp.; CalGen Project Equipment Finance Company One, LLC; CalGen Project Equipment Finance Company Three, LLC; CalGen Project Equipment Finance Company Two, LLC; Calpine Acadia Holdings, LLC; Calpine Administrative Services Company, Inc.; Calpine Agnews, Inc.; Calpine Amelia Energy Center GP, LLC; Calpine Amelia Energy Center LP, LLC; Calpine Auburndale Holdings, LLC; Calpine Baytown Energy Center GP, LLC; Calpine Baytown Energy Center LP, LLC; Calpine Bethpage 3 Pipeline Construction Company, Inc.; Calpine Bethpage 3, LLC; Calpine c* Power, Inc.; Calpine CalGen Holdings, Inc.; Calpine California Development Company, LLC; Calpine California Energy Finance, LLC; Calpine California Equipment Finance Company, LLC; Calpine Calistoga Holdings, LLC; Calpine Capital Trust; Calpine Capital Trust II; Calpine Capital Trust III; Calpine Capital Trust IV; Calpine Capital Trust V; Calpine Central Texas GP, Inc.; Calpine Central, Inc.; Calpine Central, LP; Calpine Central-Texas, Inc.; Calpine Channel Energy Center GP, LLC; Calpine Channel Energy Center LP, LLC; Calpine Clear Lake Energy GP, LLC; Calpine Clear Lake Energy, LP; Calpine Cogeneration Corporation; Calpine Construction Management Company, Inc.; Calpine Corpus Christi Energy GP, LLC; Calpine Corpus Christi Energy LP; Calpine Decatur Pipeline Inc.; Calpine Decatur Pipeline, L.P.; Calpine Dighton, Inc.; Calpine East Fuels, Inc.; Calpine East Fuels, LLC; Calpine Eastern Corporation; Calpine Energy Holdings, Inc.; Calpine Energy Services Holdings, Inc.; Calpine Energy Services, LP; Calpine Finance Company; Calpine Freestone Energy GP, LLC; Calpine Freestone Energy, LP; Calpine Freestone, LLC; Calpine Fuels Corporation; Calpine Gas Holdings LLC; Calpine Generating Company, LLC; Calpine Geysers Company, LP; Calpine Gilroy 1, Inc.; Calpine Gilroy 2, Inc.; Calpine Gilroy Cogen, L.P.; Calpine Global Services Company, Inc.; Calpine Gordonsville GP Holdings, LLC; Calpine Gordonsville LP Holdings, LLC; Calpine Gordonsville, LLC; Calpine Greenleaf Holdings, Inc.; Calpine Greenleaf, Inc.; Calpine Hidalgo Design, L.P.; Calpine Hidalgo Energy Center, L.P.; Calpine Hidalgo Holdings, Inc.; Calpine Hidalgo Power GP, LLC; Calpine Hidalgo Power, LP; Calpine Hidalgo, Inc.; Calpine International Holdings, Inc.; Calpine International, LLC; Calpine Investment Holdings, LLC; Calpine Kennedy Airport, Inc.; Calpine Kennedy Operators, Inc.; Calpine KIA, Inc.; Calpine Leasing, Inc.; Calpine Long Island, Inc.; Calpine Lost Pines Operations, Inc.; Calpine Louisiana Pipeline Company; Calpine Magic Valley Pipeline, Inc.; Calpine Monterey

Cogeneration, Inc.; Calpine MVP, Inc.; Calpine NCTP GP, LLC; Calpine NCTP, LP; Calpine Northbrook Corporation of Maine, Inc.; Calpine Northbrook Energy Holdings, LLC; Calpine Northbrook Energy, LLC; Calpine Northbrook Holdings Corporation; Calpine Northbrook Investors, LLC; Calpine Northbrook Project Holdings, LLC; Calpine Northbrook Services LLC; Calpine Northbrook Southcoast Investors, LLC; Calpine NTC, LP; Calpine Oneta Power I, LLC; Calpine Oneta Power II, LLC; Calpine Oneta Power, LP; Calpine Operating Services Company, Inc.; Calpine Operations Management Company, Inc.; Calpine Pastoria Holdings, LLC; Calpine Philadelphia, Inc.; Calpine Pittsburg, LLC; Calpine Power Company; Calpine Power Equipment, LP; Calpine Power Inc.; Calpine Power Management, Inc.; Calpine Power Management, LP; Calpine Power Services, Inc.; Calpine PowerAmerica - CA, LLC; Calpine PowerAmerica - CT, LLC; Calpine PowerAmerica - MA, LLC; Calpine PowerAmerica - ME, LLC; Calpine PowerAmerica, Inc.; Calpine PowerAmerica, LP; Calpine PowerAmerica-NH, LLC; Calpine PowerAmerica-NY, LLC; Calpine PowerAmerica-OR, LLC; Calpine Producer Services, LP; Calpine Project Holdings, Inc.; Calpine Pryor, Inc.; Calpine Rumford I, Inc.; Calpine Rumford, Inc.; Calpine Schuylkill, Inc.; Calpine Siskiyou Geothermal Partners, L.P.; Calpine Sonoran Pipeline, LLC; Calpine Stony Brook Operators, Inc.; Calpine Stony Brook Power Marketing, LLC; Calpine Stony Brook, Inc.; Calpine Sumas, Inc.; Calpine TCCL Holdings, Inc.; Calpine Texas Pipeline GP, Inc.; Calpine Texas Pipeline LP, Inc.; Calpine Texas Pipeline, L.P.; Calpine Tiverton I, Inc.; Calpine Tiverton, Inc.; Calpine ULC I Holding, LLC; Calpine University Power, Inc.; Calpine Unrestricted Funding, LLC; Calpine Unrestricted Holdings, LLC; Calpine Vapor, Inc.; Carville Energy LLC; CCFC Development Company, LLC; CCFC Equipment Finance Company, LLC; CCFC Project Equipment Finance Company One, LLC; Celtic Power Corporation; CES GP, LLC; CGC Dighton, LLC; Channel Energy Center, LP; Channel Power GP, LLC; Channel Power LP; Clear Lake Cogeneration Limited Partnership; Cogenamerica Asia, Inc.; Cogenamerica Parlin Supply Corporation; Columbia Energy LLC; Corpus Christi Cogeneration, LP; CPN 3rd Turbine, Inc.; CPN Acadia, Inc.; CPN Berks Generation, Inc.; CPN Berks LLC; CPN Bethpage 3rd Turbine Inc.; CPN Cascade, Inc.; CPN Clear Lake, Inc.; CPN Decatur Pipeline, Inc.; CPN Energy Services GP, Inc.; CPN Energy Services LP, Inc.; CPN Freestone, LLC; CPN Funding, Inc.; CPN Morris, Inc.; CPN Oxford, Inc.; CPN Pipeline Company; CPN Pleasant Hill Operating, LLC; CPN Pleasant Hill, LLC; CPN Power Services GP, LLC; CPN Power Services, LP; CPN Pryor Funding Corporation; CPN Telephone Flat, Inc.; Decatur Energy Center, LLC; Deer Park Power GP, LLC; Deer Park Power, LP; Delta Energy Center, LLC; Dighton Power Associates, LP; East Altamont Energy Center, LLC; Fond Du Lac Energy Center, LLC; Fontana Energy Center, LLC; Freestone Power Generation, LP; GEC Bethpage Inc.; Geothermal Energy Partners, LLC; Geysers Power Company II LLC; Geysers Power Company, LLC; Geysers Power I Company; Goldendale Energy Center, LLC; Hammond Energy LLC; Hillabee Energy Center, LLC; Idlewild Fuel Management Corp; JMC Bethpage, Inc.; KIAC Partners; Lake Wales Energy Center, LLC; Lawrence Energy Center, LLC; Lone Oak Energy Center, LLC; Los Esteros Critical Energy Facility, LLC; Los Medanos Energy Center, LLC; Magic Valley Gas Pipeline GP, LLC; Magic Valley Gas Pipeline LP; Magic Valley Pipeline, LP; MEP Pleasant Hill, LLC; MOAPA Energy Center, LLC; Mobile Energy LLC; Modoc Power, Inc.; Morgan Energy Center, LLC; Mount Hoffman Geothermal Company, LP; Mt. Vernon Energy LLC; Newsouth Energy LLC; Nissequogue Cogen Partners; Northwest Cogeneration, Inc.; NTC Five, Inc.; NTC GP, LLC; Nueces Bay Energy, LLC; O.L.S. Energy-Agnews, Inc.; Odyssey Land Acquisition Company; Pajaro Energy Center, LLC; Pastoria Energy Center, LLC; Pastoria Energy Facility, LLC; Philadelphia Biogas Supply Inc.; Phipps

13

Bend Energy Center, LLC; Pine Bluff Energy, LLC; Power Investors, LLC; Power Systems Mfg. LLC; Quintana Canada Holdings, LLC; Rockgen Energy LLC; Rumford Power Associates, LP; Russell City Energy Center, LLC; San Joaquin Valley Energy Center, LLC; Santa Rosa Energy Center, LLC; Silverado Geothermal Resources, Inc.; Skipanon Natural Gas, LLC; South Point Energy Center, LLC; South Point Holdings, LLC; Stony Brook Cogeneration, Inc.; Stony Brook Fuel Management Corp.; Sutter Dryers, Inc.; TBG Cogen Partners; Texas City Cogeneration, LP; Texas Cogeneration Company; Texas Cogeneration Five, Inc.; Texas Cogeneration One Company; Thermal Power Company; Thomassen Turbine Systems America, Inc.; Tiverton Power Associates, LP; VEC Holdings, LLC; Venture Acquisition Company; Vineyard Energy Center, LLC; Wawayanda Energy Center, LLC; Whatcom Cogeneration Partners, LP; and Zion Energy LLC.

98.    Debtors in Possession:  The Debtors, as debtors in possession in the Chapter 11 Cases, pursuant to sections 1107 and 1108 of the Bankruptcy Code.

99.    DIP Facility:  That certain Credit Agreement, by and among the Debtors and the DIP Lenders, dated as of March 29, 2007, and approved by the Bankruptcy Court in an order entitled, *Final Order Authorizing Debtors to Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), and 364(e)* [Docket No. 635].

100.    DIP Facility Claim:  Any Claim on account of the DIP Facility.

101.    DIP Lenders:  General Electric Capital Corporation (including its successors), as sub-agent for the revolving lenders under the DIP Facility (in such capacity and including any successors); Credit Suisse, Goldman Sachs Credit Partners L.P., and JPMorgan Chase Bank, N.A., as co-documentation agents and as co-syndication agents; Credit Suisse, as administrative agent (in such capacity and including any successors) and as collateral agent (in such capacity and including any successors); and each of the financial institutions from time to time party to the DIP Agreement.

102.    Disclosure Statement:  The Fourth Amended Disclosure Statement for the Plan describing the Plan, that is prepared and distributed in accordance with sections 1125, 1126(b), and 1145 of the Bankruptcy Code, Bankruptcy Rule 3018, and other applicable law.

103.    Disputed:  With respect to any Claim or Interest, any Claim or Interest on the Claims Register that is not yet Allowed.

104.    Disputed Second Lien Debt Claim:  That portion of the Second Lien Debt Claim consisting of default and compound interest that has not been waived pursuant to the Cash Collateral Order and subsequent amendments to the Cash Collateral Order accruing from and after the Petition Date through and including the Interest Accrual Limitation Date plus any fees and costs (including attorneys' fees) incurred in connection with any litigation over such Disputed Second Lien Debt Claim plus the Second Lien Ad Hoc Committee Transaction Fee.

105.    Distribution Agent:  The Reorganized Debtors, or the Entity or Entities chosen by the Reorganized Debtors, with the consent of the Creditors' Committee, to make or to facilitate distributions pursuant to the Plan.

106.  <u>Distribution Date</u>:  The date occurring as soon as reasonably practicable after the Effective Date when distributions under the Plan shall commence, but not later than ten days after the Effective Date, without further Bankruptcy Court order.

107.  <u>Distribution Record Date</u>:  The date for determining which Holders of Allowed Claims and Interests, except Holders of publicly traded Certificates, are eligible to receive distributions pursuant to the Plan, which shall be the Confirmation Date or such other date as designated in the Plan or a Bankruptcy Court order.

108.  <u>District Court</u>:  The United States District Court for the Southern District of New York.

109.  <u>Effective Date</u>:  The date selected by the Debtors (in consultation with the Creditors' Committee) that is a Business Day after the Confirmation Date on which the conditions as specified in the Plan have been satisfied or waived.  Unless otherwise specifically provided in the Plan, anything required to be done by the Debtors on the Effective Date may be done on the Effective Date or as soon as reasonably practicable thereafter.

110.  <u>Entity</u>:  As defined in section 101(15) of the Bankruptcy Code.

111.  <u>Equity Committee</u>:  The Official Committee of Equity Security Holders appointed in the Chapter 11 Cases.

112.  <u>Equity Security</u>:  Any equity security as defined in section 101(16) of the Bankruptcy Code in a Debtor.

113.  <u>Equity Security Holder</u>:  A Holder of an Interest.

114.  <u>Estate</u>:  The bankruptcy estate of any Debtor created by virtue of section 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Cases.

115.  <u>Exculpated Claim</u>:  Any Claim related to any act or omission in connection with, relating to, or arising out of the Debtors' in or out of court restructuring, the Debtors' Chapter 11 Cases, formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement or Plan or any contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement or Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, or the distribution of property under the Plan or any other agreement.

116.  <u>Exculpated Party</u>:  Each of: (a) the Debtors, the Reorganized Debtors, and their Affiliates; (b) the DIP Lenders in their capacities as such; (c) the New Credit Facility Lenders in their capacity as such, along with their respective affiliates; (d) with respect to each of the foregoing Entities in clauses (a) through (c), such Entities' successors and assigns; (e) any statutory committee and the members thereof in their capacity as such; (f) the Second Lien Ad Hoc Committee and the members thereof in their capacity as such; (g) the ULC1 Noteholders Ad Hoc Committee and the members thereof in their capacity as such; (h) the Indenture Trustees; (i) the Administrative Agents; (j) the Collateral Trustee; (k) Manufacturers & Traders Trust Company, solely in its capacity as indenture trustee for the 7.75% Contingent Convertible Notes

Due 2015; (l) the Ad Hoc Committee Of 6.0% Convertible Noteholders and the members thereof, solely in their capacities as such; (m) the Ad Hoc Committee Of 7.75% Convertible Noteholders and the members thereof, solely in their capacities as such; and (n) with respect to each of the foregoing Entities in clauses (a) through (m), such Entities' subsidiaries, affiliates, officers, directors, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other Professionals, in each case in their capacity as such; provided, however, that clause (n) shall not include officers, directors, or employees of the Debtors who were no longer acting in such capacity on or after the Petition Date.

117.    Federal Judgment Rate:  The federal judgment rate of 4.34%, which was in effect as of the Petition Date.

118.    FERC:  Federal Energy Regulatory Commission.

119.    FERC Jurisdictional Contract:  Any contract to which one or more of the Debtors is a party containing rates, terms, or conditions subject to the jurisdiction of the FERC pursuant to the Federal Power Act, 16 U.S.C. §§ 824–824n, or the Natural Gas Act, 15 U.S.C. §§ 717–717z.

120.    File:  To file with the Bankruptcy Court in the Chapter 11 Cases, or in the case of Proofs of Claim or Interest, to file with the Claims and Solicitation Agent.

121.    Final Decree:  The decree contemplated under Bankruptcy Rule 3022.

122.    Final Order:  As applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the  relevant subject matter, which has not been reversed, stayed, modified, or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be Filed has been resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought; provided, however, that the Debtors or Reorganized Debtors, as applicable, reserve the right to waive any such appeal or similar conditions of a Final Order in consultation with the Creditors' Committee, and with the consent of the Creditors' Committee with respect to Final Orders entered in any pending litigation or contested matter to which the Creditors' Committee is a party, any appeals Filed regarding Confirmation, the resolution of any substantial contribution applications, and the resolution of applications for Professionals' Claims.

123.    First Lien Debt Claim:  Any Claim (not including any First Lien Unsecured Makewhole Claims) on account of the 9.625% First Priority Senior Secured Notes Due 2014.

124.    First Lien Makewhole Claim:  Any Makewhole Claim on account of the 9.625% First Priority Senior Secured Notes Due 2014.

125.    First Lien Repayment Order:   The Bankruptcy Court order entitled, *Order Authorizing Repayment of Principal of First Lien Debt*, entered in the Chapter 11 Cases on May 10, 2006 [Docket No. 1542].

126.    First Lien Secured Makewhole Claim:    Any First Lien Makewhole Claim determined by Bankruptcy Court order to be Secured.

127.    First Lien Unsecured Makewhole Claim:    Any First Lien Makewhole Claim determined by Bankruptcy Court order not to be Secured.

128.    General Note Claim:    Any Claim (including any General Note Makewhole Claims, but not including any Subordinated Debt Securities Claims) on account of the: (a) 4.0% Convertible Senior Notes Due 2006; (b) 4.75% Convertible Senior Notes Due 2023; (c) 6.00% Contingent Convertible Notes Due 2014; (d) 8.5% Senior Notes Due 2011; and (e) 8.625% Senior Notes Due 2010.

129.    General Note Makewhole Claim:    Any Makewhole Claim on account of the: (a) 4.0% Convertible Senior Notes Due 2006; (b) 4.75% Convertible Senior Notes Due 2023; (c) 6.00% Contingent Convertible Notes Due 2014; (d) 8.5% Senior Notes Due 2011; and (e) 8.625% Senior Notes Due 2010.

130.    General Unsecured Claim:    Any Claim against any of the Debtors that is not a/an: (a) DIP Facility Claim; (b) Administrative Claim; (c) Priority Tax Claim; (d) First Lien Debt Claim; (e) Second Lien Debt Claim; (f) Other Secured Claim; (g) Other Priority Claim; (h) Senior Note Claim; (i) General Note Claim; (j) Subordinated Note Claim; (k) ULC1 Settlement Claim; (l) Canadian Guarantee Claim; (m) Canadian Intercompany Claim; (n) Rejection Damages Claim; (o) Unsecured Makewhole Claim; (p) Unsecured Convenience Class Claim; (q) Intercompany Claim; (r) Subordinated Equity Securities Claim; or (s) Subordinated Debt Securities Claim.

131.    Governmental Unit:    As defined in section 101(27) of the Bankruptcy Code.

132.    Government Bar Date:    August 1, 2006.

133.    Greenleaf Project:    Those certain leased cogeneration projects of 49.2 megawatts and 49.5 megawatts, respectively, along with certain related equipment, located in Sutter County, California.

134.    GTN/PNGTS Contracts:    Those FERC Jurisdictional Contracts subject to the *Debtors' Motion to Reject Certain Natural Gas Pipeline Transportation Contracts* [Docket No. 6562].

135.    GTN Net Allowed Claim:    The GTN Net Allowed Claim as defined in the Stipulation and Agreed Order Between and Among the Debtors, Portland Natural Gas Transmission System, TransCanada PipeLines Limited, and NOVA Gas Transmission Resolving and Allowing Claims and Terminating Agreements, dated December 18, 2007.

136.    Hawaii Plaintiffs:    Hawaii Structural Ironworkers Pension Trust Fund, on behalf of itself and the court-appointed representative of the class of others similarly situated, as plaintiffs in Hawaii Structural Ironworkers Pension Trust Fund v. Calpine Corp., et al, Case No. 1-04-CV-021465 (Cal. Sup. Ct.).

137.   <u>Hess Adversary Proceeding</u>:   Adversary Proceeding No. 07-03198 in the Bankruptcy Court.

138.   <u>Hess Agreement</u>:   That certain Amended and Restated Gas Sales Agreement, dated as of June 1, 1996 between Amerada Hess Corporation (n/k/a Hess Corporation) and KIAC Partners.

139.   <u>Hidalgo Facility</u>:   That certain 485 megawatt natural gas-fired cogeneration power plant located in Edinburg, Texas.

140.   <u>Hidalgo Indenture Trustee</u>:   The Bank of New York Trust Company, N.A., as successor Indenture Trustee to JPMorgan Chase Bank, N.A., f/k/a Chase Bank of Texas, National Association.

141.   <u>Hidalgo Lease</u>:   That certain Electric Generation Equipment Lease Agreement, dated as of May 1, 1999, between the Industrial Development Corporation of the City of Edinburg, Texas, as lessor, and Calpine Hidalgo Energy Center, L.P., f/k/a Duke Hidalgo, as lessee.

142.   <u>Hidalgo Leasehold Interest</u>:   That certain leasehold interest granted to Calpine Hidalgo Energy Center, L.P., f/k/a Duke Hidalgo, pursuant to the Hidalgo Lease.

143.   <u>Holder</u>:   An Entity holding a Claim or Interest, as applicable.

144.   <u>Impaired</u>:   With respect to any Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

145.   <u>Indemnification Obligation</u>:   A Debtor's obligation under an executory contract or otherwise to indemnify directors, officers, or employees of the Debtors who served in such capacity at any time, with respect to or based upon any act or omission taken or omitted in any of such capacities, or for or on behalf of any Debtor, pursuant to and to the maximum extent provided by the Debtors' respective articles of incorporation, certificates of formation, bylaws, similar corporate documents, and applicable law, as in effect as of the Effective Date.

146.   <u>Indenture Trustees</u>:   In their capacity as such, the indenture trustees and their predecessors for the: (a) 4.0% Convertible Senior Notes Due 2006; (b) 4.75% Convertible Senior Notes Due 2023; (c) 6.00% Contingent Convertible Notes Due 2014; (d) 7.625% Senior Notes Due 2006; (e) 7.75% Senior Notes Due 2009; (f) 7.875% Senior Notes Due 2008; (g) 8.5% Second Priority Senior Secured Notes Due 2010; (h) 8.5% Senior Notes Due 2011; (i) 8.625% Senior Notes Due 2010; (j) 8.75% Second Priority Senior Secured Notes Due 2013; (k) 8.75% Senior Notes Due 2007; (l) 9.875% Second Priority Senior Secured Notes Due 2011; (m) Second Priority Senior Secured Floating Rate Notes Due 2007; (n) ULC1 8.5% Senior Notes Due 2008; and (o) ULC1 8.75% Senior Notes Due 2007.

147.   <u>Insider</u>:   As defined in section 101(31) of the Bankruptcy Code.

148.   <u>Intercompany Claim</u>:   A Claim (other than a ULC1 Settlement Claim) held by a Debtor or an Affiliate.

18

149.    Intercompany Contract:  A contract between two or more Debtors or a contract between one or more Affiliates and one or more Debtors.

150.    Intercompany Interest:  An Interest held by a Debtor or an Affiliate.

151.    Intercreditor Escrow:  Any portion of the distribution to Holders of Allowed Subordinated Note Claims subject to the Intercreditor Subordination Dispute.

152.    Intercreditor Subordination Dispute:  That certain dispute regarding whether the Holders of Allowed Subordinated Note Claims have consented to, or are obligated to consent to, the distribution of any portion of their distribution under the Plan to Holders of Allowed Senior Note Claims to satisfy any Allowed Claims of the Holders of Allowed Senior Note Claims for amounts other than principal and interest accrued as of the Petition Date.

153.    Intercreditor Subordination Dispute Escrow Account:  That certain escrow account established for the benefit of the Holders of Allowed Senior Note Claims and Allowed Subordinated Note Claims pending resolution of the Intercreditor Subordination Dispute by Final Order.

154.    Interest:  Any: (a) Equity Security, including all issued, unissued, authorized, or outstanding shares of stock together with any warrants, options, or contractual rights to purchase or acquire such Equity Securities at any time and all rights arising with respect thereto and (b) partnership, limited liability company, or similar interest in a Debtor.

155.    Interest Accrual Limitation Date:  The date on which the applicable Claim is satisfied in full.

156.    Interim Compensation Order:  The order, entitled *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals*, entered by the Bankruptcy Court on January 25, 2006 [Docket No. 617], allowing Estate Professionals to seek interim compensation in accordance with the compensation procedures approved therein, as may have been modified by a Bankruptcy Court order approving the retention of the Professionals.

157.    Internal Revenue Code:  Title 26 of the United States Code, 26 U.S.C. §§ 1–9833.

158.    Judicial Code:  Title 28 of the United States Code, 28 U.S.C. §§ 1–4001.

159.    KIAC And Nissequogue Facilities:  That certain 110 megawatt natural gas-fired cogeneration power plant located at John F. Kennedy International Airport in Queens, New York and that certain 40 megawatt natural gas-fired cogeneration power plant located on the campus of the State University of New York at Stony Brook.

160.    KIAC And Nissequogue Leasehold Interests:  That certain leasehold interest granted to KIAC Partners pursuant to that certain Agreement of Lease, dated as of April 28, 1993, by and between KIAC Partners and the Port Authority of New York and New Jersey, and that certain leasehold interest granted to Nissequogue Cogen Partners pursuant to that certain Amended and Restated Lease Agreement, dated as of November 1, 1998, by and between Nissequogue Cogen Partners and the Suffolk County Industrial Development Agency.

161. <u>Legal Holiday</u>:  As defined in Bankruptcy Rule 9006(a).

162. <u>Lien</u>:  As defined in section 101(37) of the Bankruptcy Code.

163. <u>Liquidity Solutions Claims</u>:  Those certain claims of Liquidity Solutions, Inc. d/b/a Revenue Management, comprised of claim number 5248 and claim number 870.

164. <u>LS Entities</u>:  Farrington Capital, LP or LSP Cal Holdings I LLC.

165. <u>LSP Shares</u>:  Any Shares of New Calpine Common Stock distributable to the LS Entities or the Luminus Entities on account of their respective Allowed Claims.

166. <u>Luminus Entities</u>:  Luminus Asset Partners LP or Luminus Energy Partners Master Fund Ltd.

167. <u>Makewhole Claim</u>:  Any Claim for any makewhole amount, prepayment premium, early termination fee, or other similar amount asserted on account of any notes, indentures, or other instruments issued by the Debtors prior to the Petition Date, including with respect to the: (a) 9.625% First Priority Senior Secured Notes Due 2014; (b) CalGen First Priority Secured Floating Rate Notes Due 2009; (c) CalGen First Priority Secured Institutional Term Loans Due 2009; (d) CalGen Second Priority Secured Floating Rate Notes Due 2010; (e) CalGen Second Priority Secured Term Loans Due 2010; (f) CalGen 11.5% Third Priority Secured Notes Due 2011; (g) CalGen Third Priority Secured Floating Rate Notes Due 2011; (h) 8.5% Second Priority Senior Secured Notes Due 2010; (i) 8.75% Second Priority Senior Secured Notes Due 2013; (j) 9.875% Second Priority Senior Secured Notes Due 2011; (k) 8.625% Senior Notes Due 2010; (l) 8.5% Senior Notes Due 2011; (m) 4.0% Convertible Senior Notes Due 2006; (n) 4.75% Convertible Senior Notes Due 2023; (o) 6.00% Contingent Convertible Notes Due 2014; (p) 7.75% Contingent Convertible Notes Due 2015; (q) 8.75% Senior Notes Due 2007; (r) 7.875% Senior Notes Due 2008; (s) 7.625% Senior Notes Due 2006; (t) 7.75% Senior Notes Due 2009; and (u) 8.625% Senior Notes Due 2010.

168. <u>Management and Director Equity Incentive Plan</u>:  A post-Effective Date management and director compensation incentive plan intended for certain management, employees, and directors of certain of the Reorganized Debtors.

169. <u>Master Ballots</u>:  The master ballots upon which the applicable Nominee or other holder of record shall submit on behalf of the Beneficial Holders it represents the votes cast by such Beneficial Holders to accept or reject the Plan.

170. <u>Named Executive Officers</u>:  As defined in Regulation S-K, Item 402(a)(3), 17 C.F.R. § 229.402(a)(3).

171. <u>Nevada Power Stipulation And Agreed Order</u>:  That certain Stipulation and Agreed Order, which is incorporated herein by reference as though fully set forth herein, by and between Calpine and Nevada Power Company, Sierra Pacific Power Company, and Fireman's Fund, entered by the Bankruptcy Court on October 10, 2007 [Docket No. 6248].  The Nevada Power Stipulation and Agreed Order shall survive confirmation of the Plan and remain in full force and effect, and be binding on Reorganized Calpine and Reorganized Debtors.

172. <u>New Calpine Common Stock</u>: 1,500,000,000 shares of common stock in Reorganized Calpine, par value $0.001 per share, to be authorized pursuant to the Reorganized Calpine Charter, of which up to 500,000,000 shares shall be initially issued and outstanding pursuant to the Plan as of the Effective Date.

173. <u>New Calpine Common Stock Pool For Creditors</u>: All New Calpine Common Stock to be issued under the Plan, net of any shares reserved for issuance under the Management and Director Equity Incentive Plan.

174. <u>New Calpine Common Stock Pool For Subordinated Debt Securities Claimants</u>: All New Calpine Common Stock to be issued under the Plan remaining in the New Calpine Common Stock Pool For Creditors after all Holders of Allowed Claims (other than Subordinated Debt Securities Claims and Subordinated Equity Securities Claims) have been paid in full.

175. <u>New Calpine Warrants</u>: Those warrants referenced in that certain "Calpine Term Sheet Regarding Warrants to be Issued to Holders of Interests Under Calpine Plan of Reorganization," dated December 18, 2007, contained in the Plan Supplement.

176. <u>New Calpine Plan Securities</u>: The New Calpine Common Stock and New Calpine Warrants.

177. <u>New Calpine Stock Reserve</u>: The New Calpine Common Stock held in reserve pursuant to ARTICLE VII.C.3.

178. <u>New Calpine Total Enterprise Value</u>: $18.95 billion.

179. <u>New Calpine Trading Restrictions Term Sheet</u>: That certain Term Sheet for Proposed Trading Restrictions on Reorganized Calpine Common Stock by and among the Debtors and the Creditors' Committee.

180. <u>New Credit Facility</u>: That certain secured financing facility in the maximum amount of $7.6 billion, comprised of an up to $6.3 billion first lien secured term facility, a $1.0 billion first lien secured revolving credit facility, and a $300 million first lien secured bridge facility, by and among Reorganized Calpine, as borrower, and Goldman Sachs Credit Partners L.P., as well as other entities, as joint lead arrangers, book runners, and administrative agents, and a syndicate of banks, financial institutions, and other entities, as lenders, and all other documents entered into in connection therewith or contemplated thereby, substantially in the form of that facility referenced in, and subject to the modifications contained in, the Amended and Restated Commitment Papers, as such term is defined in the *Order Authorizing Amendments to Exit Financing Facility* [Docket No. 7161] entered by the Bankruptcy Court on December 17, 2007.

181. <u>New Credit Facility Lenders</u>: Goldman Sachs Credit Partners L.P. (including its successors), as administrative agent (in such capacity and including any successors) under the New Credit Facility, Credit Suisse (including its successors), as administrative agent and as collateral agent (in such capacity and including any successors) under the New Credit Facility, Credit Suisse Securities (USA) LLC, Deutsche Bank Securities Inc., Deutsche Bank Trust Company Americas, and Morgan Stanley Senior Funding (including their respective successors),

as co-syndication agents and co-documentation agents under the New Credit Facility (in such capacity and including any successors), and each of the financial institutions from time to time party to the New Credit Facility.

182.    Nominee:  Any broker, dealer, commercial bank, trust company, savings and loan, financial institution, or other party in whose name securities are registered or held of record on behalf of a Beneficial Holder.

183.    Notice of Confirmation:  That certain notice pursuant to Bankruptcy Rule 3020(c)(2) notifying Holders of Claims and Interests and parties in interest that the Bankruptcy Court has confirmed the Plan.

184.    NOVA Gas Transmission Ltd. Claims:  Those certain Claims as evidenced in the Proof of Claims or amended Proof of Claims filed by NOVA Gas Transmission Ltd.

185.    Oil and Gas Contracts:  All executory contracts or unexpired leases and any other agreements of the Debtors (a) with Petersen Production Company; or (b) related to the operation or development of the Debtors' oil and gas business.

186.    Old Calpine Common Stock:  All of the authorized, issued, and outstanding shares of common stock of Calpine as of immediately prior to the Effective Date.

187.    Other Priority Claim:  Any Claim accorded priority in right of payment pursuant to section 507(a) of the Bankruptcy Code, other than a Priority Tax Claim or an Administrative Claim.

188.    Other Secured Claim:  Any Secured Claim, other than a: (a) DIP Facility Claim; (b) First Lien Debt Claim; or (c) Second Lien Debt Claim.

189.    Periodic Distribution Date:  The first Business Day that is as soon as reasonably practicable occurring approximately ninety days after the Distribution Date, and thereafter, the first Business Day that is as soon as reasonably practicable occurring approximately ninety days after the immediately preceding Periodic Distribution Date.

190.    Person:  As defined in section 101(41) of the Bankruptcy Code.

191.    Petersen:  Petersen Production Company LLC.

192.    Petition Date:  December 20, 2005 for case numbers 05-60199 through 05-60211; December 21, 2005 for case numbers 05-60212 through 05-60218, 05-60221 through 05-60278, 05-60281 through 05-60363, 05-60365 through 05-60401, 05-60403 through 05-60441, 05-60443 through 05-60456, 05-60458 through 05-60460, and 05-40463; December 27, 2005 for case numbers 05-60464 through 05-60468; December 29, 2005 for case numbers 05-60476 and 05-60477; January 8, 2006 for case numbers 06-10026 through 06-10032; January 9, 2006 for case numbers 06-10034 and 06-10039; February 3, 2006 for case numbers 06-10197 and 06-10198; May 2, 2006 for case number 06-10939; and September 20, 2007 for case number 07-12967; provided, however, for purposes of the Plan, unless otherwise provided, the Petition Date shall be deemed to be December 20, 2005 for all Debtors.

193. <u>Phelps Plaintiffs</u>:  James Phelps, on behalf of himself, the Calpine Corporation Retirement Savings Plan, and a proposed class of others similarly situated, as plaintiffs in ERISA Litigation, Master File No. C 03-CV-1685 (SDA) (C.D. Cal.).

194. <u>Pipelines</u>:  Gas Transmission Northwest Corporation, Portland Natural Gas Transmission System, TransCanada PipeLines Limited, and NOVA Gas Transmission Ltd.

195. <u>Pipelines' Claims</u>:  Claims of Gas Transmission Northwest Corporation, Portland Natural Gas Transmission System, TransCanada PipeLines Limited, NOVA Gas Transmission Ltd. identified in the Proofs of Claim or amended Proofs of Claim filed by each of them.

196. <u>PLA</u>:  Any pre-hire project labor agreement to which one or more of the Debtors, is a party.

197. <u>Plan</u>:  This Sixth Amended Joint Plan of Reorganization for each of the Debtors pursuant to chapter 11 of the Bankruptcy Code, together with the Plan Supplement, either in its present form or as it may be altered, amended, modified, or supplemented from time to time in accordance with the terms of the Plan, the Bankruptcy Code, and the Bankruptcy Rules.

198. <u>Plan Supplement</u>:  The compilation of documents and forms of documents, schedules, and exhibits to the Plan.

199. <u>Plan Supplement Filing Date</u>:  The date that is no later than fourteen days prior to the Voting Deadline or such later date as may be approved by the Bankruptcy Court on notice to parties in interest.

200. <u>PNGTS Net Allowed Claim</u>:  The PNGTS Net Allowed Claim as defined in the Stipulation and Agreed Order Between and Among the Debtors, Portland Natural Gas Transmission System, TransCanada PipeLines Limited, and NOVA Gas Transmission Resolving and Allowing Claims and Terminating Agreements, dated December 18, 2007.

201. <u>PPA Litigation</u>:  That certain matter currently styled as <u>In re Calpine Corp.</u>; <u>Calpine Corp., et al. v. California Dept. of Water Resources, et al.</u>; Docket Nos. 06-0480-BK; 06-0676-BK; 06-0683-BK; 06-0691-BK; 06-0717-BK; and 06-0723-BK.

202. <u>Priority Tax Claim</u>:  Any Claim of the kind specified in section 507(a)(8) of the Bankruptcy Code.

203. <u>Professional</u>:  An Entity: (a) employed pursuant to a Bankruptcy Court order in accordance with sections 327, 363, and 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Confirmation Date, pursuant to sections 327, 328, 329, 330, 363, and 331 of the Bankruptcy Code or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

204. <u>Professional Fee Escrow Account</u>:  An interest-bearing account in an amount equal to the Professional Fee Reserve Amount funded and maintained by the Reorganized Debtors on and after the Effective Date solely for the purpose of paying all Allowed and unpaid fees and expenses of Professionals in the Chapter 11 Cases.

205.  <u>Professional Fee Reserve Amount</u>:  Accrued Professional Compensation through the Effective Date as estimated by the Professionals in accordance with ARTICLE IX.A.4.

206.  <u>Projects to Be Sold or Surrendered</u>: A power plant facility owned by one or more of the Debtors to be sold or surrendered pursuant to the Plan on or after the Effective Date.

207.  <u>Proof of Claim</u>:  A proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

208.  <u>Proof of Interest</u>:  A proof of Interest Filed against any of the Debtors in the Chapter 11 Cases.

209.  <u>QCH</u>:  Quintana Canada Holdings, LLC, a Delaware corporation.

210.  <u>Quadrangle And JP Morgan Claims</u>:  Those certain claims of Quadrangle Master Funding Ltd and JPMorgan Chase Bank, N.A. Allowed by the order, dated May 9, 2007, entitled *Order Approving (I) the Claims Settlement Agreement and the Release Agreement Regarding the Settlement and Release of Certain Claims Relating to the Acadia Power Plant, and (II) an $85 Million Payment to the Stalking Horse Purchaser in Consideration for the Waiver of Priority Distributions and Other Consideration* [Docket No. 4603], which Claims are classified in Class C-8.

211.  <u>Record Date</u>: September 27, 2007.

212.  <u>Reinstated</u>:  (a) Leaving unaltered the legal, equitable, and contractual rights to which a Claim entitles the Holder of such Claim or Interest so as to leave such Claim Unimpaired or (b) notwithstanding any contractual provision or applicable law that entitles the Holder of a Claim or Interest to demand or receive accelerated payment of such Claim or Interest after the occurrence of a default: (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) expressly does not require to be cured; (ii) reinstating the maturity (to the extent such maturity has not otherwise accrued by the passage of time) of such Claim as such maturity existed before such default; (iii) compensating the Holder of such Claim or Interest for any damages incurred as a result of any reasonable reliance by such Holder on such contractual provision or such applicable law; (iv) if such Claim or Interest arises from a failure to perform a nonmonetary obligation other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A), compensating the Holder of such Claim or Interest (other than the Debtor or an insider) for any actual pecuniary loss incurred by such Holder as a result of such failure; and (v) not otherwise altering the legal, equitable or contractual rights to which such Claim entitles the Holder.

213.  <u>Rejected California Energy Commission Agreements</u>:  The following agreements: (a) that certain Grant Agreement (GEO-02-004) between Calpine Corporation and the California Energy Commission, dated October 9, 2002; (b) that certain Grant Agreement (GEO-04-004) between Calpine Corporation and the California Energy Commission, dated July 1, 2004; (c) that certain Grant Agreement (GEO-04-001) between Calpine Corporation and the California Energy Commission, dated July 14, 2004; (d) that certain Funding Award Agreement (REN-98-017) between Calpine Siskiyou Geothermal Partners, L.P. and the California Energy Commission,

24

dated April 2, 1999; (e) that certain Funding Award Agreement (REN-98-018) between CPN Telephone Flat, Inc. and the California Energy Commission, dated November 20, 2001.

214. <u>Rejected Employment Agreement</u>: An agreement, other than a CBA or PLA, between or among any of the Debtors and any directors, officers, or employees of any of the Debtors for such Person to serve in such capacity that has been rejected, expired on its own terms, or otherwise terminated by the Debtors on or before the Effective Date.

215. <u>Rejection Damages Claim</u>: Any Claim on account of the rejection of an executory contract or unexpired lease pursuant to section 365 of the Bankruptcy Code or the repudiation of such contract.

216. <u>Released Party</u>: Each of: (a) the DIP Lenders in their capacities as such; (b) the New Credit Facility Lenders in their capacities as such, along with their respective affiliates; (c) with respect to each of the foregoing Entities in clauses (a) and (b), such Entities' successors and assigns; (d) any statutory committee and the members thereof in their capacity as such; (e) the Second Lien Ad Hoc Committee and the members thereof in their capacity as such; (f) the ULC1 Noteholders Ad Hoc Committee and the members thereof in their capacity as such; (g) the Indenture Trustees; (h) the Administrative Agents; (i) the Collateral Trustee; (j) Manufacturers & Traders Trust Company, solely in its capacity as indenture trustee for the 7.75% Contingent Convertible Notes Due 2015 (solely for purposes of ARTICLE VIII.D); (k) the Ad Hoc Committee Of 6.0% Convertible Noteholders and the members thereof, solely in their capacities as such (solely for purposes of ARTICLE VIII.D); (l) the Ad Hoc Committee Of 7.75% Convertible Noteholders and the members thereof, solely in their capacities as such (solely for purposes of ARTICLE VIII.D); (m) with respect to each of the foregoing Entities in clauses (a) through (l), such Entities' affiliates, subsidiaries, officers, directors, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other Professionals, in each case in their capacity as such, and only if serving in such capacity; and (n) the Debtors' and Reorganized Debtors' officers, directors, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other Professionals, in each case in their capacity as such, and only if serving in such capacity.

217. <u>Reorganized Calpine</u>: Calpine, as reorganized under and pursuant to the Plan, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date.

218. <u>Reorganized Calpine Bylaws</u>: The bylaws of Reorganized Calpine, which shall be in form and substance acceptable to the Debtors and the Creditors' Committee, substantially in the form contained in the Plan Supplement to be in effect upon the Effective Date.

219. <u>Reorganized Calpine Charter</u>: The amended and restated certificate of incorporation of Reorganized Calpine, which shall be in form and substance acceptable to the Debtors and the Creditors' Committee, substantially in the form contained in the Plan Supplement to be in effect upon the Effective Date.

220.    <u>Reorganized Debtors</u>:  The Debtors, as reorganized pursuant to and under the Plan, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date.

221.    <u>Roll-Up Transaction</u>:  A dissolution or winding up of the corporate existence of a Reorganized Debtor under applicable state law or the consolidation, merger, contribution of assets, or other transaction in which a Reorganized Debtor merges with or transfers substantially all of its assets and liabilities to another Reorganized Debtor or one or more of their Affiliates, on or after the Effective Date.

222.    <u>Rosetta</u>:  Rosetta Resources, Inc. and any of its affiliates or subsidiaries.

223.    <u>Rosetta Adversary Proceeding</u>:  That certain adversary proceeding styled *Calpine Corporation v. Rosetta, Inc. (In re Calpine Corporation, et al.)*, Adv. No. 07-01760(BRL).

224.    <u>Rosetta Contracts</u>:  All executory contracts or unexpired leases and any other agreements that were executed or transferred as part of or in connection with the July 2005 sale of one or more of the Debtors' oil and gas businesses to Rosetta and/or any of its affiliates.

225.    <u>Schedules</u>:  The schedules of assets and liabilities, schedules of executory contracts, and statement of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code, the official bankruptcy forms, and the Bankruptcy Rules.

226.    <u>Second Circuit</u>:  The United States Court of Appeals for the Second Circuit.

227.    <u>Second Lien Ad Hoc Committee</u>:  The Unofficial Committee of Second Lien Debtholders.

228.    <u>Second Lien Ad Hoc Committee Transaction Fee</u>:  That certain Transaction Fee, as defined in the Agreement, dated as of December 2, 2005, by and among Houlihan Lokey Howard & Zukin, Wilmington Trust Company as Indenture Trustee, Goldman Sachs as Term Loan Agent, and Calpine.

229.    <u>Second Lien Debt Claim</u>:  Any Claim (not including any Second Lien Unsecured Makewhole Claims) on account of the: (a) Second Priority Senior Secured Floating Rate Notes Due 2007; (b) 8.5% Second Priority Senior Secured Notes Due 2010; (c) 8.75% Second Priority Senior Secured Notes Due 2013; (d) 9.875% Second Priority Senior Secured Notes Due 2011; and (e) Second Priority Senior Secured Term Loan Due 2007.

230.    <u>Second Lien Makewhole Claim</u>:  Any Makewhole Claim on account of the: (a) Second Priority Senior Secured Floating Rate Notes Due 2007; (b) 8.5% Second Priority Senior Secured Notes Due 2010; (c) 8.75% Second Priority Senior Secured Notes Due 2013; (d) 9.875% Second Priority Senior Secured Notes Due 2011; and (e) Second Priority Senior Secured Term Loan Due 2007.

231.    <u>Second Lien Makewhole Settlement Order</u>:  The Bankruptcy Court order entitled, *Order Pursuant to 11 U.S.C. § 105(a) and Bankruptcy Rule 9019 Approving Amended Stipulation By and Among the Debtors and Debtors in Possession, the Unofficial Committee of*

26

*Second Lien Debtholders and Wilmington Trust, as Indenture Trustee for the Second Lien Fixed Rate Notes*, entered in the Chapter 11 Cases on August 8, 2007 [Docket No. 5567].

232.    <u>Second Lien Secured Makewhole Claim</u>:  Any Second Lien Makewhole Claim determined to be Secured by a Bankruptcy Court order.

233.    <u>Second Lien Unsecured Makewhole Claim</u>:  Any Second Lien Makewhole Claim determined not to be Secured by a Bankruptcy Court order.

234.    <u>Second Priority Senior Secured Floating Rate Notes Due 2007</u>:    The $500,000,000 Second Priority Senior Secured Floating Rate Notes due 2007, issued by Calpine pursuant to that certain indenture dated as of July 15, 2003, between Calpine and Wilmington Trust Company, as trustee.

235.    <u>Second Priority Senior Secured Term Loan Due 2007</u>:  The $750,000,000 Senior Secured Term Loans due 2007, issued pursuant to that certain credit agreement, dated as of July 16, 2003, among Calpine, as borrower, Goldman Sachs Credit Partners, L.P., as sole lead arranger, sole bookrunner and administrative agent and the various co-arrangers, managing agents and lenders named therein.

236.    <u>Secured</u>:  When referring to a Claim: (a) secured by a Lien on property in which the Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code or (b) Allowed pursuant to the Plan as a Secured Claim.

237.    <u>Securities Act</u>:  The Securities Act of 1933, 15 U.S.C. §§ 77a-77aa, or any similar federal, state, or local law.

238.    <u>Security</u>:  As defined in section 2(a)(1) of the Securities Act.

239.    <u>Senior Note Claim</u>:  Any Claim (including any Senior Note Makewhole Claims, but not including any Subordinated Debt Securities Claims) on account of the: (a) 7.625% Senior Notes Due 2006; (b) 7.75% Senior Notes Due 2009; (c) 7.875% Senior Notes Due 2008; (d) 8.75% Senior Notes Due 2007; and (e) 10.5% Senior Notes Due 2006 (which shall include an Allowed Claim in the amount of $72,000 for the remaining fees and expenses of U.S. Bank National Association, as indenture trustee to the 10.5% Senior Notes Due 2006, incurred through December 14, 2007 (other than fees and expenses incurred after December 14, 2007, with respect to which the Debtors or Reorganized Debtors, as applicable, the Creditors' Committee, and U.S. Bank National Association, as indenture trustee to the 10.5% Senior Notes Due 2006, reserve all their respective rights)).

240.    <u>Senior Note Makewhole Claim</u>:  Any Makewhole Claim on account of the: (a) 7.625% Senior Notes Due 2006; (b) 7.75% Senior Notes Due 2009; (c) 7.875% Senior Notes Due 2008; (d) 8.75% Senior Notes Due 2007; and (e) 10.5% Senior Notes Due 2006.

241.  <u>Servicer</u>:  An indenture trustee, agent, servicer, or other authorized representative of Holders of Claims or Interests recognized by the Debtors.

242.  <u>SJ Plaza Claim</u>:  That certain Claim of SJ Plaza, LLC. against Calpine, evidenced by claim number 6390, which amends claim number 714 and is classified in Class C-7.

243.  <u>Solicitation Procedures Order</u>:  That certain order entered by the Bankruptcy Court on September 26, 2007, approving certain solicitation procedures for solicitation of votes on the Plan [Docket No. 6136].

244.  <u>South Point Joint Venture Claims</u>:  Those certain Claims Filed by the South Point Joint Venture as Proof of Claim numbers 6400 and 6401.

245.  <u>Subordinated Debt Securities Claim</u>:  Any Claim of the type described in and subject to subordination pursuant to section 510(b) of the Bankruptcy Code relating to the: (a) 4.0% Convertible Senior Notes Due 2006; (b) 4.75% Convertible Senior Notes Due 2023; (c) 6.00% Contingent Convertible Notes Due 2014; (d) 8.5% Senior Notes Due 2011; (e) 8.625% Senior Notes Due 2010; (f) 7.625% Senior Notes Due 2006; (g) 7.75% Senior Notes Due 2009; (h) 7.875% Senior Notes Due 2008; (i) 8.75% Senior Notes Due 2007; (j) 10.5% Senior Notes Due 2006; (k) ULC1 Notes; (l) ULC2 8.375% Senior Notes Due 2008; (m) ULC2 8.875% Senior Notes Due 2011; and (n) 7.75% Contingent Convertible Notes Due 2015.

246.  <u>Subordinated Equity Securities Claim</u>:  Any Claim of the type described in and subject to subordination pursuant to section 510(b) of the Bankruptcy Code relating to any Interest.

247.  <u>Subordinated Note Claim</u>:  Any Claim (including any Subordinated Note Makewhole Claim, but not including any Subordinated Debt Securities Claims) on account of the 7.75% Contingent Convertible Notes Due 2015, issued by Calpine pursuant to that certain Indenture, dated as of August 10, 2000, between Calpine and Wilmington Trust Company, as trustee, as supplemented by the Third Supplemental Indenture, dated as of June 23, 2005.

248.  <u>Subordinated Note Makewhole Claim</u>:  Any Makewhole Claim on account of the 7.75% Contingent Convertible Notes Due 2015.

249.  <u>Supremacy Clause</u>:  Paragraph 2 of Article VI of the United States Constitution.

250.  <u>Texas Taxing Authority</u>:  Eastland County, Texas, Freestone County, Texas, Harrison County, Texas, Harrison Central Appraisal District, Beckville ISD, Cayuga ISD, Chambers County, Cisco ISD, Cisco Junior College, Coppell ISD, Dallas County, Deer Park ISD, City of Edinburg, Fort Bend County, Galveston County, Harris County, Edinburg CISD, South Texas College, South Texas ISD, Houston ISD, Katy ISD, Liberty County, Nueces County and Webb CISD.

251.  <u>Transaction Structuring Plan</u>:  The detailed step plan created pursuant to section 2.6 of the CCAA Settlement to implement the transactions contemplated by the CCAA Settlement in an efficient manner.

252. <u>TransCanada/NOVA Contracts</u>:  Those certain Contracts identified on Exhibit 20 to the Plan Supplement.

253. <u>TransCanada PipeLines Limited Claims</u>:  Those certain Claims as evidenced in the Proof of Claims or amended Proof of Claims filed by TransCanada PipeLines Limited.

254. <u>Transwestern Claim</u>:  That certain claim of Transwestern Pipeline Company, LLC Allowed by the order, dated October 25, 2007, entitled *Stipulation and Agreed Order Resolving and Allowing Claims, Terminating Agreements, and Maintaining Agreements Between the Debtors and Transwestern Pipeline Company, LLC* [Docket No. 6910], which Claim is classified in Class C-8.

255. <u>ULC1 8.5% Senior Notes Due 2008</u>:  The $2,030,000,000 8.5% Senior Notes due May 1, 2008, issued by Calpine Canada Energy Finance ULC pursuant to the ULC1 Indenture.

256. <u>ULC1 8.75% Senior Notes Due 2007</u>:  The (CAD) $200,000,000 8.75% Senior Notes due October 15, 2007, issued by Calpine Canada Energy Finance ULC pursuant to the ULC1 Indenture.

257. <u>ULC1 Filed Amount</u>:  The sum of $2,124,356,213.11, being the stated amount of the General Unsecured Claim, as of the Petition Date, of the ULC1 Indenture Trustee, on behalf of the ULC1 Noteholders, against Calpine related to the ULC1 Notes.

258. <u>ULC1 Indenture</u>:  That certain Indenture, dated as of April 25, 2001, between Calpine Canada Energy Finance ULC and Wilmington Trust Company, as indenture trustee, as amended by that certain Amended and Restated Indenture, dated as of October 16, 2001, between Calpine Canada Energy Finance ULC and Wilmington Trust Company, as indenture trustee.

259. <u>ULC1 Indenture Trustee</u>:  HSBC Bank USA, National Association, as successor indenture trustee under the ULC1 Indenture.

260. <u>ULC1 Indenture Trustee Fees</u>:  The reasonable fees, costs, and expenses of the ULC1 Indenture Trustee, including the reasonable fees, costs, and expenses of its U.S. and Canadian counsel, incurred, and to be incurred, by the ULC1 Indenture Trustee in connection with the Chapter 11 Cases and the CCAA Proceedings through the date of final distribution in respect of the ULC1 Settlement Claims.

261. <u>ULC1 Noteholder</u>:  Any holder of a ULC1 Note.

262. <u>ULC1 Noteholders Ad Hoc Committee</u>:  The informal committee of certain ULC1 Noteholders, as described more particularly in certain verified statements filed with the Bankruptcy Court pursuant to Bankruptcy Rule 2019 at docket numbers 2823, 3285, and 5353, respectively, as may be updated further.

263. <u>ULC1 Noteholders Ad Hoc Committee Fees</u>:  The reasonable fees, costs, and expenses of the ULC1 Noteholders Ad Hoc Committee, including the reasonable fees, costs, and expenses of its U.S. and Canadian counsel and its financial adviser, incurred, and to be incurred,

by the ULC1 Noteholders Ad Hoc Committee in connection with the Chapter 11 Cases and the CCAA Proceedings through the date of final distribution in respect of the ULC1 Settlement Claims, in an amount not to exceed $8 million.

264.    ULC1 Notes:  The ULC1 8.5% Senior Notes Due 2008 and the ULC1 8.75% Senior Notes Due 2007.

265.    ULC1 Settlement Claim:  Any Claim (including those held by the Debtors as of the Petition Date) arising under or relating to the ULC1 Indenture, as such Claims have been compromised and settled pursuant to the CCAA Settlement.

266.    ULC2 8.375% Senior Notes Due 2008:  The €175,000,000 8.375% Senior Notes due October 15, 2008, issued pursuant to that certain Indenture, dated as of October 18, 2001, between Calpine Canada Energy Finance I ULC and Wilmington Trust Company, as trustee.

267.    ULC2 8.875% Senior Notes Due 2011:  The £200,000,000 8.875% Senior Notes due October 15, 2011, issued pursuant to that certain Indenture, dated as of October 18, 2001, between Calpine Canada Energy Finance II ULC and Wilmington Trust Company, as trustee.

268.    Unclaimed Distribution:  Any distribution under the Plan on account of an Allowed Claim or Interest to a Holder that has not: (a) accepted a particular distribution or, in the case of distributions made by check, negotiated such check; (b) given notice to the Reorganized Debtors of an intent to accept a particular distribution; (c) responded to the Debtors' or Reorganized Debtors' requests for information necessary to facilitate a particular distribution; or (d) taken any other action necessary to facilitate such distribution.

269.    Uniform Commercial Code:  The Uniform Commercial Code as in effect on the Effective Date, as enacted in the applicable state.

270.    Unimpaired:  With respect to a Class of Claims or Interests, a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

271.    Unsecured Claim:  Any Senior Note Claim, General Note Claim, Subordinated Note Claim, ULC1 Settlement Claim, Canadian Guarantee Claim, Canadian Intercompany Claim, Rejection Damages Claim, General Unsecured Claim, Unsecured Makewhole Claim, Unsecured Convenience Class Claim, Subordinated Debt Securities Claim, and Subordinated Equity Securities Claim.

272.    Unsecured Convenience Class Claim:  Any: (a) Unsecured Claim (including interest accrued only as of the Petition Date) that is $50,000 or less or (b) General Unsecured Claim in excess of $50,000 which the Holder thereof, pursuant to such Holder's ballot or such other election accepted by the Debtors elects to have reduced to the amount of $50,000 and to be treated as an Unsecured Convenience Class Claim; provided, however, that an Unsecured Convenience Class Claim does not include a Claim on account of publicly or privately held securities.

273.    Unsecured Makewhole Claim:  Any First Lien Makewhole Claim, Second Lien Makewhole Claim, or CalGen Unsecured Makewhole Claim.

274.    <u>Voting Deadline</u>:  November 30, 2007.

275.    <u>Yellow Brick Road Claim</u>:  That certain Allowed Claim of Yellow Brick Road LLC against Calpine as provided for in the stipulation, dated  June 26, 2007, entitled *Stipulation and Consent Order Implementing Approved Settlement of Claims of the Indenture Trustee Relating to the Rumford and Tiverton Facilities* [Docket No. 5089].

B.    <u>Rules of Interpretation and Computation of Time</u>:

1.    <u>Rules of Interpretation</u>:  For purposes of the Plan:  (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (b) unless otherwise specified, any reference in the Plan to a contract, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (c) unless otherwise specified, any reference in the Plan to an existing document, schedule, or exhibit, whether or not Filed, shall mean such document, schedule, or exhibit, as it may have been or may be amended, modified, or supplemented; (d) any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors and assigns; (e) unless otherwise specified, all references in the Plan to Articles are references to Articles of the Plan or to the Plan; (f) unless otherwise specified, all references in the Plan to exhibits are references to exhibits in the Plan Supplement; (g) the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (h) subject to the provisions of any contract, certificate of incorporation, bylaw, instrument, release, or other agreement or document entered into in connection with the Plan, the rights and obligations arising pursuant to the Plan shall be governed by, and construed and enforced in accordance with applicable federal law, including the Bankruptcy Code and Bankruptcy Rules; (i) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (j) unless otherwise set forth in the Plan, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (k) any term used in capitalized form in the Plan that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable; (l) all references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (m) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, as applicable to the Chapter 11 Cases, unless otherwise stated; and (n) any immaterial effectuating provisions may be interpreted by the Reorganized Debtors in such a manner that is consistent with the overall purpose and intent of the Plan all without further Bankruptcy Court order.

2.    <u>Computation of Time</u>:  In computing any period of time prescribed or allowed, the provisions of Bankruptcy Rule 9006(a) shall apply.  If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

C.     <u>Reference to Monetary Figures</u>:  All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided.

D.     <u>Reference to the Debtors or Reorganized Debtors</u>:  Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or to the Reorganized Debtors shall mean the Debtors and Reorganized Debtors, as applicable, to the extent the context requires.

**ARTICLE II.**
**ADMINISTRATIVE AND PRIORITY CLAIMS**

In accordance with section 1123(a)(1) of the Bankruptcy Code, DIP Facility Claims, Administrative Claims, and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims set forth in ARTICLE III.

A.     <u>DIP Facility Claims</u>:  In full satisfaction, settlement, release, and discharge of and in exchange for each Allowed DIP Facility Claim, the Debtors shall either convert the DIP Facility into the New Credit Facility or pay the DIP Facility Claims in full in Cash.

B.     <u>Administrative Claims</u>:  Subject to the provisions of sections 328, 330(a), and 331 of the Bankruptcy Code, in full satisfaction, settlement, release, and discharge of and in exchange for each Allowed Administrative Claim, each Holder thereof shall be paid in full in Cash in accordance with the terms of the applicable contract, if any.

C.     <u>Priority Tax Claims</u>:  In full satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, unless otherwise agreed (with the consent of the Creditors' Committee), each Holder thereof shall be paid in full in Cash pursuant to section 1129(a)(9)(C) of the Bankruptcy Code.

**ARTICLE III.**
**CLASSIFICATION AND TREATMENT**
**OF CLAIMS AND INTERESTS**

A.     <u>Classification of Claims and Interests</u>:  All Claims and Interests, except DIP Facility Claims, Administrative Claims, and Priority Tax Claims, are classified in the Classes set forth in ARTICLE III.  A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes.  A Claim or Interest is also classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

32

1.    <u>Substantive Consolidation of Debtors</u>:  Pursuant to ARTICLE IV.A, the Plan provides for the substantive consolidation of the Estates into a single Estate for all purposes associated with Confirmation and Consummation.  As a result of the substantive consolidation of the Estates, each Class of Claims and Interests will be treated as against a single consolidated Estate without regard to the separate identification of the Debtors.

2.    <u>Class Identification</u>:  Below is a chart assigning each Class a letter and, in some cases, a number for purposes of identifying each separate Class.

| Class | Claim or Interest Type |
| --- | --- |
| A-1 | First Lien Debt Claims |
| A-2 | Second Lien Debt Claims |
| A-3 | Other Secured Claims |
| B | Other Priority Claims |
| C-1 | Senior Note Claims |
| C-2 | General Note Claims |
| C-3 | Subordinated Note Claims |
| C-4 | ULC1 Settlement Claims |
| C-5 | Canadian Guarantee Claims |
| C-6 | Canadian Intercompany Claims |
| C-7 | Rejection Damages Claims |
| C-8 | General Unsecured Claims |
| C-9 | Unsecured Makewhole Claims |
| C-10 | Unsecured Convenience Class Claims |
| C-11 | Intercompany Claims |
| C-12 | CalGen Makewhole Claims |
| D | Subordinated Debt Securities Claims |
| E-1 | Interests |
| E-2 | Subordinated Equity Securities Claims |
| E-3 | Intercompany Interests |

B.    <u>Treatment of Classes of Claims and Interests</u>

To the extent a Class contains Allowed Claims or Interests with respect to a particular Debtor, the treatment provided to each Class for distribution purposes is specified below.

33

1.      <u>Class A-1—First Lien Debt Claims</u>

      a.      <u>Classification</u>:  Class A-1 consists of all First Lien Debt Claims.

      b.      <u>Treatment</u>:  Each Allowed First Lien Debt Claim (not including any First Lien Secured Makewhole Claims), already has been paid in full in Cash pursuant to the First Lien Repayment Order.   In satisfaction of each Allowed First Lien Secured Makewhole Claim, each Holder thereof shall be paid in full in Cash.

      c.      <u>Interest Accrued After the Petition Date</u>:  Allowed Claims in Class A-1 shall not include interest; <u>provided</u>, <u>however</u>, that any Allowed First Lien Secured Makewhole Claim shall include interest accrued after the date of repayment of principal through the Interest Accrual Limitation Date at the rate determined by the Bankruptcy Court.

2.      <u>Class A-2—Second Lien Debt Claims</u>

      a.      <u>Classification</u>:  Class A-2 consists of all Second Lien Debt Claims.

      b.      <u>Treatment</u>:  In full satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Claim in Class A-2, each Allowed Second Lien Debt Claim shall be paid in full in Cash, which, with respect to any portion of the Disputed Second Lien Debt Claim that is ultimately Allowed pursuant to a Final Order, may include Cash generated pursuant to ARTICLE VII.D.9 from the sale of New Calpine Common Stock from the New Calpine Stock Reserve reserved on account of such Claim pursuant to ARTICLE VII.C.3.

      c.      <u>Interest Accrued After the Petition Date</u>:  Allowed Claims in Class A-2 shall include interest accrued after the Petition Date through the Interest Accrual Limitation Date at the contract rate determined by a Final Order to the extent not already paid or waived pursuant to the Cash Collateral Order; <u>provided</u>, <u>however</u>, that any portion of the Claims in Class A-2 consisting of Allowed Second Lien Secured Makewhole Claims shall include interest accrued after the date of repayment of principal through the Interest Accrual Limitation Date at the rate determined by the Bankruptcy Court to the extent not already paid or waived pursuant to the Cash Collateral Order. With respect to the Second Priority Senior Secured Term Loan Due 2007, the contract rate is not less than the base rate.

3.      <u>Class A-3—Other Secured Claims</u>

      a.      <u>Classification</u>:  Class A-3 consists of all Other Secured Claims, against the applicable Debtor.

      b.      <u>Treatment</u>:  In full satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Claim in Class A-3, each such Allowed Claim shall be: (i) Reinstated; (ii) paid in full in Cash; or (iii) satisfied in full by a return to such Holder of the collateral securing such Allowed Claim.  The Bethpage Claims shall be Reinstated, and the Debtors and the holders of the Bethpage Claims reserve their

respective rights under the Bethpage Notes, the Bethpage Credit Agreements and all related agreements and nothing in the Plan (including, without limitation, Sections V(H) and VII(C)(3)) or the Confirmation Order alters, amends, or modifies such rights.

c.      <u>Interest Accrued After the Petition Date</u>:  Allowed Claims in Class A-3 shall include interest accrued after the Petition Date through the Interest Accrual Limitation Date at the contract rate determined by the Bankruptcy Court or, if there is no contract, then at the Federal Judgment Rate; <u>provided</u>, <u>however</u>, that (i) the Allowed ASM, Hain, And Sierra Group Claims in Class A-3 shall include interest accrued after the Petition Date through the Interest Accrual Limitation Date at a rate per annum of eight and one-half percent and (ii) the Liquidity Solutions Claims in Class A-3 shall be Allowed in the full filed amount and shall include interest accrued after the Petition Date through the Interest Accrual Limitation Date at a rate per annum of eight and one-quarter percent.

4.      <u>Class B—Other Priority Claims</u>

a.      <u>Classification</u>:  Class B consists of all Other Priority Claims.

b.      <u>Treatment</u>:  In full satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Claim in Class B, each Holder thereof shall be paid in full in Cash.

c.      <u>Interest Accrued After the Petition Date</u>:  Allowed Claims in Class B shall include interest accrued after the Petition Date through the Interest Accrual Limitation Date at the Federal Judgment Rate.

5.      <u>Class C-1—Senior Note Claims</u>

a.      <u>Classification</u>:  Class C-1 consists of all Senior Note Claims.

b.      <u>Treatment</u>:  In full satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Claim in Class C-1 (including  any Allowed Senior Note Makewhole Claims), each Holder thereof shall receive a pro rata share of the New Calpine Common Stock Pool For Creditors until paid in full.  To the extent the distribution of New Calpine Common Stock to be made to Holders of Allowed Senior Note Claims will not result in payment in full of all principal and interest accrued as of the Petition Date under the Senior Note indentures, the Holders of Allowed Senior Note Claims will receive as part their distribution any distribution that otherwise would be made to the Holders of Allowed Subordinated Note Claims until all principal and interest accrued as of the Petition Date under the Senior Note indentures is paid in full as provided for in ARTICLE III.B.7.b.

c.      <u>Interest Accrued After the Petition Date</u>:  Allowed Claims in Class C-1 shall include interest accrued after the Petition Date through the Interest Accrual Limitation Date at the contract rate determined by the Bankruptcy Court; <u>provided</u>, <u>however</u>, that the Allowed Senior Note Makewhole Claims shall include interest accrued

after the date of repayment of principal through the Interest Accrual Limitation Date at the rate determined by the Bankruptcy Court.

6.    Class C-2—General Note Claims

     a.    Classification:  Class C-2 consists of all General Note Claims.

     b.    Treatment:  In full satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Claim in Class C-2 (including any Allowed General Note Makewhole Claims), each Holder thereof shall receive a pro rata share of the New Calpine Common Stock Pool For Creditors until paid in full.

     c.    Interest Accrued After the Petition Date:  Allowed Claims in Class C-2 shall include unpaid interest accrued after the Petition Date through the Interest Accrual Limitation Date at the contract rate determined by the Bankruptcy Court; provided, however, that Allowed General Note Makewhole Claims shall include interest accrued after the date of repayment of principal through the Interest Accrual Limitation Date at the rate determined by the Bankruptcy Court.

7.    Class C-3—Subordinated Note Claims

     a.    Classification:  Class C-3 consists of all Subordinated Note Claims.

     b.    Treatment:  In full satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Claim in Class C-3 (including any Allowed Subordinated Note Makewhole Claims), each Holder thereof shall receive a pro rata share of the New Calpine Common Stock Pool For Creditors until paid in full; provided, however, that the Holders of Allowed Subordinated Note Claims shall be deemed to consent to the distribution of any portion of their pro rata share of the New Calpine Common Stock to Holders of Allowed Senior Note Claims necessary to satisfy in full any portion of such Allowed Senior Note Claims attributable to principal and interest accrued as of the Petition Date; provided further, however, that any obligation of the Holders of Allowed Subordinated Note Claims to consent, or any consent already granted by such Holders, to the distribution of any portion of their pro rata share of the New Calpine Common Stock to Holders of Allowed Senior Note Claims to satisfy any amounts other than principal and interest accrued as of the Petition Date as part of the Intercreditor Subordination Dispute shall be determined by a court of competent jurisdiction; provided further, however, that the Intercreditor Escrow shall be distributed to the Intercreditor Subordination Dispute Escrow Account pending resolution of the Intercreditor Subordination Dispute by Final Order.  Upon distribution of the Intercreditor Escrow to the Intercreditor Subordination Dispute Escrow Account, such distributions shall be deemed to satisfy in full the obligations of the Debtors or Reorganized Debtors, as applicable, under the Plan with respect to amounts so distributed and no additional interest shall accrue against the Debtors or Reorganized Debtors, as applicable, on account of such satisfied Claims or distributions.

     c.    Interest Accrued After the Petition Date:  Allowed Claims in Class C-3 shall include interest accrued after the Petition Date through the Interest Accrual

Limitation Date at the contract rate determined by the Bankruptcy Court; provided, however, that Allowed Subordinated Note Makewhole Claims shall include interest accrued after the date of repayment of principal through the Interest Accrual Limitation Date at the rate determined by the Bankruptcy Court.

8.    Class C-4—ULC1 Settlement Claims

    a.    Classification:  Class C-4 consists of all ULC1 Settlement Claims.

    b.    Treatment:  In full satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed ULC1 Settlement Claim in Class C-4, each Holder thereof shall receive a pro rata share of the New Calpine Common Stock Pool For Creditors until paid in full.  The aggregate amount of the distribution of the New Calpine Common Stock Pool For Creditors to be made hereunder on account of Allowed ULC1 Settlement Claims in Class C-4 shall be calculated based upon the total amount of the ULC1 Settlement Claims being equal to U.S. $3,505,187,751.63; provided, however, that the aggregate amount of such distribution to be made hereunder on account of all Allowed ULC1 Settlement Claims shall not exceed an amount equal to the aggregate of (i) the outstanding principal balance of the ULC1 Notes (together with any accrued and unpaid interest thereon as of the Petition Date), as set forth in section 3.2(a)(ii)(A) of the CCAA Settlement, plus (ii) accrued and unpaid interest on the ULC1 Filed Amount from the Petition Date up to and including the date set forth in section 3.2(a)(ii)(B) of the CCAA Settlement at the contract rate (including interest compounded semi-annually, as set forth in section 3.2(a)(ii)(B) of the CCAA Settlement), plus (iii) the ULC1 Noteholders Ad Hoc Committee Fees, plus (iv) the ULC1 Indenture Trustee Fees, in each of the foregoing instances, subject to the foreign exchange adjustment described in ARTICLE III.B.8.d; provided, however, that the aggregate amount of such distribution to be made hereunder on account of all Allowed ULC1 Settlement Claims shall not include the ULC1 Noteholders Ad Hoc Committee Fees or the ULC1 Indenture Trustee Fees to the extent such fees are paid pursuant to ARTICLES IX.A.7 and 8.  Distributions to Holders of Allowed ULC1 Settlement Claims as provided herein are in accordance with the CCAA Settlement and the Transaction Structuring Plan and shall satisfy all obligations of both the Debtors and the Canadian Debtors and their estates with respect to ULC1 Settlement Claims.

    c.    Interest Accrued After the Petition Date:  Allowed ULC1 Settlement Claims shall include interest accrued at the contract rate (including interest compounded semi-annually, as set forth in section 3.2(a)(ii)(B) of the CCAA Settlement) from the Petition Date up to and including the date set forth in section 3.2(a)(ii)(B) of the CCAA Settlement, all as set forth in the CCAA Settlement; provided, however, that such inclusion of interest shall not increase the total distribution limitation contained in section 3.2(b)(ii) of the CCAA Settlement.

    d.    Foreign Currency Exchange Rate:  Certain components of the ULC1 Settlement Claims are denominated in Canadian dollars.  Without limitation, the indebtedness evidenced by the ULC1 8.75% Senior Notes Due 2007, including principal, and accrued and unpaid interest thereon, and portions of the ULC1 Noteholders Ad Hoc

Committee Fees and the ULC1 Indenture Trustee Fees relating to the services of Canadian professionals are and will be denominated in Canadian dollars. The respective amounts of such components shall be Allowed in the Chapter 11 Cases and distributions in respect thereof under the Plan shall be calculated in U.S. dollars in an amount yielded by the conversion from Canadian dollars at the noon spot rate effective on the fifth Business Day prior to the Distribution Date for U.S. currency of Scotiabank, and such conversion shall be performed by Calpine and subject to the approval of the ULC1 Indenture Trustee.

e.    <u>Application of Distributions Under the Plan</u>: Any distribution received by the ULC1 Indenture Trustee under the Plan shall be applied as follows: first, to the ULC1 Indenture Trustee Fees and the ULC1 Noteholders Ad Hoc Committee Fees; second, to interest accrued after the Petition Date; and third, to the ULC1 Filed Amount. The portion of any such distribution that is allocable to the ULC1 Ad Hoc Committee Fees shall be remitted by the ULC1 Indenture Trustee to those ULC1 Noteholders who paid such fees in the first instance in accordance with written instructions to be delivered to the ULC1 Indenture Trustee by counsel to the ULC1 Noteholders Ad Hoc Committee. The ULC1 Indenture Trustee may conclusively rely on such instructions delivered by counsel to the ULC1 Noteholders Ad Hoc Committee and shall have no liability for remitting to such ULC1 Noteholders in accordance with such instructions the portion of such distribution that is allocable to the ULC1 Noteholders Ad Hoc Committee Fees.

9.    <u>Class C-5—Canadian Guarantee Claims</u>

a.    <u>Classification</u>: Class C-5 consists of all Canadian Guarantee Claims.

b.    <u>Treatment</u>: In full satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Claim in Class C-5, each Holder thereof shall receive a pro rata share of the New Calpine Common Stock Pool For Creditors until paid in full after subtracting any payments received on account of the underlying obligation in the CCAA Proceedings; <u>provided</u>, <u>however</u>, that the Canadian Re-Toll Claim shall be deemed Allowed as of the Effective Date in the amount of $190,000,000, which amount will be satisfied entirely from the Estates and not by any funds of any Canadian Debtors, as set forth in that certain *Stipulation and Agreed Order Resolving the Objection of Harbinger and the Claims of Calpine Power L.P.*

c.    <u>Interest Accrued After the Petition Date</u>: Allowed Claims in Class C-5 shall include interest accrued after the Petition Date through the Interest Accrual Limitation Date at the default rate provided in the applicable indenture or, if there is no indenture, then at the Federal Judgment Rate.

10.    <u>Class C-6—Canadian Intercompany Claims</u>

a.    <u>Classification</u>: Class C-6 consists of all Canadian Intercompany Claims.

b.    <u>Treatment</u>: In full satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Claim in Class C-6, each Holder thereof shall

receive a pro rata share of the New Calpine Common Stock Pool For Creditors until paid in full, subject to the cap contained in the CCAA Settlement.

      c.      <u>Interest Accrued After the Petition Date</u>:  Allowed Claims in Class C-6 shall include interest consistent with, and except as may otherwise be specifically provided by, the terms of the CCAA Settlement.

11.     <u>Class C-7—Rejection Damages Claims</u>

      a.      <u>Classification</u>:  Class C-7 consists of all Rejection Damages Claims.

      b.      <u>Treatment</u>:  In full satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Claim in Class C-7, each Holder thereof shall receive a pro rata share of the New Calpine Common Stock Pool For Creditors until paid in full.

      c.      <u>Interest Accrued After the Petition Date</u>:  Allowed Claims in Class C-7 shall include interest accrued after the Petition Date through the Interest Accrual Limitation Date at the Federal Judgment Rate unless, upon application by the Holder of such Claim Filed before the Voting Deadline, the Bankruptcy Court orders otherwise prior to or in connection with the Confirmation Hearing; <u>provided</u>, <u>however</u>, that (i) the Allowed Yellow Brick Road Claim shall include, and shall be entitled to, interest accrued and accruing from December 20, 2005 through the Interest Accrual Limitation Date at a rate per annum of seven and one-half percent; (ii) the Allowed BIT Holdings Claim shall include interest accrued after the Petition Date through the Interest Accrual Limitation Date at a rate per annum of seven and three-quarters percent; (iii) the Allowed SJ Plaza Claim shall include interest accrued after the Petition Date through the Interest Accrual Limitation Date at a rate per annum of seven and three-quarters percent; (iv) the Allowed GTN Net Allowed Claim and the PNGTS Net Allowed Claim shall accrue interest after the Petition Date through the Interest Accrual Limitation Date as set forth in that certain Stipulation and Agreed Order Between and Among the Debtors, Portland Natural Gas Transmission System, Gas Transmission Northwest Corporation, Transcanada Pipelines Limited, and Nova Gas Transmission Resolving and Allowing Claims and Terminating Agreements.

12.     <u>Class C-8—General Unsecured Claims</u>

      a.      <u>Classification</u>:  Class C-8 consists of all General Unsecured Claims.

      b.      <u>Treatment</u>:  In full satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Claim in Class C-8, each Holder thereof shall receive a pro rata share of the New Calpine Common Stock Pool For Creditors until paid in full.

      c.      <u>Interest Accrued After the Petition Date</u>:  Unless otherwise agreed, Allowed Claims in Class C-8 shall include interest accrued after the Petition Date through the Interest Accrual Limitation Date at the Federal Judgment Rate unless, upon application by the Holder of such Claim Filed before the Voting Deadline, the

Bankruptcy Court orders otherwise prior to or in connection with the Confirmation Hearing; provided, however, that (i) Allowed ASM, Hain, And Sierra Group Claims in Class C-8 shall include interest accrued after the Petition Date through the Interest Accrual Limitation Date at a rate per annum of eight and one-half percent; (ii) Allowed Quadrangle and JPMorgan Claims shall include interest accrued after the Petition Date through the Interest Accrual Limitation Date at a rate per annum of eight and one-quarter percent; (iii) the Allowed Credit Suisse Claim shall include interest accrued after the Petition Date through the Interest Accrual Limitation Date at a rate per annum of nine percent; and (iv) the Allowed Transwestern Claim shall include interest accrued after the Petition Date through the Interest Accrual Limitation Date as a rate per annum of seven and three-quarters percent.

       d.      Election Rights: Each Holder of an Allowed Claim in Class C-8 may elect to be treated as a Holder of an Allowed Unsecured Convenience Class Claim in Class C-10, as applicable, by electing to reduce its Allowed Claim to $50,000 in complete satisfaction of such Allowed Claim.  Any such election must be made on the Ballot, and except as may be agreed to by the Debtors, with the consent of the Creditors' Committee, or Reorganized Debtors, no Holder of a Claim can elect the treatment described below after the Voting Deadline.  Upon such election, the Claim of such Holder shall be automatically reduced to $50,000.

13.    Class C-9—Unsecured Makewhole Claims

       a.      Classification:  Class C-9 consists of all Unsecured Makewhole Claims.

       b.      Treatment:  In full satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Claim in Class C-9, each Holder thereof shall receive a pro rata share of the New Calpine Common Stock Pool For Creditors until paid in full.

       c.      Interest Accrued After the Petition Date:  Allowed First Lien Unsecured Makewhole Claims shall include interest accrued after the date of repayment of principal through the Interest Accrual Limitation Date at the rate determined by the Bankruptcy Court.  Allowed Second Lien Unsecured Makewhole Claims shall include interest accrued after the date of repayment of principal through the Interest Accrual Limitation Date at the rate determined by the Bankruptcy Court.  Allowed CalGen Unsecured Makewhole Claims shall include interest accrued after the date of repayment of principal through the Interest Accrual Limitation Date at the rate determined by the Bankruptcy Court.

14.    Class C-10—Unsecured Convenience Class Claims

       a.      Classification: Class C-10 consists of all Unsecured Convenience Class Claims.

       b.      Treatment: In full satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Claim in Class C-10, each Holder thereof shall be paid in full in Cash.

  c. <u>Interest Accrued After the Petition Date</u>:  Allowed Claims in Class C-10 shall not include any interest accrued after the Petition Date.

15. <u>Class C-11—Intercompany Claims</u>

  a. <u>Classification</u>:  Class C-11 consists of all Intercompany Claims.

  b. <u>Treatment</u>:    At the Debtors' or Reorganized Debtors' option, in consultation with the Creditors' Committee, and except as otherwise provided in the Plan, Holders of Claims in Class C-11 shall have such Claims Reinstated or receive no distribution on account of such Claims.

16. <u>Class C-12—CalGen Makewhole Claims</u>

  a. <u>Classification</u>:  Class C-12 consists of all CalGen Makewhole Claims.

  b. <u>Treatment</u>:  In full satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Claim in Class C-12, each Holder thereof shall be paid in full with Cash, which may include proceeds generated from the sale of New Calpine Common Stock from the New Calpine Stock Reserve pursuant to ARTICLE VII.D.9.    No factual finding or legal conclusion in the Confirmation Order or in connection with the Plan that substantive consolidation of the Estates is appropriate shall affect, prejudice, or impair the CalGen Lenders' position, with respect to their alleged CalGen Makewhole Claims (which in the case of Claims for default interest shall be adjudicated as soon as reasonably practicable after the Effective Date consistent with the Bankruptcy Court's schedule), that CalGen and its direct and indirect Debtor subsidiaries are solvent.  The Debtors and the CalGen Lenders shall stipulate as to the solvency of CalGen and its direct and indirect Debtor subsidiaries solely for purposes of any future litigation regarding the CalGen Lenders' alleged entitlement to CalGen Makewhole Claims.

  c. <u>Interest Accrued After the Petition Date</u>:  Allowed CalGen Makewhole Claims shall include interest accrued after the date of repayment of principal through the Interest Accrual Limitation Date at the rate determined by Final Order.

17. <u>Class D—Subordinated Debt Securities Claims</u>

  a. <u>Classification</u>:    Class D consists of all Subordinated Debt Securities Claims.

  b. <u>Treatment</u>:  In full satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Claim in Class D, to the extent all Holders of Allowed Claims (other than Subordinated Debt Securities Claims and Subordinated Equity Securities Claims) have been paid in full, each Holder of an Allowed Class D Claim shall receive a pro rata distribution of the New Calpine Common Stock Pool For Subordinated Debt Securities Claimants until paid in full.

c.    Interest Accrued After the Petition Date:  Allowed Claims in Class D shall include interest accrued after the Petition Date through the Interest Accrual Limitation Date at the Federal Judgment Rate.

18.    Class E-1—Interests

a.    Classification:  Class E-1 consists of all Interests in Calpine.

b.    Treatment:  In full satisfaction, settlement, release, and discharge of and in exchange for each and every Interest in Class E-1, the Holders of Interests in Class E-1 shall receive a pro rata share of the New Calpine Warrants.

19.    Class E-2—Subordinated Equity Securities Claims

a.    Classification:  Class E-2 consists of all Subordinated Equity Securities Claims.

b.    Treatment:  Holders of Claims in Class E-2 shall not receive a distribution from the Estates under the Plan and may only recover from applicable insurance proceeds, if any.

20.    Class E-3—Intercompany Interests

a.    Classification:  Class E-3 consists of all Intercompany Interests.

b.    Treatment:  In full satisfaction, settlement, release, and discharge of and in exchange for each and every Interest in Class E-3, Interests in Class E-3 shall be Reinstated for the benefit of the Holders thereof in exchange for Reorganized Debtors' agreement to make certain distributions to the Holders of Allowed Unsecured Claims and Interests under the Plan, to provide management services to certain other Reorganized Debtors, and to use certain funds and assets, to the extent authorized in the Plan, to satisfy certain obligations between and among such Reorganized Debtors.

C.    Class Voting Rights:  The voting rights of each Class are as follows.

1.    Classes Entitled to Vote:  The following Classes are Impaired and thus entitled to vote to accept or reject the Plan.

| Classes |
| --- |
| C-1 |
| C-2 |
| C-3 |
| C-4 |
| C-5 |

| Classes |
| --- |
| C-6 |
| C-7 |
| C-8 |
| C-9 |
| C-10 |
| D |
| E-1 |
| E-2 |

2.     <u>Presumed Acceptance of Plan</u>:  The following Classes are Unimpaired and deemed to accept the Plan or are Impaired but deemed to accept the Plan.  Therefore, such Classes are not entitled to vote to accept or reject the Plan and the vote of such Holders of Claims and Interests shall not be solicited.

| Classes |
| --- |
| A-1 |
| A-2 |
| A-3 |
| B |
| C-11 |
| C-12 |
| E-3 |

D.     <u>Acceptance or Rejection of the Plan</u>

1.     <u>Acceptance by Impaired Classes of Claims</u>:  Pursuant to section 1126(c) of the Bankruptcy Code and except as otherwise provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims has accepted the Plan if the Holders of at least two-thirds in dollar amount and more than one-half in number of the Allowed Claims in such Class actually voting have voted to accept the Plan.

2.     <u>Acceptance by Impaired Classes of Interests</u>:  Pursuant to section 1126(d) of the Bankruptcy Code and except as otherwise provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Interests has accepted the Plan if the Holders of at least two-thirds in amount of the Allowed Interests of such Class actually voting have voted to accept the Plan.

3.     <u>Tabulation of Votes</u>:  The Debtors will tabulate all votes on the Plan on a consolidated basis for the purpose of determining whether the Plan satisfies sections 1129(a)(8)

and (10) of the Bankruptcy Code.  All votes on account of Allowed Claims and Interests shall be counted as if Filed against a single consolidated Estate.

4.     Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code:  Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by an Impaired Class of Claims.  The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.

5.     Controversy Concerning Impairment:  If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

## ARTICLE IV.
## PROVISIONS FOR IMPLEMENTATION OF THE PLAN

A.     Substantive Consolidation:  The Plan shall serve as a motion by the Debtors seeking entry of a Bankruptcy Court order substantively consolidating all of the Estates into a single consolidated Estate for all purposes associated with Confirmation and Consummation.

If substantive consolidation of all of the Estates is ordered, then on and after the Effective Date, all assets and liabilities of the Debtors shall be treated as though they were merged into the Estate of Calpine for all purposes associated with Confirmation and Consummation, and all guarantees by any Debtor of the obligations of any other Debtor shall be eliminated so that any Claim and any guarantee thereof by any other Debtor, as well as any joint and several liability of any Debtor with respect to any other Debtor shall be treated as one collective obligation of the Debtors.  Substantive consolidation shall not affect the legal and organizational structure of the Reorganized Debtors or their separate corporate existences or any prepetition or postpetition guarantees, Liens, or security interests that are required to be maintained under the Bankruptcy Code, under the Plan, or, in connection with contracts or leases that were assumed or entered into during the Chapter 11 Cases.  Any alleged defaults under any applicable agreement with the Debtors, the Reorganized Debtors, or the Affiliates arising from substantive consolidation under the Plan shall be deemed cured as of the Effective Date.  Notwithstanding anything in the Plan or in the Confirmation Order to the contrary, the entry of the Confirmation Order ordering substantive consolidation of the Estates shall not have any effect upon the separate and distinct legal entities as they existed at the time of any prepetition transaction that is the subject of any litigation asserting claims for fraudulent conveyance; provided, however, that the foregoing provisions shall not serve to prejudice or compromise whatever rights, if any, Calpine or Reorganized Calpine, as applicable, may have to contend in any pending or future adversary proceeding that Calpine or Reorganized Calpine, as applicable, may prosecute claims for fraudulent conveyance arising from transfers made by one or more of its affiliates based on any theory or doctrine, including any federal, state, or common law alter-ego, veil-piercing, or any other theory or doctrine that would permit or require the disregard of corporate separateness, or facts as they existed at the time of the transaction in question.

44

B.    Sources of Consideration for Plan Distributions:  The Reorganized Debtors shall fund distributions under the Plan with Cash on hand, existing assets, the post-Confirmation borrowings described below, and the issuance of New Calpine Plan Securities.

1.    New Credit Facility:  On the Effective Date, the Reorganized Debtors shall enter into the New Credit Facility.  Confirmation shall be deemed approval of the New Credit Facility (including the transactions contemplated thereby, such as any supplementation or additional syndication of the New Credit Facility, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees, indemnities, and expenses provided for therein) and authorization for the Reorganized Debtors to enter into and execute the New Credit Facility documents and such other documents as the New Credit Facility Lenders may reasonably require to effectuate the treatment afforded to such lenders pursuant to the New Credit Facility, subject to such modifications as the Reorganized Debtors, with the consent of the Creditors' Committee as to material modifications, may deem to be reasonably necessary to consummate such New Credit Facility.    The Reorganized Debtors may use the New Credit Facility for any purpose permitted thereunder, including the funding of obligations under the Plan, such as the payment of Administrative Claims, and satisfaction of ongoing working capital needs.  To the extent doing so would violate the project financing agreements related to the Greenleaf Project and the Agnews Project, the Debtors shall not pledge any of the assets of O.L.S. Energy-Agnews, Inc., Calpine Greenleaf, Inc. and Calpine Greenleaf Holdings, Inc. to the New Credit Facility Lenders under the New Credit Facility, and O.L.S. Energy-Agnews, Inc., Calpine Greenleaf, Inc. and Calpine Greenleaf Holdings, Inc. shall not guarantee the Debtors' obligations to the New Credit Facility Lenders under the New Credit Facility.

2.    New Calpine Common Stock:  On the Effective Date, Reorganized Calpine shall issue New Calpine Common Stock (based upon the New Calpine Total Enterprise Value) for distribution as follows: (a) all New Calpine Common Stock to be issued under the Plan shall be distributed to the New Calpine Common Stock Pool For Creditors (after setting aside sufficient New Calpine Common Stock to fund the Management and Director Equity Incentive Plan); (b) after all Allowed Claims (excluding Subordinated Debt Securities Claims and Subordinated Equity Securities Claims) are satisfied in full, any remaining New Calpine Common Stock to be issued under the Plan shall be distributed to the New Calpine Common Stock Pool For Subordinated Debt Securities Claimants; and (c) after all Allowed Subordinated Debt Securities Claims are satisfied in full, any remaining New Calpine Common Stock to be issued under the Plan shall be cancelled.

3.    New Calpine Warrants:  On the Effective Date, Reorganized Calpine shall issue the New Calpine Warrants for distribution to Holders of Interests in Class E-1.

C.    Section 1145 Exemption:  Pursuant to section 1145 of the Bankruptcy Code, the offering, issuance, and distribution of any Securities contemplated by the Plan and any and all settlement agreements incorporated herein, including the New Calpine Plan Securities, shall be exempt from, among other things, the registration requirements of section 5 of the Securities Act and any other applicable law requiring registration prior to the offering, issuance, distribution, or sale of Securities.  In addition, under section 1145 of the Bankruptcy Code any Securities contemplated by the Plan and any and all settlement agreements incorporated therein, including the New

Calpine Plan Securities, will be freely tradable by the recipients thereof, subject to (i) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act, and compliance with any rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of such Securities or instruments; (ii) the restrictions, if any, on the transferability of such Securities and instruments; and (iii) applicable regulatory approval.

D.      Listing Rights:  Reorganized Calpine shall use reasonable efforts to list the New Calpine Common Stock on a national securities exchange or for quotation on a national automated interdealer quotation system on the Effective Date, but shall have no liability if it is unable to do so.    Entities receiving distributions of New Calpine Common Stock, by accepting such distributions, shall be deemed to have agreed to cooperate with the Reorganized Debtors' reasonable requests to assist them in their efforts to list the New Calpine Common Stock on a national securities exchange or quotation system.

E.      Restrictions on Resale of Securities to Protect Net Operating Losses:  The Reorganized Calpine Charter shall contain the restrictions on the transfer of New Calpine Common Stock in the same form and substance as those contained in the New Calpine Trading Restriction Term Sheet to minimize the likelihood of any potential adverse federal income tax consequences resulting from an ownership change (as defined in section 382 of the Internal Revenue Code) in Reorganized Calpine.

F.      Issuance and Distribution of the New Calpine Plan Securities:  The New Calpine Plan Securities, when issued or distributed as provided in the Plan, will be duly authorized, validly issued, and, if applicable, fully paid and nonassessable.  Each distribution and issuance referred to in ARTICLE III shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

G.      Corporate Existence:  Except as otherwise provided in the Plan, each Debtor shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other formation documents) are amended by the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be pursuant to the Plan and require no further action or approval.

H.      Vesting of Assets in the Reorganized Debtors:  Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated therein, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances (except for Liens, if any, granted to secure the New Credit Facility and Claims pursuant to the DIP Facility that by their terms survive termination of

the DIP Facility).  On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

I.     Cancellation of Debt and Equity Securities and Related Obligations:  On the Effective Date, except as otherwise specifically provided for in the Plan: (1) the Old Calpine Common Stock and any other Certificate, note, bond, indenture, purchase right, option, warrant, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Interest (except such Certificates, notes, other instruments or documents evidencing indebtedness or obligations of the Debtors that are Reinstated pursuant to the Plan), shall be cancelled solely as to the Debtors, and the Reorganized Debtors shall not have any continuing obligations thereunder and (2) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the Old Calpine Common Stock and any other Certificates, notes, bonds, indentures, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors (except such agreements or Certificates, notes or other instruments evidencing indebtedness or obligations of the Debtors that are specifically Reinstated pursuant to the Plan) shall be released and discharged; provided, however, that notwithstanding Confirmation, any such indenture or agreement that governs the rights of the Holder of a Claim or Interest shall continue in effect solely for purposes of: (w) allowing Holders to receive distributions under the Plan; (x) allowing a Servicer to make distributions on account of such Claims or Interests as provided in ARTICLE VII; (y) permitting such Servicer to maintain any rights and Liens it may have against property other than the Reorganized Debtors' property for fees, costs, and expenses pursuant to such indenture or other agreement; and (z) governing (i) the rights and obligations of non-Debtor parties to such agreements vis-à-vis each other, (ii) determination of the rights and obligations of non-Debtor parties with respect to the subordination provisions of any indenture in favor of the non-Debtor parties of any other indenture, including the calculation of such rights and obligations, and (iii) the reimbursement and indemnification obligations, if any, of the Debtors in favor of an indenture trustee that is party to the Intercreditor Subordination Dispute solely with respect to fees and expenses incurred, if any, by such indenture trustee after the Confirmation Date in connection with the Intercreditor Subordination Dispute, subject to the Debtors' or Reorganized Debtors', as applicable, and Creditors' Committee's rights to object to any such fees and expenses; provided, further, however, that the preceding proviso shall not affect the discharge of Claims or Interests pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan, or result in any expense or liability to the Reorganized Debtors not otherwise specifically provided for herein.  The Reorganized Debtors shall not have any obligations to any Servicer for any fees, costs, or expenses, except as expressly otherwise provided in the Plan.  Notwithstanding the foregoing, the indenture governing the First Lien Debt Claims and any related documents thereto governing the rights and obligations of the Debtors and non-Debtor parties with respect to the First Lien Debt Claims shall survive for purposes of the First Lien Makewhole Claim litigation, until such time as the First Lien Debt Claims have been Allowed by a Final Order and the obligations are satisfied in accordance with the terms of the Plan or the First Lien Debt Claims have been disallowed by Final Order.   Notwithstanding the foregoing, the indentures and the credit

agreement governing the Second Lien Debt Claims and any related documents thereto governing the rights and obligations of the Debtors and non-Debtor parties with respect to the Second Lien Debt Claims shall survive solely for purposes of permitting the Indenture Trustees for the Second Lien Debt Claims and the Administrative Agent to litigate the Disputed Second Lien Debt Claim, until such time as the Disputed Second Lien Debt Claim shall have been determined by a Final Order and all obligations in respect of the Disputed Second Lien Debt Claim are satisfied in accordance with the terms of the Plan.  Nothing in the Plan or Confirmation Order shall limit or otherwise affect the continuing effectiveness of the bonds, indentures, and other documents related to the KIAC And Nissequogue Leasehold Interests and the Hidalgo Leasehold Interest. Notwithstanding the foregoing, the notes, the indentures, and other related documents governing the 4.0% Convertible Senior Notes Due 2006, 4.75% Convertible Senior Notes Due 2023, 6.00% Contingent Convertible Notes Due 2014, 7.625% Senior Notes Due 2006, 7.75% Senior Notes Due 2009, 7.875% Senior Notes Due 2008, 8.5% Senior Notes Due 2011, 8.625% Senior Notes Due 2010, 8.75% Senior Notes Due 2007, 7.75% Contingent Convertible Notes Due 2015, and 10.5% Senior Notes Due 2006 shall survive for purposes of prosecuting or defending any matter, action or proceeding with respect to any and all rights and claims thereunder, including conversion right claims, any Makewhole Claims not previously resolved, any issues or claims with respect to the calculation of post-petition interest, or allowance and payment of indenture trustee fees and expenses (collectively, the "Bond Claims and Rights") until such time as the Bond Claims and Rights have been (1) Allowed by a Final Order and the obligations are satisfied in accordance with the terms of the Plan, (2) disallowed by Final Order, or (3) otherwise resolved; provided, however, the Debtors or Reorganized Debtors, as applicable, and the Creditors' Committee, reserve all their rights in any way related to the Bond Claims and Rights.

J.      Restructuring Transactions:  On the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtors may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including: (1) the execution and delivery of appropriate agreements or other documents of merger, consolidation, or reorganization containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of the Plan; (3) the filing of appropriate certificates of incorporation, merger, or consolidation with the appropriate governmental authorities pursuant to applicable law; (4) the Roll-Up Transactions; and (5) all other actions that the Reorganized Debtors determine are necessary or appropriate, including the making of filings or recordings in connection with the relevant Roll-Up Transactions.  The form of each Roll-Up Transaction shall be determined by the Reorganized Debtor that is party to such Roll-Up Transaction.  Implementation of the Roll-Up Transactions shall not affect any distributions, discharges, exculpations, releases, or injunctions set forth in the Plan.  Prior to the Effective Date, the Debtors shall have obtained the reasonable consent of the Creditors' Committee regarding their intentions with respect to the Roll-Up Transactions.

K.      Post-Confirmation Property Sales:  To the extent the Debtors or Reorganized Debtors, as applicable, sell any of their property prior to or including the date that is one year after Confirmation, the Debtors or Reorganized Debtors, as applicable, may elect to sell such property pursuant to sections 363, 1123, and 1146(a) of the Bankruptcy Code.

L.    Corporate Action:  Each of the matters provided for by the Plan involving the corporate structure of the Debtors or corporate or related actions to be taken by or required of the Reorganized Debtors shall, as of the Effective Date, be deemed to have occurred and be effective as provided in the Plan (except to the extent otherwise indicated), and shall be authorized, approved, and, to the extent taken prior to the Effective Date, ratified in all respects without any requirement of further action by Holders of Claims or Interests, directors of the Debtors, or any other Entity.  Without limiting the foregoing, such actions may include:  the adoption and filing of the Reorganized Calpine Charter and Reorganized Calpine Bylaws; the appointment of directors and officers for the Reorganized Debtors; the adoption, implementation, and amendment of the Management and Director Equity Incentive Plan; and consummation or implementation of the New Credit Facility.

M.    Certificate of Incorporation and Bylaws:  The certificates of incorporation and bylaws (or other formation documents relating to limited liability companies, limited partnerships, or other forms of Entity) of the Debtors (other than Calpine) shall be amended in a form reasonably acceptable to the Creditors' Committee as may be required to be consistent with the provisions of the Plan and the Bankruptcy Code.  The certificate of incorporation and bylaws of Calpine shall be amended as may be required to be consistent with the provisions of the Plan and the Bankruptcy Code, and the form and substance of the Reorganized Calpine Charter and Reorganized Calpine Bylaws shall be included in the Plan Supplement not less than fourteen days before the Voting Deadline.  The certificate of incorporation of Reorganized Calpine shall be amended to, among other things:  (1) authorize the issuance of the shares of New Calpine Common Stock; (2) authorize the issuance of the New Calpine Warrants; and (3) pursuant to and only to the extent required by section 1123(a)(6) of the Bankruptcy Code, include (a) a provision prohibiting the issuance of non-voting equity securities and (b) a provision setting forth an appropriate distribution of voting power among classes of equity securities possessing voting power, including, in the case of any class of equity securities having a preference over another class of equity securities with respect to dividends, adequate provisions for the election of directors representing such preferred class in the event of default in the payment of such dividends.  On or as soon as reasonably practicable after the Effective Date, to the extent required, each of the Reorganized Debtors (other than Reorganized Calpine) shall file new certificates of incorporation (or other formation documents relating to limited liability companies, limited partnerships, or other forms of Entity) in a form reasonably acceptable to the Creditors' Committee with the secretary (or equivalent state officer or Entity) of the state under which each such Reorganized Debtor is or is to be incorporated or organized.  On or as soon as reasonably practicable after the Effective Date, to the extent required, Reorganized Calpine shall file the Reorganized Calpine Charter with the secretary (or equivalent state officer or Entity) of the state under which Reorganized Calpine is or is to be incorporated or organized.  After the Effective Date, each Reorganized Debtor may amend and restate its new certificate of incorporation and other constituent documents as permitted by the relevant state corporate law.

N.    Effectuating Documents, Further Transactions:  On and after the Effective Date, the Reorganized Debtors, and the officers and members of the boards of directors thereof, are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the Securities issued pursuant to the Plan in the name of and on behalf of the

Reorganized Debtors, without the need for any approvals, authorizations, or consents except for those expressly required pursuant to the Plan.

O.     Exemption from Certain Transfer Taxes and Recording Fees:   Pursuant to section 1146(a) of the Bankruptcy Code, any transfer from a Debtor to a Reorganized Debtor or to any Entity pursuant to, in contemplation of, or in connection with the Plan or pursuant to:  (1) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors or the Reorganized Debtors; (2) the creation, modification, consolidation, or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (3) the making, assignment, or recording of any lease or sublease; or (4) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, FERC filing or recording fee, or other similar tax or governmental assessment, and the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

P.     Directors and Officers of Reorganized Calpine:   On the Effective Date, the term of the current members of the board of directors of Calpine shall expire, and the initial board of directors of Reorganized Calpine shall consist of the Persons selected in accordance with the Board Selection Term Sheet, a copy of which shall be included in the Plan Supplement.  In accordance with section 1129(a)(5) of the Bankruptcy Code, the identities and affiliations of any Person proposed to serve as an officer or director of Reorganized Calpine shall have been disclosed at or before the Confirmation Hearing or such earlier date as required by the Board Selection Term Sheet.  To the extent any Person proposed to serve as a board member or an officer of Reorganized Calpine is an Insider, the nature of any compensation for such Person shall have been disclosed at or before the Confirmation Hearing.  The classification and composition of the board of directors of Reorganized Calpine shall be consistent with the Reorganized Calpine Charter and the Reorganized Calpine Bylaws.  Each director or officer of Reorganized Calpine shall serve from and after the Effective Date pursuant to the terms of the Reorganized Calpine Charter, the Reorganized Calpine Bylaws, or other constituent documents, and applicable state corporation law.

Q.     Directors and Officers of Reorganized Debtors Other Than Calpine:   Unless otherwise provided in the Debtors' disclosure pursuant to section 1129(a)(5) of the Bankruptcy Code, the officers and directors of each of the Debtors other than Calpine shall continue to serve in their current capacities after the Effective Date.  The classification and composition of the boards of directors of the Reorganized Debtors other than Reorganized Calpine shall be consistent with their respective new certificates of incorporation and bylaws.  Each such director or officer shall serve from and after the Effective Date pursuant to the terms of such new certificate of incorporation, bylaws, other constituent documents, and applicable state corporation law.  In accordance with section 1129(a)(5) of the Bankruptcy Code, the identities and affiliations of any

Person proposed to serve as an officer or director of the Reorganized Debtors other than Reorganized Calpine shall have been disclosed at or before the Confirmation Hearing.

R.    Employee and Retiree Benefits:    Except with respect to any Rejected Employment Agreements, on and after the Effective Date, the Reorganized Debtors may: (1) honor, in the ordinary course of business, any contracts, agreements, policies, programs, and plans for, among other things, compensation (including equity based and bonus compensation), health care benefits, disability benefits, deferred compensation benefits, travel benefits, savings, severance benefits, retirement benefits, welfare benefits, workers' compensation insurance, and accidental death and dismemberment insurance for the directors, officers, and employees of any of the Debtors who served in such capacity at any time; (2) distribute or reallocate any unused designated employee success fee and bonus funds related to Confirmation and Consummation in the ordinary course of their business; and (3) honor, in the ordinary course of business, Claims of employees employed as of the Effective Date for accrued vacation time arising prior to the Petition Date; provided, however, that the Debtors' or Reorganized Debtors' performance of any employment agreement that is not a Rejected Employment Agreement will not entitle any Person to any benefit or alleged entitlement under any policy, program, or plan that has expired or been terminated before the Effective Date, or restore, reinstate, or revive any such benefit or alleged entitlement under any such policy, program, or plan. Nothing in the Plan shall limit, diminish, or otherwise alter the Reorganized Debtors' defenses, claims, Causes of Action, or other rights with respect to any such contracts, agreements, policies, programs, and plans. Notwithstanding the foregoing, pursuant to section 1129(a)(13) of the Bankruptcy Code, on and after the Effective Date, all retiree benefits (as that term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

S.    Management and Director Equity Incentive Plan:    The Reorganized Debtors shall implement the Management and Director Equity Incentive Plan, which shall be deemed effective as of the Effective Date. The terms of the Management and Director Equity Incentive Plan shall be set forth in the Plan Supplement and provide for aggregate grants of New Calpine Common Stock to certain management, employees, and directors of certain of the Reorganized Debtors of between 2% to 3% of the New Calpine Common Stock (inclusive of initial grants and reserves for future grants) to be issued under the Plan. The compensation committee of the board of directors of Calpine will determine in advance of the Voting Deadline the terms and conditions of the initial grants and the recipients thereof (provided that the Creditors' Committee's consent, which shall not be unreasonably withheld, shall be obtained in connection with the terms and conditions of any initial grants and the recipients thereof). The Debtors will disclose in an exhibit to the Plan Supplement on or before the Plan Supplement Filing Deadline the terms and conditions of the initial grants, the amount of the initial grant for each Named Executive Officer position, and the aggregate amount of the initial grants for all other recipients. With respect to Robert P. May, as Chief Executive Officer of Reorganized Calpine, if Mr. May has not entered into a new employment agreement with Reorganized Calpine within six months after the Effective Date, the initial grant under the Management and Director Equity Incentive Plan to Mr. May shall be null and void and Mr. May shall not be entitled to any additional compensation on account thereof; provided, however, that if there is a change in control in Reorganized Calpine while Mr. May is employed as the Chief Executive Officer within six months after the Effective Date, the initial grant under the Management and Director Equity Incentive Plan to Mr. May shall vest and remain in full force and effect regardless of whether Mr. May entered into a new

employment agreement with Reorganized Calpine within six months after the Effective Date. All other terms and conditions of the Management and Director Equity Incentive Plan shall be determined by the board of directors of Reorganized Calpine. For purposes hereof, "change in control" shall mean the sale of all or substantially all of the assets of the Reorganized Debtors or the acquisition by one or more related entities of 50.1% or more of the New Calpine Common Stock. The board of directors of Reorganized Calpine shall determine the permanent long-term Chief Executive Officer of Reorganized Calpine and shall also discharge its other fiduciary duties in good faith and in accordance with applicable laws and regulations.

T.    Creation of Professional Fee Escrow Account:  On the Effective Date, the Reorganized Debtors shall establish the Professional Fee Escrow Account and reserve an amount necessary to pay all of the Accrued Professional Compensation.

U.    Preservation of Rights of Action:  In accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action against them. The Debtors or Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors reserve and shall retain the foregoing Causes of Action notwithstanding the rejection or repudiation of any executory contract or unexpired lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors, as the case may be. The applicable Reorganized Debtor, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court, except with respect to any actions pending as of the Effective Date to which the Creditors' Committee is a party in which case all of the foregoing rights shall be as they were immediately before the Effective Date.

V.    Rights of Action Against Pipelines:  To the extent the Debtors have any Causes of Action or claims against Gas Transmission Northwest Corporation or Portland Natural Gas Transmission System arising under the GTN/PNGTS Contracts or under the Bankruptcy Code or other applicable bankruptcy law as of the date of the *Stipulation and Agreed Order Between and Among the Debtors, Portland Natural Gas Transmission System, Gas Transmission Northwest Corporation, TransCanada Pipelines Limited, and NOVA Gas Transmission Resolving and Allowing Claims and Terminating Agreements*, such Causes of Action or claims are hereby expressly waived, relinquished, and released.  To the extent the Debtors have any Causes of Action or claims against NOVA Gas Transmission Ltd. or TransCanada PipeLines Limited arising under the TransCanada/NOVA Contracts or under the Bankruptcy Code or other applicable bankruptcy law as of the date of this Stipulation, such Causes of Action or claims are hereby expressly waived, relinquished, and released.

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.    Assumption and Rejection of Executory Contracts and Unexpired Leases:  Except as otherwise provided in the Plan, the Debtors' executory contracts or unexpired leases not assumed or rejected pursuant to a Bankruptcy Court order prior to the Effective Date shall be deemed rejected pursuant to sections 365 and 1123 of the Bankruptcy Code, except for those executory contracts or unexpired leases: (1) listed on the schedule of "Assumed Executory Contracts and Unexpired Leases" in the Plan Supplement; (2) listed on the schedule of "Rejected Executory Contracts and Unexpired Leases" in the Plan Supplement; (3) that are Intercompany Contracts, in which case such Intercompany Contracts are deemed automatically assumed by the applicable Debtor as of the Effective Date, unless such Intercompany Contract previously was rejected by the Debtors pursuant to a Bankruptcy Court order, is the subject of a motion to reject pending on the Effective Date, or is listed on the schedule of "Rejected Executory Contracts and Unexpired Leases" in the Plan Supplement; (4) that are the subject of a motion to assume or reject pending on the Effective Date (in which case such assumption or rejection and the effective date thereof shall remain subject to a Bankruptcy Court order); (5) that are subject to a motion to reject with a requested effective date of rejection after the Effective Date; (6) that are Rosetta Contracts whose treatment under the Plan is provided for in ARTICLE V.A.3; (7) that are Oil and Gas Contracts whose treatment under the Plan is provided for in ARTICLE V.A.4; or (8) that are otherwise expressly assumed or rejected pursuant to the Plan (including ARTICLE V as set forth below). Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the assumptions or rejections of such executory contracts or unexpired leases as set forth in the Plan, all pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Unless otherwise indicated, all assumptions or rejections of such executory contracts and unexpired leases in the Plan are effective as of the Effective Date.  Each such executory contract and unexpired lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party prior to the Effective Date shall revest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by such order.  Notwithstanding anything to the contrary in the Plan, the Debtors or Reorganized Debtors, as applicable, reserve the right to alter, amend, modify, or supplement the schedules of executory contracts or unexpired leases identified in ARTICLE V and in the Plan Supplement at any time through and including the later of fifteen days after the Effective Date or such other date as set forth in ARTICLE V.C; provided, however, that this sentence shall not apply to: (1)

the executory contracts or unexpired leases with: (a) Hess Corporation (formerly known as Amerada Hess Corporation); (b) the Industrial Development Corporation of the City of Edinburg, Texas; (c) BP Amoco Chemical Co. and BP Energy Company; (d) Enbridge Pipelines (Bamagas Intrastate) L.L.C. f/k/a BAMAGAS Company; (e) Spectra Energy Corporation, Texas Eastern Transmission LP (f/k/a Texas Eastern Transmission Corporation), Egan Hub Storage LLC, Moss Bluff Hub Partners LP, Gulfstream Natural Gas System, and Maritimes & Northeast US; (f) Energy Transfer Fuel, L.P., ETC Marketing, Inc., and Houston Pipeline Co. LP.; or (g) The Dow Chemical Company and its affiliates, or (2) Intercompany Contracts relating to the Deer Park Energy Center LP, a non-Debtor Affiliate.

1.      <u>Indemnification Obligations</u>:  Each Indemnification Obligation shall be assumed by the applicable Debtor effective as of the Effective Date, pursuant to sections 365 and 1123 of the Bankruptcy Code, to the extent such Indemnification Obligation is executory, unless such Indemnification Obligation previously was rejected by the Debtors pursuant to a Bankruptcy Court order, is the subject of a motion to reject pending on the Effective Date, or is listed on the schedule of "Rejected Indemnification Obligations for Former Employees" in the Plan Supplement.  Notwithstanding the foregoing, an Indemnification Obligation to any Person who as of the Petition Date no longer was a director, officer, or employee of a Debtor, shall terminate and be discharged pursuant to section 502(e) of the Bankruptcy Code or otherwise, as of the Effective Date; <u>provided</u>, <u>however</u>, that the Reorganized Debtors reserve the right to honor or reaffirm Indemnification Obligations other than those terminated by a prior or subsequent order of the Bankruptcy Court, whether or not executory, in which case such honoring or reaffirmation shall be in complete satisfaction, discharge, and release of any Claim on account of such Indemnification Obligation.  Each Indemnification Obligation that is assumed, deemed assumed, honored, or reaffirmed shall remain in full force and effect, shall not be modified, reduced, discharged, impaired, or otherwise affected in any way, and shall survive Unimpaired and unaffected, irrespective of when such obligation arose.

2.      <u>Treatment of FERC Jurisdictional Contracts</u>:  Each FERC Jurisdictional Contract shall be deemed automatically assumed as of the Effective Date pursuant to section 365 and 1123 of the Bankruptcy Code, unless such FERC Jurisdictional Contract was: (a) previously terminated by mutual agreement by the Debtors and the counterparty or counterparties to such FERC Jurisdictional Contract; (b) previously the subject of a written notice from the Debtors to the counterparty or counterparties stating that such FERC Jurisdictional Contract was repudiated; or (c) subject of a motion to reject pending as of the Effective Date ("Rejection Motion").  The GTN/PNGTS Contracts shall be terminated by mutual agreement according to the terms of the Stipulation and Agreed Order Between and Among the Debtors, Portland Natural Gas Transmission System, Gas Transmission Northwest Corporation, Transcanada Pipelines Limited, and Nova Gas Transmission Resolving and Allowing Claims and Terminating Agreements.

3.      <u>Treatment of Rosetta Contracts</u>:  Notwithstanding any language herein to the contrary, by stipulation and agreement of the Debtors and Rosetta incorporated herein, the deadline to assume or reject the Rosetta Contracts is and shall be extended to fifteen days following entry of a Final Order in the Rosetta Adversary Proceeding.  All rights and duties of the Debtors, Reorganized Debtors, and Rosetta under the Bankruptcy Code with respect to assumption or rejection of the Rosetta Contracts, including the right to argue that certain or all of the Rosetta Contracts are interrelated and form one integrated agreement, rights of offset or cure,

or right to election under section 365(i) of the Bankruptcy Code, are expressly reserved as they relate to the Rosetta Contracts. In the event that Rosetta prevails in the Adversary Proceeding, the Debtors or Reorganized Debtors, as applicable, shall, within twenty days of the entry of final, non-appealable judgment in favor of Rosetta, File a motion to assume the Rosetta Contracts and shall include therein a statement of the cure amount (if any) they propose to pay in respect of the assumption of the Rosetta Contracts. In the event Rosetta disputes such cure amounts, the proper cure amounts will be determined by the Bankruptcy Court and any cure amounts found to be due shall be paid by the Reorganized Debtors to Rosetta in Cash and, as a result, the Debtors shall not be required to reserve any amounts on account of such cure Claims.

4.     Treatment of Oil and Gas Contracts: Notwithstanding any language herein to the contrary, by stipulation and agreement of the Debtors and Petersen incorporated herein, the deadline to assume or reject the Oil and Gas Contracts is and shall be extended to fifteen days following entry of a Final Order in the Rosetta Adversary Proceeding. All rights and duties of the Debtors, Reorganized Debtors, Petersen, and any other applicable counterparty under the Bankruptcy Code with respect to assumption or rejection of the Oil and Gas Contracts, including the right to argue that certain or all of the Oil and Gas Contracts are interrelated and form one integrated agreement, rights of offset or cure, or right to election under section 365(i) of the Bankruptcy Code, are expressly reserved as they relate to the Oil and Gas Contracts. In the event that Rosetta prevails in the Adversary Proceeding, the Debtors or Reorganized Debtors, as applicable, shall, within twenty days of the entry of final, non-appealable judgment in favor of Rosetta, File a motion to assume the Oil and Gas Contracts, to the extent they have not already been assumed, and shall include therein a statement of the cure amount (if any) they propose to pay in respect of the assumption of the Oil and Gas Contracts. In the event Petersen or other applicable counterparty disputes such cure amounts, the proper cure amounts will be determined by the Bankruptcy Court and any cure amounts found to be due shall be paid by the Reorganized Debtors to Petersen, or other counterparty, as applicable, in Cash and, as a result, the Debtors shall not be required to reserve any amounts on account of such cure Claims. Nothing contained herein shall be construed to prevent the Debtors from deciding to assume or reject the Oil and Gas Contracts prior to the outside deadline established above or Petersen from seeking an earlier determination for cause shown.

5.     Treatment of California Energy Commission Agreements:

a.     Rejected California Energy Commission Agreements: Notwithstanding any language herein to the contrary, the Debtors hereby reject the Rejected California Energy Commission Agreements. California Energy Commission stipulates that there are zero dollars in damages on account of the rejection of these contracts. California Energy Commission will terminate these agreements pursuant to their terms or as otherwise required by state law and no expenses shall be reimbursed on account of any of these agreements.

b.     Assumed July 14 California Energy Commission Agreement: Notwithstanding any language herein to the contrary, the Debtors hereby assume the Assumed July 14 California Energy Commission Agreement with a zero dollar cure. Reorganized Calpine shall complete performance of this grant agreement by completing a final report before the end date of the grant agreement on March 31, 2008.

c.    Assumed July 1 California Energy Commission Agreement: Notwithstanding any language herein to the contrary, the Debtors hereby assume the Assumed July 1 California Energy Commission Agreement.    California Energy Commission agrees to reimburse Reorganized Calpine for its expenses that are eligible to be reimbursed under the terms of this agreement, up to a ceiling amount of $152,000. Reorganized Calpine agrees to complete a final report, detailing the work performed and tasks completed and agrees that it will determine the actual amount of reimbursable expenses incurred and reimbursable, but not yet invoiced to California Energy Commission.    The amount which California Energy Commission agrees to pay Reorganized Calpine pursuant to this agreement will be the actual accounting of the invoices that will be billed to California Energy Commission, not the agreement ceiling amount of $219,000.    Reorganized Calpine agrees to invoice California Energy Commission by March 31, 2008, when the grant terminates.  The Debtors or Reorganized Debtors, as applicable, and California Energy Commission agree that the Assumed July 21 California Energy Commission Agreement shall terminate pursuant to its own terms on March 31, 2008.

6.    Treatment of Ace Agreements:  Notwithstanding anything to the contrary in the Plan or the Confirmation Order, all of the pre- and postpetition agreements between the Debtors and members of the ACE group of companies will remain in full force and effect, and will be performed according to their terms by the Reorganized Debtors and the ACE companies.  The Debtors and the ACE companies reserve their respective rights under the insurance and surety agreements and applicable non-bankruptcy law and nothing in the Plan or Confirmation Order will alter, amend, or modify such rights.

7.    Treatment of the Hess Agreement:  On the Effective Date, the Hess Agreement shall be assumed, and Cure in connection with such assumption shall be made as follows: (a) Claim No. 3781 shall be a Class C-8 Allowed Claim in the amount of $9,391,977.90; (b) Claim No. 3778 shall be a Class C-8 Allowed Claim in the amount of $249,999; (c) Hess shall be entitled to an additional Class C-8 Allowed Claim in the amount of $100,000 for attorney's fees and costs; and (d) Hess shall be entitled to an Allowed Administrative Claim under section 503(b)(9) of the Bankruptcy Code in the amount of $3,814,317.06.  The Class C-8 Allowed Claims and the Allowed Administrative Claim shall include postpetition interest at the rate set forth in Section 6.5 of the Hess Agreement.  The Allowed C-8 Claims and the Allowed Administrative Claim shall be paid in full with Cash, which may include proceeds generated from the sale of New Calpine Common Stock from the New Calpine Stock Reserve pursuant to ARTICLE VII.D.9.  The Allowed Administrative Claim shall be paid within ten (10) days of the Effective Date.  The following shall be deemed withdrawn with prejudice as of the Effective Date: (a) the *Objection of Hess Corporation to Debtors' Request to Reject Agreement Between KIAC Partners and Hess Corporation and Limited Objection to Confirmation of Plan with Respect to KIAC Partners Pursuant to Section 1129(a)(3) of the Bankruptcy Code* [Docket No. 7109], (b) the Hess Adversary Proceeding, and (c) Claim No. 3782.

B.    Cure of Defaults for Assumed Executory Contracts and Unexpired Leases:  With respect to each of the Debtors' executory contracts or unexpired leases listed on the schedule of "Assumed Executory Contracts and Unexpired Leases," the Debtors shall have designated a proposed Cure, and the assumption of such executory contract or unexpired lease may be

conditioned upon the disposition of all issues with respect to Cure. Any provisions or terms of the Debtors' executory contracts or unexpired leases to be assumed pursuant to the Plan that are, or may be, alleged to be in default, shall be satisfied solely by Cure, or by an agreed-upon waiver of Cure. Except with respect to executory contracts and unexpired leases in which the Debtors and the applicable counterparties have stipulated in writing to payment of Cure, all requests for payment of Cure that differ from the amounts proposed by the Debtors must be Filed with the Claims and Solicitation Agent on or before the Cure Bar Date. Any request for payment of Cure that is not timely Filed shall be disallowed automatically and forever barred from assertion and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or further notice to or action, order, or approval of the Bankruptcy Court, and any Claim for Cure shall be deemed fully satisfied, released, and discharged upon payment by the Debtors of the amounts listed on the Debtors' proposed Cure schedule, notwithstanding anything included in the Schedules or in any Proof of Claim to the contrary; provided, however, that nothing shall prevent the Reorganized Debtors from paying any Cure despite the failure of the relevant counterparty to File such request for payment of such Cure. The Reorganized Debtors also may settle any Cure without further notice to or action, order, or approval of the Bankruptcy Court.

If the Debtors or Reorganized Debtors, as applicable, object to any Cure or any other matter related to assumption, the Bankruptcy Court shall determine the Allowed amount of such Cure and any related issues. If there is a dispute regarding such Cure, the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption, then Cure shall occur as soon as reasonably practicable after entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment), or as may be agreed upon by the Debtors, in consultation with the Creditors' Committee, or Reorganized Debtors, as applicable, and the counterparty to the executory contract or unexpired lease. Any counterparty to an executory contract and unexpired lease that fails to object timely to the proposed assumption of any executory contract or unexpired lease will be deemed to have consented to such assumption. The Debtors or Reorganized Debtors, as applicable, reserve the right either to reject or nullify the assumption of any executory contract or unexpired lease no later than thirty days after a Final Order determining the Cure or any request for adequate assurance of future performance required to assume such executory contract or unexpired lease; provided, however, that this sentence shall not apply to The Dow Chemical Company and its affiliates.

Assumption of any executory contract or unexpired lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed executory contract or unexpired lease at any time prior to the effective date of assumption. Any Proofs of Claim filed with respect to an executory contract or unexpired lease that has been assumed shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.

C.    <u>Executory Contracts and Unexpired Leases Relating to Projects to be Sold or Surrendered</u>:  Each of the Debtors' executory contracts and unexpired leases listed on the

schedule of "Conditionally Assumed Executory Contracts and Unexpired Leases" in the Plan Supplement shall be deemed assumed by the contracting Debtors or Reorganized Debtor, as applicable, on a conditional basis pursuant to sections 365 and 1123 of the Bankruptcy Code, provided that the Debtors, with the reasonable consent of the Creditors' Committee, or Reorganized Debtors, as applicable, may alter the treatment of such listed executory contracts and unexpired leases through the later of a date that is sixty days after the Effective Date or such other date as set forth in ARTICLE V.A, at which time the executory contracts and unexpired leases remaining on such list are unconditionally assumed so that the Cure provisions of ARTICLE V.B shall apply, and the executory contracts and unexpired leases no longer remaining on such list are unconditionally rejected or repudiated all pursuant to sections 365 and 1123 of the Bankruptcy Code or otherwise.

D.    Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases: Rejection or repudiation of any executory contract or unexpired lease pursuant to the Plan or otherwise shall not constitute a termination of pre-existing obligations owed to the Debtors under such contracts or leases.  In particular, notwithstanding any nonbankruptcy law to the contrary, the Reorganized Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased by the contracting Debtors or Reorganized Debtors, as applicable, from counterparties to rejected or repudiated executory contracts.

E.    Claims Based on Rejection or Repudiation of Executory Contracts and Unexpired Leases:  Unless otherwise provided by a Bankruptcy Court order, any Proofs of Claim asserting Claims arising from the rejection or repudiation of the Debtors' executory contracts and unexpired leases pursuant to the Plan or otherwise must be Filed with the Claims and Solicitation Agent no later than thirty days after the later of the Effective Date or the effective date of rejection or repudiation.  Any Proofs of Claim arising from the rejection or repudiation of the Debtors' executory contracts or unexpired leases that are not timely Filed shall be disallowed automatically, forever barred from assertion, and shall not be enforceable against any Reorganized Debtor without the need for any objection by the Reorganized Debtors or further notice to or action, order, or approval of the Bankruptcy Court, and any Claim arising out of the rejection or repudiation of the executory contract or unexpired lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules or a Proof of Claim to the contrary.  All Allowed Claims arising from the rejection or repudiation of the Debtors' executory contracts and unexpired leases shall be classified as Rejection Damages Claims and shall be treated in accordance with ARTICLE III.B.11.

F.    Intercompany Contracts, Contracts, and Leases Entered Into After the Petition Date: Intercompany Contracts, contracts, and leases entered into after the Petition Date by any Debtor, and any executory contracts and unexpired leases assumed by any Debtor, may be performed by the applicable Reorganized Debtor in the ordinary course of business.  For the avoidance of doubt, if approved by an order of the Bankruptcy Court, the transactions contemplated by that certain *Motion For Entry Of An Order Pursuant To Sections 105, 363 And 365 Of The Bankruptcy Code And Bankruptcy Rule 9019 Authorizing And Approving (I) Entry Into Settlement Agreement With Lease Financing Parties Related To Pasadena Cogeneration L.P., (II) Assumption Of Certain Pasadena Facility Transaction Documents, (III) Amendment Of Certain Pasadena Facility Transaction Documents And (IV) The Post-Petition Execution Of*

*Certain Agreements Related To The Pasadena Facility*, filed on November 21, 2007, [Docket No. 6669], shall be binding upon the applicable Reorganized Debtors and the counterparties to such transactions, notwithstanding anything contained in the Plan or the Confirmation Order to the contrary.  Notwithstanding anything in the Plan, the Plan Supplement, or the Confirmation Order to the contrary, with respect to Merrill Lynch Commodities, Inc., to the extent that the Stipulation and Order entered by the Bankruptcy Court on or about June 30, 2006 (the "Merrill Lynch Stipulation") [Docket No. 2099] is inconsistent with the Plan, the Plan Supplement, or Confirmation Order, the Merrill Lynch Stipulation shall govern.  Notwithstanding anything in the Plan to the contrary, the Plan shall not modify or alter any executory contract or unexpired lease relating to the Greenleaf Project or the Agnews Project assumed pursuant to a Bankruptcy Court order prior to the Effective Date.

G.      <u>Guarantees Issued or Reinstated After the Petition Date</u>:  Those guarantee obligations of any Debtor listed in the Plan Supplement shall be deemed Reinstated on the Effective Date, and such obligations, as well as any other guarantee obligations of any Debtor incurred after the Petition Date, shall be performed by the applicable Reorganized Debtor in the ordinary course of business pursuant to the terms thereof.

H.      <u>Modification of Executory Contracts and Unexpired Leases Containing Equity Ownership Restrictions</u>:  All executory contracts and unexpired leases to be assumed, or conditionally assumed, under the Plan pursuant to sections 365 and 1123 of the Bankruptcy Code shall be deemed so assumed, or so conditionally assumed, without giving effect to any provisions contained in such executory contracts or unexpired leases restricting the change in control or ownership interest composition of any or all of the Debtors, and upon the Effective Date (1) any such restrictions shall be deemed of no further force and effect and (2) any breaches that may arise thereunder as a result of Confirmation or Consummation shall be deemed waived by the applicable non-Debtor counterparty.

I.      <u>Modifications, Amendments, Supplements, Restatements, or Other Agreements</u>:  Unless otherwise provided in the Plan, each executory contract or unexpired lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such executory contract or unexpired lease, and all executory contracts and unexpired leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition executory contracts and unexpired leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the executory contract or unexpired lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

J.      <u>Reservation of Rights</u>:  Neither the exclusion nor inclusion of any contract or lease in the Plan Supplement, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an executory contract or unexpired lease or that any Reorganized Debtor has any liability thereunder.  Neither the exclusion nor inclusion of any contract or lease in the Plan Supplement, any failure of the Hidalgo Indenture Trustee to assert or

pursue objections to the Plan or object to any relief sought by the Debtors in the Chapter 11 Cases, nor anything contained in the Plan, shall constitute an admission by the Hidalgo Indenture Trustee that the Hidalgo Lease is in fact an executory contract or unexpired lease (rather than a financing transaction).  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or Reorganized Debtors, as applicable, shall have thirty days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.  Confirmation shall have no preclusive effect in any case or proceeding other than the Chapter 11 Cases with respect to the issue of whether the Hidalgo Lease is an unexpired lease or executory contract (rather than a secured financing).  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or Reorganized Debtors, as applicable, shall have thirty days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

K.    Nonoccurrence of Effective Date:  In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any consensual request to extend the deadline for assuming or rejecting unexpired leases pursuant to section 365(d)(4) of the Bankruptcy Code.

## ARTICLE VI.
## PROCEDURES FOR RESOLVING DISPUTED CLAIMS AND INTERESTS

A.    Allowance of Claims and Interests:  After the Effective Date, each Reorganized Debtor shall have and retain any and all rights and defenses such Debtor had with respect to any Claim or Interest immediately prior to the Effective Date, including the Causes of Action referenced in ARTICLE IV.U.

B.    Claims and Interests Administration Responsibilities:  Except as otherwise specifically provided in the Plan, after the Effective Date, the Reorganized Debtors shall have the sole authority: (1) to File, withdraw, or litigate to judgment, objections to Claims or Interests; (2) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.

C.    Estimation of Claims and Interests:  Before or after the Effective Date, the Debtors or Reorganized Debtors, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Disputed Claim or Interest that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim or Interest, including during the litigation of any objection to any Claim or Interest or during the appeal relating to such objection.  Notwithstanding any provision otherwise in the Plan, a Claim or Interest that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.  In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim or Interest, that estimated amount shall

constitute a maximum limitation on such Claim or Interest for all purposes under the Plan (including for purposes of distributions), and the relevant Reorganized Debtor may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim or Interest.

D.      Adjustment to Claims and Interests Without Objection:  Any Claim or Interest that has been paid or satisfied, or any Claim or Interest that has been amended or superseded, may be adjusted or expunged on the Claims Register by the Reorganized Debtors without a claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.  Beginning on the end of the first full calendar quarter that is at least ninety days after the Effective Date, the Reorganized Debtors shall publish every calendar quarter a list of all Claims or Interests that have been paid, satisfied, amended, or superseded during such prior calendar quarter.

E.      Time to File Objections to Claims:  Any objections to Claims shall be Filed on or before the later of (1) the date that is one year after the Effective Date and (2) such date as may be fixed by the Bankruptcy Court, after notice and a hearing, whether fixed before or after the date that is one year after the Effective Date.

F.      Disallowance of Claims or Interests:  Any Claims or Interests held by Entities from which property is recoverable under section 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims and Interests may not receive any distributions on account of such Claims and Interests until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Reorganized Debtors.  All Claims Filed on account of an Indemnification Obligation to a director, officer, or employee shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent such Indemnification Obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order, or approval of the Bankruptcy Court.  All Claims Filed on account of a guarantee Reinstated pursuant to ARTICLE V.G shall be deemed satisfied and expunged from the Claims Register, without any further notice to or action, order, or approval of the Bankruptcy Court.  All Claims Filed on account of an employee benefit referenced in ARTICLE IV.R shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent the Reorganized Debtors elect to honor such employee benefit, without any further notice to or action, order, or approval of the Bankruptcy Court.

**EXCEPT AS PROVIDED HEREIN OR OTHERWISE AGREED, ANY AND ALL PROOFS OF CLAIM (INCLUDING SUBORDINATED DEBT AND EQUITY SECURITIES CLAIMS) FILED AFTER THE BAR DATE SHALL BE DEEMED DISALLOWED AND EXPUNGED AS OF THE EFFECTIVE DATE WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL OF THE BANKRUPTCY COURT, AND HOLDERS OF SUCH CLAIMS MAY NOT RECEIVE ANY DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS, UNLESS ON OR BEFORE THE CONFIRMATION HEARING SUCH LATE CLAIM HAS BEEN DEEMED**

TIMELY FILED BY A BANKRUPTCY COURT ORDER; <u>**PROVIDED**</u>, <u>**HOWEVER**</u>, **THAT NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED HEREIN, THE FOREGOING SENTENCE SHALL NOT APPLY TO ANY CLAIMS, CLAIM AMENDMENTS, OR CLAIM SUPPLEMENTS THAT HAVE BEEN FILED OR ALLEGEDLY WERE FILED AFTER THE BAR DATE ON BEHALF OF HOLDERS OF THE (1) 4.75% CONVERTIBLE SENIOR NOTES DUE 2023, (2) 6.00% CONTINGENT CONVERTIBLE NOTES DUE 2014, AND (3) 7.75% CONTINGENT CONVERTIBLE NOTES DUE 2015, TO THE EXTENT SUCH CLAIMS, CLAIM AMENDMENTS, OR CLAIM SUPPLEMENTS ARE DETERMINED BY FINAL ORDER TO BE ALLOWED CLAIMS, WHICH DETERMINATION SHALL BE MADE WITHOUT REFERENCE TO THE FOREGOING SENTENCE;** <u>**PROVIDED**</u> <u>**FURTHER**</u>, <u>**HOWEVER**</u>, **THAT NOTHING IN THIS SENTENCE OR THE PLAN SHALL IN ANY WAY BE CONSTRUED TO ALLOW OR DISALLOW THE CLAIMS, CLAIM SUPPLEMENTS, OR CLAIM AMENDMENTS THAT HAVE BEEN FILED OR ALLEGEDLY WERE FILED AFTER THE BAR DATE ON BEHALF OF HOLDERS OF THE (1) 4.75% CONVERTIBLE SENIOR NOTES DUE 2023, (2) 6.00% CONTINGENT CONVERTIBLE NOTES DUE 2014 AND (3) 7.75% CONTINGENT CONVERTIBLE NOTES DUE 2015, THAT HAVE BEEN DISALLOWED PURSUANT TO THE BANKRUPTCY COURT'S** *ORDER GRANTING DEBTORS' LIMITED OBJECTION TO CONVERTIBLE NOTEHOLDERS CLAIM NOS. 2404, 2821, 2823, 6247, 6249, 6280, 6299 AND 6300* **[DOCKET NO. 5595], ENTERED ON AUGUST 10, 2007, WHICH ORDER IS CURRENTLY THE SUBJECT OF AN APPEAL;** <u>**PROVIDED**</u> <u>**FURTHER**</u>, <u>**HOWEVER**</u>, **THAT NOTHING IN THIS SENTENCE SHALL MODIFY ANY OTHER PROVISION OF THE PLAN RELATING TO THE NEW CALPINE STOCK RESERVE AND ESTIMATION OF CLAIMS;** <u>**PROVIDED**</u> <u>**FURTHER**</u>, <u>**HOWEVER**</u>, **THAT THE FOREGOING SHALL NOT PREJUDICE ROSETTA'S RIGHT, IF ANY, TO FILE PROOFS OF CLAIM IN ACCORDANCE WITH SECTION 502(h) OF THE BANKRUPTCY CODE OR OTHERWISE UPON THE CONCLUSION OF THE ROSETTA ADVERSARY PROCEEDING NOR THE DEBTORS' OR REORGANIZED DEBTORS', AS APPLICABLE, RIGHTS TO OBJECT ON ANY GROUNDS TO ANY SUCH PROOFS OF CLAIM FILED BY ROSETTA.  NOTWITHSTANDING THE FOREGOING, THE SOUTH POINT JOINT VENTURE CLAIMS SHALL BE DEEMED TIMELY FILED;** <u>**PROVIDED**</u>, <u>**HOWEVER**</u>, **THAT (1) THE DEBTORS OR REORGANIZED DEBTORS, AS APPLICABLE, RESERVE THEIR RIGHTS TO OBJECT TO THE SOUTH POINT JOINT VENTURE CLAIMS ON ANY GROUNDS OTHER THAN TIMELINESS AND (2) THE ALLOWED AMOUNT OF THE SOUTH POINT JOINT VENTURE CLAIMS, IF ANY, SHALL BE CAPPED AT THE LESSER OF $750,000 OR 80% OF THE FINAL TAX LIABILITY OF THE SOUTH POINT JOINT VENTURE, AS EMBODIED IN A FINAL, NON-APPEALABLE ORDER OR ADMINISTRATIVE DETERMINATION, OR A SETTLEMENT BETWEEN THE SOUTH POINT JOINT VENTURE AND THE ARIZONA DEPARTMENT OF REVENUE.**

G.    <u>Offer of Judgment</u>:  The Reorganized Debtors are authorized to serve upon a Holder of a Claim an offer to allow judgment to be taken on account of such Claim, and, pursuant to Bankruptcy Rules 7068 and 9014, Federal Rule of Civil Procedure 68 shall apply to such offer of judgment.  To the extent the Holder of a Claim or Interest must pay the costs incurred by the

Reorganized Debtors after the making of such offer, the Reorganized Debtors are entitled to setoff such amounts against the amount of any distribution to be paid to such Holder without any further notice to or action, order, or approval of the Bankruptcy Court.

H.     Amendments to Claims:  On or after the Effective Date, except as provided in ARTICLE V.E, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Reorganized Debtors, and any such new or amended Claim Filed shall be deemed disallowed in full and expunged without any further action.

# ARTICLE VII.
## PROVISIONS GOVERNING DISTRIBUTIONS

A.     Total Enterprise Value for Purposes of Distributions Under the Plan and the New Calpine Stock Reserve:  Distributions of New Calpine Common Stock to Holders of Allowed Claims, and the establishment and maintenance of the New Calpine Stock Reserve, both as described below, shall be based upon, among other things, the New Calpine Total Enterprise Value.  For purposes of distribution, the New Calpine Common Stock shall be deemed to have the value assigned to it based upon, among other things, the New Calpine Total Enterprise Value regardless of the date of distribution.

B.     Distributions on Account of Claims and Interests Allowed as of the Effective Date: Except as otherwise provided in the Plan, a Final Order, or as agreed to by the relevant parties (which, prior to its dissolution, shall include the Creditors' Committee) and subject to the establishment of the New Calpine Stock Reserve, initial distributions under the Plan on account of Claims and Interests Allowed on or before the Effective Date shall be made on the Distribution Date; provided, however, that (1) Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases or assumed by the Debtors prior to the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice, (2) Allowed Administrative Claims for taxes asserted by the Texas Taxing Authority and the Louisiana Department of Revenue shall accrue interest and, in the event they become delinquent, penalties at the applicable state-law rate and to the extent provided by state law, and (3) Allowed Priority Tax Claims, unless otherwise agreed, shall be paid in full in Cash on the Distribution Date or over a five-year period as provided in section 1129(a)(9)(C) of the Bankruptcy Code with annual interest provided by applicable non-bankruptcy law; provided, however, that for the Allowed Priority Tax Claims asserted by the Louisiana Department of Revenue, the interest rate provided by applicable non-bankruptcy law shall be determined in accordance with section 511(b) of the Bankruptcy Code.

C.     Distributions on Account of Claims Allowed After the Effective Date:

1.     Payments and Distributions on Disputed Claims:  Except as otherwise provided in the Plan, a Final Order, or as agreed to by the relevant parties, and subject to the establishment of the New Calpine Stock Reserve, distributions under the Plan on account of Disputed Claims that become Allowed after the Effective Date shall be made on the Periodic Distribution Date that is at least thirty days after the Disputed Claim becomes an Allowed Claim or Interest; provided, however, that (a) Disputed Administrative Claims with respect to liabilities incurred by the

Debtors in the ordinary course of business during the Chapter 11 Cases or assumed by the Debtors on or before the Effective Date that become Allowed after the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice and (b) Disputed Priority Tax Claims that become Allowed Priority Tax Claims after the Effective Date, unless otherwise agreed, shall be paid in full in Cash on the Periodic Distribution Date that is at least thirty days after the Disputed Claim becomes an Allowed Claim or over a five-year period as provided in section 1129(a)(9)(C) of the Bankruptcy Code with annual interest provided by applicable non-bankruptcy law; provided further, however, that for the Allowed Priority Tax Claims asserted by the Louisiana Department of Revenue, the interest rate provided by applicable non-bankruptcy law shall be determined in accordance with section 511(b) of the Bankruptcy Code.

2.      Special Rules for Distributions to Holders of Disputed Claims:  Notwithstanding any provision otherwise in the Plan and except as otherwise agreed by the relevant parties: (a) no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order and (b) any Entity that holds both an Allowed Claim and a Disputed Claim shall not receive any distribution on the Allowed Claim unless and until all objections to the Disputed Claim have been resolved by settlement or Final Order and the Claims have been Allowed; provided, however, that the Reorganized Debtors shall make distributions to Holders of Allowed First Lien Debt Claims, Allowed Second Lien Debt Claims, Allowed Other Secured Claims, Allowed General Note Claims, Allowed Senior Note Claims, and Allowed Subordinated Note Claims on account of the Allowed portion of such Holders' Claims; provided further, however, that with respect to any separately-Filed Claim of the United States of America or any Governmental Unit thereof that is a Disputed Claim, as each such Disputed Claim becomes an Allowed Claim, such Allowed Claim shall be paid in accordance with the provisions of the Plan, notwithstanding the fact that other Disputed Claims of the United States of America or any Governmental Unit thereof have not been Allowed.  In the event that there are Disputed Claims requiring adjudication and resolution, the Reorganized Debtors shall establish appropriate reserves for potential payment of such Claims pursuant to ARTICLE VII.C.3.   Subject to ARTICLE VII, all distributions made pursuant to the Plan on account of an Allowed Claim shall be made together with any dividends, payments, or other distributions made on account of, as well as any obligations arising from, the distributed property as if such Allowed Claim had been an Allowed Claim on the dates distributions were previously made to Holders of Allowed Claims included in the applicable Class.

3.      Reserve of New Calpine Common Stock:  On the Effective Date, the Reorganized Debtors shall maintain in reserve shares of New Calpine Common Stock as the New Calpine Stock Reserve to pay Holders of Allowed Claims pursuant to the terms of the Plan.  The amount of New Calpine Common Stock withheld as a part of the New Calpine Stock Reserve for the benefit of a Holder of a Disputed Claim shall be equal to the lesser of: (a) the number of shares necessary to satisfy the distributions required to be made pursuant to the Plan based on the asserted amount of the Disputed Claim or, if the Claim is denominated as contingent or unliquidated as of the Distribution Record Date, the amount that the Debtors, in consultation with the Creditors' Committee, elect to withhold on account of such Claim in the New Calpine Stock Reserve; (b) the number of shares necessary to satisfy the distributions required to be

made pursuant to the Plan for such Disputed Claim based on an amount as estimated by the Bankruptcy Court pursuant to section 502(c) of the Bankruptcy Code for purposes of allowance; or (c) the number of shares necessary to satisfy the distributions required to be made pursuant to the Plan based on an amount as may be agreed upon by the Holder of such Disputed Claim and the Reorganized Debtors.    As Disputed Claims are Allowed, the Distribution Agent shall distribute, in accordance with the terms of the Plan, New Calpine Common Stock to Holders of Allowed Claims, and the New Calpine Stock Reserve shall be adjusted.  The Distribution Agent shall withhold in the New Calpine Stock Reserve any dividends, payments, or other distributions made on account of, as well as any obligations arising from, the New Calpine Common Stock initially withheld in the New Calpine Stock Reserve, to the extent that such New Calpine Common Stock continues to be withheld in the New Calpine Stock Reserve at the time such distributions are made or such obligations arise, and such dividends, payments, or other distributions shall be held for the benefit of Holders of Disputed Claims whose Claims, if Allowed, are entitled to distributions under the Plan.  Nothing in the Plan shall require the Reorganized Debtors to reserve New Calpine Common Stock on account of agreements, programs, and plans the Debtors may continue to honor after the Effective Date pursuant to ARTICLE IV.R and no such New Calpine Common Stock shall be so reserved.    The Reorganized Debtors may (but are not required to) request estimation for any Disputed Claim that is contingent or unliquidated, as set forth in ARTICLE VI.C.

The LSP Shares shall be issued on the Effective Date, and, to the extent the approvals outlined below have not been received and to the extent necessary to comply with applicable law, placed in the New Calpine Stock Reserve.  The LSP Shares shall be distributed to the LS Entities and the Luminus Entities or their designees, respectively, from the New Calpine Stock Reserve immediately upon the receipt by the LS Entities or the Luminus Entities, respectively, of any approval of the New York State Public Service Commission required in connection with the issuance of the LSP Shares to the LS Entities or the Luminus Entities, respectively; provided, however, that, to the extent that the Debtors or Reorganized Debtors, as applicable, are required to obtain approval of FERC pursuant to section 203 of the Federal Power Act, 16 U.S.C. §§ 824n-824n, with respect to the issuance of any LSP Shares to the LS Entities or the Luminus Entities, respectively, any LSP Shares in excess of 9.9 percent of the total amount of issued and outstanding New Calpine Common Stock that are held by the LS Entities or the Luminus Entities, respectively, together, in each case, with any Entities that are determined to be their "affiliates" under section 203 of the Federal Power Act, shall remain in the New Calpine Stock Reserve, and shall be distributed to the LS Entities or the Luminus Entities or their designees, respectively, immediately: (a) upon the Debtors or Reorganized Debtors, as applicable, obtaining any approval from FERC under section 203 of the FPA required with respect to the issuance to the LS Entities or the Luminus Entities, respectively, of the LSP Shares or (b) at such time as a given distribution to the LS Entities or the Luminus Entities, respectively, would not cause their holdings of New Calpine Common Stock, together with the holdings of any Entities that are determined to be their "affiliates" under section 203 of the Federal Power Act, to exceed 9.9 percent of the total amount of the issued and outstanding New Calpine Common Stock. Notwithstanding the foregoing, the LS Entities and the Luminus Entities shall at all times have the right, in their sole discretion, to direct the Distribution Agent to sell or otherwise dispose of any of their LSP Shares held in the New Calpine Stock Reserve, and the Distribution Agent shall immediately sell or dispose of such LSP Shares upon receiving and in accordance with any such direction from the LS Entities or the Luminus Entities, as applicable.    Any dividends and

distributions (except for proceeds relating to any disposition of LSP Shares as set forth above which shall be immediately distributed to the LSP Entities or the Luminus Entities, as the case may be) related to the LSP Shares held in the New Calpine Stock Reserve that accrue on or after the Effective Date shall also be held in the New Calpine Stock Reserve, and shall be distributed directly to the LS Entities or the Luminus Entities or their designees, as applicable, at the time the LSP Shares to which they relate are distributed to the LS Entities or the Luminus Entities or their designees.

**Notwithstanding anything in the applicable Holder's Proof of Claim or otherwise to the contrary, the Holder of a Claim shall not be entitled to receive or recover a distribution under the Plan on account of a Claim in excess of the lesser of the amount: (a) stated in the Holder's Proof of Claim, if any, as of the Distribution Record Date, plus interest thereon to the extent provided for by the Plan; (b) if the Claim is denominated as contingent or unliquidated as of the Distribution Record Date, the amount that the Debtors, in consultation with the Creditors' Committee, elect to withhold on account of such Claim in the New Calpine Stock Reserve and set forth in the Plan Supplement, or such other amount as may be estimated by the Bankruptcy Court prior to the Confirmation Hearing; or (c) if a Claim has been estimated, the amount deposited in the New Calpine Stock Reserve to satisfy such Claim after such estimation.**

For purposes of any shareholder vote occurring after the Effective Date, the Distribution Agent or Servicer, as applicable, shall be deemed to have voted any New Calpine Common Stock held in the New Calpine Stock Reserve in the same proportion as all outstanding shares properly cast in such shareholder vote.

4.      Tax Reporting Matters:  Subject to definitive guidance from the Internal Revenue Service or an applicable court to the contrary (including the receipt by the Reorganized Debtors of a private letter ruling or the receipt of an adverse determination by the Internal Revenue Service upon audit, if not contested by the Reorganized Debtors), the Reorganized Debtors shall treat the New Calpine Stock Reserve as a single trust, consisting of separate and independent shares to be established with respect to each Disputed Claim, in accordance with the trust provisions of the Internal Revenue Code, and, to the extent permitted by law, shall report consistently with the foregoing for federal, state, and local tax purposes.  All Holders of Claims shall report, for federal, state, and local tax purposes, consistently with the foregoing.

D.      Delivery of Distributions

1.      Record Date for Distributions:  On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions pursuant to ARTICLE VII shall instead be authorized and entitled to recognize only those record Holders listed on the Claims Register as of the close of business on the Distribution Record Date. Notwithstanding the foregoing, if a Claim or Interest, other than one based on a publicly traded Certificate is transferred twenty or fewer days before the Distribution Record Date, the Distribution Agent shall make distributions to the transferee only to the extent practical and in any event only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

2.     Distribution Agent:  The Distribution Agent shall make all distributions required under the Plan, except that distributions to Holders of Allowed Claims and Interests governed by a separate agreement and administered by a Servicer shall be deposited with the appropriate Servicer, at which time such distributions shall be deemed complete, and the Servicer shall deliver such distributions in accordance with the Plan and the terms of the governing agreement.

3.     Delivery of Distributions in General:  Except as otherwise provided in the Plan, and notwithstanding any authority to the contrary, distributions to Holders of Allowed Claims and Interests shall be made to Holders of record as of the Distribution Record Date by the Distribution Agent or a Servicer, as appropriate: (a) in accordance with Federal Rule of Civil Procedure 4, as modified and made applicable by Bankruptcy Rule 7004; (b) to the signatory set forth on any of the Proofs of Claim or Interest Filed by such Holder or other representative identified therein (or at the last known addresses of such Holder if no Proof of Claim or Interest is Filed or if the Debtors have been notified in writing of a change of address); (c) at the addresses set forth in any written notices of address changes delivered to the Distribution Agent after the date of any related Proof of Claim or Interest; (d) at the addresses reflected in the Schedules if no Proof of Claim or Interest has been Filed and the Distribution Agent has not received a written notice of a change of address; or (e) on any counsel that has appeared in the Chapter 11 Cases on the Holder's behalf.  Except as provided in ARTICLES IV.I and IX.A.7, distributions under the Plan on account of Allowed Claims and Interests shall not be subject to levy, garnishment, attachment, or like legal process, so that each Holder of an Allowed Claim or Interest shall have and receive the benefit of the distributions in the manner set forth in the Plan. The Debtors, the Reorganized Debtors, and the Distribution Agent, as applicable, shall not incur any liability whatsoever on account of any distributions under the Plan except for gross negligence or willful misconduct.  Distributions to holders of publicly traded Certificates will be made in accordance with ARTICLE VII.D.10.

4.     Accrual of Dividends and Other Rights:  For purposes of determining the accrual of dividends or other rights after the Effective Date, the New Calpine Common Stock shall be deemed distributed as of the Effective Date regardless of the date on which it is actually issued, dated, authenticated, or distributed even though the Reorganized Debtors shall not pay any such dividends or distribute such other rights until distributions of the New Calpine Common Stock actually take place.  Except as specifically otherwise provided in the Plan, in no event shall interest accrue after the Interest Accrual Limitation Date on account of any satisfied portion of an Allowed Claim or Interest.

5.     Allocation Between Principal and Accrued Interest:  Except as otherwise provided in the Plan, distributions on account of Allowed Claims and Interests shall be treated as allocated first to principal and interest accrued as of the Petition Date and thereafter, to the extent the New Calpine Total Enterprise Value is sufficient to satisfy such principal and interest accrued as of the Petition Date, any interest accrued from the Petition Date through the Interest Accrual Limitation Date.

6.     Compliance Matters:  In connection with the Plan, to the extent applicable, the Reorganized Debtors and the Distribution Agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements.

Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors and the Distribution Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. The Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

7.    Foreign Currency Exchange Rate:  Except as otherwise provided in the Plan or a Bankruptcy Court order, as of the Effective Date, any Unsecured Claim asserted in currency(ies) other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate as of Tuesday, December 20, 2005, as quoted at 4:00 p.m. (EDT), mid-range spot rate of exchange for the applicable currency as published in *The Wall Street Journal, National Edition*, on December 21, 2005.

8.    Fractional, De Minimis, Undeliverable, and Unclaimed Distributions:

a.    Fractional Distributions:  Notwithstanding any other provision of the Plan to the contrary, payments of fractions of shares of New Calpine Common Stock or New Calpine Warrants shall not be made and shall be deemed to be zero, and the Distribution Agent shall not be required to make distributions or payments of fractions of dollars. Whenever any payment of Cash of a fraction of a dollar pursuant to the Plan would otherwise be required, the actual payment shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars or less being rounded down.

b.    De Minimis Distributions:  Neither the Distribution Agent nor any Servicer shall have any obligation to make a distribution on account of an Allowed Claim or Interest from the New Calpine Stock Reserve or otherwise if: (i) the aggregate amount of all distributions authorized to be made from such New Calpine Stock Reserve or otherwise on the Periodic Distribution Date in question is or has an economic value less than $10,000,000, based on Calpine's Total Enterprise Value, unless such distribution is a final distribution or (ii) the amount to be distributed to the specific Holder of an Allowed Claim or Interest on the particular Periodic Distribution Date does not constitute a final distribution to such Holder and is or has an economic value less than $500.

c.    Undeliverable Distributions:  If any distribution to a Holder of an Allowed Claim or Interest is returned to a Distribution Agent as undeliverable, no further distributions shall be made to such Holder unless and until such Distribution Agent is notified in writing of such Holder's then-current address, at which time all currently due missed distributions shall be made to such Holder on the next Periodic Distribution Date. Undeliverable distributions shall remain in the possession of the Reorganized Debtors until such time as a distribution becomes deliverable, or such distribution reverts to the Reorganized Debtors pursuant to ARTICLE VII.D.8.d, and shall not be supplemented with any interest, dividends, or other accruals of any kind.

d.    Reversion:   Any distribution under the Plan that is an Unclaimed Distribution for a period of six months after distribution shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and such Unclaimed Distribution shall revest in the Reorganized Debtors and, to the extent such Unclaimed Distribution is New Calpine Common Stock or New Calpine Warrants, shall be deemed cancelled. Upon such revesting, the Claim or Interest of any Holder or its successors with respect to such property shall be cancelled, discharged, and forever barred notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary.  The provisions of the Plan regarding undeliverable distributions and Unclaimed Distributions shall apply with equal force to distributions that are issued by the Debtors, made pursuant to any indenture or Certificate (but only with respect to the initial distribution by the Servicer to Holders that are entitled to be recognized under the relevant indenture or Certificate and not with respect to Entities to whom those recognized Holders distribute), notwithstanding any provision in such indenture or Certificate to the contrary and notwithstanding any otherwise applicable federal or state escheat, abandoned, or unclaimed property law.

9.    Manner of Payment Pursuant to the Plan:  Any payment in Cash to be made pursuant to the Plan shall be made at the election of the Reorganized Debtors by check or by wire transfer.   Checks issued by the Distribution Agent or applicable Servicer on account of Allowed Claims and Interests shall be null and void if not negotiated within ninety days after issuance, but may be requested to be reissued until the distribution revests in the Reorganized Debtors pursuant to ARTICLE VII.D.8.d.   The Debtors, with the consent of the Creditors' Committee, or Reorganized Debtors, as applicable, may (a) agree with any Holder of an Allowed Claim that is to receive New Calpine Common Stock under the Plan to satisfy such Allowed Claim with Cash generated from the sale of New Calpine Common Stock, (b) satisfy an Allowed CalGen Makewhole Claim with Cash generated from the sale of New Calpine Common Stock, and (c) satisfy any portion of the Disputed Second Lien Debt Claim that is ultimately Allowed pursuant to a Final Order with Cash generated from the sale of New Calpine Common Stock reserved on account of such Claim pursuant to ARTICLE VII.C.3; provided, however, that the Reorganized Debtors may only take actions provided in (c) through a resolution of the board of directors of Reorganized Calpine.

10.    Surrender of Cancelled Instruments or Securities:  On the Effective Date or as soon as reasonably practicable thereafter, each Holder of a Certificate shall surrender such Certificate to the Distribution Agent or a Servicer (to the extent the relevant Claim or Interest is governed by an agreement and administered by a Servicer).  Such Certificate shall be cancelled solely with respect to the Debtors, and such cancellation shall not alter the obligations or rights of any non-Debtor third parties vis-à-vis one another with respect to such Certificate.   No distribution of property pursuant to the Plan shall be made to or on behalf of any such Holder unless and until such Certificate is received by the Distribution Agent or the Servicer or the unavailability of such Certificate is reasonably established to the satisfaction of the Distribution Agent or the Servicer pursuant to the provisions of ARTICLE VII.D.11.  Any Holder who fails to surrender or cause to be surrendered such Certificate or fails to execute and deliver an affidavit of loss and indemnity acceptable to the Distribution Agent or the Servicer prior to the first anniversary of the Effective Date, shall have its Claim or Interest discharged with no further action, be forever barred from asserting any such Claim or Interest against the relevant

Reorganized Debtor or its property, be deemed to have forfeited all rights, Claims, and Interests with respect to such Certificate, and not participate in any distribution under the Plan; furthermore, all property with respect to such forfeited distributions, including any dividends or interest attributable thereto, shall revert to the Reorganized Debtors, notwithstanding any federal or state escheat, abandoned, or unclaimed property law to the contrary.  Notwithstanding the foregoing paragraph, ARTICLE VII.D.10 shall not apply to any Claims Reinstated pursuant to the terms of the Plan.

        11.     <u>Lost, Stolen, Mutilated, or Destroyed Debt Securities</u>:  Any Holder of Allowed Claims or Interests evidenced by a Certificate that has been lost, stolen, mutilated, or destroyed shall, in lieu of surrendering such Certificate, deliver to the Distribution Agent or Servicer, if applicable, an affidavit of loss acceptable to the Distribution Agent or Servicer setting forth the unavailability of the Certificate, and such additional indemnity as may be required reasonably by the Distribution Agent or Servicer to hold the Distribution Agent or Servicer harmless from any damages, liabilities, or costs incurred in treating such Holder as a Holder of an Allowed Claim or Interest.  Upon compliance with this procedure by a Holder of an Allowed Claim or Interest evidenced by such a lost, stolen, mutilated, or destroyed Certificate, such Holder shall, for all purposes pursuant to the Plan, be deemed to have surrendered such Certificate.

E.     <u>Claims Paid or Payable by Third Parties</u>:

        1.     <u>Claims Paid by Third Parties</u>:  The Claims and Solicitation Agent shall reduce in full a Claim, and such Claim shall be disallowed without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or Reorganized Debtor.  Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such Holder shall, within two weeks of receipt thereof, repay or return the distribution to the applicable Reorganized Debtor, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.  The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Reorganized Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the two-week grace period specified above until the amount is repaid.  Except to the extent set forth in the Second Lien Makewhole Settlement Order, nothing in the Plan shall affect the rights of the Holders of Second Lien Debt Claims to exercise the subordination rights granted to them in connection with the 6.00% Contingent Convertible Notes Due 2014 and the 7.75% Contingent Senior Convertible Notes Due 2015.  Nothing in this paragraph shall (a) require the Pipelines to return any Claim distributions that otherwise might be interpreted to be required to be returned to the Reorganized Debtors by this paragraph on account of any future sales of pipeline capacity by the Pipelines to third parties or other transportation services by the Pipelines provided to third parties or (b) permit the Debtors to set off any future sales of pipeline capacity by the Pipelines to third parties or other transportation services by the Pipelines against Claim distributions to be made under the Plan.

2.      Claims Payable by Third Parties:  No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy.  To the extent that one or more of the Debtors' insurers agrees to satisfy in full a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, such Claim may be expunged to the extent of any agreed upon satisfaction on the Claims Register by the Claims and Solicitation Agent without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

3.      Applicability of Insurance Policies:  Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy.  Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

F.      Treatment of Interests:  Notwithstanding anything in the Plan to the contrary, any provision in the Plan pertaining to the allowance of, or to potential distributions to be received in respect of, Interests shall only apply to the extent consistent with the distribution provisions in ARTICLES III.B.18, III.B.19, and III.B.20.

## ARTICLE VIII.
## EFFECT OF CONFIRMATION OF THE PLAN

A.      Discharge of Claims and Termination of Interests:  Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims, Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors prior to the Effective Date and that arise from a termination of employment or a termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim or Interest based upon such debt, right, or Interest is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan.  Any default by the Debtors or their Affiliates with respect to any Claim or Interest that existed immediately prior to or on account of the filing of the Chapter 11 Cases shall

be deemed Cured on the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring. Nothing in this paragraph shall impair the police or regulatory powers of the United States of America or any Governmental Unit thereof. The actions of the Securities and Exchange Commission that: (1) are non-pecuniary, (2) do not relate to collection of a Claim, or (3) do not pursue injunctions that could be reduced to a monetary Claim, are not discharged under ARTICLE VIII.A.

B.      <u>Subordinated Claims</u>: The allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Reorganized Debtors reserve the right to re-classify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto; <u>provided</u>, <u>however</u>, that the Reorganized Debtors must have authority from a Final Order of a court of competent jurisdiction to re-classify any Allowed Subordinated Note Claim other than as set forth in the Plan unless the Holder of such Allowed Subordinated Note Claim consents to such re-classification.

C.      <u>Compromise and Settlement of Claims and Controversies</u>: Pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such an Allowed Claim or Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable. In accordance with the provisions of the Plan, pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against them and Causes of Action against other Entities.

D.      **<u>Releases by the Debtors</u>: Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or the Plan Supplement, for good and valuable consideration, including the service of the Released Parties to facilitate the expeditious reorganization of the Debtors and the implementation of the restructuring contemplated by the Plan, on and after the Effective Date, the Released Parties are deemed released and discharged by the Debtors, the Reorganized Debtors, and the Estates from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims asserted on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Debtors, the Reorganized Debtors, the Estates, or their Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Entity, based on**

or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Plan and Disclosure Statement, or related agreements, instruments, or other documents, upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than Claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes a failure to perform the duty to act in good faith, with the care of an ordinarily prudent person and in a manner the Released Party reasonably believed to be in the best interests of the Debtors (to the extent such duty is imposed by applicable non-bankruptcy law) where such failure to perform constitutes willful misconduct or gross negligence. In addition, any and all releases by the Debtors provided for in section 3.6 of the CCAA Settlement are hereby adopted and incorporated as if explicitly set forth herein.

E.     **Exculpation**:     Except as otherwise specifically provided in the Plan or Plan Supplement, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from any Claim, obligation, Cause of Action, or liability for any Exculpated Claim, except for gross negligence or willful misconduct, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Debtors and the Reorganized Debtors (and each of their respective Affiliates, agents, directors, officers, employees, advisors, and attorneys) have, and upon Confirmation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code with regard to the distributions of the securities pursuant to the Plan, and therefore are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan. Nothing in this paragraph shall impair the police or regulatory powers of the United States of America or any Governmental Unit thereof. Nothing in this paragraph shall apply in any action brought by the Securities and Exchange Commission in exercise of its police and regulatory powers.

F.     **Releases by Holders of Claims and Interests**:     Except as otherwise specifically provided in the Plan or Plan Supplement, on and after the Effective Date, Holders of Claims and Interests (a) voting to accept the Plan or (b) abstaining from voting on the Plan and electing not to opt out of the release contained in this paragraph (which by definition, does not include Holders of Claims and Interests who are not entitled to vote in favor of or against the Plan), shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever, released and discharged the Debtors, the Reorganized Debtors, and the Released Parties from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims asserted on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or

relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the Debtors' Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Plan and Disclosure Statement, or related agreements, instruments, or other documents, upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than Claims or liabilities arising out of or relating to any act or omission of a Debtor, a Reorganized Debtor, or a Released Party that constitutes a failure to perform the duty to act in good faith, with the care of an ordinarily prudent person and in a manner the Debtor, the Reorganized Debtor, or the Released Party reasonably believed to be in the best interests of the Debtors (to the extent such duty is imposed by applicable non-bankruptcy law) where such failure to perform constitutes willful misconduct or gross negligence.  In addition, any and all releases in section 3.6 of the CCAA Settlement are hereby adopted and incorporated as if set forth herein.  Nothing in this paragraph shall apply in any action brought by the Securities and Exchange Commission in exercise of its police and regulatory powers.  The Phelps Plaintiffs, the United States of America and any Governmental Unit thereof, and the Hawaii Plaintiffs are deemed to have opted out of the releases provided for in this paragraph and, therefore, are not bound by the releases provided for in this paragraph (and any injunctions relating to such releases).  Notwithstanding ARTICLE VIII.F and ARTICLE VIII.G, and regardless of whether or how they vote on the Plan, the underwriter defendants in the state court litigation pending on the Petition Date in the Superior Court of California, County of Santa Clara, captioned *Hawaii Structural Ironworkers Pension Trust Fund v. Calpine Corp.*, Case No. 1-04-CV-021465 (Cal. Sup. Ct.) (the "Hawaii Litigation"), will not be, solely by virtue of the Plan, (a) deemed to have released any Claims for contribution in connection with the Hawaii Litigation against any of the director and officer defendants in the Hawaii Litigation, or (b) enjoined from pursuing any such Claims against such defendants.

G.    **Injunction:**  Except as otherwise expressly provided in the Plan or for obligations issued pursuant to the Plan, all Entities who have held, hold, or may hold Claims or Interests that have been released pursuant to ARTICLE VIII.D or ARTICLE VIII.F, discharged pursuant to ARTICLE VIII.A, or are subject to exculpation pursuant to ARTICLE VIII.E are permanently enjoined, from and after the Effective Date, from: (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree or order against such Entities on account of or in connection with or with respect to any such Claims or Interests;  (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property or Estates of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such Holder has Filed a motion requesting the right to perform such setoff on or before the

**Confirmation Date, and notwithstanding an indication in a Proof of Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan. Nothing in the Plan or Confirmation Order shall preclude any Entity from pursuing an action against one or more of the Debtors in a nominal capacity to recover insurance proceeds so long as the Debtors or Reorganized Debtors, as applicable, in consultation with the Creditors' Committee, and any such Entity agree in writing that such Entity will: (a) waive all Claims against the Debtors, the Reorganized Debtors, and the Estates related to such action and (b) enforce any judgment on account of such Claim solely against applicable insurance proceeds, if any.**

H.    <u>Protection Against Discriminatory Treatment</u>:    Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors, or another Entity with whom such Reorganized Debtors have been associated, solely because one of the Debtors has been a debtor under chapter 11, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtor is granted or denied a discharge) or has not paid a debt that is dischargeable in the Chapter 11 Cases.

I.    **<u>Setoffs</u>:  Except as otherwise expressly provided for in the Plan, each Reorganized Debtor pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim or Interest, may setoff against any Allowed Claim or Interest and the distributions to be made pursuant to the Plan on account of such Allowed Claim or Interest (before any distribution is made on account of such Allowed Claim or Interest), any Claims, rights, and Causes of Action of any nature that such Debtor or Reorganized Debtor, as applicable, may hold against the Holder of such Allowed Claim or Interest, to the extent such Claims, rights, or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); <u>provided, however,</u> that neither the failure to effect such a setoff nor the allowance of any Claim or Interest pursuant to the Plan shall constitute a waiver or release by such Reorganized Debtor of any such Claims, rights, and Causes of Action that such Reorganized Debtor may possess against such Holder.  In no event shall any Holder of Claims or Interests be entitled to setoff any Claim or Interest against any Claim, right, or Cause of Action of the Debtor or Reorganized Debtor, as applicable, unless such Holder has Filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in any Proof of Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 or otherwise; <u>provided, however,</u> that this provision shall have no effect on the setoff rights that may be held by: (a) Tara Energy, Inc.; (b) Manufacturers & Traders Trust Company, in its capacity as indenture trustee for the 7.75% Contingent Convertible Notes Due 2015; (c) Duke Energy Trading and Marketing L.L.C.; (d) Energy**

Transfer Fuel, L.P., ETC Marketing, Inc., and Houston Pipeline Co. LP; (e) Spectra Energy Corporation, Texas Eastern Transmission LP (f/k/a Texas Eastern Transmission Corporation), Egan Hub Storage LLC, Moss Bluff Hub Partners LP, Gulfstream Natural Gas System, and Maritimes & Northeast US; (f) Wisconsin Electric Power Company; (g) any BP entities, including BP Products North America Inc., BP Amoco Chemical Company, BP Energy Company, BP Pipelines and BP CanadaEnergy Marketing Corp., and their predecessors and/or successors, if any; or (h) Tampa Electric Company.  The setoff(s) and/or netting performed by Reliant Energy Electric Solutions, LLC ("REES") on or about January 26, 2006 in connection with the transactions giving rise to REES' Claim Nos. 2888 and 2889 (the "Setoffs and/or Netting") are not affected by ARTICLE VIII.I.  REES is not required to file the motion required by ARTICLE VIII.I in connection with the Setoffs and/or Netting.  The Debtors reserve their right to object to REES' Claim Nos. 2888 and 2889; provided, however, that the Debtors may not object to REES' Claims on the basis that REES has not complied with ARTICLE VIII.I.

J.    **Recoupment**:  In no event shall any Holder of Claims or Interests be entitled to recoup any Claim or Interest against any Claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment; provided, however, that this provision shall have no effect on any recoupment rights of: (1) Manufacturers & Traders Trust Company, in its capacity as indenture trustee for the 7.75% Contingent Convertible Notes Due 2015; (2) Tara Energy, Inc.; (3) Wisconsin Electric Power Company; (4) any BP entities, including BP Products North America Inc., BP Amoco Chemical Company, BP Energy Company, BP Pipelines and BP CanadaEnergy Marketing Corp., and their predecessors and/or successors, if any; or (5) Tampa Electric Company.

K.    **Release of Liens**:  Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to ARTICLE VII and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, and discharged (except for charging Liens of the Indenture Trustees to the extent the Indenture Trustee's fees and expenses are not paid pursuant to the Plan), and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtor and its successors and assigns; provided, however, that nothing in the Plan shall release (i) Liens granted by KIAC Partners and Nissequogue Cogen Partners to secure payment of the bonds used to construct the KIAC And Nissequogue Facilities; (ii) Liens granted by Calpine Hidalgo Energy Center, L.P., f/k/a Duke Hidalgo, to the Hidalgo Indenture Trustee and the Industrial Development Corporation of the City of Edinburg, Texas in connection with the Hidalgo Lease and to secure payment of the bonds used to construct the Hidalgo Facility; (iii) the Liens provided to the CalGen Lenders and the CalGen Collateral Agent pursuant to the CalGen Debt Repayment Order; (iv) the Liens securing ad valorem property taxes

owed to the Texas Taxing Authority, and such Liens will remain in full force and effect with the same validity, priority and to the same extent provided by state law until satisfaction in full of the tax claim or such portion thereof as is Allowed, and any penalties, fees or interest owed thereon as provided by ARTICLE VII.B; (v) the mortgages, deeds of trust, Liens, pledges, or other security interests granted to: (a) Bankers Commercial Corporation, (b) UNBC Leasing, Inc., and (c) U.S. Bank National Association, not in its individual capacity but solely as owner trustee, in connection with the Debtors' leasing of the Greenleaf Project; and (vi) the mortgages, deeds of trust, Liens, pledges, or other security interests granted to: (a) Verizon Capital Corporation and (b) The Bank of New York Trust Company, NA, not in its individual capacity but solely as owner trustee, in connection with the Debtors' leasing of the Agnews Project.

L.      Document Retention:  On and after the Effective Date, the Reorganized Debtors may maintain documents in accordance with their current document retention policy, as may be altered, amended, modified, or supplemented by the Reorganized Debtors in the ordinary course of business.

M.      Reimbursement or Contribution:  If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Effective Date:  (1) such Claim has been adjudicated as noncontingent or (2) the relevant Holder of a Claim has Filed a noncontingent Proof of Claim on account of such Claim and a Final Order has been entered determining such Claim as no longer contingent.

<h2 style="text-align:center">ARTICLE IX.<br>ALLOWANCE AND PAYMENT OF CERTAIN ADMINISTRATIVE CLAIMS</h2>

A.      Professional Claims

1.      Final Fee Applications:  All final requests for payment of Claims of a Professional shall be Filed no later than forty-five days after the Effective Date.  After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior Bankruptcy Court orders, the Allowed amounts of such Professional Claims shall be determined by the Bankruptcy Court.

2.      Payment of Interim Amounts:  Except as otherwise provided in the Plan and subject to ARTICLE IX.A.1, Professionals shall be paid pursuant to the Interim Compensation Order.

3.      Professional Fee Escrow Account:  In accordance with ARTICLE IX.A.4, on the Effective Date, the Reorganized Debtors shall fund the Professional Fee Escrow Account with Cash equal to the aggregate Professional Fee Reserve Amount for all Professionals.  The Professional Fee Escrow Account shall be maintained in trust for the Professionals with respect to whom fees or expenses have been held back pursuant to the Interim Compensation Order. Such funds shall not be considered property of the Reorganized Debtors.  The remaining amount

of Professional Claims owing to the Professionals shall be paid in Cash to such Professionals by the Reorganized Debtors from the Professional Fee Escrow Account when such Claims are Allowed by a Bankruptcy Court order.  When all Professional Claims have been paid in full, amounts remaining in the Professional Fee Escrow Account, if any, shall be paid to the Reorganized Debtors.

4.      Professional Fee Reserve Amount:  To receive payment for unbilled fees and expenses incurred through the Effective Date, on or before the Effective Date, the Professionals shall estimate their Accrued Professional Compensation prior to and as of the Effective Date and shall deliver such estimate to the Debtors and the Creditors' Committee.  If a Professional does not provide an estimate, the Reorganized Debtors may estimate the unbilled fees and expenses of such Professional; provided, however, that such estimate shall not be considered an admission with respect to the fees and expenses of such Professional.  The total amount so estimated as of the Effective Date shall comprise the Professional Fee Reserve Amount.

5.      Post-Effective Date Fees and Expenses:  Except as otherwise specifically provided in the Plan, from and after the Effective Date, the Reorganized Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable legal, professional, or other fees and expenses related to implementation and Consummation incurred by the Reorganized Debtors and incurred by the Creditors' Committee in connection with those matters for which it remains in existence after the Effective Date pursuant to the Plan.  Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

6.      Substantial Contribution Compensation and Expenses:  Except as otherwise specifically provided in the Plan, any Entity who requests compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4), and (5) of the Bankruptcy Code (with the exception of the Indenture Trustees as set forth in ARTICLE IX.A.7) must File an application and serve such application on counsel for the Debtors or Reorganized Debtors, as applicable, and as otherwise required by the Bankruptcy Court and the Bankruptcy Code on or before the Administrative Claim Bar Date or be forever barred from seeking such compensation or expense reimbursement.

7.      Indenture Trustee, Administrative Agent, and Collateral Trustee Fees, and Indemnification Obligations:  Unless otherwise ordered by the Bankruptcy Court or specifically provided for in the Plan, all reasonable fees and expenses of the Indenture Trustees, the First Lien Indenture Trustee, the Administrative Agents, and the Collateral Trustee (and their counsel, agents, and advisors) that are provided for under the respective indentures or credit agreements and the Collateral Trust Agreement (including, without limitation, in connection with service on the Creditors' Committee and in connection with distributions under the Plan, but excluding fees and expenses related to litigation of Disputed Claims) shall be paid in full in Cash without a reduction to the recoveries of applicable Holders of Allowed Claims as soon as reasonably practicable after the Effective Date.  Notwithstanding the foregoing, to the extent any fees or expenses of the Indenture Trustees, the First Lien Indenture Trustee, the Administrative Agents,

and the Collateral Trustee are not paid (including, without limitation, any fees or expenses incurred in connection with any unresolved litigation relating to Disputed Claims), the Indenture Trustees, the First Lien Indenture Trustee, the Administrative Agents, and the Collateral Trustee may assert their charging liens against any recoveries received on behalf of their respective Holders for payment of such unpaid amounts. The Debtors' contractual indemnification obligations to Indenture Trustees asserting a Second Lien Debt Claim, the Administrative Agents, the Collateral Trustee, and the CalGen Collateral Agent shall be reinstated as unsecured obligations of the Reorganized Debtors. Not later than thirty days after receipt of an invoice, the Reorganized Debtors shall pay the reasonable, actual, and documented fees and expenses incurred by the Indenture Trustee for the Second Lien Debt Claims and the Administrative Agent in connection with litigation over the Disputed Second Lien Debt Claim, provided that such fees and expenses shall not exceed $600,000 in the aggregate. In addition to their reinstated indemnification obligations to the CalGen Collateral Agent, the Reorganized Debtors shall pay, on the Distribution Date, the reasonable, actual, and documented fees and expenses incurred by the CalGen Collateral Agent from March 29, 2007, to November 30, 2007, in consideration for the CalGen Collateral Agent's withdrawal from the appeal of the CalGen Debt Repayment Order and all related orders, provided that such fees and expenses for that period do not exceed $150,000.

8. <u>Payment of ULC1 Noteholders Ad Hoc Committee Fees and ULC1 Indenture Trustee Fees</u>: Notwithstanding anything to the contrary in the Plan, the ULC1 Noteholders Ad Hoc Committee Fees and the ULC1 Indenture Trustee Fees shall be paid in full by the Debtors, on or as soon as reasonably practicable after the Effective Date, in Cash (in U.S. dollars), without the need for application to, or approval of, the Bankruptcy Court as a "substantial contribution" administrative expense under section 503(b) of the Bankruptcy Code. Any of such fees that are denominated in Canadian dollars shall be paid by the Debtors in U.S. dollars in accordance with the provisions of ARTICLE III.B.8.d.

9. <u>Payment of Second Lien Ad Hoc Committee Fees</u>: Notwithstanding anything to the contrary in the Plan, all Claims for reasonable fees and expenses of the professionals and advisors to the Second Lien Ad Hoc Committee shall be paid in full by the Debtors or Reorganized Debtors, as applicable, in accordance with the terms of the Cash Collateral Order.

B. <u>Other Administrative Claims</u>: All requests for payment of an Administrative Claim must be Filed with the Claims and Solicitation Agent and served upon counsel to the Debtors or Reorganized Debtors, as applicable, on or before the Administrative Claim Bar Date. Any request for payment of an Administrative Claim pursuant to ARTICLE IX.B that is not timely Filed and served shall be disallowed automatically without the need for any objection by the Debtors or the Reorganized Debtors. The Reorganized Debtors may settle and pay any Administrative Claim in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court. In the event that any party with standing objects to an Administrative Claim, the Bankruptcy Court shall determine the Allowed amount of such Administrative Claim. Notwithstanding the foregoing, no request for payment of an Administrative Claim need be Filed with respect to an Administrative Claim previously Allowed by Final Order.

## ARTICLE X.
## CONDITIONS PRECEDENT TO CONFIRMATION
## AND CONSUMMATION OF THE PLAN

A.    Conditions to Confirmation:  The following are conditions precedent to Confirmation that must be satisfied or waived in accordance with ARTICLE X.C:

1.    The Bankruptcy Court shall have approved the Disclosure Statement, in a manner acceptable to the Debtors and the Creditors' Committee, as containing adequate information with respect to the Plan within the meaning of section 1125 of the Bankruptcy Code.

2.    The proposed Confirmation Order shall be in form and substance acceptable to the Debtors and the Creditors' Committee.

3.    The terms and conditions of employment or retention of any Persons proposed to serve as Named Executive Officers or directors of Reorganized Calpine, including, without limitation, as to compensation, shall be acceptable to the Debtors and the Creditors' Committee and be set forth in the Plan Supplement to the extent such terms and conditions of employment or retention differ from those in existence on August 21, 2007.

4.    The most current version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein (including the Reorganized Calpine Bylaws and the Reorganized Calpine Charter) shall have been Filed in form and substance acceptable to the Debtors and the Creditors' Committee.

B.    Conditions Precedent to Consummation:  The following are conditions precedent to Consummation that must be satisfied or waived in accordance with ARTICLE X.C:

1.    The Bankruptcy Court shall have authorized the assumption and rejection of executory contracts and unexpired leases by the Debtors as contemplated by ARTICLE V.

2.    The New Credit Facility shall have been executed and delivered by all of the Entities that are parties thereto, and all conditions precedent to the consummation thereof shall have been waived, with the reasonable consent of the Creditors' Committee, or satisfied in accordance with the terms thereof, and funding pursuant to the New Credit Facility shall have occurred.

3.    The Confirmation Order shall have become a Final Order in form and substance acceptable to the Debtors and the Creditors' Committee.

4.    The final version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein (including the Reorganized Calpine Bylaws and the Reorganized Calpine Charter) shall have been Filed in form and substance acceptable to the Debtors and the Creditors' Committee without prejudice to the Reorganized Debtors' rights under the Plan to alter, amend, or modify certain of the schedules, documents, and exhibits contained in the Plan Supplement.

5.    The Confirmation Date shall have occurred.

6.    The New Calpine Common Stock shall have been accepted for listing on a national securities exchange or for quotation on a national automated interdealer quotation system.

C.    <u>Waiver of Conditions Precedent</u>:  The Debtors or the Reorganized Debtors, as applicable, with the consent of the Creditors' Committee and in consultation with the Equity Committee, may waive any of the conditions to Confirmation or Consummation set forth in ARTICLE X at any time, without any notice to parties-in-interest and without any further notice to or action, order, or approval of the Bankruptcy Court, and without any formal action other than proceeding to confirm or consummate the Plan.  A failure to satisfy or waive any condition to Confirmation or Consummation may be asserted as a failure of Confirmation or Consummation regardless of the circumstances giving rise to such failure (including any action or inaction by the party asserting such failure).  The failure of the Debtors or Reorganized Debtors, as applicable, to exercise any of the foregoing rights shall not be deemed a waiver of any other rights, and each such right shall be deemed an ongoing right, which may be asserted at any time.

D.    <u>Effect of Non-Occurrence of Conditions to Consummation</u>:  Each of the conditions to Consummation must be satisfied or duly waived pursuant to ARTICLE X.C, and Consummation must occur within 180 days of Confirmation, or by such later date established by Bankruptcy Court order.  If Consummation has not occurred within 180 days of Confirmation, then upon motion by a party in interest made before Consummation and a hearing, the Confirmation Order may be vacated by the Bankruptcy Court; <u>provided</u>, <u>however</u>, that notwithstanding the Filing of such motion to vacate, the Confirmation Order may not be vacated if Consummation occurs before the Bankruptcy Court enters an order granting such motion.  If the Confirmation Order is vacated pursuant to ARTICLE X.D or otherwise, then except as provided in any order of the Bankruptcy Court vacating the Confirmation Order, the Plan will be null and void in all respects, including the discharge of Claims and termination of Interests pursuant to the Plan and section 1141 of the Bankruptcy Code and the assumptions, assignments, or rejections of executory contracts or unexpired leases pursuant to ARTICLE V, and nothing contained in the Plan or Disclosure Statement shall: (1) constitute a waiver or release of any Claims, Interests, or Causes of Action; (2) prejudice in any manner the rights of such Debtor or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking of any sort by such Debtor or any other Entity.

E.    <u>Satisfaction of Conditions Precedent to Confirmation</u>:   Upon entry of a Confirmation Order acceptable to the Debtors and the Creditors' Committee, each of the conditions precedent to Confirmation, as set forth in ARTICLE X.A, shall be deemed to have been satisfied or waived in accordance with the Plan.

**ARTICLE XI.**
**MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN**

A.    <u>Modification and Amendments</u>:  Except as otherwise specifically provided in the Plan, the Debtors, with the consent of the Creditors' Committee as to material terms, reserve the right to modify the Plan and seek Confirmation consistent with the Bankruptcy Code.  Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, each of the

Debtors expressly reserves its respective rights to revoke or withdraw, or, with the consent of the Creditors' Committee, to alter, amend, or modify materially the Plan with respect to such Debtor, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan. Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with ARTICLE XI. Upon its Filing, the Plan Supplement may be inspected in the office of the clerk of the Bankruptcy Court or its designee during normal business hours, at the Bankruptcy Court's website at www.nysb.uscourts.gov, and at the Debtors' private website at http://www.kccllc.net/calpine. The documents contained in the Plan Supplement are an integral part of the Plan and shall be approved by the Bankruptcy Court pursuant to the Confirmation Order.

B.      Effect of Confirmation on Modifications:  Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C.      Revocation or Withdrawal of Plan:  The Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date and to file subsequent plans of reorganization. If the Debtors revoke or withdraw the Plan, or if Confirmation or Consummation does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of executory contracts or unexpired leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of such Debtor or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by such Debtor or any other Entity.

## ARTICLE XII.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.      Allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2.      Decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.    Resolve any matters related to: (a) the assumption, assumption and assignment, or rejection of any executory contract or unexpired lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Cure or Claims arising therefrom, including Cure or Claims pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any executory contract or unexpired lease that is assumed; (c) the Reorganized Debtors amending, modifying, or supplementing, after the Effective Date, pursuant to ARTICLE V, any executory contracts or unexpired leases to the list of executory contracts and unexpired leases to be assumed or rejected or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory or expired;

4.    Ensure that distributions to Holders of Allowed Claims and Interests are accomplished pursuant to the provisions of the Plan;

5.    Adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.    Adjudicate, decide, or resolve any and all matters related to Causes of Action;

7.    Adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

8.    Enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

9.    Enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

10.    Resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

11.    Issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

12.    Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, and other provisions contained in ARTICLE VIII and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

13.    Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid pursuant to ARTICLE VII.E.1;

14.     Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

15.     Determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement;

16.     Enter an order or Final Decree concluding or closing the Chapter 11 Cases;

17.     Adjudicate any and all disputes arising from or relating to distributions under the Plan;

18.     Consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

19.     Determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

20.     Hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

21.     Hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

22.     Hear and determine all disputes involving the existence, nature, or scope of the Debtors' discharge, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

23.     Enforce all orders previously entered by the Bankruptcy Court; and

24.     Hear any other matter not inconsistent with the Bankruptcy Code.

## ARTICLE XIII.
## MISCELLANEOUS PROVISIONS

A.     Immediate Binding Effect:  Subject to ARTICLE X.B and notwithstanding Bankruptcy Rules 3020(e), 6004(g), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and any and all Holders of Claims or Interests (irrespective of whether such Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan or herein, each Entity acquiring property under the Plan, and any and all non-Debtor parties to executory contracts and unexpired leases with the Debtors.

B.    Additional Documents:  On or before the Effective Date, the Debtors may file with the Bankruptcy Court such agreements and other documents in form and substance acceptable to the Creditors' Committee as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtors or Reorganized Debtors, as applicable, and all Holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C.    Payment of Statutory Fees:  All fees payable pursuant to section 1930(a) of the Judicial Code, as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code, shall be paid for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.

D.    Dissolution of Committees:  Upon the Effective Date, the Creditors' Committee shall dissolve automatically (except with respect to any pending litigation or contested matter to which the Creditors' Committee is a party, any appeals Filed regarding Confirmation, the resolution of any substantial contribution applications, and the resolution of applications for Professional Claims), and members thereof shall be released and discharged from all rights, duties, responsibilities, and liabilities arising from, or related to, the Chapter 11 Cases and under the Bankruptcy Code; provided, however, that notwithstanding the foregoing: (1) the post-Effective Date Creditors' Committee shall consist of no more than five members; (2) the Creditors' Committee shall automatically dissolve upon payment in full of all Allowed Claims (after reconciliation of all Disputed Claims); (3) any consent or consultation rights of the Creditors' Committee set forth in the Plan will cease to be of any force and effect upon the dissolution of the Creditors' Committee; and (4) after the Effective Date the Creditors' Committee shall retain only those professional advisors or experts on terms that are reasonably acceptable to the Reorganized Debtors or authorized to be retained by further order of the Bankruptcy Court; provided, however, that the Creditors' Committee's professional advisors and experts that have been retained by Bankruptcy Court order prior to the Effective Date shall be deemed reasonably acceptable to the Reorganized Debtors (but not necessarily as to compensation).  The Reorganized Debtors shall continue to compensate the Creditors' Committee's professional advisors for reasonable services provided in connection with any of the foregoing post-Effective Date activities.

Upon the Effective Date, the Equity Committee shall dissolve automatically, except with respect to applications for Professional Claims, and members thereof shall be released and discharged from all rights, duties, responsibilities, and liabilities arising from, or related to, the Chapter 11 Cases and under the Bankruptcy Code.

E.    Reservation of Rights:  Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order.  None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

F.    <u>Successors and Assigns</u>:  The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

G.    <u>Service of Documents</u>

1.    After the Effective Date, any pleading, notice, or other document required by the Plan to be served on or delivered to the Reorganized Debtors shall be served on:

| Debtors | Counsel to Debtors |
|---|---|
| Calpine Corporation<br>717 Texas Avenue, Suite 1000<br>Houston, Texas 77002<br>Attn.:  Gregory L. Doody, Esq. | Kirkland & Ellis LLP<br>153 East 53rd Street<br>New York, New York 10022<br>Attn.:  Richard M. Cieri, Esq.<br><br>and<br><br>Kirkland & Ellis LLP<br>200 East Randolph Street<br>Chicago, Illinois 60601<br>Attn.:  Marc Kieselstein, P.C.<br>        David R. Seligman, Esq.<br>        James J. Mazza, Jr., Esq. |
| **United States Trustee** | **Counsel to the DIP Lenders** |
| Office of the United States Trustee<br>for the Southern District of New York<br>33 Whitehall Street, 21st Floor<br>New York, New York 10004<br>Attn.:  Paul K. Schwartzberg, Esq. | Simpson Thacher & Bartlett LLP<br>425 Lexington Avenue<br>New York, New York 10017<br>Attn.:  Peter V. Pantaleo, Esq.<br>        David J. Mack, Esq. |
| **Counsel to the Creditors' Committee** | **Counsel to the Equity Committee** |
| Akin Gump Strauss Hauer & Feld LLP<br>590 Madison Avenue<br>New York, New York 10022-2524<br>Attn.:  Michael S. Stamer, Esq.<br>        Philip C. Dublin, Esq. | Fried, Frank, Harris, Shriver & Jacobson LLP<br>One New York Plaza<br>New York, New York 10004<br>Attn.:  Brad E. Scheler, Esq.<br>        Gary L. Kaplan, Esq. |
| **Counsel to Second Lien Ad Hoc Committee** | **Counsel to Lenders of New Credit Facility** |
| Paul Weiss Rifkind Wharton & Garrison LLP<br>1285 Avenue of the Americas<br>New York, New York 10019-6064<br>Attn.:  Alan W. Kornberg, Esq.<br>        Andrew N. Rosenberg, Esq.<br>        Elizabeth R. McColm, Esq. | Simpson Thatcher & Bartlett LLP<br>425 Lexington Avenue<br>New York, New York 10017<br>Attn.:  Peter V. Pantaleo, Esq.<br>        David J. Mack, Esq. |

K&E 12300541.14

2.      After the Effective Date, the Debtors have authority to send a notice to Entities that to continue to receive documents pursuant to Bankruptcy Rule 2002, they must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the Effective Date, the Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

3.      In accordance with Bankruptcy Rules 2002 and 3020(c), within ten business days of the date of entry of the Confirmation Order, the Debtors shall serve the Notice of Confirmation by United States mail, first class postage prepaid, by hand, or by overnight courier service to all parties having been served with the Confirmation Hearing Notice; provided, however, that no notice or service of any kind shall be required to be mailed or made upon any Entity to whom the Debtors mailed a Confirmation Hearing Notice, but received such notice returned marked "undeliverable as addressed," "moved, left no forwarding address" or "forwarding order expired," or similar reason, unless the Debtors have been informed in writing by such Entity, or are otherwise aware, of that Entity's new address. To supplement the notice described in the preceding sentence, within twenty days of the date of the Confirmation Order the Debtors shall publish the Notice of Confirmation once in The Wall Street Journal (National Edition).  Mailing and publication of the Notice of Confirmation in the time and manner set forth in the this paragraph shall be good and sufficient notice under the particular circumstances and in accordance with the requirements of Bankruptcy Rules 2002 and 3020(c), and no further notice is necessary.

H.      Term of Injunctions or Stays:   Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.   All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

I.      Entire Agreement:   Except as otherwise indicated, the Plan and the Plan Supplement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

J.      Governing Law:  Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control), and corporate governance matters; provided, however, that corporate governance matters relating to Debtors or Reorganized Debtors, as applicable, not incorporated in New York shall be governed by the laws of the state of incorporation of the applicable Debtor or Reorganized Debtor, as applicable.

K.    Exhibits:  All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.  Except as otherwise provided in the Plan, such exhibits and documents included in the Plan Supplement shall be Filed with the Bankruptcy Court on or before the Plan Supplement Filing Date.  After the exhibits and documents are Filed, copies of such exhibits and documents shall have been available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Debtors' private website at http://www.kccllc.net/calpine or the Bankruptcy Court's website at www.nysb.uscourts.gov.   To the extent any exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of the Plan shall control.

L.    Nonseverability of Plan Provisions:  If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.   Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.   The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the Debtors' consent and, subject to ARTICLE XI.A, the Creditors' Committee's consent;  and (3) nonseverable and mutually dependent.

M.    Closing of Chapter 11 Cases:  The Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Cases, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

N.    **Waiver or Estoppel:  Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, Secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, the Creditors' Committee or its counsel, the Equity Committee or its counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.  NOTWITHSTANDING ANYTHING CONTAINED IN THE DISCLOSURE STATEMENT TO THE CONTRARY, AS SET FORTH IN THE PLAN, ACTUAL DISTRIBUTIONS UNDER THE PLAN TO CREDITORS AND, IF APPLICABLE, EQUITY SECURITY HOLDERS WILL BE PREDICATED ON THE NEW CALPINE TOTAL ENTERPRISE VALUE AS DETERMINED BY THE BANKRUPTCY COURT.  NEITHER A VOTE TO ACCEPT THE PLAN BY A CREDITOR OR EQUITY SECURITY HOLDER, NOR THE ACCEPTANCE OF THE PLAN BY ANY CLASS OF CREDITORS OR EQUITY SECURITY HOLDERS, SHALL IN ANY WAY BE DEEMED TO (I) IMPAIR THE RIGHT OF A CREDITOR OR EQUITY SECURITY HOLDER, OR AD HOC**

**COMMITTEE OR OFFICIAL COMMITTEE REPRESENTING THE INTERESTS OF ANY CLASS OF CREDITORS OR EQUITY SECURITY HOLDERS TO ASSERT IN CONNECTION WITH CONFIRMATION THAT THE NEW CALPINE TOTAL ENTERPRISE VALUE IS DIFFERENT FROM THE AMOUNT ESTIMATED BY THE DEBTORS OR ANY OTHER PARTY OR (II) BE DEEMED A WAIVER OF ANY PARTY'S RIGHT TO OBJECT TO THE PLAN UNDER BANKRUPTCY CODE SECTIONS 1129(a)(7) OR 1129(b)(2) BASED ON VALUATION.**

O.     <u>Conflicts</u>:  Except as set forth in the Plan, to the extent that any provision of the Disclosure Statement, the Plan Supplement, or any other order (other than the Confirmation Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements, or amendments to any of the foregoing), conflict with or are in any way inconsistent with any provision of the Plan, the Plan shall govern and control.

New York, New York
Dated:  December 19, 2007

CALPINE CORPORATION (for itself and all other Debtors)

By:    /s/ Gregory L. Doody
Name:   Gregory L. Doody
Title:    Executive Vice President, General Counsel, and Secretary

89

# EXHIBIT C

**UNITED STATES BANKRUPTCY COURT**
**THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| Calpine Corporation, et al., | ) Case No. 05-60200 (BRL) |
| | ) Jointly Administered |
| Debtors. | ) |
| | ) |

**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER**
**CONFIRMING SIXTH AMENDED JOINT PLAN OF**
**REORGANIZATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

Calpine Corporation and certain of its direct and indirect subsidiaries, as debtors and

debtors in possession (collectively, the "Debtors") having:[1]

a. beginning on December 20, 2005 (the "Petition Date"), commenced chapter 11 cases (collectively, the "Chapter 11 Cases") by filing voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C §§ 101-1532 (as amended, the "Bankruptcy Code");

b. continued to operate their businesses and manage their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code;

c. filed, on June 20, 2007, the *Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* and the *Debtors' Disclosure Statement for Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code*, which plan and related documents were subsequently amended several times;

d. filed, beginning on June 20, 2007 and continuing thereafter, the various documents comprising the Plan Supplement, with all exhibits to the Plan Supplement having been filed as of November 16, 2007, and with amendments to the exhibits to the Plan Supplement continuing to be filed;

e. filed, on September 27, 2007, the *Debtors' Fourth Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 6139] and the *Debtors' Fourth Amended Disclosure Statement for Debtors' Fourth*

---

[1] Unless otherwise noted, capitalized terms not defined in the *Findings of Fact, Conclusions of Law, and Order Confirming Fifth Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* (the "Confirmation Order"), shall have the meanings ascribed to them in *Debtors' Sixth Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 7237] (as the same may have been subsequently modified, supplemented, and amended, the "Plan"). The rules of interpretation set forth in Article I.B of the Plan shall apply to the Confirmation Order.

*Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* (the "Disclosure Statement") [Docket No. 6140];

f.  distributed solicitation materials beginning on or about October 1, 2007, consistent with the Bankruptcy Code, the Bankruptcy Rules, and the *Order (A) Approving The Adequacy Of The Debtors' Disclosure Statement; (B) Approving Solicitation And Notice Procedures With Respect To Confirmation Of The Debtors' Proposed Plan Of Reorganization; (C) Approving The Form Of Various Ballots And Notices In Connection Therewith; And (D) Scheduling Certain Dates With Respect Thereto* entered on September 26, 2007 [Docket No. 6136] (the "Solicitation Procedures Order"), as evidenced by the *Affidavit of Service of Jade Hwa of Kurtzman Carson Consultants LLC* [Docket No. 6311] (the "KCC Affidavit") and the *Affidavits of Service of Jane Sullivan of Financial Balloting Group LLC of Solicitation Packages and Non-Voting Notices on Holders of Public Securities* [Docket Nos. 6371, 6407, 6432] (the "FBG Affidavits");

g.  published notice of the Confirmation Hearing (the "Confirmation Hearing Notice") in *The Wall Street Journal*, *USA Today*, *The Financial Times*, *The San Jose Mercury News*, *The Houston Chronicle*, and *The Toronto Globe & Mail*, consistent with the Solicitation Procedures Order, as evidenced by the *Affidavit of Publication in The Wall Street Journal of Tiffany Cox* [Docket No. 6398], the *Affidavit of Publication in USA Today National Edition of Marcus Edmonds* [Docket No. 6346], the *Affidavit of Publication in The Financial Times of Tim Hart* [Docket No. 6957], the *Affidavit of Publication in The San Jose Mercury News of Gwen Whinn* [Docket No. 6959], the *Affidavit of Publication in The Houston Chronicle of Gail Feagins* [Docket No. 6958], and *Affidavit of Publication in The Toronto Globe & Mail of Meagan Russell* [Docket No. 6960] (collectively, the "Publication Affidavits");

h.  filed, on November 19, 2007, the Debtors' *Updated Valuation Analysis for Calpine Corporation et. al.* [Docket No. 6642];

i.  filed, on November 20, 2007, the Debtors' *Notice Regarding Identification of Members of Post-Emergence Board of Directors* [Docket No. 6659];

j.  filed, on December 12, 2007, the *Declaration of Robb C. McWilliams Regarding the Tabulation of Claims for the Solicitation of the Debtors' Fourth Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code* [Docket No. 7028], the *Certification of Jane Sullivan with respect to the Tabulation of Votes on the Debtors' Fourth Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code* [Docket No. 7029], and the *Affidavit of Christopher R. Schepper Regarding Votes Accepting or Rejecting the Debtors' Fourth Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code* [Docket No. 7030] (collectively, the "Voting Certifications") each detailing the results of the Plan voting process;

k.  filed, on December 13, 2007, the *Debtors' Reply Memorandum in Support of Debtors' Valuation* (the "Valuation Brief") [Docket No. 7033];

l.  filed, on December 13, 2007, the *Reorganizing Debtors' Memorandum of Law (A) In Support of Confirmation of the Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code and (B) In Response to Objections Thereto* [Docket No. 7037] (the "Plan Confirmation Brief"), together with the *Affidavit of Gregory L. Doody in Support of Confirmation of the Debtors' Fourth Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy*

*Code* (the "Doody Affidavit"), the *Affidavit of Samuel M. Greene in Support of Confirmation of the Debtors' Fourth Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* (the "Greene Affidavit"); the *Affidavit of Lisa J. Donahue in Support of Confirmation of the Debtors' Fourth Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* (the "Donahue Affidavit"); and the *Affidavit of John Castellano in Support of Confirmation of the Debtors' Fourth Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* (the "Castellano Affidavit");

m. filed, on December 19, 2007, the *Calpine Term Sheet Regarding Warrants to be Issued to Holders of Interests Under Calpine Plan of Reorganization* (the "Warrant Term Sheet");

n. filed, on December 19, 2007, the *Supplemental Affidavit of Christopher R. Schepper Regarding Votes Accepting or Rejecting the Debtor' Fourth Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code* (the "Supplemental Voting Certification"); and

o. filed, on December 19, 2007, the Plan.

This Court having:

a. entered the Solicitation Procedures Order on September 26, 2007;

b. set December 17, 2007, at 10:00 a.m., prevailing Eastern Time, as the date and time for the commencement of the Confirmation Hearing pursuant to Bankruptcy Rules 3017 and 3018 and sections 1126, 1128, and 1129 of the Bankruptcy Code;

c. reviewed the Plan, Disclosure Statement, the Plan Confirmation Brief, the Valuation Brief, the Doody Affidavit, the Greene Affidavit, the Donahue Affidavit, the Castellano Affidavit, the Voting Certifications, the Official Committee of Unsecured Creditors' Memorandum of Law In Support of Confirmation of the Debtors' Fifth Joint Amended Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code, the Warrant Term Sheet, the Supplemental Voting Certification, and all filed pleadings, exhibits, statements, and comments regarding Confirmation, including all objections, statements, and reservations of rights;

d. heard the statements, arguments, and objections made by counsel in respect of Confirmation;

e. considered all oral representations, testimony, documents, filings, and other evidence regarding Confirmation;

f. overruled any and all objections to the Plan and Confirmation thereof and all statements and reservations of rights not consensually resolved or withdrawn, unless otherwise indicated; and

g. taken judicial notice of the papers and pleadings filed in the Chapter 11 Cases.

NOW, THEREFORE, it appearing to the Bankruptcy Court that notice of the Confirmation Hearing and the opportunity for any party in interest to object to Confirmation

have been adequate and appropriate as to all parties affected or to be affected by the Plan and the transactions contemplated thereby, and the legal and factual bases set forth in the documents filed in support of Confirmation and presented at the Confirmation Hearing establish just cause for the relief granted herein; and after due deliberation thereon and good cause appearing therefore, the Court hereby makes and issues the following Findings of Fact, Conclusions of Law, and Orders:

## I.    FINDINGS OF FACT AND CONCLUSIONS OF LAW

IT IS HEREBY DETERMINED, FOUND, ADJUDGED, DECREED, AND ORDERED THAT:

### A.    Jurisdiction and Venue.

1.    Beginning on the Petition Date, the Debtors commenced the Chapter 11 Cases. Venue in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") was proper as of the Petition Date pursuant to 28 U.S.C. §§1408 and 1409 and continues to be proper during the Chapter 11 Cases.  Confirmation of the Plan is a core proceeding under 28 U.S.C. § 157(b)(2).  The Bankruptcy Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  Confirmation of the Plan is a core proceeding pursuant to section 157(b)(2)(L) of title 28 of the United States Code.  The Bankruptcy Court has exclusive jurisdiction to determine whether the Plan complies with the applicable provisions of the Bankruptcy Code and should be confirmed.

### B.    Eligibility for Relief.

2.    The Debtors were and are entities eligible for relief under section 109 of the Bankruptcy Code.

**C.**     **Commencement and Joint Administration of the Chapter 11 Cases.**

3.     Beginning on the Petition Date, each of the above-captioned Debtors commenced a case under chapter 11 of the Bankruptcy Code.  By prior order of the Bankruptcy Court, the Chapter 11 Cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Bankruptcy Rule 1015.  The Debtors have operated their businesses and managed their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in the Chapter 11 Cases.

**D.**     **Judicial Notice.**

4.     The Bankruptcy Court takes judicial notice of (and deems admitted into evidence for Confirmation) the docket of the Chapter 11 Cases and all related adversary proceedings and appeals maintained by the clerk of the applicable court or its duly appointed agent, including all pleadings and other documents on file, all orders entered, all hearing transcripts, and all evidence and arguments made, proffered, or adduced at the hearings held before the applicable court during the pendency of the Chapter 11 Cases.  Any resolutions of objections to Confirmation explained on the record at the Confirmation Hearing are hereby incorporated by reference.  All unresolved objections, statements, and reservations of rights are overruled on the merits.

**E.**     **Burden of Proof.**

5.     The Debtors, as proponents of the Plan, have met their burden of proving the elements of sections 1129(a) and 1129(b) of the Bankruptcy Code by a preponderance of the evidence, which is the applicable evidentiary standard for the Confirmation.  Further, the Debtors have proven the elements of sections 1129(a) and 1129(b) of the Bankruptcy Code by clear and convincing evidence.

F.    **Solicitation Procedures Order.**

6.    On September 26, 2007, the Bankruptcy Court entered the Solicitation Procedures Order, which, among other things: (a) approved the Disclosure Statement as containing adequate information within the meaning of section 1125 of the Bankruptcy Code and Bankruptcy Rule 3017; (b) fixed September 27, 2007, as the Voting Record Date (as defined in the Solicitation Procedures Order); (c) fixed November 30, 2007, as the Voting Deadline for voting to accept or reject the Plan; (d) fixed November 30, 2007, as the deadline for objecting to the Plan; (e) fixed December 18, 2007, at 10:00 a.m. prevailing Eastern Time, as the date and time for the commencement of the Confirmation Hearing (which date was subsequently changed to December 17, 2007, at 10:00 a.m. prevailing Eastern Time, and later further adjourned to December 19, 2007); and (e) approved the form and method of notice of the Confirmation Hearing Notice set forth therein.

G.    **Transmittal and Mailing of Materials; Notice.**

7.    As evidenced by the KCC Affidavit and the FBG Affidavits, due, adequate, and sufficient notice of the Disclosure Statement, Plan, Plan Supplement, and Confirmation Hearing, together with all deadlines for voting on or objecting to the Plan, has been given to: (a) all known Holders of Claims and Interests; (b) parties that requested notice in accordance with Bankruptcy Rule 2002; (c) all counterparties to unexpired leases and executory contracts with the Debtors; and (d) all taxing authorities listed on the Debtors' Schedules or Claims Register, in substantial compliance with the Solicitation Procedures Order and Bankruptcy Rules 2002(b), 3017, and 3020(b), and no other or further notice is or shall be required.  Adequate and sufficient notice of the Confirmation Hearing, as continued from time to time, and other bar dates and hearings described in the Solicitation Procedures Order was given in compliance with the Bankruptcy Rules and Solicitation Procedures Order, and no other or further notice is or shall be required.

8.     The Debtors published the Confirmation Hearing Notice once each in *The Wall Street Journal*, *USA Today*, *The Financial Times*, *The San Jose Mercury News*, *The Houston Chronicle*, and *Toronto Globe & Mail*, in substantial compliance with the Solicitation Procedures Order and Bankruptcy Rule 2002(l), as evidenced by the Publication Affidavits.

**H.      Solicitation.**

9.     Votes for acceptance and rejection of the Plan were solicited in good faith and in compliance with sections 1125 and 1126 of the Bankruptcy Code, Bankruptcy Rules 3017 and 3018, the Disclosure Statement, the Solicitation Procedures Order, all other applicable provisions of the Bankruptcy Code and all other applicable rules, laws, and regulations.  Specifically, the solicitation materials approved by the Bankruptcy Court in the Solicitation Procedures Order (including the Disclosure Statement, Plan, Ballots, and Solicitation Procedures Order) were transmitted to and served on all Holders of Claims or Interests in Classes that were entitled to vote to accept or reject the Plan, as well as to other parties in interest in the Chapter 11 Cases, in compliance with section 1125 of the Bankruptcy Code, the Solicitation Procedures Order, and the Bankruptcy Rules.  Such transmittal and service were adequate and sufficient, and no further notice is or shall be required.  In addition, Holders of Claims or Interests in Classes that were not entitled to vote to accept or reject the Plan were provided with certain non-voting materials approved by the Bankruptcy Court in compliance with the Solicitation Procedures Order.  The Debtors were excused from mailing solicitation materials to those Entities to whom the Debtors mailed a notice regarding the hearing on the Disclosure Statement and received a notice from the United States Postal Service or other carrier that such notice was undeliverable.  If an Entity changed its mailing address after the Petition Date, the burden was on such Entity, not the Debtors, to advise Kurtzman Carson Consultants LLC of the new address.  All procedures used to distribute solicitation materials to Holders of Claims and Interests were fair, and conducted in

accordance with the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules, and all other applicable rules, laws, and regulations.

## I.    Voting Certifications.

10.    Prior to the Confirmation Hearing, the Debtors filed the Voting Certifications and the Supplemental Voting Certification.  All procedures used to tabulate the Ballots and Master Ballots were fair and conducted in accordance with the Solicitation Procedures Order, the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules, and all other applicable rules, laws, and regulations.

11.    As evidenced by the Voting Certifications and the Supplemental Voting Certification, Class E-1 (Interests) (the "Rejecting Class") voted to reject the Plan.  As further evidenced by the Voting Certifications and Supplemental Voting Certification, all other voting Classes, specifically Classes C-1 (Senior Note Claims), C-2 (General Note Claims), C-3 (Subordinated Note Claims), C-4 (ULC1 Settlement Claims), C-5 (Canadian Guarantee Claims), C-6 (Canadian Intercompany Claims), C-7 (Rejection Damages Claims), C-8 (General Unsecured Claims), C-9 (Unsecured Makewhole Claims), and C-10 (Unsecured Convenience Class Claims) (collectively, the "Impaired Accepting Classes") voted to accept the Plan.

12.    In addition, Creditors in Classes A-1 (First Lien Debt Claims), A-2 (Second Lien Debt Claims), A-3 (Other Secured Claims), B (Other Priority Claims), C-11 (Intercompany Claims), and C-12 (CalGen Makewhole Claims) are Unimpaired and deemed to accept the Plan and, therefore, are not entitled to vote to accept or reject the Plan.  Creditors in Class E-3 (Intercompany Interests) are Unimpaired and deemed to accept the Plan (to the extent Reinstated) or are Impaired but deemed to accept the Plan (to the extent not Reinstated), and, in either event, are not entitled to vote to accept or reject the Plan.

**J.    Plan Supplement.**

13.    Beginning on June 20, 2007, and continuing thereafter, the Debtors filed certain components of the Plan Supplement.  The Plan Supplement complies with the terms of the Plan, and the filing and notice of such documents was good and proper in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Solicitation Procedures Order, and no other or further notice is or shall be required.  The Debtors are authorized to modify the Plan Supplement following entry of the Confirmation Order in accordance with the terms of the Plan.

**K.    Modifications to the Plan.**

14.    Subsequent to solicitation, the Debtors made certain non-material modifications to the Plan.  All modifications to the Plan since the entry of the Solicitation Procedures Order are consistent with all of the provisions of the Bankruptcy Code, including, but not limited to, sections 1122, 1123, 1125, and 1127 of the Bankruptcy Code, including, *inter alia*, (a) the modification regarding the CalGen Lenders approved by entry of an order of the Bankruptcy Court on November 8, 2007 [Docket No. 6542] (the "CalGen Modification"); and (b) the modifications regarding the settlement of certain objections to the Plan and certain other changes to the Plan that resulted in acceptance of the Plan by all Classes of Claims and resolved the valuation dispute among the Debtors, the Creditors' Committee, and the Equity Committee approved by entry of an order of the Bankruptcy Court on December 19th, 2007.  Except as provided for by law, contract, or prior order of the Bankruptcy Court, none of the modifications made since the commencement of solicitation adversely affects the treatment of any Holder of a Claim or Interest under the Plan, including, without limitation, the CalGen Modification and the subsequent modifications.  Accordingly, pursuant to section 1127(a) of the Bankruptcy Code, none of the modifications require additional disclosure under section 1125 of the Bankruptcy Code or resolicitation of votes under section 1126 of the Bankruptcy Code.

15.     Prior notice regarding the substance of any modifications to the Plan, coupled with the filing with the Bankruptcy Court of the Plan as modified, and the disclosure of the Plan modifications on the record at or prior to the Confirmation Hearing constitute due and sufficient notice of any and all of such modifications.

16.     In accordance with section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, all Holders of Claims who voted to accept the Plan or who are conclusively presumed to have accepted the Plan are deemed to have accepted the Plan as modified by the Plan modifications.   No Holder of a Claim or Interest shall be permitted to change its vote as a consequence of the Plan modifications, unless otherwise agreed to by the Holder of the Claim or Interest and the Debtors.   The modifications to the Plan are hereby approved, pursuant to section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019.   The Plan as modified shall constitute the Plan submitted for Confirmation.

## L.     **Bankruptcy Rule 3016.**

17.     The Plan is dated and identifies the Entities submitting it, thereby satisfying Bankruptcy Rule 3016(a).   The filing of the Disclosure Statement with the clerk of the Bankruptcy Court satisfied Bankruptcy Rule 3016(b).

## M.     **Compliance with the Requirements of Section 1129 of the Bankruptcy Code.**

18.     The Plan complies with all applicable provisions of section 1129 of the Bankruptcy Code as follows.

### 1.     **Section 1129(a)(1)—Compliance of the Plan with Applicable Provisions of the Bankruptcy Code.**

19.     The Plan complies with all applicable provisions of the Bankruptcy Code as required by section 1129(a)(1) of the Bankruptcy Code, including sections 1122 and 1123.

### (i)    Section 1122 and 1123(a)(1)—Proper Classification.

20.    The classification of Claims and Interests under the Plan is proper under the Bankruptcy Code.    Pursuant to sections 1122(a) and 1123(a)(1) of the Bankruptcy Code, Article III of the Plan provides for the separate classification of Claims and Interests into twenty Classes, based on differences in the legal nature or priority of such Claims and Interests (other than DIP Facility Claims, Administrative Claims, and Priority Tax Claims, which are addressed in Article II of the Plan, and which are required not to be designated as separate Classes pursuant to section 1123(a)(1) of the Bankruptcy Code).    Valid business, factual, and legal reasons exist for the separate classification of the various Classes of Claims and Interests created under the Plan, the classifications were not done for any improper purpose, and the creation of such Classes does not unfairly discriminate between or among Holders of Claims or Interests.

21.    As required by section 1122(a) of the Bankruptcy Code, each Class of Claims and Interests contains only Claims or Interests that are substantially similar to the other Claims or Interests within that Class.    In addition, in accordance with section 1122(b) of the Bankruptcy Code, the Plan provides for Class C-10, which is a Class of Unsecured Claims of $50,000 or less. Class C-10 is reasonable and necessary for administrative convenience and thus is proper.    As a result thereof, the requirements of sections 1122(a), 1122(b), and 1123(a)(1) of the Bankruptcy Code have been satisfied.

### (ii)    Section 1123(a)(2)—Specification of Unimpaired Classes.

22.    Article III of the Plan specifies that Claims in Classes A-1, A-2, A-3, B, C-11, C-12, and E-3 are Unimpaired under the Plan.    Additionally, Article II of the Plan specifies that Administrative Claims, DIP Facility Claims, and Priority Tax Claims are Unimpaired, although these Claims are not classified under the Plan.    As a result thereof, the requirements of section 1123(a)(2) of the Bankruptcy Code have been satisfied.

### (iii)     Section 1123(a)(3)—Specification of Treatment of Impaired Classes.

23.     Article III of the Plan specifies the treatment of each Impaired Class under the Plan, including Classes C-1, C-2, C-3, C-4, C-5, C-6, C-7, C-8, C-9, C-10, D, E-1, and E-2. As a result thereof, the requirements of section 1123(a)(3) of the Bankruptcy Code have been satisfied.

### (iv)     Section 1123(a)(4)—No Discrimination.

24.     Pursuant to section 1123(a)(4) of the Bankruptcy Code, Article III of the Plan uniformly provides for the same treatment of each Claim or Interest in a particular Class, as the case may be, unless the Holder of a particular Claim or Interest has agreed to a less favorable treatment with respect to such Claim or Interest. As a result thereof, the requirements of section 1123(a)(4) of the Bankruptcy Code have been satisfied.

### (v)     Section 1123(a)(5)—Additional Plan Provisions.

25.     Pursuant to section 1123(a)(5) of the Bankruptcy Code, Article IV and various other provisions of the Plan specifically provide in detail adequate and proper means for the Plan's implementation, including: (a) substantive consolidation of all of the Estates into a single consolidated Estate for all purposes associated with Confirmation and Consummation; (b) the continuation of the corporate existence of the Debtors and the vesting of assets in the Reorganized Debtors; (c) the amendment of the certificates of incorporation, charter, and bylaws of the Debtors as required to be consistent with the provisions of the Plan and the Bankruptcy Code; (d) the cancellation of the Old Calpine Common Stock; (e) the authorization for the Reorganized Debtors' entry into the New Credit Facility and the execution of related documents; (f) the authorization and issuance or distribution of the New Calpine Plan Securities and the execution of related documents; (g) the selection of the initial directors and officers of the Reorganized Debtors; (h) the sources of Cash for distributions under the Plan; (i) establishment

of the Disputed Claims Reserve; and (j) establishment of the Professional Fee Escrow Account which will ensure the payment of all Accrued Professional Compensation awardable and allowable under sections 328, 330(a), or 331 of the Bankruptcy Code. Moreover, the Reorganized Debtors will have, immediately upon the Effective Date, sufficient Cash to make all payments required to be made on the Effective Date pursuant to the terms of the Plan. As a result thereof, the requirements of section 1123(a)(5) of the Bankruptcy Code have been satisfied.

### (vi)     Section 1123(a)(6)—Voting Power of Equity Securities.

26.     Article IV.I of the Plan provides that the certificate of incorporation of Reorganized Calpine and the certifications of incorporation of the Reorganized Debtors other than Reorganized Calpine will prohibit the issuance of non-voting equity securities, thereby satisfying section 1123(a)(6) of the Bankruptcy Code.

### (vii)     Section 1123(a)(7)—Selection of Officers and Directors.

27.     Articles IV.L and IV.M of the Plan and the Board Selection Term Sheet describe the manner of selection of directors and officers of Reorganized Calpine. In addition, the identities and affiliations of any and all persons proposed to serve as a director or officer were disclosed in filings with the Bankruptcy Court prior to Confirmation, and such filings complied with the Board Selection Term Sheet and applicable law. The selection of the initial directors and officers of the Reorganized Debtors was consistent with the interests of Holders of Claims and Interests and public policy. As a result, the requirements of section 1123(a)(7) of the Bankruptcy Code have been satisfied.

### (viii)     Section 1123(b)—Discretionary Contents of the Plan.

28.     The Plan contains various provisions that may be construed as discretionary, but are not required for Confirmation under the Bankruptcy Code. As set forth below, such

discretionary provisions comply with section 1123(b) of the Bankruptcy Code and are not inconsistent in any way with the applicable provisions of the Bankruptcy Code.  Thus, section 1123(b) of the Bankruptcy Code is satisfied.

(a)     **Section 1123(b)(1)-(2)—Claims and Executory Contracts.**

29.     Pursuant to sections 1123(b)(1) and 1123(b)(2) of the Bankruptcy Code, respectively, Article III of the Plan impairs or leaves unimpaired, as the case may be, each Class of Claims and Interests, and Article V of the Plan provides for the assumption, assumption and assignment, or rejection of the executory contracts and unexpired leases of the Debtors not previously assumed, assumed or assigned, or rejected pursuant to section 365 of the Bankruptcy Code and appropriate authorizing orders of the Bankruptcy Court; provided, however, that subject to the limitations set forth in the Plan, the Debtors shall be authorized to assume or reject executory contracts and unexpired leases identified in Article V of the Plan and in the Plan Supplement at any time through and including fifteen days after the Effective Date, or such other date as set forth in Article V.C of the Plan.

(b)     **Section 1123(b)(3)—Release, Exculpation, Injunction, Discharge, and Preservation of Claims Provisions.**

30.     **Releases by the Debtors**.  The releases and discharges of claims and Causes of Action by the Debtors described in Article VIII.D of the Plan pursuant to section 1123(b)(3)(A) of the Bankruptcy Code represent a valid exercise of the Debtors' business judgment.  Pursuing any such claims against the Released Parties is not in the best interest of the Debtors' estates various constituencies as the costs involved likely would outweigh any potential benefit from pursuing such claims.

31.     **Releases by Holders of Claims and Interests**.  The releases of Claims and Causes of Action by Holders of Claims and Interests described in Article VIII.F of the Plan are

an important aspect of the Plan.  Such releases by Holders of Claims and Interests provide for the release by Holders of Claims and Interests that vote in favor of the Plan, who abstain from voting and choose not to opt out of the releases, or who have otherwise consented to give a release, and are consensual.  The Ballots explicitly stated that a vote to accept the Plan or abstention from voting without opting out of the releases each constitutes an acceptance and assent to the releases set forth in the Plan and directed parties to Article VIII of the Plan for further information about the release provisions.  Thus, those Holders of Claims and Interests voting to accept the Plan or abstaining from voting and choosing not to opt out of the releases were given due and adequate notice that they would be granting the releases by acting in such a manner.

32.     **Injunction**.  The injunction provisions set forth in Article VIII.G of the Plan are necessary to preserve and enforce the releases granted by the Plan in Article VIII.F and are narrowly tailored to achieve that purpose.

33.     **Exculpation**.  The exculpation provisions set forth in Article VIII.E of the Plan are appropriately tailored to protect the Exculpated Parties from inappropriate litigation and do not relieve any party of liability for gross negligence or willful misconduct.

34.     Thus, each of the discharge, release, indemnification, and exculpation provisions set forth in the Plan: (a) is within the jurisdiction of the Bankruptcy Court under 28 U.S.C. §§ 1334(a), 1334(b), and 1334(d); (b) is an essential means of implementing the Plan pursuant to section 1123(a)(6) of the Bankruptcy Code; (c) is an integral element of the transactions incorporated into the Plan; (d) confers material benefits on, and is in the best interests of, the Debtors, their Estates, and their Creditors; (e) is important to the overall objectives of the Plan to finally resolve all Claims among or against the parties-in-interest in the Chapter 11 Cases with respect to the Debtors; and (f) is consistent with sections 105, 1123, 1129, and other applicable

provisions of the Bankruptcy Code.  The record of the Confirmation Hearing and the Chapter 11 Cases is sufficient to support the discharge, release, exculpation, and injunction provisions contained in Article VIII of the Plan.

35.    **Preservation of Claims and Causes of Action**.   Article IV.Q of the Plan appropriately provides for the preservation by the Debtors of the Causes of Action in accordance with section 1123(b)(3)(B) of the Bankruptcy Code.  The provisions regarding Causes of Action in the Plan are appropriate and are in the best interests of the Debtors, their Estates, and Holders of Claims and Interests.

2.    **Section 1129(a)(2)—Compliance of the Debtors and Others With The Applicable Provisions of the Bankruptcy Code.**

36.    The Debtors, as proponents of the Plan, have complied with all applicable provisions of the Bankruptcy Code as required by section 1129(a)(2) of the Bankruptcy Code, including sections 1123, 1125, and 1126 of the Bankruptcy Code and Bankruptcy Rules 3017, 3018, and 3019.

37.    The Debtors and their respective present and former members, officers, directors, employees, advisors, attorneys, and agents did not solicit the acceptance or rejection of the Plan by any Holders of Claims or Interests prior to the approval and transmission of the Disclosure Statement.  Votes to accept or reject the Plan were only solicited by the Debtors and their agents after disclosure to Holders of Claims or Interests of adequate information as defined in section 1125(a) of the Bankruptcy Code.

38.    The Debtors and their respective present and former members, partners, representatives, officers, directors, employees, advisors, attorneys, and agents have solicited and tabulated votes on the Plan and have participated in the activities described in section 1125 of the Bankruptcy Code fairly, in good faith within the meaning of section 1125(e) of the Bankruptcy

Code, and in a manner consistent with the applicable provisions of the Solicitation Procedures Order, the Disclosure Statement, the Bankruptcy Code, the Bankruptcy Rules, and all other applicable rules, laws, and regulations, and are entitled to the protections afforded by section 1125(e) of the Bankruptcy Code and the exculpation provisions set forth in Article VIII of the Plan.

39.    The Debtors and their respective present and former members, officers, directors, employees, advisors, attorneys, and agents have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code with regard to the offering, issuance, and distribution of recoveries under the Plan and, therefore, are not, and on account of such distributions will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

   **3.    Section 1129(a)(3)—Proposal of Plan in Good Faith.**

40.    The Debtors have proposed the Plan in good faith and not by any means forbidden by law.  In determining that the Plan has been proposed in good faith, the Bankruptcy Court has examined the totality of the circumstances surrounding the filing of the Chapter 11 Cases, the Plan itself, and the process leading to its formulation.  The Debtors' good faith is evident from the facts and records of the Chapter 11 Cases, the Disclosure Statement and the hearing thereon, and the record of the Confirmation Hearing and other proceedings held in the Chapter 11 Cases. The Plan is the product of arm's-length negotiations between the Debtors, the Holders of various Claims and Interests, the Creditors' Committee, and the Equity Committee.  The Plan itself, and the process leading to its formulation, provide independent evidence of the Debtors' good faith, serve the public interest, and assure fair treatment of Holders of Claims and Interests.  Consistent with the overriding purpose of chapter 11, the Chapter 11 Cases were filed, and the Plan was

proposed, with the legitimate purpose of allowing the Debtors to reorganize and emerge from bankruptcy with a capital structure that will allow them to satisfy their obligations with sufficient liquidity and capital resources.

**4.    Section 1129(a)(4)—Bankruptcy Court Approval of Certain Payments as Reasonable.**

41.    The procedures set forth in the Plan for the Bankruptcy Court's review and ultimate determination of the fees and expenses to be paid by the Debtors in connection with the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, satisfy the objectives of and are in compliance with section 1129(a)(4) of the Bankruptcy Code.

**5.    Section 1129(a)(5)—Disclosure of Identity of Proposed Management, Compensation of Insiders and Consistency of Management Proposals with the Interests of Creditors and Public Policy.**

42.    The Plan complies with the requirements of section 1129(a)(5) of the Bankruptcy Code because the Debtors have disclosed (a) the identity and affiliations of each proposed director and officer of the Reorganized Debtors following Confirmation and (b) the identity of and nature of any compensation for any insider who will be employed or retained by the Reorganized Debtors.  The method of appointment of directors and officers was consistent with the interests of Holders of Claims and Interests and public policy.

**6.    Section 1129(a)(6)—Approval of Rate Changes.**

43.    The Plan does not contain any rate changes subject to the jurisdiction of any governmental regulatory commission and will not require governmental regulatory approval, therefore section 1129(a)(6) of the Bankruptcy Code is satisfied.

**7.    Section 1129(a)(7)—Best Interests of Holders of Claims and Interests.**

44.    The liquidation analysis included in the Plan Supplement (the "Liquidation Analysis") and the other evidence related thereto that was proffered or adduced at or prior to, or

in affidavits in connection with, the Confirmation Hearing: (a) are reasonable, persuasive, and credible; (b) utilize reasonable and appropriate methodologies and assumptions; (c) have not been controverted by other evidence; and (d) establish that, with respect to each Impaired Class, each Holder of an Allowed Claim or Interest in such Class has voted to accept the Plan or will receive under the Plan on account of such Claim or Interest property of a value, as of the Effective Date, that is not less than the amount such Holder would receive if the Debtors were liquidated on the Effective Date under chapter 7 of the Bankruptcy Code.  Thus, the Plan satisfies the "best interests of creditors test" set forth in section 1129(a)(7) of the Bankruptcy Code.

**8.      Section 1129(a)(8)—Conclusive Presumption of Acceptance by Unimpaired Classes; Acceptance of the Plan by Each Impaired Class.**

45.      Classes A-1, A-2, A-3, B, C-11, and E-3 are each Classes of Unimpaired Claims or Interests that are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.

46.      Because the Plan has not been accepted by the Rejecting Class, the Debtors sought Confirmation under section 1129(b), rather than section 1129(a)(8), of the Bankruptcy Code.  Thus, although section 1129(a)(8) of the Bankruptcy Code has not been satisfied with respect to the Rejecting Class, the Plan is confirmable because the Plan does not discriminate unfairly and is fair and equitable with respect to the Rejecting Class and thus satisfies section 1129(b) of the Bankruptcy Code with respect to such Class as described further below.

**9.      Section 1129(a)(9)—Treatment of Claims Entitled to Priority Pursuant to Section 507(a) of the Bankruptcy Code.**

47.      The treatment of Allowed Administrative Claims, Allowed Priority Tax Claims, and Allowed Other Priority Claims under Articles II, III, and IX of the Plan satisfies the requirements of and complies in all respects with section 1129(a)(9) of the Bankruptcy Code.

10.    **Section 1129(a)(10)—Acceptance By At Least One Impaired Class.**

48.    As set forth in the Voting Certifications and the Supplemental Voting Certification, the Impaired Accepting Classes have voted to accept the Plan. As such, there is at least one Class of Claims that is Impaired under the Plan and has accepted the Plan, determined without including any acceptance of the Plan by any insider, thus satisfying section 1129(a)(10) of the Bankruptcy Code in all respects.

11.    **Section 1129(a)(11)—Feasibility of the Plan.**

49.    The Plan satisfies section 1129(a)(11) of the Bankruptcy Code. The evidence proffered or adduced at, or prior to, or in affidavits filed in connection with, the Confirmation Hearing: (a) is reasonable, persuasive, and credible; (b) has not been controverted by other evidence; (c) establishes that the Plan is feasible and Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Reorganized Debtors or any successor to the Reorganized Debtors under the Plan; and (d) establishes that the Reorganized Debtors will have sufficient funds available to meet their obligations under the Plan, thus satisfying the requirements of section 1129(a)(11) of the Bankruptcy Code.

12.    **Section 1129(a)(12)—Payment of Bankruptcy Fees.**

50.    Article XIII.C of the Plan provides that all fees payable pursuant to section 1930 of the United States Judicial Code, as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code, shall be paid for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first. The Plan therefore satisfies the requirements of section 1129(a)(12) of the Bankruptcy Code.

13.    **Section 1129(a)(13)—Retiree Benefits.**

51.    Section 1129(a)(13) of the Bankruptcy Code requires a plan to provide for retiree benefits at levels established pursuant to section 1114 of the Bankruptcy Code. Article IV.N of

the Plan provides that, on and after the Effective Date, all retiree benefits (as that term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law. The Plan therefore satisfies the requirements of section 1129(a)(13) of the Bankruptcy Code.

**14.    Section 1129(b)—Confirmation of Plan Over Nonacceptance of Impaired Class.**

52.    Notwithstanding the fact that the Rejecting Class has voted not to accept the Plan, the Plan may be confirmed pursuant to section 1129(b)(1) of the Bankruptcy Code because: (a) the Impaired Accepting Classes have voted to accept the Plan; and (b) the Plan does not discriminate unfairly and is fair and equitable with respect to the Rejecting Class. Thus, the Plan may be confirmed notwithstanding the Debtors' failure to satisfy section 1129(a)(8) of the Bankruptcy Code. After entry of the Confirmation Order and upon the occurrence of the Effective Date, the Plan shall be binding upon the members of the Rejecting Class.

53.    The Plan does not unfairly discriminate because members within each Class are treated similarly. Accordingly, the Plan does not discriminate unfairly in respect to the Rejecting Class or any other Class of Claims or Interests.

54.    To determine whether a plan is "fair and equitable" with respect to a Class of Interests, section 1129(b)(2)(C)(ii) of the Bankruptcy Code provides that "the holder of any interest that is junior to the interests of such class will not receive or retain under the plan on account of such junior interest any property." There are no Classes junior to the Rejecting Class that will receive any distribution under the Plan. Therefore the Plan is fair and equitable and satisfies the requirements of section 1129(b).

**15.    Section 1129(c)—Only One Plan.**

55.    Other than the Plan (including previous versions thereof), no other plan has been filed in the Chapter 11 Cases.    Accordingly, the requirements of section 1129(c) of the Bankruptcy Code have been satisfied.

**16.    Section 1129(d)—Principal Purpose of the Plan Is Not Avoidance of Taxes.**

56.    No Governmental Unit has requested that the Bankruptcy Court refuse to confirm the Plan on the grounds that the principal purpose of the Plan is the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act.    As evidenced by its terms, the principal purpose of the Plan is not such avoidance.    Accordingly, the Plan satisfies the requirements of section 1129(d) of the Bankruptcy Code.

**N.    <u>Satisfaction of Confirmation Requirements.</u>**

57.    Based upon the foregoing, the Plan satisfies the requirements for confirmation set forth in section 1129 of the Bankruptcy Code.

**O.    <u>Good Faith.</u>**

58.    The Debtors and the agents, arrangers, and the New Credit Facility Lenders (and all of their respective members, officers, directors, agents, financial advisers, attorneys, employees, partners, affiliates, and representatives) have been, are, and will continue to act in good faith if they proceed to: (a) consummate the Plan and the agreements, settlements, transactions, and transfers contemplated thereby (including, without limitation, the entry into and performance under the New Credit Facility); and (b) take the actions authorized and directed by the Confirmation Order.

**P.    <u>Disclosure: Agreements and Other Documents.</u>**

59.    The Debtors have disclosed all material facts regarding: (a) the adoption the new certificate of incorporation and bylaws, or similar constituent documents; (b) the selection of

directors and officers for the Reorganized Debtors; (c) the New Credit Facility; (d) the distribution of Cash; (e) the issuance of the New Calpine Plan Securities; (f) the adoption, execution, and implementation of the other matters provided for under the Plan involving corporate action to be taken by or required of the Reorganized Debtors; (g) the Management and Director Equity Incentive Plan; and (h) the adoption, execution, and delivery of all contracts, leases, instruments, releases, indentures, and other agreements related to any of the foregoing.

**Q.     Transfers by Debtors; Vesting of Assets.**

60.     All transfers of property of the Debtors' estates, including the transfer of the New Calpine Plan Securities, shall be free and clear of all Liens, charges, Claims, encumbrances, and other interests, except as expressly provided in the Plan.  Pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all property of each of the Debtors (excluding property that has been abandoned pursuant to the Plan or an order of the Bankruptcy Court) shall vest in each respective Reorganized Debtor or its successors or assigns, as the case may be, free and clear of all Liens, charges, Claims, encumbrances, and other interests, except as expressly provided in the Plan. Such vesting does not constitute a voidable transfer under the Bankruptcy Code or applicable nonbankruptcy law.

**R.     Conditions to Confirmation.**

61.     Entry of the Confirmation Order, in a form and substance acceptable to the Debtors and the Creditors' Committee, shall satisfy the conditions to Confirmation set forth in Article X.A of the Plan.

**S.     Likelihood of Satisfaction of Conditions Precedent to Consummation.**

62.     Each of the conditions precedent to Consummation, as set forth in Article X.B of the Plan, has been satisfied or waived in accordance with the provisions of the Plan, or is

reasonably likely to be satisfied, provided, however, that no waiver of the conditions precedent to Consummation shall have occurred without the consent of the Creditors' Committee.

**T.**     **Implementation.**

63.     All documents and agreements necessary to implement the Plan, including those contained in the Plan Supplement, and all other relevant and necessary documents (including the documentation of the New Credit Facility), have been negotiated in good faith, at arm's length, and are in the best interests of the Debtors and the Reorganized Debtors and shall, upon completion of documentation and execution be valid, binding, and enforceable documents and agreements not in conflict with any federal or state law.

**U.**     **Warrant Term Sheet**

64.     The Warrant Term Sheet was negotiated in good faith and at arms-length among the Debtors, the Creditors' Committee, and the Equity Committee and their respective Professionals with the leadership, input, guidance, and encouragement of the expert appointed by the Court under Rule 706 of the Federal Rules of Evidence and its Professionals.  The Warrant Term Sheet represents a fair and reasonable compromise and settlement of the Equity Committee's objections to Confirmation and the disputes regarding the value of the Debtors and provides a fair recovery to Calpine's shareholders under the circumstances of the Chapter 11 Cases.  Based upon the value available for distribution to Holders of Allowed Claims and Interests, the Plan is fair and equitable with respect to Holders of Class E-1 Interests.

**V.**     **Approval of New Credit Facility.**

65.     The New Credit Facility is an essential element of the Plan, and entry into the New Credit Facility is in the best interests of the Debtors, their Estates, and their Creditors.  The Debtors have exercised reasonable business judgment in determining to enter into the New Credit Facility and have provided adequate notice thereof and are authorized, without further

approval of this Court or any other party (except as set forth in paragraph 96), to execute and deliver all agreements, documents, instruments and certificates relating thereto and perform their obligations thereunder. The New Credit Facility has been negotiated in good faith and at arm's-length among the Debtors and the New Credit Facility Lenders, and any credit extended, letters of credit issued for the account of, and loans made to the Reorganized Debtors by the New Credit Facility Lenders pursuant to the New Credit Facility shall be deemed to have been extended, issued, and made in good faith. The terms and conditions of the New Credit Facility described in the Amended and Restated Commitment Papers (as such term is defined in the *Debtors' Motion for Order Authorizing Amendments to Exit Financing Facility* [Docket No. 7116], as approved by the Bankruptcy Court by order dated December 17, 2007 [Docket No. 7161]), are fair and reasonable and are reaffirmed and approved.

66.    The Debtors have made an overwhelming and uncontroverted showing of the very substantial cost, harm, risk, and prejudice to the Estates and their Creditors that would result if the Plan is not consummated on or before Thursday, February 7, 2008.

## II.  ORDER

**BASED ON THE FOREGOING FINDINGS OF FACT, IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED THAT:**

**A.    Order.**

67.    This Confirmation Order shall confirm the Plan. A copy of the Plan is attached hereto as Exhibit A.

**B.**    <u>**Objections.**</u>

68.    To the extent that any objections, reservations of rights, statements, or joinders to Confirmation have not been withdrawn, waived, or settled prior to entry of the Confirmation Order or otherwise resolved as stated on the record of the Confirmation Hearing, they are hereby overruled on the merits.

**C.**    <u>**Findings of Fact and Conclusions of Law.**</u>

69.    The findings of fact and the conclusions of law stated in the Confirmation Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to the proceeding by Bankruptcy Rule 9014.  To the extent any finding of fact shall be determined to be a conclusion of law, it shall be so deemed, and to the extent any conclusion of law shall be determined to be a finding of fact, it shall be so deemed.

**D.**    <u>**Confirmation of the Plan.**</u>

70.    The Plan and Plan Supplement (as such may be amended by the Confirmation Order or in accordance with the Plan) and each of their provisions are confirmed in each and every respect pursuant to section 1129 of the Bankruptcy Code.  The documents contained in the Plan Supplement, and any amendments, modifications, and supplements thereto, and all documents and agreements related thereto (including all exhibits and attachments thereto and documents referred to in such papers), and the execution, delivery, and performance thereof by the Reorganized Debtors, are authorized and approved as finalized, executed, and delivered. Without further order or authorization of the Bankruptcy Court, the Debtors, Reorganized Debtors, and their successors are authorized and empowered to make all modifications to all documents included as part of the Plan Supplement that are consistent with the Plan.  As set forth in the Plan, once finalized and executed, the documents comprising the Plan Supplement and all other documents contemplated by the Plan shall constitute legal, valid, binding, and authorized

obligations of the respective parties thereto, enforceable in accordance with their terms and, to the extent applicable, shall create, as of the Effective Date, all Liens and other security interests purported to be created thereby.

71.     The terms of the Plan, the Plan Supplement, and exhibits thereto are incorporated by reference into, and are an integral part of, the Confirmation Order.  The terms of the Plan, the Plan Supplement, all exhibits thereto, and all other relevant and necessary documents, shall be effective and binding as of the Effective Date of the Plan.

**E.      Plan Classification Controlling.**

72.     The terms of the Plan shall solely govern the classification of Claims and Interests for purposes of the distributions to be made thereunder.  The classifications set forth on the Ballots tendered to or returned by the Holders of Claims or Interests in connection with voting on the Plan: (a) were set forth on the Ballots solely for purposes of voting to accept or reject the Plan; (b) do not necessarily represent, and in no event shall be deemed to modify or otherwise affect, the actual classification of such Claims and Interests under the Plan for distribution purposes; (c) may not be relied upon by any Holder of a Claim or Interest as representing the actual classification of such Claim or Interest under the Plan for distribution purposes; and (d) shall not be binding on the Debtors and Reorganized Debtors except for voting purposes.

**F.      Substantive Consolidation.**

73.     The Plan is predicated on the substantive consolidation of the Estates, for all purposes associated with Confirmation and Consummation, all as set forth more fully in Article IV.A of the Plan.

74.     Based upon the evidence proffered or adduced at or prior to, or in affidavits in connection with, the Confirmation Hearing, the Debtors and their professionals spent significant time and attention analyzing intercompany relationships and dealings in order to determine the

propriety of substantive consolidation.   The due diligence conducted, methodology used, assumptions made, and conclusions employed were reasonable.  Substantive consolidation of the Debtors is in the best interests of all Holders of Claims and Interests, necessary for the implementation of the Plan, and is appropriate in the Chapter 11 Cases.  The Bankruptcy Court therefore concludes that the substantive consolidation proposed in the Plan is necessary and appropriate and satisfies the test set forth in *In re Augie/Restivo Baking, Co.*, 860 F.2d 515, 518 (2d Cir. 1988).  Thus, substantive consolidation of the Estates is approved.

75.     Substantive consolidation shall not affect the legal and organizational structure of the Reorganized Debtors or their separate corporate existences or any prepetition or postpetition guarantees, Liens, or security interests that are required to be maintained under the Bankruptcy Code, under the Plan, or, in connection with contracts or leases that were assumed or entered into during the Chapter 11 Cases.  Any alleged defaults under any applicable agreement with the Debtors, the Reorganized Debtors, or the Affiliates arising from substantive consolidation under the Plan shall be deemed cured as of the Effective Date.

**G.    Valuation.**

76.     The Bankruptcy Court finds that the New Calpine Total Enterprise Value is equal to $18.95 billion.

**H.    The Releases, Injunction, Exculpation, and Related Provisions Under the Plan.**

77.     The following releases, injunctions, exculpations, and related provisions set forth in Article VIII of the Plan are hereby approved and authorized in their entirety:

**1.     Releases by the Debtors.**

**78.     Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or the Plan Supplement, for good and valuable consideration, including the service of the Released Parties to facilitate the expeditious reorganization of the Debtors and the implementation of the restructuring contemplated by the Plan, on and after**

the Effective Date, the Released Parties are deemed released and discharged by the Debtors, the Reorganized Debtors, and the Estates from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims asserted on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Debtors, the Reorganized Debtors, the Estates, or their Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Plan and Disclosure Statement, or related agreements, instruments, or other documents, upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than Claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes a failure to perform the duty to act in good faith, with the care of an ordinarily prudent person and in a manner the Released Party reasonably believed to be in the best interests of the Debtors (to the extent such duty is imposed by applicable non-bankruptcy law) where such failure to perform constitutes willful misconduct or gross negligence.  In addition, any and all releases by the Debtors provided for in section 3.6 of the CCAA Settlement are hereby adopted and incorporated as if explicitly set forth herein.

2.      **Releases by Holders of Claims and Interests.**

79.      Except as otherwise specifically provided in the Plan or Plan Supplement, on and after the Effective Date, Holders of Claims and Interests (a) voting to accept the Plan or (b) abstaining from voting on the Plan and electing not to opt out of the release contained in this paragraph (which by definition, does not include Holders of Claims and Interests who are not entitled to vote in favor of or against the Plan), shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever, released and discharged the Debtors, the Reorganized Debtors, and the Released Parties from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims asserted on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the Debtors' Chapter 11 Cases, the purchase, sale, or

rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Plan and Disclosure Statement, or related agreements, instruments, or other documents, upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than Claims or liabilities arising out of or relating to any act or omission of a Debtor, a Reorganized Debtor, or a Released Party that constitutes a failure to perform the duty to act in good faith, with the care of an ordinarily prudent person and in a manner the Debtor, the Reorganized Debtor, or the Released Party reasonably believed to be in the best interests of the Debtors (to the extent such duty is imposed by applicable non-bankruptcy law) where such failure to perform constitutes willful misconduct or gross negligence. In addition, any and all releases in section 3.6 of the CCAA Settlement are hereby adopted and incorporated as if set forth herein. Nothing in this paragraph shall apply in any action brought by the Securities and Exchange Commission in exercise of its police and regulatory powers. The Phelps Plaintiffs, the United States of America and any Governmental Unit thereof, and the Hawaii Plaintiffs are deemed to have opted out of the releases provided for in this paragraph and, therefore, are not bound by the releases provided for in this paragraph (and any injunctions relating to such releases). Notwithstanding Article VIII.F and Article VIII.G of the Plan, and regardless of whether or how they vote on the Plan, the underwriter defendants in the state court litigation pending on the Petition Date in the Superior Court of California, County of Santa Clara, captioned *Hawaii Structural Ironworkers Pension Trust Fund v. Calpine Corp.*, Case No. 1-04-CV-021465 (Cal. Sup. Ct.) (the "Hawaii Litigation"), will not be, solely by virtue of the Plan, (a) deemed to have released any Claims for contribution in connection with the Hawaii Litigation against any of the director and officer defendants in the Hawaii Litigation, or (b) enjoined from pursuing any such Claims against such defendants.

3.    **Exculpation.**

80.    Except as otherwise specifically provided in the Plan or Plan Supplement, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from any Claim, obligation, Cause of Action, or liability for any Exculpated Claim, except for gross negligence or willful misconduct, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Debtors and the Reorganized Debtors (and each of their respective Affiliates, agents, directors, officers, employees, advisors, and attorneys) have, and upon Confirmation of the Plan shall be deemed to have, participated in good faith and in compliance

with the applicable provisions of the Bankruptcy Code with regard to the distributions of the securities pursuant to the Plan, and therefore are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.  Nothing in this paragraph shall impair the police or regulatory powers of the United States of America or any Governmental Unit thereof.  Nothing in this paragraph shall apply in any action brought by the Securities and Exchange Commission in exercise of its police and regulatory powers.

4.     Injunction.

81.     Except as otherwise expressly provided in the Plan or for obligations issued pursuant to the Plan, all Entities who have held, hold, or may hold Claims or Interests that have been released pursuant to Article VIII.D or Article VIII.F of the Plan, discharged pursuant to Article VIII.A of the Plan, or are subject to exculpation pursuant to Article VIII.E of the Plan are permanently enjoined, from and after the Effective Date, from: (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property or Estates of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Confirmation Date, and notwithstanding an indication in a Proof of Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan.  Nothing in the Plan or Confirmation Order shall preclude any Entity from pursuing an action against one or more of the Debtors in a nominal capacity to recover insurance proceeds so long as the Debtors or Reorganized Debtors, as applicable, in consultation with the Creditors' Committee, and any such Entity agree in writing that such Entity will: (a) waive all Claims against the Debtors, the Reorganized Debtors, and the Estates related to such action and (b) enforce any judgment on account of

**such Claim solely against applicable insurance proceeds, if any.**

## I.     Post-Confirmation Notices and Bar Dates.

### 1.     Notice of Entry of the Confirmation Order.

82.     In accordance with Bankruptcy Rules 2002 and 3020(c), within ten business days of the date of entry of the Confirmation Order, the Debtors shall serve the Notice of Confirmation by United States mail, first class postage prepaid, by hand, or by overnight courier service to all parties having been served with the Confirmation Hearing Notice; provided, however, that no notice or service of any kind shall be required to be mailed or made upon any Entity to whom the Debtors mailed a Confirmation Hearing Notice, but received such notice returned marked "undeliverable as addressed," "moved, left no forwarding address" or "forwarding order expired," or similar reason, unless the Debtors have been informed in writing by such Entity, or are otherwise aware, of that Entity's new address.  To supplement the notice described in the preceding sentence, within twenty days of the date of the Confirmation Order the Debtors shall publish the Notice of Confirmation once in The Wall Street Journal (National Edition).  Mailing and publication of the Notice of Confirmation in the time and manner set forth in the this paragraph shall be good and sufficient notice under the particular circumstances and in accordance with the requirements of Bankruptcy Rules 2002 and 3020(c), and no other or further notice is necessary.

83.     The Notice of Confirmation shall have the effect of an order of the Bankruptcy Court, shall constitute sufficient notice of the entry of the Confirmation Order to such filing and recording officers, and shall be a recordable instrument notwithstanding any contrary provision of applicable non-bankruptcy law.

### 2.    Professional Compensation.

84.    All final requests for payment of Claims of a Professional shall be filed with the Bankruptcy Court no later than forty-five days after the Effective Date.  After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior Bankruptcy Court orders, the Allowed amounts of such Professional Claims shall be determined by the Bankruptcy Court.

85.    Except as otherwise specifically provided in the Plan, from and after the Effective Date, the Reorganized Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable legal, professional, or other fees and expenses related to implementation and Consummation incurred by the Reorganized Debtors and incurred by the Creditors' Committee in connection with those matters for which it remains in existence after the Effective Date pursuant to the Plan.  Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

### J.    Exemption from Securities Laws

86.    Pursuant to section 1125(e) of the Bankruptcy Code, the Debtors' transmittal of the Plan solicitation materials as set forth herein, their solicitation of acceptances of the Plan, and the Reorganized Debtors' issuance and distribution of the New Calpine Plan Securities pursuant to the Plan are not and will not be governed by or subject to any otherwise applicable law, rule, or regulation governing the solicitation or acceptance of a plan of reorganization or the offer, issuance, sale, or purchase of securities.

87.     Pursuant to section 1145 of the Bankruptcy Code, the offering, issuance, and distribution of any Securities contemplated by the Plan and any and all settlement agreements incorporated herein, including the New Calpine Plan Securities, shall be exempt from, among other things, the registration requirements of section 5 of the Securities Act and any other applicable law requiring registration prior to the offering, issuance, distribution, or sale of Securities.  In addition, under section 1145 of the Bankruptcy Code any Securities contemplated by the Plan and any and all settlement agreements incorporated therein, including the New Calpine Plan Securities, will be freely tradable by the recipients thereof, subject to (i) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act, and compliance with any rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of such Securities or instruments; (ii) the restrictions, if any, on the transferability of such Securities and instruments; and (iii) applicable regulatory approval.

**K.**     **Exemptions from Taxation.**

88.     Pursuant to section 1146(a) of the Bankruptcy Code, any transfer from a Debtor to a Reorganized Debtor or to any Entity pursuant to, in contemplation of, or in connection with the Plan or pursuant to:  (1) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors or the Reorganized Debtors; (2) the creation, modification, consolidation, or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (3) the making, assignment, or recording of any lease or sublease; or (4) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the

Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, FERC filing or recording fee, or other similar tax or governmental assessment, and the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

**L.    Binding Effect.**

89.    Subject to Article X.B of the Plan and notwithstanding Bankruptcy Rules 3020(e), 6004(g), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and any and all Holders of Claims or Interests (irrespective of whether such Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan or herein, each Entity acquiring property under the Plan, and any and all non-Debtor parties to executory contracts and unexpired leases with the Debtors.

90.    The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

**M.    CalGen First Lien Stipulation.**

91.    The terms and conditions of the Stipulation By and Among the Debtors and Debtors in Possession, the Official Committee of Unsecured Creditors of Calpine Corporation, Wilmington Trust FSB, as Indenture Trustee for CalGen First Priority Floating Rate Notes,

Wilmington Trust Company, as Administrative Agent for CalGen First Priority Term Loans and Whitebox Advisors LLC and its Affiliates (the "CalGen First Lien Stipulation") and the Order approving the CalGen First Lien Stipulation, entered on November 27, 2007 [Docket No. 6710] shall remain in effect under the Confirmation Order.

## N.    **Retention of Jurisdiction for Post-Confirmation Sales.**

92.    Pursuant to Articles IV.G, V, and XII of the Plan, the Bankruptcy Court retains jurisdiction after Confirmation to enter an order, pursuant to sections 105(a), 363(b), 363(f), 365, 503, 507, 1123, 1142 and 1146(a) of the Bankruptcy Code: (a) authorizing the sale of substantially all of the assets of the Debtors or Reorganized Debtors, as applicable, related to the partially completed power plant located in Fremont, Ohio and certain related assets (the "Fremont Assets") free and clear of any and all liens, claims, encumbrances and other interests; (b) authorizing the assumption and assignment of certain executory contracts and unexpired leases in connection therewith (the "Assigned Fremont Contracts"); (c) exempting such sale and assignment from any stamp tax or similar tax; and (d) granting certain related relief as more fully set forth in the motion (the "Fremont Sale Motion") filed by the Debtors on November 21, 2007 [Docket No. 6664].  Upon entry of any order approving the Fremont Sale Motion, the Debtors or the Reorganized Debtors, as the case may be, shall be authorized to, among other things, sell the Fremont Assets free and clear of any and all Liens, claims, encumbrances and other interests and assume and assign the Assigned Fremont Contracts pursuant to the terms of such order.

93.    Pursuant to Articles IV.G, V, and XII of the Plan, the Bankruptcy Court retains jurisdiction after Confirmation to enter an order, pursuant to sections 105(a), 363(b), 363(f), 365, 503, 507, 1123, 1142 and 1146(a) of the Bankruptcy Code: (a) authorizing the sale of substantially all of the assets of the Debtors or Reorganized Debtors, as applicable, related to the partially completed power plant located in Alexander City, Alabama and certain related assets

(the "Hillabee Assets") free and clear of any and all liens, claims, encumbrances and other interests; (b) authorizing the assumption and assignment of certain executory contracts and unexpired leases in connection therewith (the "Assigned Hillabee Contracts"); (c) exempting such sale and assignment from any stamp tax or similar tax; and (d) granting certain related relief as more fully set forth in the motion (the "Hillabee Sale Motion") anticipated to by filed by the Debtors on or about December 21, 2007.  Upon entry of any order approving the Hillabee Sale Motion, the Debtors or the Reorganized Debtors, as the case may be, shall be authorized to, among other things, sell the Hillabee Assets free and clear of any and all Liens, claims, encumbrances and other interests and assume and assign the Assigned Hillabee Contracts pursuant to the terms of such order.

**O.      References to Plan Provisions.**

94.      The failure specifically to include or to refer to any particular article, section, or provision of the Plan, Plan Supplement, or any related document in the Confirmation Order shall not diminish or impair the effectiveness of such article, section, or provision, it being the intent of the Bankruptcy Court that the Plan and any related documents be confirmed in their entirety.

**P.      New Credit Facility.**

95.      The New Credit Facility, any related agreements, and the transactions contemplated thereby are approved in their entirety and, upon execution and delivery of the agreements and documents relating thereto by the applicable parties, the New Credit Facility shall be in full force and effect and valid, binding and enforceable in accordance with its terms. The loans and other extensions of credit contemplated by the New Credit Facility (including the First Lien Long Term Facilities and the Bridge Facility, as such terms are defined in the Amended and Restated Commitment Papers for the New Credit Facility) and the granting of Liens to secure such loans and other extensions of credit is approved and authorized in all

respects.  The granting of such Liens, the making of such loans and other extensions of credit, and the execution and consummation of the New Credit Facility shall not constitute a fraudulent conveyance or transfer under state or federal law and such Liens shall be unavoidable for all purposes.  The foregoing provision and the release and exculpatory provisions contained herein and in the Plan satisfies the requirements set forth in clauses (i) and (ii) of paragraph (a) of annex C to the Amended and Restated Commitment Letter (as such term is defined in the *Debtors' Motion for Order Authorizing Amendments to Exit Financing Facility* [Docket No. 7116], as approved by the Bankruptcy Court by order dated December 17, 2007 [Docket No. 7161]).

97.    Notwithstanding anything contained herein to the contrary, the Debtors or Reorganized Debtors, as applicable, shall not execute material New Credit Facility documents without the prior written consent of the Creditors' Committee which shall not be unreasonably withheld.

**Q.    CCAA Order.**

97.    The *Order (Canada/U.S. Global Settlement Order)* approving the CCAA Settlement entered in the CCAA Proceedings on July 27, 2007 by the Canadian Court is incorporated by reference in its entirety.

**R.    Governing Law.**

98.    Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control), and corporate governance matters; provided, however, that corporate governance

matters relating to Debtors or Reorganized Debtors, as applicable, not incorporated in New York shall be governed by the laws of the state of incorporation of the applicable Debtor or Reorganized Debtor, as applicable.

S.    **Effectiveness of All Actions.**

99.    Except as set forth in the Plan, all actions authorized to be taken pursuant to the Plan shall be effective on, prior to, or after the Effective Date pursuant to the Confirmation Order, without further application to, or order of the Bankruptcy Court, or further action by the respective officers, directors, members, or stockholders of Reorganized Calpine or the other Reorganized Debtors and with the effect that such actions had been taken by unanimous action of such officers, directors, members, or stockholders.

T.    **Approval of Consents and Authorization to Take Acts Necessary to Implement Plan.**

100.    Pursuant to section 1142(b) of the Bankruptcy Code, section 303 of the Delaware General Corporation Law and any comparable provision of the business corporation laws of any other state, each of the Debtors and the Reorganized Debtors hereby is authorized and empowered to take such actions and to perform such acts as may be necessary, desirable or appropriate to comply with or implement the Plan, the New Credit Facility, the Warrant Term Sheet, any other Plan documents, including the election or appointment, as the case may be, of directors and officers of the Reorganized Debtors as contemplated in the Plan, and all documents, instruments, and agreements related thereto and all annexes, exhibits, and schedules appended thereto, and the obligations thereunder shall constitute legal, valid, binding and authorized obligations of each of the respective parties thereto, enforceable in accordance with their terms without the need for any stockholder or board of directors' approval.  Each of the Debtors and the Reorganized Debtors hereby is authorized and empowered to take such actions, to perform all acts, to make, execute, and deliver all instruments and documents, and to pay all

fees and expenses as set forth in the documents relating to the Plan and the New Credit Facility, including without limitation, the Warrant Term Sheet, and that may be required or necessary for its performance thereunder without the need for any stockholder or board of directors' approval. On the Effective Date, the appropriate officers of the Reorganized Debtors and members of the boards of directors of the Reorganized Debtors are authorized and empowered to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan and the New Credit Facility in the name of and on behalf of the Reorganized Debtors. Subject to the terms of this Confirmation Order, each of the Debtors, the Reorganized Debtors, and the officers and directors thereof are authorized to take any such actions without further corporate action or action of the directors or stockholders of the Debtors or the Reorganized Debtors. On the Effective Date, or as soon thereafter as is practicable, the Reorganized Debtors shall file their amended certificates of incorporation with the Secretary of State of the state in which each such entity is (or will be) organized, in accordance with the applicable general business law of each such jurisdiction.

101. This Confirmation Order shall constitute all approvals and consents required, if any, by the laws, rules, and regulations of all states and any other governmental authority with respect to the implementation or consummation of the Plan and any documents, instruments, or agreements, and any amendments or modifications thereto, and any other acts and transactions referred to in or contemplated by the Plan, the Plan Supplement, the Disclosure Statement, and any documents, instruments, or agreements, and any amendments or modifications thereto.

**U.    Changes to Plan and Plan Supplement.**

102. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, each of the Debtors expressly reserves its respective rights to revoke or withdraw, or,

with the consent of the Creditors' Committee, to alter, amend, or modify materially the Plan and the Plan Supplement with respect to such Debtor, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.  Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with Article XI of the Plan.  Entry of the Confirmation Order means that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

## V.    Ownership and Control.

103.    The Consummation of the Plan shall not constitute a change of ownership or change in control, as such terms are used in any statute, regulation, contract, or agreement, including, but not limited to, any employment, severance, or termination, or insurance agreements, in effect on the Effective Date and to which either of the Debtors is a party or under any applicable law of any applicable Governmental Unit.  Notwithstanding the foregoing, the Debtors and Reorganized Debtors reserve the right to selectively waive this provision of the Plan.

## W.    Effect of Conflict Between Plan and Confirmation Order.

104.    If there is any direct conflict between the terms of the Plan or the Plan Supplement and the terms of the Confirmation Order, the terms of the Confirmation Order shall control.

**X.**    **Authorization to Consummate.**

105.    The Debtors are authorized to consummate the Plan at any time after the entry of the Confirmation Order subject to satisfaction or waiver (by the required parties) of the conditions precedent to Consummation set forth in Article X.B of the Plan.

**Y.**    **Final Confirmation Order.**

106.    This Confirmation Order is a final order and the period in which an appeal must be filed shall commence upon the entry hereof.

IT IS SO ORDERED.

Dated:  New York, New York
        December 19, 2007                         /s/Burton R. Lifland_____
                                                 UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT D

Action No. 0501-17864

IN THE COURT OF QUEEN'S BENCH OF ALBERTA

JUDICIAL DISTRICT OF CALGARY

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT*

*ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF

CALPINE CANADA ENERGY LIMITED, CALPINE CANADA POWER LTD.,

CALPINE CANADA ENERGY FINANCE ULC, CALPINE ENERGY SERVICES

CANADA LTD., CALPINE CANADA RESOURCES COMPANY, CALPINE CANADA

POWER SERVICES LTD., CALPINE CANADA ENERGY FINANCE II ULC, CALPINE

NATURAL GAS SERVICES LIMITED, AND 3094479 NOVA SCOTIA COMPANY

COLLECTIVELY THE "APPLICANTS"

28th REPORT OF THE MONITOR

ERNST & YOUNG INC.

January 10, 2008

≡‖ *ERNST & YOUNG*

## INTRODUCTION

1.  On December 20, 2005, the Applicants filed for and obtained protection from their creditors under the *Companies' Creditors Arrangement Act*, R.S.C. 1985 c. C-36, as amended, (the "CCAA") pursuant to an order of the Court dated December 20, 2005 (the "Initial Order").  In addition to the Applicants, the Initial Order provided for a stay of proceedings against Calpine Energy Services Canada Partnership ("CESCA"), Calpine Canada Natural Gas Partnership ("CCNG"), and Calpine Canadian Saltend Limited Partnership ("Saltend LP"), collectively referred to as the "CCAA Parties".  The Applicants and CCAA Parties are collectively referred to as the "CCAA Debtors".

2.  Pursuant to the Initial Order, Ernst & Young Inc. was appointed monitor of the Applicants and CCAA Parties during these CCAA proceedings (the "Monitor").

## PURPOSE OF REPORT

3.  The purpose of this twenty-eighth report (the "28th Report") is to provide creditors and this Honourable Court with:

    a) An update of the Court proceedings since the 27th Report;

    b) An update of the ULC2 escrow account held by the Monitor;

    c) The Monitor's analysis and recommendations with respect to Late Claims (as defined below);

    d) The Monitor's analysis and recommendations with respect to:

        i.   The proposed initial distribution by ULC1 to its creditors including the ULC1 Indenture Trustee;

        ii.  The estimated remaining distributions by Calpine Canada Energy Limited ("CCEL") relating to certain outstanding inter-company obligations, and also to effect returns of capital by CCEL to its parent Quintana Canada Holdings, LLC("QCH");

        iii. The estimated remaining distributions by CCPL;

        iv.  The estimated remaining distributions by CCRC including the payment to CESCA of the CESCA Shortfall Claim;

        v.   ULC2's final distribution of its remaining funds on hand to CCRC;

vi. The proposed initial distribution by CESCA and CESCL; and

vii. The remaining distributions by CCNG.

**TERMS OF REFERENCE**

4.      In preparing this 28th Report, the Monitor has relied upon unaudited financial information, company records and discussions with management of the CCAA Debtors. The Monitor has not performed an audit, review or other verification of such information. An examination of the financial forecast as outlined in the Canadian Institute of Chartered Accountants Handbook has not been performed.

5.      Capitalized terms not defined in this report or the Appendices hereto are as defined in the Initial Order, the Affidavits of Mr. Toby Austin dated January 9, 2008, the Orders issued in these CCAA Proceedings or the Monitor's First through 27th Reports.

6.      The claims of creditors of the CCAA Debtors, other than the ULC1 Settled Claims (as defined below), denominated in currencies other than Canadian dollars are assumed to be converted to Canadian dollars at the rates in effect at December 20, 2005 as set out in the Claims Procedure Order.

7.      All references to dollars are in Canadian currency unless otherwise noted.

**BACKGROUND**

8.      Background to these CCAA proceedings, including the Initial Order, subsequent Orders granted by the Court, supporting affidavits and reports by the Monitor, have been posted by the Monitor on its website at **http://www.ey.com/ca/calpinecanada.** Calpine Corporation and certain of its direct and indirect subsidiaries in the U.S. (the "U.S. Debtors") filed voluntary petitions to restructure under Chapter 11 of the U.S. Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York, New York on December 20 and 21, 2005 (the "U.S. Proceedings"). Information concerning the U.S. Debtors' restructuring can be found at **http://www.kccllc.net/calpine**.

**ΞJ** *ERNST & YOUNG*                                    - 3 -

**UPDATE ON COURT PROCEEDINGS**

9.      Since the date of the 27th Report, a hearing was held on December 17, 2007 at which time the Court issued an Order extending the Stay Date and Stay Period as defined in the Initial Order dated December 20, 2005 to January 31, 2008.

**ULC2 ESCROW ACCOUNT HELD BY MONITOR**

10.     Pursuant to the terms of a court order dated September 13, 2007, ULC2 paid certain monies to the Monitor to hold in escrow pending resolution of certain claims advanced by Manufacturers and Traders Trust Company, the Ad Hoc Committee of Creditors of Calpine Canada Energy Finance II ULC and Harbinger Capital Partners Master Fund I Ltd. against CCRC and ULC2.

11.     As described in the 26th and 27th Reports, these claims were resolved by the parties agreeing to terms of settlement ("ULC2 Settlement Agreement").

12.     On December 10, 2007, this Court granted an order, which was not appealed, approving the ULC2 Settlement Agreement.  Accordingly, the Monitor has now distributed the monies in the escrow accounts pursuant to the terms of that order.

13.     The schedule below provides an accounting of the escrow monies held by the Monitor, interest earned thereon and the final distribution to the ULC2 Indenture Trustee and the CCAA Debtors.

|  | Monitor Escrow Bank Accounts | |
| --- | --- | --- |
|  | £ | € |
| Amounts paid into escrow | 15,952,721 | 5,173,334 |
| Interest earned | 187,035 | 42,908 |
| Amount available for distribution | 16,139,756 | 5,216,242 |
| Distributed to ULC2 Trustee | 7,328,877 | 2,194,764 |
| Returned to to ULC2 | 8,810,879 | 3,021,478 |
|  | 16,139,756 | 5,216,242 |

14.     Certain other payments required to be made pursuant to the ULC2 Settlement Agreement and the December 10, 2007 Order including the Harbert Fees Claim, the Ad Hoc Committee Fees Claim and the ULC2 Indenture Trustee Fees Claim have been or will be paid directly by ULC2 or CCRC shortly.

## LATE CLAIMS

16.     In July of 2007, Calpine Power, L.P. ("CLP") brought an application seeking leave to file a $30 million late claim against CCPL, in respect of certain litigation that had been commenced against CLP by a third party, Calpine Power Developers Group Inc. ("CPDG"). This Court reserved its decision on that matter. Recently, counsel for the CCAA Debtors, with the concurrence of the Monitor, requested that this Court not release a decision on the late CLP claim. The Monitor now understands that an agreement has been reached that will settle the underlying claim by CPDG such that the CLP late claim will be withdrawn without any payment being made by CCPL.

15.     The Monitor notes that 5 other claims totalling approximately $0.8 million ("Late Claims") were received pursuant to the Claims Procedure Order after the Claims Bar Date. An allocation of these claims by CCAA Debtor is as detailed below:

| CCAA Debtor | # of Late Claims | Amount |
|---|---|---|
| Calpine Natural Gas Partnership | 4 | $   91,563 |
| Calpine Canada Resources Company | 1 | 700,000 |
| | 5 | $   791,563 |

16.     Paragraph 20 of the Claims Procedure Order allows the Monitor and the CCAA Debtors to agree in writing to allow a claim into the claims procedure process notwithstanding the fact that it was filed after the Claims Bar Date.

17.   As all Late Claims were received prior to any distributions occurring and the creditors of those CCAA Debtors against which late claims have been filed are all receiving a 100% recovery, there does not appear to be any prejudice to the creditors as a whole as a result of the late claims being filed.  Accordingly, the Monitor, in conjunction with the CCAA Debtors, is reviewing the Late Claims to assess whether it is would be appropriate to allow the claims having regard to the established legal criteria.

18.   If the Monitor and the CCAA Debtors believe there may be merit to any Late Claim, the Late Claim will be allowed into the claim procedure process and determined in accordance with the Claims Procedure Order.

19.   The Monitor and CCAA Debtors, without further order from this Court, will not consider any Claims (as defined in the Claims Order) filed after the date of this 28th Report.

**DISTRIBUTIONS**

20.   By Court Orders dated September 13, 2007, November 13, 2007 and December 13, 2007 (collectively referred to as the "Distribution Orders"), all third party claims against the following CCAA Debtors have either been repaid in full or provided for:

     i.   ULC2;

     ii.   CCRC;

     iii.   CCEL;

     iv.   Saltend LP;

     v.   3094479 Nova Scotia Company (referred to as "309NS")

     vi.   CCPL; and

     vii.  CCNG.

21.   The only CCAA Debtors that have not completed a distribution to date include:

    i.   ULC1;

    ii.  CESCA; and

    iii. CESCL.

22.   As previously reported to the Court, distributions by ULC1 to the ULC1 Indenture Trustee are to be made pursuant to the Global Settlement Agreement dated July 24, 2007 (the "Settlement") and as set out in the US Debtors' Plan of Reorganization (the "US Plan"), which provided for the satisfaction of the ULC1 Settled Claims (as defined below) by the issuance of new common shares of CORPX.  Accordingly, ULC1 is unable to complete any distribution to the ULC1 Indenture Trustee until the effective date of the US Plan (anticipated to be January 31, 2008).  As the implementation of the US Plan is imminent, ULC1 is requesting authorization of this Court to proceed with a distribution in conjunction with the implementation of the US Plan.

23.   CESCA has yet to propose a distribution to this Court as a significant claim by CLP arising from the repudiation by CESCA of a long-term tolling agreement relating to the Calgary Energy Centre (referred to as the "CLP Toll Claim") was unresolved.  It was not practical for CESCA to complete an interim distribution given the quantum of the unresolved CLP Toll Claim.  However, as discussed in further detail below, the CLP Toll Claim was settled in December 2007, and, accordingly, CESCA is now in a position to propose a distribution to repay its creditors.

24.   CESCL is now in a position to propose a distribution to its creditors as it has realized on its only significant asset, a claim against certain US Debtors, in December 2007.

25.   The Monitor's analysis indicates that the CCAA Debtors have sufficient distributable assets to complete the distribution contemplated below and note that any returns of capital to the US Debtors (as set out and discussed below) would not be completed until

the CCAA Debtor contemplating the return of capital had repaid in full, or fully reserved for, all its respective outstanding claims.

26.    Attached at Appendix A for each CCAA Debtor is the following information:

     i.    A listing of creditors and the original claim amount;

     ii.    Accepted revisions and final claim amount (if resolved);

     iii.   Amounts distributed to date by creditor;

     iv.   Amounts proposed to be distributed to each creditor; and

     v.    Amounts reserved for by creditor.

27.    If the relief sought in the notice of motion dated January 9, 2008 is granted the CCAA Debtors will be able to pay all of the proven claims of their respective third parties in full and without compromise and allow the CCAA Debtors to proceed to emerge from CCAA Proceedings.

**ULC1 Distribution**

28.    Pursuant to the Settlement among the CCAA Debtors, Calpine Corp. ("CORPX") and the ULC1 Indenture Trustee, the parties agreed to a settlement of the amount of claims by the ULC1 Indenture Trustee as against ULC1 (the "ULC1 Settled Claims"). In addition, the US Plan provided for a satisfaction of the ULC1 Settled Claims by the issuance of new common shares of CORPX on the implementation of the US Plan, which is anticipated to be completed by January 31, 2008.

29.    ULC1 and the US Debtors have concluded that the various inter-company obligations that exist pursuant to the Hybrid Note Structure between CCEL, QCH and ULC1 should be satisfied in conjunction with the distribution to the ULC1 Settled Claims. The following steps are anticipated to be completed to unwind the Hybrid Note Structure and satisfy the ULC1 Settled Claims:

    i.   QCH contributes sufficient capital (comprising new common shares of CORPX) to CCEL that would allow CCEL to repay its obligations to ULC1 pursuant to the Hybrid Note Structure; and

    ii.   ULC1 distributes the new common shares of CORPX it received from CCEL to repay its obligations relating the ULC1 Settled Claims.

30.    The table below summarizes ULC1's distributable assets and its anticipated distribution and reserves for allocated professional costs.  After ULC1 completes the proposed distribution, ULC1 will have no remaining creditors.

| ULC1 Distribution | In C$000's | | Note |
|---|---|---|---|
| **ULC1 distributable assets** | | | |
| Cash on hand | 962 | | a |
| Distribution from QCH | 596,720 | | b |
| Distribution from CESCL | 108 | | |
| Distribution from CCPL | 2 | | |
| Distribution from CCEL (HNS) | 3,516,020 | 4,113,812 | c |
| **Distributions and reserves** | | | |
| ULC1 Settled Claims | 2,600,344 | | d |
| Repayment of CCRC note (post filing) | 2,034 | | e |
| Distribution to CCRC | 15,732 | | f |
| Distribution to CORPX (closing of swap) | 1,192,000 | | g |
| Distribution to CORPX (guarantee fee) | 52,183 | | h |
| Distribution to CORPX (inter-company) | 46,936 | 3,909,229 | i |
| Allocated professional costs | | 24,565 | |
| | | 3,933,794 | |
| **Available for US Debtors** | | 180,018 | j |

**Note (a) – Cash on hand**

31.    ULC1 currently has approximately $962,000 of cash on hand that is available for distribution.

**Note (b) – Distribution from QCH**

32.    Approximately $597 million is owed by QCH to ULC1 relating to principal and accrued interest up to January 31,2008, on a promissory note dated April 25, 2001.  QCH's

obligations to ULC are anticipated to be repaid, in full, upon the implementation of the US Plan by QCH delivering new common shares of CORPX to ULC1.

**Note (c) – Distribution from CCEL**

33.    Pursuant to the Hybrid Note Structure, as at January 31, 2008, CCEL will owe ULC1 approximately $3.5 billion and it is anticipated that CCEL will settle the inter-company obligations by delivering to ULC1 new common shares of CORPX (received from QCH, as discussed below).

**Note (d) – ULC1 Settled Claims**

34.    The amounts owed relating to the ULC1 Settled Claims total approximately $2.6 billion including accrued interest to January 31, 2008 and an accrual for outstanding professional fees owed to the ULC1 Indenture Trustee's professional advisors and the advisors to the Ad Hoc Committee of ULC1 Noteholders.

**Note (e) – Repayment of CCRC note (post-filing)**

35.    As previously advised to the Court, in August 2007, ULC1 borrowed $1 million from CCRC and in September 2007, ULC1 borrowed an additional $1 million from CCRC (collectively, the "ULC1 CCAA Loan"). The ULC1 CCAA Loan was required to allow ULC1 to pay the legal costs incurred by the ULC1 Indenture Trustee and the ULC1 CCAA Loan was supported by a promissory note and accrued interest at a commercially reasonable rate. As at January 15, 2008, ULC1 owed approximately $2.034 million (principal and interest). The ULC1 CCAA Loan will be repaid, in full, in conjunction with the distribution to the ULC1 Settled Claims.

**Note (f) – Distribution to CCRC**

36.    ULC1 owes CCRC an additional amount of approximately $15.7 million relating to a pre-filing inter-company loan. The inter-company loan will be repaid, in full, in conjunction with the distribution to the ULC1 Settled Claims.

**Note (g) – Swap agreement**

37.    The Hybrid Note Structure included a currency swap agreement between ULC1 and
certain US Debtors.  With the unwinding of the Hybrid Note Structure, it is estimated
that ULC1 will owe CORPX approximately $1.2 billion to close out the swap
arrangements.  As discussed above, ULC1 will fund the repayment to CORPX with new
common shares of CORPX received from CCEL.

**Note (h) – Distribution to CORPX (guarantee fee)**

38.    Approximately $52.2 million is estimated to be payable by ULC1 to CORPX relating to
fees owed to CORPX for proving the guarantees to the note holders of the ULC1 Notes.
The guarantee fees owing relate to the fiscal 2006 and 2007 and are proposed to be paid
by ULC1, in full, with new common shares of CORPX, upon the unwinding of the
Hybrid Note Structure.

**Note (i) – Distribution to CORPX**

39.    ULC1 owes CORPX approximately $46.9 million relating to a pre-filing inter-company
loan and this inter-company balance will be repaid, in full, upon the distribution in
respect of the ULC1 Settled Claims.

**Note (j) – Available for US Debtors**

40.    ULC1 will have no third party creditors after the completion of the above distributions.
It is anticipated that approximately $180 million (comprising new common shares of
CORPX) will be available for distribution to the US Debtors.

**CCEL Distribution**

41.　CCEL completed an initial distribution in November 2007 as set out in the Monitor's 25th Report and authorized by the Distribution Orders. The table below provides an update as to CCEL's remaining distributable assets and the anticipated remaining distributions and reserves.

| CCEL | In C$000's | | Note |
|---|---|---|---|
| **CCEL distributable assets** | | | |
| Cash on hand | 39,540 | | a |
| Distribution from CESCA | 4 | | |
| Distribution from CCPL | 12,255 | | b |
| Distribution from QCH | 701,627 | | c |
| Equity contribution from QCH | 3,692,297 | 4,445,723 | d |
| **Distributions and reserves** | | | |
| Distribution to ULCl | | 3,516,020 | e |
| Reserve for general and admin | | 2,000 | f |
| Allocated professional costs | | 3,960 | |
| | | 3,521,980 | |
| **Available for US Debtors** | | 923,743 | g |

**Note (a) – Cash on hand**

42.　CCEL currently has approximately $39.5 million of cash on hand that is available for distribution. The cash on hand primarily relates to distributions CCEL received from CCPL in November 2007 (as set out in the Monitor's 25th Report) less the amounts distributed by CCEL to its creditors to date.

**Note (b) – Distribution from CCPL**

43.　As discussed in further detail below, it is anticipated that CCPL will make a further distribution of approximately $12.2 million relating to inter-company obligations owed by CCPL to CCEL.

**Note (c) – Distribution from QCH**

44.    As of January 31, 2008, QCH will owe CCEL approximately $702 million relating to:

      i.    Principal of approximately $559 million owing on four promissory notes, plus accrued interest to January 31, 2008 of $114.7 million;

      ii.    Approximately $27.9 million of post-filing withholding taxes paid by CCEL on behalf of QCH; and

      iii.    Other miscellaneous inter-company accounts totalling approximately $105,000.

45.    It is anticipated, in conjunction with the implementation of the US Plan, that QCH will repay, in full, its obligations to CCEL by delivering new common shares of CORPX.

**Note (d) – Equity contribution from QCH**

46.    As discussed above, to allow for the unwinding of the Hybrid Note Structure, it has been assumed that QCH will contribute approximately $3.7 billion to CCEL, of which, approximately $3.5 billion will be used by CCEL to repay, in full, its obligations ULC1.

**Note (e) – Distribution to ULC1**

47.    Pursuant to the Hybrid Note Structure, CCEL owes ULC1 approximately $3.5 billion which is anticipated to be repaid upon the implementation of the US Plan. CCEL's repayment of its obligations to ULC1 will comprise new common shares of CORPX.

**Note (f) – Reserve for general and administrative costs**

48.    $2 million has been reserved to cover certain ongoing general and administrative costs that will be incurred by CCEL to complete the administration of these CCAA Proceedings.

**Note (g) – Available funds for US Debtors**

49.     After the completion of the above distributions, CCEL will have no creditors and it is anticipated that approximately $924 million will be available for distributions to the US Debtors comprising a combination of cash and new common shares of CORPX.

**CCPL Distribution**

50.     CCPL made an initial distribution in November 2007, as set out in the Monitor's 25th Report and authorized by the Distribution Orders. The table below provides an update as to CCPL's remaining distributable assets and anticipated distributions and remaining reserves.

| CCPL | In C$000's | Note |
|---|---:|:---:|
| **CCPL distributable assets** | | |
| Cash on hand | 18,281 | a |
| | | |
| **Distributions and reserves** | | |
| Distribution to CCNG (pro-rata) | 4,955 | |
| Distribution to CCEL (pro-rata) | 12,255 | |
| Distribution to ULC1 (pro-rata) | 2 | |
| Reserve for unresolved claims | 359    17,571 | b |
| Allocated professional costs | 710 | |
| | 18,281 | |
| | | |
| **Remaining funds** | - | c |

**Note (a) – Cash on hand**

51.     CCPL current holds approximately $18.3 million in cash which primarily relates to the proceeds received from the sale of certain claims against the US Debtors as set out in the Monitor's 27th Report.

52.     As set out in the Monitor's 25th Report, CCPL had reserved assets of approximately $31 million in relation to unresolved claims, including a $30 million late claim filed by CLP relating to a potential liability CLP may have to CPDG (the "CPDG Claim"). The assets

reserved consisted of cash of approximately $18 million and CCPL's interest in the Whitby Cogeneration Facility valued at an estimated $12 million.

53.    The Monitor understands that the $30 million CPDG Claim filed against CCPL has been resolved in principle by the parties to the underlying claim (the "CPDG Claim Settlement"). CCPL is not required to make any payment in respect of the CPDG Settlement. Accordingly, once the settlement is finalized, CCPL's net cash remaining, after reserving for allocated professional fees and the remaining reserve for unresolved claims, can be released and distributed to CCPL's only remaining creditors, CCNG, ULC1 and CCEL, on a prorated basis as discussed below.

**Note (b) – Distribution by CCPL**

54.    Approximately $17.2 million is anticipated to be distributed by CCPL to CCEL, CCNG and ULC1 (on a prorated basis as authorized by the Distribution Orders) comprising the cash on hand of $18.3 million, less a reserve for the remaining unresolved claim of $359,000 and allocated professional fees of $723,000.

**Note (c) – Remaining funds**

55.    After completing the above distributions and funding of the required reserves for unresolved claims and allocated professional fees, CCPL will have no remaining funds on hand.

56.    CCPL's only remaining assets will be its interest in the Whitby Cogeneration Facility, the value of which is estimated at $12 million.

**CCRC Distribution**

57.  The table below indicates CCRC currently has approximately $272 million in distributable assets and it proposes to distribute $229 million to CESCA relating to the CESCA Shortfall Claim, fund a $6.9 million reserve for unresolved claims and allocated professional fees. It is anticipated that approximately $36.4 million will be available for distribution to the US Debtors as return of capital from CCRC to CCEL to QCH.

| CCRC Distribution | In C$000's | | Note |
|---|---|---|---|
| **CCRC distributable assets** | | | |
| Cash on hand | 164,049 | | |
| Distribution from QCH | 207,440 | | |
| Distribution from ULC1 | 15,732 | | |
| Distribution from ULC2 | 32,784 | | |
| Repayment of note by ULC1 (post-filing) | 2,034 | | |
| Distribution from CCNG | 57,382 | 479,421 | a |
| **Distributions/payments** | | | |
| Resolved claims | 5 | | b |
| Lehman Commercial Paper Inc. | 184,051 | | c |
| Reserve for unresolved claims | 700 | 184,756 | b |
| Allocated professional costs | | 6,094 | |
| | | 190,850 | |
| **Net funds remaining** | | $ 288,571 | d |
| *Contribution / Distributed to:* | | | |
| CESCA Shortfall Claim | | $ 228,545 | d |
| Available for US Debtors | | $  60,026 | d |

**Note (a) – CCRC's distributable assets**

58.  CCRC's distributable assets comprise:

    i.  $164 million of cash on hand relating primarily to proceeds received from the forward sale of the CORPX shares ("the Forward Sale Obligation") to be received from QCH  on the repayment of the inter-company claims and accrued interest relating to the two promissory notes (as discussed in (ii) below) and in the Monitor's 27th Report);

ii. $207.4 million distribution from QCH (to be distributed upon the implementation of the US Plan) comprising a repayment, in full, of QCH's obligations to CCRC which include:

- Principal of approximately $156 million owing by QCH to CCRC on two promissory notes, plus accrued interest to January 31, 2008 of approximately $28 million, for a total amount owing of $184 million;

- $21,000 of miscellaneous inter-company accounts; and

- $23.4 million of withholding taxes paid by CCRC on behalf of QCH (post-filing);

iii. The repayment of a $15.7 million inter-company obligation from ULC1;

iv. $32.8 million of cash expected to be received from ULC2 relating to excess funds ULC2 has on hand after the full repayment of ULC2's obligations and the settlement of the Make-Whole Claim, as discussed below;

v. $2.034 million expected to be received upon ULC1 repaying the ULC1 CCAA Loan as discussed above; and

vi. $57.4 million expected to be received from CCNG representing CCNG's remaining funds on hand as a partial repayment of the inter-company loan owed by CCNG to CCRC, as discussed below.

**Note (b) – Third Party Claims**

59.    As set out in the Monitor's 24th Report, CCRC completed an initial distribution that repaid, in full, all of its third party creditors with resolved claims as authorized by the Distribution Orders. CCRC currently owes $5,000 to other CCAA Debtors which CCRC proposes to repay, in full. CCRC also has approximately $700,000 in claims that remain unresolved, and CCRC will hold a sufficient reserve for these unresolved claims.

**ΞU ERNST & YOUNG**                              - 17 -

**Note (c) – Distribution to Lehman Commercial Paper Inc**

60.     A distribution to Lehman Commercial Paper Inc. of $184.1 million comprising the new shares of CORPX to be received from QCH upon implementation of the US Plan in relation to the Forward Sale Obligation.

**Note (d) – Net remaining funds**

61.     After funding appropriate reserves for the unresolved claims and CCRC's portion of the allocated professional fees, approximately $288.5 million in surplus funds remain. Approximately $228.5 million is anticipated to be contributed by CCRC to CESCA relating to the CESCA Shortfall Claim. As CCRC will have fully repaid all creditors, it is anticipated that $60.0 million will be available for distribution to the US Debtors, as a return of capital from CCRC to CCEL (CCRC's parent) and ultimately the US Debtors.

**ULC2 Distribution**

62.     ULC2 completed its initial distribution in September 2007. In completing this distribution and pursuant to the Settlement, CCRC was required to fund certain amounts to ULC2 to allow it to fully repay its creditors and fund certain reserves for unresolved claims (i.e. the ULC2 Make-Whole Claim). As previously reported to the Court, all claims against ULC2 have now been resolved and paid in full, resulting in ULC2 currently holding approximately $35.5 million in cash. After funding a reserve for ULC2's allocated share of the professional costs, it is anticipated that approximately $32.8 million will be distributed to CCRC as set out in the table below:

| ULC2 Distribution | In C$000's |
|---|---|
| **ULC2 distributable assets** | |
| Cash on hand | 35,528 |
| **Distributions/payments** | |
| Allocated professional costs | 2,744 |
| **Distribution to CCRC** | $  32,784 |

**CESCL Distribution**

63.    The table below indicates CESCL currently has approximately $937,000 in cash and anticipates distributing $108,000 to ULC1 to repay obligations to ULC1 and to fund reserves for unresolved claims of $778,000 and professional fees of $5,000.

| CESCL Distribution | | In C$000's |
|---|---|---|
| **CESCL distributable assets** | | |
| Cash on hand | | 937 |
| | | |
| **Distributions and reserves** | | |
| Third party claims | - | |
| Distribution to ULC1 | 108 | |
| Reserve for unresolved claims | 778 | 886 |
| Allocated professional costs | | 5 |
| | | 891 |
| **Remaining Funds** | | $    46 |

64.    The table above indicates that upon completion of the above noted distributions and the funding of the reserves, CESCL will have approximately $46,000 remaining. The funds will ultimately be available for distribution to CESCL's parent company, as CESCL will have no remaining liabilities.

**CESCA Distribution**

65.    The table below indicates that CESCA currently has approximately $118.2 million in cash and anticipates receiving a $228.6 million distribution from CCRC, allowing CESCA to distribute $287.2 million to its third party creditors with resolved claims, distribute $50.0 million to the US Debtors relating to certain claims postponed pursuant to the Settlement and hold approximately $9.6 million in reserves for unresolved claims and allocated professional fees. The Monitor notes that the analysis below has assumed that the claim of CCNG against CESCA remains a deferred claim (as described in the Monitors 25th Report) given the circular nature of the claims between CESCA, CCNG and CCRC.

**ERNST & YOUNG**

| CESCA | In C$000's | | Note |
|---|---|---|---|
| **CESCA distributable assets** | | | |
| Cash on hand | 118,260 | | a |
| Contribution from CCRC | 228,545 | 346,805 | b |
| **Distributions and reserves** | | | |
| Third party claims | 97,198 | | c |
| CLP Toll Claim | 190,000 | | c |
| Distribution to CCEL | 4 | | |
| Distribution to US Debtors (postponed claims) | 49,977 | | d |
| Reserve for unresolved claims | 7,893 | 345,072 | e |
| Allocated professional costs | | 1,733 | |
| | | 346,805 | |
| **Net funds remaining** | | - | f |

## Note (a) – CESCA's cash on hand

66.    CESCA currently holds approximately $118 million of cash on hand relating to proceeds received from the sale of certain claims against US Debtors and cash generated during these CCAA Proceedings as previously reported.

## Note (b) – Contribution from CCRC

67.    As discussed above, it is anticipated that CCRC will contribute approximately $229 million to CESCA (relating to the CESCA Shortfall Claim) which will provide CESCA sufficient funds to repay its third party claim and fund appropriate reserves for the unresolved claims and its share of the allocated professional fees.

## Note (c) – Distributions to third party creditors with resolved claims

68.    CESCA anticipates distributing approximately $97.2 million to third party creditors with resolved claims and $190 million relating to the CLP Toll Claim, which as previously reported to the Court, has been settled.

69.    It is the Monitor's understanding that as part of the settlement of the CLP Toll Claim, CORPX will be satisfying CLP's claim (i.e. the CLP Toll Claim). CESCA will pay to CORPX $US 190 million as consideration for CORPX settling the CLP Toll Claim.

**Note (d) – Distributions to the US Debtors**

70.    The Settlement provided that claims by US Debtors against CESCA totalling approximately $50 million are postponed to all third party claims against CESCA. It is anticipated that all third party claims will be repaid by CESCA in full, accordingly, it is assumed that $50 million will ultimately be available for distribution to the US Debtors as a return of capital

**Note (e) – Reserved Claims**

71.    Approximately $7.9 million in claims remain outstanding and unresolved and a reserve has been established for the full amounts claimed.

**Note (f) – Net funds remaining**

72.    After completing the above distributions and funding of reserves, CESCA will have no remaining funds on hand.

**CCNG Distribution**

73.    CCNG completed an initial distribution in November 2007 as set out in the Monitor's 25th Report and authorized by the Distribution Orders. The table below provides an update that indicates CCNG expects to distribute approximately $62 million in cash plus a $4.7 million reserve for the remaining unresolved claims and allocated professional fees. Other than the amounts reserved for, there are no claims remaining against CCNG other than an inter-company payable to CCRC (see paragraph 57, 58 and 59 of the Monitor's 25th Report) and, accordingly CCNG anticipates to distribute the net remaining funds on hand of approximately $57.4 million to CCRC as set out in the table below.

| CCNG | In C$000's | |
|---|---|---|
| **CCNG distributable assets** | | |
| Cash on hand | 57,091 | |
| Distribution from CCPL | 4,955 | 62,046 |
| **Reserves** | | |
| Reserve for unresolved claims | 4,163 | 4,163 |
| Allocated professional costs | | 501 |
| | | 4,664 |
| **Distribution to CCRC (deferred claim)** | | 57,382 |

## RECOMMENDATIONS

74.    The Monitor recommends approval of the relief sought including:

    i.  ULC1 be allowed to make distributions (by cash and/or in the form of new common shares of CORPX) to related entities in satisfaction of allowed claims settled pursuant to the Settlement, to establish appropriate reserves for ULC1's portion of the allocated professional costs, and to effect distributions to ULC1's parent company once all claims against ULC1 have been satisfied;

    ii.  CCEL be allowed to make distributions (by cash and/or in the form of new common shares of CORPX) to related entities in satisfaction of allowed claims settled pursuant to the Settlement, to establish appropriate reserves for CCEL's portion of the allocated professional costs and general and administrative costs and to effect returns of capital to CCEL's parent company once all claims against CCEL have been satisfied; and

    iii.  CESCL and CESCA be allowed to make distributions to their respective creditors, once their respective proven claims have been resolved, and to establish and fund reserves relating to allocated professional fees and unresolved claims and to effect distributions to CESCL's parent company once all claims against CESCL have been satisfied.

All of which is respectfully submitted this 10th day of January, 2008.

**ERNST & YOUNG INC.**
**in its capacity as Court Appointed**
**Monitor of the Applicants and CCAA Parties**


Neil Narfason, CA•CIRP, CBV
Senior Vice-President


Deryck Helkaa, CA•CIRP
Vice-President

## ULC1 - Detailed Claims Listing
### (in CDN $)

| Claim # | Claimant | Claim filed | General revisions | Settlement revisions | Total revisions | Net remaining claims | Status (settled or open) | Proposed Distribution | Amount to be Reserved |
|---|---|---|---|---|---|---|---|---|---|
| 1-001 | Angelo & Cathie L. Guerri | 11,734 | (11,734) | | (11,734) | 0 | settled | | 0 |
| 1-008 | Canada Revenue Agency | 58,500,000 | (58,500,000) | | (58,500,000) | 0 | settled | | 0 |
| 1-009 | Canada Revenue Agency | 107,857,901 | (107,857,901) | | (107,857,901) | 0 | settled | | 0 |
| 1-002 | H. Menefee & L. Menefee | 11,734 | (11,734) | | (11,734) | 0 | settled | | 0 |
| 1-010 | HSBC Bank USA, National Association | 2,492,719,580 | 97,122,274 | | 98,624,777 | 2,591,344,357 | settled | 2,591,344,357 | 0 |
| 1-010 | HSBC Bank USA, National Association | TBD | 9,000,000 | | 9,000,000 | 9,000,000 | settled | 9,000,000 | 0 |
| 1-003 | IHS Energy (Canada) Ltd | 2,177,603 | (2,177,603) | | (2,177,603) | 0 | settled | | 0 |
| 1-004 | John F. Sago | 704,040 | (704,040) | | (704,040) | 0 | settled | | 0 |
| 1-005 | Patricia Michael Taylor | 9,918 | (9,918) | | (9,918) | 0 | settled | | 0 |
| 1-012 | Wilmington Trust Company | TBD | 0 | | 0 | 0 | settled | | 0 |
| Subtotal | Third Party claims | 2,661,992,510 | (61,150,656) | | (61,648,153) | 2,600,344,357 | | 2,600,344,357 | 0 |
| CCEL | Calpine Canada Energy Ltd. | 106,636 | (106,636) | | (106,636) | 0 | settled | | 0 |
| CCRC | Calpine Canada Resources Co. | 17,601,000 | (1,868,959) | | (1,868,959) | 15,732,041 | settled | 15,732,041 | 0 |
| Subtotal | Cdn Debtors | 17,707,636 | (1,975,595) | | (1,975,595) | 15,732,041 | | 15,732,041 | 0 |
| 1-011 | Quintana Canada Holdings LLC | 12,350,833 | (12,350,833) | | (12,350,833) | 0 | settled | | 0 |
| 1-011 | Quintana Canada Holdings LLC | 40,118,995 | | (40,118,995) | (40,118,995) | 0 | settled | | 0 |
| 1-011 | Quintana Canada Holdings LLC | TBD | 0 | 0 | 0 | 0 | settled | | 0 |
| 1-006 | Calpine Corporation | 2,786,942,340 | | (2,786,942,340) | (2,786,942,340) | 0 | settled | | 0 |
| 1-006 | Calpine Corporation | 167,199,477 | (167,199,477) | | (167,199,477) | 0 | settled | | 0 |
| 1-006 | Calpine Corporation | 226,250,000 | (226,250,000) | | (226,250,000) | 0 | settled | | 0 |
| 1-006 | Calpine Corporation | 46,936,000 | 0 | | 0 | 46,936,000 | settled | 46,936,000 | 0 |
| 1-007 | Calpine Group US | TBD | 0 | | 0 | 0 | settled | | 0 |
| | Calpine Corporation (swap closing) | | | 1,192,000,000 | 1,192,000,000 | 1,192,000,000 | settled | 1,192,000,000 | 0 |
| | Calpine Corporation (guarantee fee) | | | 52,183,000 | 52,183,000 | 52,183,000 | settled | 52,183,000 | 0 |
| Subtotal | US Debtors | 3,279,797,645 | (405,800,310) | (1,582,878,335) | (1,988,678,645) | 1,291,119,000 | | 1,291,119,000 | 0 |
| Total Claims | | 5,959,497,792 | (470,926,562) | (1,582,878,335) | (2,052,302,394) | 3,907,195,398 | | 3,907,195,398 | 0 |

## CCEL - Detailed Claims Listing
### (in CDN $)

| Claim # Claimant | Gross Claim Amount | Total revisions | Net remaining claims | Status (settled or open) | Previously Distributed | Allocation of Remaining Claim | |
|---|---|---|---|---|---|---|---|
| | | | | | | Proposed Distribution | Amount Deferred |
| 2-001 Canada Revenue Agency | 9,641 | 30,182,250 | 30,191,891 | settled | 30,191,891 | 0 | 0 |
| 2-002 Charlotte's Web Florist | 375 | 0 | 375 | settled | 375 | 0 | 0 |
| 2-006 HSBC Bank USA, National Association | TBD | 0 | 0 | settled | 0 | 0 | 0 |
| 2-003 IHS Energy (Canada) Ltd | 2,177,603 | (2,177,603) | 0 | settled | 0 | 0 | 0 |
| 2-007 NOVA Gas Transmission Ltd. | 36,205,274 | (36,205,274) | 0 | settled | 0 | 0 | 0 |
| 2-008 TransCanada Pipelines Limited | 81,129,548 | (81,129,548) | 0 | settled | 0 | 0 | 0 |
| 2-011 Van Houtte Coffee Services | 607 | 0 | 607 | settled | 607 | 0 | 0 |
| 2-009 Wilmington Trust Company | 3,550,425,146 | (3,550,425,146) | 0 | settled | 0 | 0 | 0 |
| 2-010 Wilmington Trust Company | TBD | 0 | 0 | settled | 0 | 0 | 0 |
| Subtotal Third Party claims | 3,669,948,193 | (3,639,755,321) | 30,192,872 | | 30,192,872 | 0 | 0 |
| ULC1 Calpine Canada Energy Finance ULC | 3,007,359,852 | 508,660,074 | 3,516,019,926 | settled | 0 | 3,516,019,926 | 0 |
| Saltend LP Calpine Canadian Saltend LP (now CCRC) | 21,259 | 0 | 21,259 | settled | 21,259 | 0 | 0 |
| CCNG Calpine Canada Natural Gas Partnership | 8,725,898 | 0 | 8,725,898 | settled | 8,725,898 | 0 | 0 |
| Subtotal Cdn Debtors | 3,016,107,009 | 508,660,074 | 3,524,767,083 | | 8,747,157 | 3,516,019,926 | 0 |
| 2-004 Calpine Corporation | 221,587 | (79,197) | 142,390 | settled | 142,390 | 0 | 0 |
| 2-005 Calpine Group US | TBD | 0 | 0 | settled | 0 | 0 | 0 |
| Subtotal US Debtors | 221,587 | (79,197) | 142,390 | | 142,390 | 0 | 0 |
| Total Claims | 6,686,276,789 | (3,131,174,444) | 3,555,102,346 | | 39,082,419 | 3,516,019,926 | 0 |

**CCPL - Detailed Claims Listing**
**(in CDN $)**

| Claim # Claimant | Gross Claim Amount | Total revisions | Net remaining claims | Status (settled or open) | Previously Distributed | Allocation of Remaining Claims | |
|---|---|---|---|---|---|---|---|
| | | | | | | To be Distributed | Amount to be Reserved |
| 3-001 4087844 Canada Inc. | 23,328 | (23,328) | 0 | settled | 0 | 0 | 0 |
| 3-002 California Climate Action Registry | 880 | 0 | 880 | settled | 880 | 0 | 0 |
| 3-010 Calpine Commercial Trust | 37,734,432 | (37,734,432) | 0 | settled | 0 | 0 | 0 |
| 3-011 Calpine Power Income Fund, Calpine Power LP, Calpine Commercial Trust | TBD | 0 | 0 | settled | 0 | 0 | 0 |
| 3-011a Calpine Power Income Fund, Calpine Power LP, Calpine Commercial Trust | TBD | 0 | 0 | settled | 0 | 0 | 0 |
| 3-012 Calpine Power Income Fund, Calpine Power LP | TBD | 0 | 0 | settled | 0 | 0 | 0 |
| 3-013 Calpine Power LP | TBD | 250,000 | 250,000 | settled | 250,000 | 0 | 0 |
| 3-016 Canada Revenue Agency | 229,328.87 | (229,328.87) | 0 | settled | 0 | 0 | 0 |
| 3-016A Canada Revenue Agency | 283,963 | 283,963 | 283,963 | open | 0 | 0 | 283,963 |
| 3-016B Canada Revenue Agency | 71,796 | 71,796 | 71,796 | open | 0 | 0 | 71,796 |
| 3-017 Canada Revenue Agency | 11,544,090 | (11,544,090) | 0 | settled | 0 | 0 | 0 |
| 3-003 Canada Revenue Agency | 3,449 | 0 | 3,449 | open | 0 | 0 | 3,449 |
| 3-004 Canada Revenue Agency#1 | 83,307 | (83,307) | 0 | settled | 0 | 0 | 0 |
| 3-004 Canada Revenue Agency#2 | 33,721 | (33,721) | 0 | settled | 0 | 0 | 0 |
| 3-018 HSBC Bank USA, National Association | TBD | 0 | 0 | settled | 0 | 0 | 0 |
| 3-005 IHS Energy (Canada) Ltd | 2,177,603 | (2,177,603) | 0 | settled | 0 | 0 | 0 |
| 3-006 Kestrel Data Limited | 117 | 0 | 117 | settled | 117 | 0 | 0 |
| 3-007 Sandwell Consulting Engineers Ltd. | 25,181 | 0 | 25,181 | settled | 25,181 | 0 | 0 |
| 3-019 Wilmington Trust Company | TBD | 0 | 0 | settled | 0 | 0 | 0 |
| Late Claim | 30,000,000 | (30,000,000) | 0 | open | 0 | 0 | 0 |
| Subtotal  Third Party claims | 81,855,436 | (81,220,051) | 635,385 | | 276,177 | 0 | 359,208 |
| ULCI Calpine Canada Energy Finance ULC | 18,746 | 0 | 18,746 | settled | 6,526 | 1,572 | 0 |
| CCEL Calpine Canada Energy Ltd. | 146,123,304 | 0 | 146,123,304 | settled | 50,868,192 | 12,254,600 | 0 |
| CCNG Calpine Canada Natural Gas Partnership | 59,082,669 | 0 | 59,082,669 | settled | 20,567,757 | 4,954,956 | 0 |
| Subtotal  Cdn Debtors | 205,224,719 | 0 | 205,224,719 | settled | 71,442,475 | 17,211,128 | 0 |
| 3-008 C*Power Inc. | 7,641 | (96) | 7,545 | settled | 7,545 | 0 | 0 |
| 3-009 Calpine Central, LP | 57,251 | (718) | 56,533 | settled | 56,533 | 0 | 0 |
| 3-014 Calpine Corporation | 2,425,216 | (2,425,216) | 0 | settled | 0 | 0 | 0 |
| 3-015 Calpine Group US | TBD | 0 | 0 | settled | 0 | 0 | 0 |
| Subtotal  US Debtors | 2,490,109 | (2,426,030) | 64,079 | | 64,079 | 0 | 0 |
| Total Claims | 289,570,264 | (83,646,081) | 205,924,183 | | 71,782,731 | 17,211,128 | 359,208 |

## CCRC - Detailed Claims Listing
### (in CDN $)

| Claim #   Claimant | Gross Claim Amount | Total revisions | Net remaining claims | Status (settled or open) | Previously Distributed | Allocation of Remaining Claims | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | Proposed Distribution | Amount to be Reserved | Amount to be Deferred |
| 5-002 4087844 Canada Inc. | 23,328 | (23,328) | 0 | settled | 0 | 0 | 0 | 0 |
| 5-028 Alliance Pipeline Limited Partnership | 52,755,276 | (52,755,276) | 0 | settled | 0 | 0 | 0 | 0 |
| 5-041 Alliance Pipeline Limited Partnership | 40,980,017 | (40,980,017) | 0 | settled | 0 | 0 | 0 | 0 |
| 5-003 Anadarko Canada Corp. | 28,828 | (28,828) | 0 | settled | 0 | 0 | 0 | 0 |
| 5-004 Anadarko Canada Corp. | 316,561 | (316,561) | 0 | settled | 0 | 0 | 0 | 0 |
| 5-029 Apache Canada Ltd | 129,878 | (129,878) | 0 | settled | 0 | 0 | 0 | 0 |
| 5-005 Arc Resources Ltd | 2,660 | (2,660) | 0 | settled | 0 | 0 | 0 | 0 |
| 5-006 Beauvista Petroleum | 4,466 | (4,466) | 0 | settled | 0 | 0 | 0 | 0 |
| 5-047 Burlington Resources Canada | 5,269 | (5,269) | 0 | settled | 0 | 0 | 0 | 0 |
| 5-048 Burlington Resources Canada | 2,317 | (2,317) | 0 | settled | 0 | 0 | 0 | 0 |
| 5-031 Calpine Power LP | 2,934,582 | (2,934,582) | 0 | settled | 0 | 0 | 0 | 0 |
| 5-031 Calpine Power LP | 766,129,764 | (766,129,764) | 0 | settled | 0 | 0 | 0 | 0 |
| CRA Canada Revenue Agency (NRWT) | 40,075,603 | | 40,075,603 | settled | 40,075,603 | 0 | 0 | 0 |
| 5-046 Canadian Natural Resources & CNR Limited | 863,566 | (863,566) | 0 | settled | 0 | 0 | 0 | 0 |
| 5-007 Canpar Holdings Ltd | 66,465 | (66,465) | 0 | open | 0 | 0 | 0 | 0 |
| 5-008 Checker Cabs Limited | 497 | 0 | 497 | settled | 497 | 0 | 0 | 0 |
| 5-044 Conoco Phillips Canada Limited | 98,223 | (98,223) | 0 | settled | 0 | 0 | 0 | 0 |
| 5-042 Conoco Phillips Western Canada Partnerships | 27,674 | (27,674) | 0 | settled | 0 | 0 | 0 | 0 |
| 5-043 Conoco Phillips Western Canada Partnerships | 51,686 | (51,686) | 0 | settled | 0 | 0 | 0 | 0 |
| 5-009 Devon Canada Corporation | 35,555 | (35,555) | 0 | settled | 0 | 0 | 0 | 0 |
| 5-049 Encana Corporation | 257,727 | (257,727) | 0 | settled | 0 | 0 | 0 | 0 |
| 5-010 Enermark Inc. | (37,264) | 37,264 | 0 | settled | 0 | 0 | 0 | 0 |
| 5-011 Enerplus Resources Corporation | 162 | (162) | 0 | settled | 0 | 0 | 0 | 0 |
| 5-012 EOG Resources Canada Inc. | 3,588 | (3,588) | 0 | settled | 0 | 0 | 0 | 0 |
| 5-045 Harbinger Capital Partners Master Fund I Ltd. | 5,516,329 | (5,516,329) | 0 | settled | 0 | 0 | 0 | 0 |
| 5-013 Hewlett-Packard (Canada) Co. | 3,685 | 0 | 3,685 | settled | 3,685 | 0 | 0 | 0 |
| 5-032 HSBC Bank USA, National Association | TBD | 0 | 0 | settled | 0 | 0 | 0 | 0 |
| 5-014 Hunt Oil Company of Canada, Inc. | 30,565 | (30,565) | 0 | settled | 0 | 0 | 0 | 0 |
| 5-015 IHS Energy (Canada) Ltd | 2,177,603 | (2,177,603) | 0 | settled | 0 | 0 | 0 | 0 |
| 5-016 Kestrel Data Limited | 19,511 | 0 | 19,511 | settled | 19,511 | 0 | 0 | 0 |
| 5-018 Laurie Hawkins | 12,858 | (2,163) | 10,695 | settled | 10,695 | 0 | 0 | 0 |
| 5-017 Lyreco (Canada) Inc. | 541 | 0 | 541 | settled | 541 | 0 | 0 | 0 |

## CCRC – Detailed Claims Listing
### (in CDN $)

| Claim # / Claimant | Gross Claim Amount | Total revisions | Net remaining claims | Status (settled or open) | Previously Distributed | Proposed Distribution | Amount to be Reserved | Amount to be Deferred |
|---|---|---|---|---|---|---|---|---|
| 5-033 Manufacturers & Traders Trust Company | 639,044,000 | (639,044,000) | 0 | settled | 0 | 0 | 0 | 0 |
| 5-034 Minister of Energy | TBD | 0 | 0 | settled | 0 | 0 | 0 | 0 |
| 5-053 Murphy Oil Company Ltd | 129,154 | (129,154) | 0 | settled | 0 | 0 | 0 | 0 |
| 5-035 and 5 NOVA Gas Transmission Ltd./TCPL 039 | 117,334,822 | (117,334,822) | 0 | settled | 0 | 0 | 0 | 0 |
| 5-019 PCC Properties (Calgary) Ltd. | 4,377 | 0 | 4,377 | settled | 4,377 | 0 | 0 | 0 |
| 5-001 Perfectly Clean (995103 Alberta Ltd) | 252 | 0 | 252 | settled | 252 | 0 | 0 | 0 |
| 5-020 Petro-Canada Oil and Gas | 97,886 | (97,886) | 0 | settled | 0 | 0 | 0 | 0 |
| 5-021 Petrofund Corp. | 207,012 | (207,012) | 0 | settled | 0 | 0 | 0 | 0 |
| 5-022 Plains Marketing Canada, L.P. | 826 | (826) | 0 | settled | 0 | 0 | 0 | 0 |
| 5-036 PrimeWest Energy Inc. | 1,092,041 | (1,092,041) | 0 | settled | 0 | 0 | 0 | 0 |
| 5-052 Provident Energy Ltd. | 237,245 | (237,245) | 0 | settled | 0 | 0 | 0 | 0 |
| 5-037 Province of BC | 967,758 | (591,009) | 376,749 | settled | 376,749 | 0 | 0 | 0 |
| 5-050 Shiningbank Energy Ltd | 226,581 | (226,581) | 0 | settled | 0 | 0 | 0 | 0 |
| 5-038 Talisman Energy Inc. | 1,374,069 | (1,374,069) | 0 | settled | 0 | 0 | 0 | 0 |
| 5-023 Telus Communications Inc. | 33,801 | (15,249) | 18,552 | settled | 18,552 | 0 | 0 | 0 |
| 5-051 Telus Mobility | 614 | 0 | 614 | settled | 614 | 0 | 0 | 0 |
| 5-024 TKE Energy Partnerships | 34 | (34) | 0 | settled | 0 | 0 | 0 | 0 |
| 5-026 True Energy Inc | 44,276 | (44,276) | 0 | settled | 0 | 0 | 0 | 0 |
| 5-025 True Energy, an Alberta Partnership | 1,761 | (1,761) | 0 | settled | 0 | 0 | 0 | 0 |
| 5-019 Westcoast Energy | 26,269,708 | 26,269,708 | 26,269,708 | settled | 26,269,708 | 0 | 0 | 0 |
| 5-027 Weyerhaeuser Company Limited | 14,787 | (14,787) | 0 | settled | 0 | 0 | 0 | 0 |
| 5-040 Wilmington Trust Company | TBD | 0 | 0 | settled | 0 | 0 | 0 | 0 |
| Reserve for Late Claim | - | 700,000 | 700,000 | open | 0 | 0 | 700,000 | 0 |
| Subtotal Third Party claims | 1,633,253,211 | (1,565,772,427) | 67,480,784 | | 66,780,784 | 0 | 700,000 | 0 |
| ULC1 Calpine Canada Energy Finance ULC | 1,868,960 | (1,868,960) | 0 | settled | 0 | 0 | 0 | 0 |
| CCEL Calpine Canada Energy Ltd. | 2,081,181,110 | 234,355,624 | 2,315,736,734 | settled | 0 | 0 | 0 | 2,315,736,734 |
| ULC2 Calpine Canada Energy Finance II | 674,777,254 | 98,392,432 | 773,169,686 | settled | 773,169,686 | 0 | 0 | 0 |
| ULC2 ULC2 Shortfall Claim | TBD | 0 | 0 | settled | 0 | 0 | 0 | 0 |
| CESCA Calpine Energy Services Canada Partnership | 5,051 | 0 | 5,051 | settled | 0 | 5,051 | 0 | 0 |
| 309NS 3094479 Nova Scotia Company | 52,753 | (52,753) | 0 | settled | 0 | 0 | 0 | 0 |
| Subtotal Related Party claims | 2,758,085,128 | 330,826,343 | 3,088,911,471 | | 773,169,686 | 5,051 | - | 2,315,736,734 |
| 5-030 Calpine Group US | 2,581,383 | (2,581,383) | 0 | settled | 0 | 0 | 0 | 0 |

**CCRC – Detailed Claims Listing**
**(in CDN $)**

| Claim # Claimant | Gross Claim Amount | Total revisions | Net remaining claims | Status (settled or open) | Previously Distributed | Allocation of Remaining Claims | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | Proposed Distribution | Amount to be Reserved | Amount to be Deferred |
| 5-030 Calpine Group US | TBD | 0 | 0 | settled | 0 | 0 | 0 | 0 |
| Subtotal US Debtors | 2,581,383 | (2,581,383) | 0 | | 0 | 0 | 0 | 0 |
| Total Claims | 4,393,919,722 | (1,237,527,466) | 3,156,392,256 | - | 839,950,470 | 5,051 | 700,000 | 2,315,736,734 |

## CESCL - Detailed Claims Listing
### (in CDN $)

| Claim # Claimant | Gross Claim Amount | Total revisions | Net remaining claims | Status (settled or open) | Allocation of Remaining Claims | |
|---|---|---|---|---|---|---|
| | | | | | Proposed Distribution | Amount to be reserved |
| 7-004 Alliance Pipeline Limited Partnership | 40,980,017 | (40,980,017) | 0 | settled | 0 | 0 |
| 7-005 Alliance Pipeline Limited Partnership | 52,755,276 | (52,755,276) | 0 | settled | 0 | 0 |
| 7-010 Canada Revenue Agency | 4,712,852 | (4,712,852) | 0 | settled | 0 | 0 |
| 7-001 Canada Revenue Agency | 37,141 | (37,141) | 0 | settled | 0 | 0 |
| 7-001 Canada Revenue Agency | 667,884 | (667,884) | 0 | settled | 0 | 0 |
| 7-001A Canada Revenue Agency (GST) [Trust] | 0 | 682,190 | 682,190 | open | 0 | 682,190 |
| 7-001B Canada Revenue Agency (GST) | 0 | 96,075 | 96,075 | open | 0 | 96,075 |
| 7-012 HSBC Bank USA, National Association | TBD | 0 | 0 | settled | 0 | 0 |
| 7-002 IHS Energy (Canada) Ltd | 2,177,603 | (2,177,603) | 0 | settled | 0 | 0 |
| 7-014 MIT Power Canada Investments Inc. | TBD | 0 | 0 | settled | 0 | 0 |
| 7-013 MIT Power Canada LP Inc. | TBD | 0 | 0 | settled | 0 | 0 |
| 7-015 NOVA Gas Transmission Ltd. | 36,205,274 | (36,205,274) | 0 | settled | 0 | 0 |
| 7-016 TransCanada Pipelines Limited | 81,129,548 | (81,129,548) | 0 | settled | 0 | 0 |
| 7-019 Westcoast Energy | 66,785,886 | (66,785,886) | 0 | settled | 0 | 0 |
| 7-017 Wilmington Trust Company | TBD | 0 | 0 | settled | 0 | 0 |
| 7-003 Zee Medical Canada Inc. | 131 | 0 | 131 | settled | 131 | 0 |
| **Subtotal Third Party Claims** | 285,451,613 | (284,673,217) | 778,395 | settled | 131 | 778,264 |
| 7-018 CM Greenfield Power Corp | TBD | 0 | 0 | settled | 0 | 0 |
| 7-011 Greenfield Energy LP | TBD | 0 | 0 | settled | 0 | 0 |
| ULCl Calpine Canada Energy Finance ULC | 108,055 | - | 108,055 | settled | 108,055 | 0 |
| **Subtotal Cdn Debtors** | 108,055 | - | 108,055 | | 108,055 | 0 |
| 7-006 Calpine Corporation | 2,581,818 | (2,581,818) | 0 | settled | 0 | 0 |
| 7-007 Calpine Group US | TBD | 0 | 0 | settled | 0 | 0 |
| 7-008 Calpine International, LLC | 50 | 0 | 50 | settled | 50 | 0 |
| 7-009 Calpine Power LP | 2,934,582 | (2,934,582) | 0 | settled | 0 | 0 |
| 7-009 Calpine Power LP | 766,129,764 | (766,129,764) | 0 | settled | 0 | 0 |
| **Subtotal US Debtors** | 771,646,214 | (771,646,164) | 50 | | 50 | 0 |
| **Total Claims** | 1,057,205,882 | (1,056,319,381) | 886,501 | | 108,237 | 778,264 |

Appendix A
Page 8 of 11

# CESCA - Detailed Claims Listing
## (in CDN $)

| Claim # | Claimant | Gross Claim Amount | Total revisions | Net remaining claims | Status (settled or open) | Allocation of Remaining Claims | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | Proposed Distribution | Amount to be Reserved | Amount to be Deferred |
| 8-005 | Alliance Pipeline Limited Partnership | 40,980,017 | (33,625,508) | 7,354,509 | settled | 7,354,509 | 0 | 0 |
| 8-006 | Alliance Pipeline Limited Partnership | 52,755,276 | (40,206,989) | 12,548,286 | settled | 12,548,286 | 0 | 0 |
| 8-001 | Aquila Merchant Services - Intl, Ltd. | 4,191,922 | 0 | 4,191,922 | open | 0 | 4,191,922 | 0 |
| 8-011 | Calpine Power LP | 769,064,346 | (579,064,346) | 190,000,000 | open | 190,000,000 | 0 | 0 |
| 8-018 | Canada Revenue Agency (GST) | 1,000,000 | (1,000,000) | 0 | open | 0 | 0 | 0 |
| 8-017 | Canada Revenue Agency (NRWT) | 22,852,725 | (22,852,725) | 0 | open | 0 | 0 | 0 |
| 8-017A | Canada Revenue Agency | - | | 0 | open | 0 | 0 | 0 |
| 8-017B | Canada Revenue Agency (NRWT) [TRUST] | - | 1,573 | 1,573 | open | 0 | 1,573 | 0 |
| 8-018A | Canada Revenue Agency (GST) [TRUST] | - | 81,699 | 81,699 | open | 0 | 81,699 | 0 |
| 8-018B | Canada Revenue Agency (GST) | - | 3,613,152 | 3,613,152 | open | 0 | 3,613,152 | 0 |
| 8-004 | HSBC Bank USA, National Association | TBD | 4,532 | 4,532 | open | 0 | 4,532 | 0 |
| 8-002 | IHS Energy (Canada) Ltd | TBD | | 0 | settled | 0 | 0 | 0 |
| 8-016 | Independent System Operator | 2,177,603 | (2,177,603) | 0 | settled | 0 | 0 | 0 |
| 8-012 | NOVA Gas Transmission Ltd. | 3,887,500 | (3,887,500) | 0 | settled | 0 | 0 | 0 |
| 8-013 | Pengrowth Corporation | 36,205,274 | (4,573,416) | 31,631,859 | settled | 31,631,859 | 0 | 0 |
| 8-003 | Progress Energy Ltd. | 536,490 | (536,490) | 0 | settled | 0 | 0 | 0 |
| 8-014 | TransCanada Pipelines Limited | 1,294,861 | 0 | 1,294,861 | settled | 1,294,861 | 0 | 0 |
| 8-015 | Wilmington Trust Company | 81,129,548 | (36,761,407) | 44,368,141 | settled | 44,368,141 | 0 | 0 |
| | | TBD | 0 | 0 | settled | 0 | 0 | 0 |
| | **Subtotal Third Party Claims** | 1,016,075,563 | (720,985,029) | 295,090,534 | | 287,197,657 | 7,892,877 | 0 |
| CCEL | Calpine Canada Energy Ltd. | 3,765 | 0 | 3,765 | settled | 3,765 | 0 | 0 |
| CCNG | Calpine Canada Natural Gas Partnership | 186,078,996 | 0 | 186,078,996 | settled | 0 | 0 | 186,078,996 |
| | **Subtotal Cdn Debtors** | 186,082,761 | - | 186,082,761 | | 3,765 | 0 | 186,078,996 |
| 8-007 | Calpine Corporation (***) | 26,883,767 | 0 | 26,883,767 | settled | 26,883,767 | 0 | 0 |
| 8-008 | Calpine Energy Management LP (***) | 19,649,557 | 0 | 19,649,557 | settled | 19,649,557 | 0 | 0 |
| 8-009 | Calpine Energy Services LP (***) | 3,443,518 | 0 | 3,443,518 | settled | 3,443,518 | 0 | 0 |
| 8-010 | Calpine Group US | TBD | 0 | 0 | settled | 0 | 0 | 0 |
| | **Subtotal US Debtors** | 49,976,843 | - | 49,976,843 | | 49,976,843 | 0 | 0 |
| | **Total Claims** | 1,252,135,166 | (720,985,029) | 531,150,138 | | 337,178,265 | 7,892,877 | 186,078,996 |

## CCNG - Detailed Claims Listing
### (in CDN $)

| Claim # | Claimant | Gross Claim Amount | Total revisions | Net remaining claims | Status (settled or open) | Previous Distribution | Allocation of Remaining Claims Amount to be Reserved | Amount to be Deferred |
|---|---|---|---|---|---|---|---|---|
| 12-022 | 4087844 Canada Inc. | 23,328 | 0 | 23,328 | settled | 23,328 | 0 | 0 |
| 12-001 | Anadarko Canada Corp. | 8,055 | (8,055) | 0 | settled | 0 | 0 | 0 |
| 12-002 | Anadarko Canada Corp. | 4,775 | (4,775) | 0 | settled | 0 | 0 | 0 |
| 12-036 | Anadarko Canada Corp. | 2,698 | (2,698) | 0 | settled | 0 | 0 | 0 |
| 12-027 | Apache Canada Ltd. | 233,066 | (134,918) | 98,147 | settled | 98,147 | 0 | 0 |
| 12-003 | Arc Resources Ltd. | 184,519 | (59,592) | 124,927 | settled | 124,927 | 0 | 0 |
| 12-004 | Bell Canada | 1,505 | (1,505) | 0 | settled | 0 | 0 | 0 |
| 12-005 | Bonavista Petroleum | 62,529 | (14,557) | 47,972 | settled | 47,972 | 0 | 0 |
| 12-042 | Burlington Resources Canada Ltd. | (54,008) | 54,008 | 0 | settled | 0 | 0 | 0 |
| 12-043 | Burlington Resources Canada Ltd. | 21,487 | (21,487) | 0 | settled | 0 | 0 | 0 |
| 12-037 | Canada Revenue Agency | 500,000 | (500,000) | 0 | settled | 0 | 0 | 0 |
| 12-037A | Canada Revenue Agency (GST) [TRUST] | 0 | 487,976 | 487,976 | open | 0 | 487,976 | 0 |
| 12-037A | Canada Revenue Agency (GST) | 0 | 0 | 0 | open | 0 | 0 | 0 |
| 12-046 | Canadian Natural Resources / CNR Ltd (joint claim) | 812,845 | 2,719,449 | 2,719,449 | open | 0 | 2,719,449 | 0 |
| 12-15-007 | Carpar Holdings Ltd. | | 50,721 | 863,566 | | 0 | 863,566 | 0 |
| 12-047 | Conoco Phillips Canada Limited | 2,549 | 57,720 | 57,720 | settled | 57,720 | 0 | 0 |
| 12-038 | Conoco Phillips Canada Resources Corporation | 97,794 | 98,223 | 100,773 | settled | 100,773 | 0 | 0 |
| 12-039 | Conoco Phillips Energy Partnerships | 112,028 | 0 | 97,794 | settled | 97,794 | 0 | 0 |
| 12-040 | Conoco Phillips Western Canada Partnerships | 3,985 | 0 | 112,028 | settled | 112,028 | 0 | 0 |
| 12-006 | Deep Resources Ltd | 12,584 | 21,891 | 25,876 | settled | 25,876 | 0 | 0 |
| 12-023 | Devon Canada Corporation | 145,978 | 0 | 12,584 | settled | 12,584 | 0 | 0 |
| 12-045 | Encana Corporation | 24,142 | 54,300 | 200,277.65 | settled | 200,278 | 0 | 0 |
| 12-008 | Enermark Inc. | 19,794 | 257,727 | 281,869 | settled | 281,869 | 0 | 0 |
| 12-007 | Enerplus Oil & Gas Ltd | 7,525 | (19,794) | 0 | settled | 0 | 0 | 0 |
| 12-15-011 | Enerplus Resources Company | | 0 | 7,525 | settled | 7,525 | 0 | 0 |
| 12-021 | CVI GVF (Lux) Master S.a.r.l | 49,279,000 | 162 | 162 | settled | 162 | 0 | 0 |
| 12-010 | EOG Resources Canada Inc. | 1,127 | (46,228,160) | 3,050,840 | settled | 3,050,840 | 0 | 0 |
| 12-T5-012 | EOG Resources Canada | | (523) | 605 | settled | 605 | 0 | 0 |
| 12-009 | Esprit Exploration Ltd. | 6,413 | 3,588 | 3,588 | settled | 3,588 | 0 | 0 |
| 12-031 | HSBC Bank USA, National Association | TBD | 0 | 6,413 | settled | 6,413 | 0 | 0 |
| | | | 0 | 0 | settled | 0 | 0 | 0 |

## CCNG - Detailed Claims Listing
### (in CDN $)

| Claim # | Claimant | Gross Claim Amount | Total revisions | Net remaining claims | Status (settled or open) | Previous Distribution | Allocation of Remaining Claims | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | Amount to be Reserved | Amount to be Deferred |
| 12-T5-014 | Hunt Oil Company of Canada, Inc. | | 30,565 | 30,565 | settled | 30,565 | 0 | 0 |
| 12-050 | Liquidity Solutions | 68,737 | (54,632) | 14,105 | settled | 14,105 | 0 | 0 |
| 12-011 | IHS Energy (Canada) Ltd | 2,177,603 | (1,477,603) | 700,000 | settled | 700,000 | 0 | 0 |
| 12-014 | Iroquois Falls Power Corp. | 43,115,666 | (11,115,666) | 32,000,000 | settled | 32,000,000 | 0 | 0 |
| 12-012 | Kestrel Data Limited | 8,940 | 0 | 8,940 | settled | 8,940 | 0 | 0 |
| 12-013 | Keyera Energy Partnership - Revised | 30,042 | (29,376) | 665 | settled | 665 | 0 | 0 |
| 12-032 | Minister of Energy | TBD | 0 | 0 | settled | 0 | 0 | 0 |
| 12-T5-053 | Murphy Oil Company Ltd | | 129,154 | 129,154 | settled | 129,154 | 0 | 0 |
| 12-024 | PCC Properties (Calgary) Ltd. | 4,377 | (4,377) | 0 | settled | 0 | 0 | 0 |
| 12-044 | Pengrowth Corporation | 536,490 | (536,490) | 0 | settled | 0 | 0 | 0 |
| 12-025 | Liquidity Solutions Inc. | 6,647 | 91,579 | 98,226 | settled | 98,226 | 0 | 0 |
| 12-015 | Liquidity Solutions Inc. | 38,635 | 161,468 | 200,103 | settled | 200,103 | 0 | 0 |
| 12-016 | Plains Marketing Canada, L.P. | 876 | (876) | 0 | settled | 0 | 0 | 0 |
| 12-033 | Longacre Master Fund, Ltd. | 748,180 | (248,180) | 500,000 | settled | 500,000 | 0 | 0 |
| 12-048 | Provident Acquisition LP | 278,030 | (278,030) | | settled | 0 | 0 | 0 |
| 12-049 | Provident Energy Ltd. | 5,250 | 196,625 | 201,875 | settled | 201,875 | 0 | 0 |
| 12-017 | Rife Resources Ltd. | 1,633 | (685) | 948 | settled | 948 | 0 | 0 |
| 12-T5-050 | Shiningbank Energy Ltd | | 173,633 | 173,633 | settled | 173,633 | 0 | 0 |
| 12-018 | Suncor Energy Inc. | 12,645 | (10,055) | 2,590 | settled | 2,590 | 0 | 0 |
| 12-019 | Sutton Energy Ltd | 3,127 | 0 | 3,127 | settled | 3,127 | 0 | 0 |
| 12-041 | Talisman Energy Inc. | 1,374,069 | (362,788) | 1,011,281 | settled | 1,011,281 | 0 | 0 |
| 12-020 | TKE Energy Partnerships | 1,652 | (871) | 781 | settled | 781 | 0 | 0 |
| 12-T5-026 | True Energy Inc. | | 12,992 | 12,992 | settled | 12,992 | 0 | 0 |
| 12-T5-025 | True Energy, an Alberta Partnership | | 392 | 392 | settled | 392 | 0 | 0 |
| 12-026 | Viking Holdings Inc. | 72,287 | 0 | 72,287 | settled | 72,287 | 0 | 0 |
| 12-035 | Weir Hill Exploration Inc. | 6,892 | 0 | 6,892 | settled | 6,892 | 0 | 0 |
| 12-T5-027 | Weyerhaeuser Company Limited | | 7,575 | 7,575 | settled | 7,575 | 0 | 0 |
| | Reserve for Late Claims | | 91,564 | 91,564 | open | 0 | 91,564 | 0 |
| Subtotal | Third Party claims | 100,005,497 | (56,414,383) | 43,591,114 | | 39,428,559 | 4,162,555 | 91,564 |
| 12-034 | Wilmington Trust Company | TBD | 0 | 0 | settled | 0 | 0 | 0 |

Appendix A
Page 11 of 11

## CCNG - Detailed Claims Listing
### (in CDN $)

| Claim # | Claimant | Gross Claim Amount | Total revisions | Net remaining claims | Status (settled or open) | Previous Distribution | Amount to be Reserved | Amount to be Deferred |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | Allocation of Remaining Claims | |
| ULC1 | Calpine Canada Energy Finance ULC | 10,103 | 0 | 10,103 | settled | 10,103 | 0 | 0 |
| CCRC | Calpine Canada Resources Company | 61,804,059 | 0 | 61,804,059 | settled | 0 | 0 | 61,804,059 |
| ULC2 | Calpine Canada Energy Finance II | 9,164 | 0 | 9,164 | settled | 9,164 | 0 | 0 |
| Subtotal | Cdn Related Party claims | 61,823,327 | 0 | 61,823,327 | | 19,267 | 0 | 61,804,059 |
| 12-028 | Calpine Corporation | 4,551,332 | (2,788,927) | 1,762,406 | settled | 1,762,406 | 0 | 0 |
| 12-029 | Calpine Energy Services LP | 1,968,482 | (24,692) | 1,943,790 | settled | 1,943,790 | 0 | 0 |
| 12-030 | Calpine Group US | TBD | 0 | 0 | settled | 0 | 0 | 0 |
| Subtotal | | 6,519,814 | (2,813,618) | 3,706,196 | | 3,706,196 | 0 | 0 |
| Total Claims | | 168,348,638 | (59,228,001) | 109,120,636 | | 43,154,022 | 4,162,555 | 61,804,059 |

Action No.: 0501-17864

IN THE COURT OF QUEEN'S BENCH
OF ALBERTA

JUDICIAL DISTRICT OF CALGARY

IN THE MATTER OF THE *COMPANIES'*
*CREDITORS ARRANGEMENT ACT*
R.S.C. 1985, Chap. C-36, as amended

AND IN THE MATTER OF

CALPINE CANADA ENERGY LIMITED,
CALPINE CANADA POWER LTD.,
CALPINE CANADA ENERGY FINANCE
ULC, CALPINE ENERGY SERVICES
CANADA LTD., CALPINE CANADA
RESOURCES COMPANY, CALPINE
CANADA POWER SERVICES LTD.
CALPINE CANADA ENERGY FINANCE II
ULC, CALPINE NATURAL GAS SERVICES
LIMITED AND 3094479 NOVA SCOTIA
COMPANY

## TWENTY EIGHTH REPORT OF THE MONITOR

CLERK OF THE COURT

JAN 1 1 2008

CALGARY, ALBERTA

**BORDEN LADNER GERVAIS** LLP
Barristers and Solicitors
1000 Canterra Tower
400 Third Avenue S.W.
Calgary, Alberta T2P 4H2

**Attention: Patrick T. McCarthy**
**Telephone:** (403) 232-9441
**Fax:** (403) 266-1395

File No. 413255/4

# EXHIBIT E

Action No. 0501-17864

**IN THE COURT OF QUEEN'S BENCH OF ALBERTA**

**JUDICIAL DISTRICT OF CALGARY**

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT*

*ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF

**CALPINE CANADA ENERGY LIMITED, CALPINE CANADA POWER LTD.,**

**CALPINE CANADA ENERGY FINANCE ULC, CALPINE ENERGY SERVICES**

**CANADA LTD., CALPINE CANADA RESOURCES COMPANY, CALPINE CANADA**

**POWER SERVICES LTD., CALPINE CANADA ENERGY FINANCE II ULC, CALPINE**

**NATURAL GAS SERVICES LIMITED, AND 3094479 NOVA SCOTIA COMPANY**

**COLLECTIVELY THE "APPLICANTS"**

**29th REPORT OF THE MONITOR**

**ERNST & YOUNG INC.**

**February 6, 2008**

⫴ *ERNST & YOUNG*

## INTRODUCTION

1.    On December 20, 2005, the Applicants filed for and obtained protection from their creditors under the *Companies' Creditors Arrangement Act,* R.S.C. 1985 c. C-36, as amended, (the "CCAA") pursuant to an order of the Court dated December 20, 2005 (the "Initial Order").    In addition to the Applicants, the Initial Order provided for a stay of proceedings against Calpine Energy Services Canada Partnership ("CESCA"), Calpine Canada Natural Gas Partnership ("CCNG"), and Calpine Canadian Saltend Limited Partnership ("Saltend LP"), collectively referred to as the "CCAA Parties".    The Applicants and CCAA Parties are collectively referred to as the "CCAA Debtors".

2.    Pursuant to the Initial Order, Ernst & Young Inc. was appointed monitor of the Applicants and CCAA Parties during these CCAA proceedings (the "Monitor").

## PURPOSE OF REPORT

3.    The purpose of this twenty-ninth report (the "29th Report") is to provide creditors and this Honourable Court with:

    a)    An update of the events since the 28th Report including the distribution by ULC1 to its creditors on or about February 6, 2008;

    b)    The Monitor's final summary of the recoveries and related distributions and reserves for each CCAA Debtor commencing with the CCAA filing on December 20, 2005;

    c)    A summary of the claims that remain unresolved and the amount of reserves each CCAA Debtor has retained; and

    d)    The Monitor's recommendations with respect to the following relief being sought (the "Final Relief") including:

        i.    The approval of the cancellation of the senior notes issued by ULC1 (the "ULC1 Notes") and the discharge of the ULC1 Indenture Trustee;

        ii.    Confirmation of the claims bar date and amending the Claims Process Order such that the respective CCAA Debtors are tasked with the resolution of the remaining disputed claims in substitution of the Monitor;

iii.   A declaration that payments made in respect of third party claims as previously authorized by Orders of this Court represent full and final payment and satisfaction of those claims;

iv.   Approving the conduct of the Monitor from the date of its appointment to the present, and discharging and releasing the Monitor and its counsel from claims arising as a result of the Monitor's role in these proceedings;

v.   Approving the release of the directors, officers, employees and other servants and agents of the CCAA Debtors, including their counsel, from all claims against the CCAA Debtors and claims arising as a result of these proceedings;

vi.   Discharging the Consolidated Applications for Bankruptcy Orders made against CCRC, ULC2 and ULC1;

vii.   A declaration that the key employee retention plan approved by Order of this Court dated July 12, 2006 has been completed and is no longer in effect; and

viii.   Terminating the stay of proceedings and the related charges and other relief as defined and granted in the Initial Order.

## TERMS OF REFERENCE

4.   In preparing this 29th Report, the Monitor has relied upon unaudited financial information, company records and discussions with management of the CCAA Debtors. The Monitor has not performed an audit, review or other verification of such information. An examination of the financial forecast as outlined in the Canadian Institute of Chartered Accountants Handbook has not been performed.

5.   Capitalized terms not defined in this report or the Appendices hereto are as defined in the Initial Order, the Affidavit of Mr. Toby Austin dated February 4, 2008, the Orders issued in these CCAA Proceedings or the Monitor's First through 28th Reports.

6.   All references to dollars are in Canadian currency unless otherwise noted.

≣Ⅱ ERNST & YOUNG                                    - 3 -

**BACKGROUND**

7.   Background to these CCAA proceedings, including the Initial Order, subsequent Orders granted by the Court, supporting affidavits and reports by the Monitor, have been posted by the Monitor on its website at **http://www.ey.com/ca/calpinecanada.** Calpine Corporation and certain of its direct and indirect subsidiaries in the U.S. (the "U.S. Debtors") filed voluntary petitions to restructure under Chapter 11 of the U.S. Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York, New York on December 20 and 21, 2005 (the "U.S. Proceedings"). Information concerning the U.S. Debtors' restructuring can be found at **http://www.kccllc.net/calpine**.

**ULC1 DISTRIBUTION**

8.   On or about February 6, 2008, ULC1 completed its distribution as outlined in the Monitor's 28th Report (the "ULC1 Distribution")

9.   Upon the completion of the ULC1 Distribution, ULC1 has fully repaid or reserved for all its third party creditors and all holders of the ULC1 Notes. Accordingly, ULC1 is now seeking an Order to allow for the cancellation of the ULC1 Notes and the discharge and release of the ULC1 Indenture Trustee.

**RECOVERIES, DISTRIBUTIONS AND RESERVES BY CCAA DEBTOR**

10.   Calpine Canada has been able to restructure its affairs such that all third party creditors will have recovered their full proven claims.

11.   With the implementation of the US Plan, the CCAA Debtors were able to complete their remaining distributions which primarily related to the repayment of the obligations owing to the ULC1 Notes and the unwinding of the Hybrid Note Structure.

12.  The table below provides a summary of the financial events for each CCAA Debtor during the period of these CCAA proceeding and illustrates the total recoveries, related distributions and payments and the reserves for unresolved claims:

    i.  The CCAA Debtors' recoveries totalled approximately $11.0 billion, including $5.1 billion in recoveries from claims against the US Debtors;

    ii.  The CCAA Debtors distributed $3.5 billion to third party creditors, allowing each CCAA Debtor to fully repay all resolved third party claims;

    iii.  $4.7 billion in claims were resolved between CCAA Debtors;

    iv.  $1.3 billion in distributions have been made in respect of claims owing to the US Debtors;

    v.  Approximately $83.7 million as a full reserve for unresolved claims which remain outstanding; and

    vi.  Approximately $943 million in capital has been returned to the US Debtors.

| In Cdn $ millions | ULC1 | CCEL | CCPL | CCRC | ULC2 | CESCL | CESCA | Saltend LP and 309NS | CCNG | Gross Total |
|---|---|---|---|---|---|---|---|---|---|---|
| **Recoveries** | | | | | | | | | | |
| Opening cash on hand | 0.3 | 2.3 | 1.2 | 18.4 | 2.4 | 0.1 | - | 12.1 | 8.6 | 45.4 |
| Other recoveries | 2.0 | 37.3 | 118.4 | 671.7 | 0.4 | - | 75.9 | - | 74.5 | 980.2 |
| From claims against US Debtors | 493.1 | 4,392.7 | 10.7 | 180.9 | - | 0.8 | 69.1 | - | - | 5,147.3 |
| From CCAA Parties | 3,514.8 | 133.9 | - | 330.2 | 773.2 | - | - | - | 36.3 | 4,788.4 |
| Shortfall Claim | - | - | - | (251.6) | 19.9 | - | 231.7 | - | - | - |
| Equity recovery (distribution) | - | - | - | 42.4 | 10.3 | - | - | (10.3) | (42.4) | - |
| | 4,010.2 | 4,566.2 | 130.3 | 992.0 | 806.2 | 0.9 | 376.7 | 1.8 | 77.0 | 10,961.3 |
| **Distributions** | | | | | | | | | | |
| Third party claims | 2,573.0 | 30.2 | 0.3 | 66.8 | 514.1 | 0.8 | 291.4 | - | 39.5 | 3,516.1 |
| CCAA Debtors' claims | 15.7 | 3,523.5 | 96.0 | 838.7 | 284.6 | 0.1 | - | 1.8 | 28.0 | 4,788.4 |
| US Debtors' claims | 1,290.5 | 0.1 | 0.1 | - | - | - | 50.0 | - | 3.7 | 1,344.4 |
| *sub-total - claims' distributions* | 3,879.2 | 3,553.8 | 96.4 | 905.5 | 798.7 | 0.9 | 341.4 | 1.8 | 71.2 | 9,648.9 |
| Reserved for unresolved claims | 66.6 | - | 0.4 | . 0.6 | 3.3 | - | 7.3 | - | 4.1 | 82.3 |
| Other payments | 2.2 | 14.5 | 32.8 | 3.8 | 1.5 | - | 26.3 | - | 1.2 | 82.3 |
| Settlment payment to US | - | - | - | 76.0 | - | - | - | - | - | 76.0 |
| Allocated professional costs | 24.6 | 4.0 | 0.7 | 6.1 | 2.7 | - | 1.7 | - | 0.5 | 40.3 |
| Return of capital to US | - | 943.4 | - | - | - | - | - | - | - | 943.4 |
| Reserve for future costs | - | 2.0 | - | - | - | - | - | - | - | 2.0 |
| | 3,972.6 | 4,517.7 | 130.3 | 992.0 | 806.2 | 0.9 | 376.7 | 1.8 | 77.0 | 10,875.2 |
| Available for US Debtors | 37.6 | 48.5 | - | - | - | - | - | - | - | 86.1 |
| *Represented by:* | | | | | | | | | | |
| Cash | - | 48.5 | - | - | - | - | - | - | - | 48.5 |
| CORPX shares | 37.6 | - | - | - | - | - | - | - | - | 37.6 |

## Cash on hand

13.    Opening cash on hand comprises the funds on hand at the date of the CCAA filing, which totalled approximately $45.4 million as at December 31, 2005.

## Other recoveries

14.    Other recoveries totalled approximately $980 million with the significant recoveries comprising:

    i.    CCNG's collection of a $57.8 million receivable that was factored with a third party;

    ii.    CCRC's repatriation of approximately $251.4 million in funds from its foreign subsidiaries (referred to as the "Saltend Proceeds");

    iii.  CCPL's sale of its B Units of the Fund for net proceeds of approximately $97.7 million (net of costs and payment of the Manager's Loan);

    iv.  CCRC's sale of its ULC1 Notes for net proceeds of $403.7 million; and

    v.  CESCA's recoveries of $75.9 million comprising the proceeds from the sale of natural gas under a call-on-production agreement ("COP Agreement") as well as the collection of miscellaneous pre-filing accounts receivable.

**Recoveries from claims against US Debtors**

15.    $5.1 billion has been recovered from the US Debtors as summarized in the table below:

| Recoveries from claims against US Debtors | ULC1 | CCEL | CCPL | CCRC | CESCL | CESCA | TOTAL |
|---|---|---|---|---|---|---|---|
| *in C$ millions* | | | | | | | |
| QCH | 493.1 | 701.6 | - | 29.9 | - | - | 1,224.6 |
| QCH subscription agreement | - | 3,691.0 | - | - | - | - | 3,691.0 |
| Sale of US claims | - | 0.1 | 10.7 | 151.0 | 0.8 | 69.1 | 231.7 |
| | 493.1 | 4,392.7 | 10.7 | 180.9 | 0.8 | 69.1 | 5,147.3 |

    i.  $1.2 billion in claims owing by QCH were repaid on or about February 1, 2008, in conjunction with the implementation of the US Plan. QCH's distributions were funded by the distribution of new shares of CORPX;

    ii.  In conjunction with the implementation of the US Plan, QCH contributed to CCEL a further $3.7 billion in CORPX shares as part of the unwinding of the Hybrid Note Structure. CCEL used the contribution from QCH to repay its obligations to ULC1; and

    iii.  $231.7 million in net proceeds were received by the CCAA Debtors in December 2007 relating to the sale of certain claims against the US Debtors as set out in the Monitor's 27th Report.

**Distributions from CCAA Parties**

16.    $4.8 billion in inter-company claims owing amongst the CCAA Parties have been distributed as set out in the table below and detailed at Appendix A.

| Recoveries by CCAA Debtors | ULC1 | CCEL | CCRC | ULC2 | CCNG | TOTAL |
|---|---|---|---|---|---|---|
| *In C$ millions* | | | | | | |
| *Distribution from:* | | | | | | |
| ULC1 | - | - | 15.7 | - | - | 15.7 |
| CCEL | 3,514.7 | - | - | - | 8.7 | 3,523.4 |
| CCPL | - | 68.4 | - | - | 27.6 | 96.0 |
| CCRC | - | 65.5 | - | 773.2 | - | 838.7 |
| ULC2 | - | - | 284.6 | - | - | 284.6 |
| CESCL | 0.1 | - | - | - | - | 0.1 |
| Saltend LP and 309NS | - | - | 1.9 | - | - | 1.9 |
| CCNG | - | - | 28.0 | - | - | 28.0 |
| | 3,514.8 | 133.9 | 330.2 | 773.2 | 36.3 | 4,788.4 |

**Shortfall Claims**

17.    As previously reported to the Court, under the Global Settlement Agreement, CCRC was responsible for the following claims:

   i.    The amount that CESCA's liabilities exceeded its assets (referred to as the "CESCA Shortfall Claim"); and

   ii.   The amount that ULC2's liabilities exceed its assets (referred to as the "ULC2 Shortfall Claim").

18.    Upon the distribution to ULC2's and CESCA's creditors, the amount required to be contributed by CCRC relating to the ULC2 Shortfall Claim and the CESCA Shortfall Claim totalled approximately $251.6 million, representing a payment of $19.9 million to ULC2 in respect of the ULC2 Shortfall Claim and $231.7 million to CESCA in respect of the CESCA Shortfall Claim.

**Equity recoveries (distributions)**

19.    Equity recoveries (distributions) relates to amounts that have been distributed by one CCAA Debtor to its parent after all third party creditor claims of the respective CCAA Debtor have been repaid in full.

**Distributions in respect of claims of third parties, CCAA Debtors and US Debtors**

20.    Approximately $9.65 billion in distributions with respect to claims have been made by the CCAA Debtors, comprising the following distributions:

      i.   $3.5 billion in distributions in respect of resolved claims of third parties;

      ii.   $4.8 billion in distributions in respect of claims of other CCAA Debtors; and

      iii.   $1.3 billion in distributions in respect of claims of the US Debtors.

**Reserve for unresolved claims**

21.    Approximately $82.3 million in claims remain unresolved of which approximately $66.6 million relates to the deferral of the ULC1 guarantee fee owing to Calpine Corporation. A listing of the individual unresolved claims, by CCAA Debtor, is attached at Appendix A and discussed in further detail below.

22.    The Monitor notes that each CCAA Debtor has withheld sufficient cash as a reserve against the unresolved claim amounts.

**Other payments**

23.    Other payments of $81.7 million were made by the CCAA Debtors during these CCAA proceedings comprising the following types of payments:

      i.   The purchase of natural gas as required under the COP Agreements; and

      ii.   Payment of employee costs and general and administrative costs.

**Settlement payment**

24.    Approximately $76 million was distributed by CCRC to the US Debtors as part of the implementation of the Global Settlement Agreement.

**Allocated professional fees and key employee retention plan ("KERP")**

25.    Professional fees and KERP payments total approximately $40.3 million, including an accrual for professional fees to allow for the completion of these CCAA proceedings. The professional fees have been allocated amongst the CCAA Debtors based on percentage of gross recoveries. For example, if CCRC's recoveries are 20% of the total recoveries of all the CCAA Debtors, then CCRC would be allocated 20% of the professional fees.

26.    The KERP payments have been allocated based on the agreement approved by the Court.

**Return of capital to the US Debtors**

27.    In conjunction with the implementation of the US Plan, CCEL returned to QCH (its parent) approximately $943.4 million in capital, comprising CORPX shares that CCEL received from QCH as part of the unwinding of the Hybrid Note Structure.

**Reserve for future costs**

28.    CCEL has accrued an additional $2.0 in costs for future general and administrative costs to complete these CCAA proceedings.

**Amounts remaining for the US Debtors**

29.    Approximately $86.1 million is estimated to be available for the US Debtors, representing the remaining funds (cash and CORPX Shares) after each CCAA Debtor has fully reserved for all estimated remaining costs and unresolved claims. Of the $86.1 million remaining, $48.5 million is comprised of cash and $37.6 million of CORPX Shares.

**RESERVED CLAIMS IN DISPUTE**

**UCL1**

30.    ULC1 is indebted to Calpine Corporation in the amount of approximately $66.6 million on account of guarantee fees relating to the outstanding ULC1 bonds.  The settlement of this claim has not yet occurred and will be deferred until some time after ULC1 emerges from its CCAA proceedings.

31.    ULC1 is entitled to receive a further recovery of approximately $113.7 million from QCH as repayment of an outstanding promissory note that has only be partially repaid.  The recovery of this amount has also been deferred until some time after ULC1 emerges from its CCAA proceedings.

**CCPL**

32.    Canada Revenue Agency ("CRA") has filed 2 claims against CCPL in the amounts of approximately $356,000 with respect to outstanding GST and related accrued interest and approximately $3,000 with respect to source deductions.  CCPL has filed a Notice of Appeal with CRA relating to $47,000 of the GST claim and related accrued interest.  A Notice of Revision pursuant to the Claims Procedure Order will be issued by CCPL prior to February 8, 2008.  A reserve for 100% of the filed amount of the claim has been established and it its anticipated the claim will be resolved in due course through the Notice of Appeal process.

**CCRC**

33.    Talisman Energy Inc. ("Talisman") has filed two claims against CCRC with respect to reclamation costs related to certain well sites.  The quantum of these claims has been agreed to between CCRC and Talisman and a reserve has been established in the amount of $609,000 to satisfy the claims upon execution of settlement documentation.

**CESCA**

34.    Aquila Merchant Services International, Ltd. ("Aquila") filed a claim against CESCA in the amount of US$3.572 million for amounts owing pursuant to the purchase of natural gas.  Aquila previously had set off this amount against monies that it owed to Calpine

Energy Services, L.P. ("CES"), a US Debtor.  The parties have agreed to settle this matter by having Aquila assign this claim to CES in exchange for mutual releases of all parties and CESCA will pay the amount of the claim to CES upon execution of settlement documentation.  A reserve has been established for the full amount of the claim.

35.     CRA has filed 2 claims against CESCA; approximately $3.618 million with respect to outstanding GST and related accrued interest; and approximately $83,000 with respect to non resident withholding taxes ("NRWT") and related accrued interest.  CESCA has filed a Notice of Appeal with CRA relating to $2.2 million of the GST claim and related accrued interest and CESCA is in the process of filing a Notice of Appeal with respect to the $50,000 of the NRWT.  A Notice of Revision pursuant to the Claims Procedure Order will be issued by CESCA prior to February 8, 2008.  A reserve for 100% of the filed amount of the claims has been established and it its anticipated the claims will be resolved in due course through the Notice of Appeal process.

**CCNG**

36.     CRA has filed a claim against CCNG in the amount of approximately $3.207 million with respect to outstanding GST and related accrued interest.  CCNG has filed a Notice of Appeal with CRA relating to $2.2 million of the GST claim and related accrued interest.  A Notice of Revision pursuant to the Claims Procedure Order will be issued by CESCA prior to February 8, 2008.  A reserve for 100% of the filed amount of the claim has been established and it is anticipated the claim will be resolved in due course through the Notice of Appeal process.

37.     Canadian Natural Resources Limited ("CNRL") has filed a claim against CCNG in the amount of approximately $884,000 with respect to net operating profits it believes are owed to it from a well previously owned by CCNG.  CCNG has previously issued a Notice of Revision valuing the claim at $Nil and CNRL has filed a Notice of Dispute reiterating its position that it is owed the amount included in its original claim.  The parties are currently in the process of negotiating a settlement of the claim.  A reserve for 100% of the filed amount of the claim has been established.

**RECOMMENDATIONS**

38.    The Monitor recommends approval of the Final Relief on the basis that :

    i.   ULC1 has completed its distributions to repay all its third party creditors, including all amounts owed to ULC1 Note holders, therefore, it is appropriate for the ULC1 Notes to be cancelled and the ULC1 Indenture Trustee discharged;

    ii.   All claims paid to date, and reserved for, have been based on the Claims Process Order and distributed as approved by previous Orders of this Court;

    iii.   All third party creditors of the CCAA Debtors have been either paid in full, or fully reserved, therefore there is no need for a plan of compromise;

    iv.   The remaining unresolved claims have been substantially advanced and the Monitor believes that the CCAA Debtors are capable of resolving these claims. In addition, sufficient cash has been reserved for each disputed claim;

    v.   The payments have been made or fully reserved for as required under the KERP; and

    vi.   The duties of the Monitor have been substantially completed.

All of which is respectfully submitted this 6th day of February, 2008.

**ERNST & YOUNG INC.**
**in its capacity as Court Appointed**
**Monitor of the Applicants and CCAA Parties**

Neil Narfason, CA•CIRP, CBV
Senior Vice-President

Deryck Helkaa, CA•CIRP
Vice-President

## ULC1 - Detailed Claims Listing
## (in CDN $)

| Claim # | Claimant | Proofs of Claim Filed | Accepted | Claims | Distributions To Date | Amount Reserved / Deferred |
|---|---|---|---|---|---|---|
| 1-001 | Angelo & Cathie L. Gurreri | 11,734 | - | | - | - |
| 1-008 | Canada Revenue Agency | 58,500,000 | - | | - | - |
| 1-009 | Canada Revenue Agency | 107,857,901 | - | | - | - |
| 1-002 | H. Menefee & L. Menefee | 11,734 | - | | - | - |
| 1-010 | HSBC Bank USA, National Association | 2,492,719,580 | 2,568,087,150 | | 2,568,087,150 | - |
| 1-010 | HSBC Bank USA, National Association | TBD | 4,873,643 | | 4,873,643 | - |
| 1-003 | IHS Energy (Canada) Ltd | 2,177,603 | - | | - | - |
| 1-004 | John F. Sage | 704,040 | - | | - | - |
| 1-005 | Patricia Michael Taylor | 9,918 | - | | - | - |
| 1-012 | Wilmington Trust Company | TBD | - | | - | - |
| **Subtotal** | **Third Party claims** | **2,661,992,510** | **2,572,960,793** | | **2,572,960,793** | **-** |
| CCEL | Calpine Canada Energy Ltd. | 106,636 | - | | - | - |
| CCRC | Calpine Canada Resources Co. | 17,601,000 | 15,732,041 | | 15,732,041 | - |
| **Subtotal** | **Cdn Debtors** | **17,707,636** | **15,732,041** | | **15,732,041** | **-** |
| 1-011 | Quintana Canada Holdings LLC | 12,350,833 | - | | - | - |
| 1-011 | Quintana Canada Holdings LLC | 40,118,995 | - | | - | - |
| 1-011 | Quintana Canada Holdings LLC | TBD | - | | - | - |
| 1-006 | Calpine Corporation | 2,786,942,340 | - | | - | - |
| 1-006 | Calpine Corporation | 167,199,477 | - | | - | - |
| 1-006 | Calpine Corporation | 226,250,000 | - | | - | - |
| 1-006 | Calpine Corporation | 46,936,000 | 46,936,000 | | 46,936,000 | - |
| 1-007 | Calpine Group US | TBD | - | | - | - |
| | Calpine Corporation (swap closing) | - | 1,243,551,106 | | 1,243,551,106 | - |
| | Calpine Corporation (guarantee fee) | - | 66,553,231 | | | 66,553,231 |
| **Subtotal** | **US Debtors** | **3,279,797,645** | **1,357,040,337** | | **1,290,487,106** | **66,553,231** |
| **Total Claims** | | **5,959,497,792** | **3,945,733,171** | | **3,879,179,940** | **66,553,231** |

## CCEL - Detailed Claims Listing
### (in CDN $)

| Claim # | Claimant | Proofs of Claim Filed | Accepted Claims | Distributions To Date | Amount Reserved |
|---------|----------|----------------------:|----------------:|----------------------:|----------------:|
| 2-001 | Canada Revenue Agency | 9,641 | 30,191,891 | 30,191,891 | - |
| 2-002 | Charlotte's Web Florist | 375 | 375 | 375 | - |
| 2-006 | HSBC Bank USA, National Association | TBD | - | - | - |
| 2-003 | IHS Energy (Canada) Ltd | 2,177,603 | - | - | - |
| 2-007 | NOVA Gas Transmission Ltd. | 36,205,274 | - | - | - |
| 2-008 | TransCanada Pipelines Limited | 81,129,548 | - | - | - |
| 2-011 | Van Houtte Coffee Services | 607 | 607 | 607 | - |
| 2-009 | Wilmington Trust Company | 3,550,425,146 | - | - | - |
| 2-010 | Wilmington Trust Company | TBD | - | - | - |
| **Subtotal** | **Third Party claims** | **3,669,948,193** | **30,192,872** | **30,192,872** | **-** |
| ULC1 | Calpine Canada Energy Finance ULC | 3,007,359,852 | 3,514,711,070 | 3,514,711,070 | - |
| Saltend LP | Calpine Canadian Saltend LP (now CCRC) | 21,259 | 21,259 | 21,259 | - |
| CCNG | Calpine Canada Natural Gas Partnership | 8,725,898 | 8,725,898 | 8,725,898 | - |
| **Subtotal** | **Cdn Debtors** | **3,016,107,009** | **3,523,458,227** | **3,523,458,227** | **-** |
| 2-004 | Calpine Corporation | 221,587 | 142,390 | 142,390 | - |
| 2-005 | Calpine Group US | TBD | - | - | - |
| **Subtotal** | **US Debtors** | **221,587** | **142,390** | **142,390** | **-** |
| **Total Claims** | | **6,686,276,789** | **3,553,793,489** | **3,553,793,489** | **-** |

**CCPL - Detailed Claims Listing
(in CDN $)**

| Claim # | Claimant | Proofs of Claim Filed | Accepted Claims | Distributions To Date | Amount Reserved |
|---|---|---|---|---|---|
| 3-001 | 4087844 Canada Inc. | 23,328 | - | - | - |
| 3-002 | California Climate Action Registry | 880 | 880 | 880 | - |
| 3-010 | Calpine Commercial Trust | 37,734,432 | - | - | - |
| 3-011 | Calpine Power Income Fund, Calpine Power LP, Calpine Commercial Trust | TBD | - | - | - |
| 3-011a | Calpine Power Income Fund, Calpine Power LP, Calpine Commercial Trust | TBD | - | - | - |
| 3-012 | Calpine Power Income Fund, Calpine Power LP | TBD | - | - | - |
| 3-013 | Calpine Power LP | TBD | 250,000 | 250,000 | - |
| 3-016 | Canada Revenue Agency | 229,329 | - | - | - |
| 3-016A | Canada Revenue Agency | | 283,963 | - | 283,963 |
| 3-016B | Canada Revenue Agency | | 71,796 | - | 71,796 |
| 3-017 | Canada Revenue Agency | 11,544,090 | - | - | - |
| 3-003 | Canada Revenue Agency | 3,449 | 3,449 | - | 3,449 |
| 3-004 | Canada Revenue Agency#1 | 83,307 | - | - | - |
| 3-004 | Canada Revenue Agency#2 | 33,721 | - | - | - |
| 3-018 | HSBC Bank USA, National Association | TBD | - | - | - |
| 3-005 | IHS Energy (Canada) Ltd | 2,177,603 | - | - | - |
| 3-006 | Kestrel Data Limited | 117 | 117 | 117 | - |
| 3-007 | Sandwell Consulting Engineers Ltd. | 25,181 | 25,181 | 25,181 | - |
| 3-019 | Wilmington Trust Company | TBD | - | - | - |
| | Late Claim | 30,000,000 | - | - | - |
| **Subtotal** | **Third Party claims** | **81,855,436** | **635,385** | **276,177** | **359,208** |
| ULC1 | Calpine Canada Energy Finance ULC | 18,746 | 18,746 | 18,746 | - |
| CCEL | Calpine Canada Energy Ltd. | 146,123,304 | 146,123,304 | 68,351,359 | - |
| CCNG | Calpine Canada Natural Gas Partnership | 59,082,669 | 59,082,669 | 27,636,801 | - |
| **Subtotal** | **Cdn Debtors** | **205,224,719** | **205,224,719** | **96,006,906** | **-** |
| 3-008 | C*Power Inc. | 7,641 | 7,545 | 7,545 | - |
| 3-009 | Calpine Central, LP | 57,251 | 56,533 | 56,533 | - |
| 3-014 | Calpine Corporation | 2,425,216 | - | - | - |
| 3-015 | Calpine Group US | TBD | - | - | - |
| **Subtotal** | **US Debtors** | **2,490,109** | **64,079** | **64,079** | **-** |
| **Total Claims** | | **289,570,264** | **205,924,183** | **96,347,162** | **359,208** |

## CCPSL - Detailed Claims Listing
## (in CDN $)

| Claim # | Claimant | Proofs of Claim Filed | Accepted Claims | Distributions To Date | Amount Reserved |
|---------|----------|----------------------|-----------------|----------------------|-----------------|
| 4-004 | HSBC Bank USA, National Association | TBD | - | - | - |
| 4-001 | IHS Energy (Canada) Ltd | 2,177,603 | - | - | - |
| 4-002 | Ministry of Finance (Ontario) | 1,409 | - | - | - |
| 4-005 | Wilmington Trust Company | TBD | - | - | - |
| **Subtotal** | **Third Party Claims** | **2,179,012** | **-** | **-** | **-** |
| 4-003 | Calpine Group US | TBD | - | - | - |
| **Subtotal** | **US Debtors** | **-** | **-** | **-** | **-** |
| **Total Claims** | | **2,179,012** | **-** | **-** | **-** |

## CCRC - Detailed Claims Listing
## (in CDN $)

| Claim # | Claimant | Proofs of Claim Filed | Accepted Claims | Distributions To Date | Amount Reserved |
|---------|----------|----------------------:|----------------:|----------------------:|----------------:|
| 5-002 | 4087844 Canada Inc. | 23,328 | - | - | - |
| 5-028 | Alliance Pipeline Limited Partnership | 52,755,276 | - | - | - |
| 5-041 | Alliance Pipeline Limited Partnership | 40,980,017 | - | - | - |
| 5-003 | Anadarko Canada Corp. | 28,828 | - | - | - |
| 5-004 | Anadarko Canada Corp. | 316,561 | - | - | - |
| 5-029 | Apache Canada Ltd | 129,878 | - | - | - |
| 5-005 | Arc Resources Ltd | 2,660 | - | - | - |
| 5-006 | Bonavista Petroleum | 4,466 | - | - | - |
| 5-047 | Burlington Resources Canada | 5,269 | - | - | - |
| 5-048 | Burlington Resources Canada | 2,317 | - | - | - |
| 5-031 | Calpine Power LP | 2,934,582 | - | - | - |
| 5-031 | Calpine Power LP | 766,129,764 | - | - | - |
| CRA | Canada Revenue Agency (NRWT) | | 40,075,603 | 40,075,603 | 0 |
| 5-046 | Canadian Natural Resources & CNR Limited | 863,566 | - | - | - |
| 5-007 | Canpar Holdings Ltd | 66,465 | - | - | - |
| 5-008 | Checker Cabs Limited | 497 | 497 | 497 | - |
| 5-044 | Conaco Phillips Canada Limited | 98,223 | - | - | - |
| 5-042 | Conaco Phillips Western Canada Partnerships | 27,674 | - | - | - |
| 5-043 | Conaco Phillips Western Canada Partnerships | 51,686 | - | - | - |
| 5-009 | Devon Canada Corporation | 35,555 | - | - | - |
| 5-049 | Encana Corporation | 257,727 | - | - | - |
| 5-010 | Enermark Inc. | (37,264) | - | - | - |
| 5-011 | Enerplus Resources Corporation | 162 | - | - | - |
| 5-012 | EOG Resources Canada Inc. | 3,588 | - | - | - |
| 5-045 | Harbinger Capital Partners Master Fund I Ltd. | 5,516,329 | - | - | - |
| 5-013 | Hewlett-Packard (Canada) Co. | 3,685 | 3,685 | 3,685 | - |
| 5-032 | HSBC Bank USA, National Association | TBD | - | - | - |
| 5-014 | Hunt Oil Company of Canada, Inc. | 30,565 | - | - | - |
| 5-015 | IHS Energy (Canada) Ltd | 2,177,603 | - | - | - |
| 5-016 | Kestrel Data Limited | 19,511 | 19,511 | 19,511 | - |
| 5-018 | Laurie Hawkins | 12,858 | 10,695 | 10,695 | - |
| 5-017 | Lyreco (Canada) Inc. | 541 | 541 | 541 | - |
| 5-033 | Manufacturers & Traders Trust Company | 639,044,000 | - | - | - |
| 5-034 | Minister of Energy | TBD | - | - | - |
| 5-053 | Murphy Oil Company Ltd | 129,154 | - | - | - |
| 5-035 and 5-039 | NOVA Gas Transmission Ltd./ TCPL | 117,334,822 | - | - | - |
| 5-019 | PCC Properties (Calgary) Ltd. | 4,377 | 4,377 | 4,377 | - |
| 5-001 | Perfectly Clean (995103 Alberta Ltd) | 252 | 252 | 252 | - |
| 5-020 | Petro-Canada Oil and Gas | 97,886 | - | - | - |
| 5-021 | Petrofund Corp. | 207,012 | - | - | - |

## CCRC - Detailed Claims Listing
## (in CDN $)

| Claim # | Claimant | Proofs of Claim Filed | Accepted Claims | Distributions To Date | Amount Reserved |
|---|---|---|---|---|---|
| 5-022 | Plains Marketing Canada, L.P. | 826 | - | - | - |
| 5-036 | PrimeWest Energy Inc. | 1,092,041 | - | - | - |
| 5-052 | Provident Energy Ltd. | 237,245 | - | - | - |
| 5-037 | Province of BC | 967,758 | 376,749 | 376,749 | - |
| 5-050 | Shiningbank Energy Ltd | 226,581 | - | - | - |
| 5-038 | Talisman Energy Inc. | 1,374,069 | - | - | - |
| 5-023 | Telus Communications Inc. | 33,801 | 18,552 | 18,552 | - |
| 5-051 | Telus Mobility | 614 | 614 | 614 | - |
| 5-024 | TKE Energy Partnerships | 34 | - | - | - |
| 5-026 | True Energy Inc | 44,276 | - | - | - |
| 5-025 | True Energy, an Alberta Partnership | 1,761 | - | - | - |
| 5-019 | Westcoast Energy | | 26,269,708 | 26,269,708 | - |
| 5-027 | Weyerhaeuser Company Limited | 14,787 | - | - | - |
| 5-040 | Wilmington Trust Company | TBD | - | - | - |
| | Talisman Energy Inc. | - | 609,000 | | 609,000 |
| **Subtotal** | **Third Party claims** | **1,633,253,211** | **67,389,784** | **66,780,784** | **609,000** |
| ULC1 | Calpine Canada Energy Finance ULC | 1,868,960 | - | - | - |
| CCEL | Calpine Canada Energy Ltd. | 2,081,381,110 | 2,315,736,734 | 65,535,788 | - |
| ULC2 | Calpine Canada Energy Finance II | 674,777,254 | 773,169,686 | 773,169,686 | - |
| ULC2 | ULC2 Shortfall Claim | TBD | - | | - |
| CESCA | Calpine Energy Services Canada Partnership | 5,051 | 5,051 | 5,051 | - |
| 309NS | 3094479 Nova Scotia Company | 52,753 | - | - | - |
| **Subtotal** | **Related Party claims** | **2,758,085,128** | **3,088,911,471** | **838,710,525** | **-** |
| 5-030 | Calpine Group US | 2,581,383 | - | - | - |
| 5-030 | Calpine Group US | TBD | - | - | - |
| **Subtotal** | **US Debtors** | **2,581,383** | **-** | **-** | **-** |
| **Total Claims** | | **4,393,919,722** | **3,156,301,256** | **905,491,309** | **609,000** |

## ULC2 - Detailed Claims Listing
## (in CDN $)

| Claim # | Claimant | Proofs of Claim Filed | Accepted Claims | Distributions To Date | Amount Reserved / Deferred |
|---|---|---|---|---|---|
| 6-007 | Harbinger Capital Partners Master Fund I Ltd. | 5,516,329 | 8,104,360 | 8,104,360 | - |
| 6-004 | HSBC Bank USA, National Association | TBD | - | - | - |
| 6-001 | IHS Energy (Canada) Ltd | 2,177,603 | - | - | - |
| 6-005 | Manufacturers & Traders Trust Company | 665,157,736 | 487,370,796 | 487,370,796 | - |
| 6-005 | MTTC - ULC2 Trustee Cost Reserve | 3,059,196 | 582,913 | 582,913 | - |
|  | MTTC - ULC2 Make-Whole Reserve | - | 17,996,251 | 17,996,251 | - |
|  | MTTC - ULC2 Interest Reserve | - | - | - | - |
| 6-006 | Wilmington Trust Company | TBD | - | - | - |
| **Subtotal** | **Third Party Claims** | **675,910,864** | **514,054,319** | **514,054,319** | **-** |
| ULC1 | Calpine Canada Energy Finance ULC | 16,247 | 16,247 | - | 16,247 |
| CCEL | Calpine Canada Energy Ltd. | 67,876 | 67,876 | - | 67,876 |
| CCRC | Calpine Canada Resources Company | 2,986,214 | - | - | - |
| Saltend LP | Calpine Canadian Saltend LP | 245,938,104 | 284,582,860 | 284,582,860 | - |
| **Subtotal** | **Cdn Debtors** | **249,008,441** | **284,666,983** | **284,582,860** | **84,123** |
| 6-002 | Calpine Corporation | TBD | - | - | - |
| 6-002 | Calpine Corporation | 963,797,353 | - | - | - |
| 6-003 | Calpine Group US | TBD | - | - | - |
| CORPX | Guarantee fees | - | 3,200,000 | - | 3,200,000 |
| **Subtotal** | **US Debtors** | **963,797,353** | **3,200,000** | **-** | **3,200,000** |
| **Total Claims** |  | **1,888,716,658** | **801,921,302** | **798,637,179** | **3,284,123** |

## CESCL - Detailed Claims Listing
## (in CDN $)

| Claim # | Claimant | Proofs of Claim Filed | Accepted Claims | Distributions To Date | Amount Reserved |
|---------|----------|----------------------:|----------------:|----------------------:|----------------:|
| 7-004 | Alliance Pipeline Limited Partnership | 40,980,017 | - | - | - |
| 7-005 | Alliance Pipeline Limited Partnership | 52,755,276 | - | - | - |
| 7-010 | Canada Revenue Agency | 4,712,852 | - | - | - |
| 7-001 | Canada Revenue Agency | 37,141 | - | - | - |
| 7-001 | Canada Revenue Agency | 667,884 | - | - | - |
| 7-001A | Canada Revenue Agency (GST) [Trust] | - | 682,190 | 682,190 | - |
| 7-001B | Canada Revenue Agency (GST) | - | 96,075 | 96,075 | - |
| 7-012 | HSBC Bank USA, National Association | TBD | - | - | - |
| 7-002 | IHS Energy (Canada) Ltd | 2,177,603 | - | - | - |
| 7-014 | MIT Power Canada Investments Inc. | TBD | - | - | - |
| 7-013 | MIT Power Canada LP Inc. | TBD | - | - | - |
| 7-015 | NOVA Gas Transmission Ltd. | 36,205,274 | - | - | - |
| 7-016 | TransCanada Pipelines Limited | 81,129,548 | - | - | - |
| 7-019 | Westcoast Energy | 66,785,886 | - | - | - |
| 7-017 | Wilmington Trust Company | TBD | - | - | - |
| 7-003 | Zee Medical Canada Inc. | 131 | 131 | 131 | - |
| **Subtotal** | **Third Party Claims** | **285,451,613** | **778,396** | **778,396** | **-** |
| 7-018 | CM Greenfield Power Corp | TBD | - | - | - |
| 7-011 | Greenfield Energy LP | TBD | - | - | - |
| ULC1 | Calpine Canada Energy Finance ULC | 108,055 | 108,055 | 108,055 | - |
| **Subtotal** | **Cdn Debtors** | **108,055** | **108,055** | **108,055** | **-** |
| 7-006 | Calpine Corporation | 2,581,818 | - | - | - |
| 7-007 | Calpine Group US | TBD | - | - | - |
| 7-008 | Calpine International, LLC | 50 | 50 | 50 | - |
| 7-009 | Calpine Power LP | 2,934,582 | - | - | - |
| 7-009 | Calpine Power LP | 766,129,764 | - | - | - |
| **Subtotal** | **US Debtors** | **771,646,214** | **50** | **50** | **-** |
| **Total Claims** | | **1,057,205,882** | **886,501** | **886,501** | **-** |

## CESCA - Detailed Claims Listing
## (in CDN $)

| Claim # | Claimant | Proofs of Claim Filed | Accepted Claims | Distributions To Date | Amount Reserved / Deferred |
|---|---|---|---|---|---|
| 8-005 | Alliance Pipeline Limited Partnership | 40,980,017 | 8,660,088 | 8,660,088 | - |
| 8-006 | Alliance Pipeline Limited Partnership | 52,755,276 | 12,063,764 | 12,063,764 | - |
| 8-001 | Aquila Merchant Services - Intl., Ltd. | 4,191,922 | 3,572,458 | - | 3,572,458 |
| 8-011 | Calpine Power LP | 769,064,346 | 193,211,000 | 193,211,000 | - |
| 8-018 | Canada Revenue Agency (GST) | 1,000,000 | - | - | - |
| 8-017 | Canada Revenue Agency (NRWT) | 22,852,725 | - | - | - |
| 8-017A | Canada Revenue Agency | - | 1,573 | - | 1,573 |
| 8-017B | Canada Revenue Agency (NRWT) [TRUST] | - | 81,699 | - | 81,699 |
| 8-018A | Canada Revenue Agency (GST) [TRUST} | - | 3,613,152 | - | 3,613,152 |
| 8-018B | Canada Revenue Agency (GST) | - | 4,532 | - | 4,532 |
| 8-004 | HSBC Bank USA, National Association | TBD | - | - | - |
| 8-002 | IHS Energy (Canada) Ltd | 2,177,603 | - | - | - |
| 8-016 | Independent System Operator | 3,887,500 | - | - | - |
| 8-012 | NOVA Gas Transmission Ltd. | 36,205,274 | 31,631,859 | 31,631,859 | - |
| 8-013 | Pengrowth Corporation | 536,490 | - | - | - |
| 8-003 | Progress Energy Ltd. | 1,294,861 | 1,432,506 | 1,432,506 | - |
| 8-014 | TransCanada Pipelines Limited | 81,129,548 | 44,368,141 | 44,368,141 | - |
| 8-015 | Wilmington Trust Company | TBD | - | - | - |
| **Subtotal** | **Third Party Claims** | **1,016,075,563** | **298,640,771** | **291,367,358** | **7,273,413** |
| CCEL | Calpine Canada Energy Ltd. | 3,765 | 3,765 | 3,765 | - |
| CCNG | Calpine Canada Natural Gas Partnership | 186,078,996 | 186,078,996 | - | - |
| **Subtotal** | **Cdn Debtors** | **186,082,761** | **186,082,761** | **3,765** | **-** |
| 8-007 | Calpine Corporation | 26,883,767 | 26,883,767 | 26,883,767 | - |
| 8-008 | Calpine Energy Management LP | 19,649,557 | 19,649,557 | 19,649,557 | - |
| 8-009 | Calpine Energy Services LP | 3,443,518 | 3,443,518 | 3,443,518 | - |
| 8-010 | Calpine Group US | TBD | - | - | - |
| **Subtotal** | **US Debtors** | **49,976,843** | **49,976,843** | **49,976,843** | **-** |
| **Total Claims** | | **1,252,135,166** | **534,700,375** | **341,347,966** | **7,273,413** |

## 309NS - Detailed Claims Listing
## (in CDN $)

| Claim # | Claimant | Proofs of Claim Filed | Accepted Claims | Distributions To Date | Amount Reserved |
|---|---|---|---|---|---|
| 9-002 | HSBC Bank USA, National Association | TBD | - | - | - |
| 9-001 | IHS Energy (Canada) Ltd | 2,177,603 | - | - | - |
| 9-003 | Wilmington Trust Company | TBD | - | - | - |
| CRA | Canada Revenue Agency (income tax) | - | - | - | - |
| **Subtotal** | **Third Pary Claims** | **2,177,603** | **-** | **-** | **-** |
| CCEL | Calpine Canada Energy Ltd. | 7,961 | 7,961 | 7,961 | - |
| CCRC | Calpine Canada Resources Company | 1,806,997 | 1,754,245 | 1,754,245 | - |
| ULC2 | Calpine Canada Energy Finance II | 15,191 | 15,191 | 15,191 | - |
| **Subtotal** | **Cdn Debtors** | **1,830,149** | **1,777,396** | **1,777,396** | **-** |
| **Total Claims** | | **6,185,355** | **1,777,396** | **1,777,396** | **-** |

**Saltend LP - Detailed Claims Listing
(in CDN $)**

| Claim # | Claimant | Proofs of Claim Filed | Accepted Claims | Distributions To Date | Amount Reserved |
|---|---|---|---|---|---|
| 10-002 | HSBC Bank USA, National Association | TBD | - | - | - |
| 10-001 | IHS Energy (Canada) Ltd | 2,177,603 | - | - | - |
| 10-003 | Wilmington Trust Company | TBD | - | - | - |
| **Total Claims** | | **2,177,603** | **-** | **-** | **-** |

## CNGSL - Detailed Claims Listing
## (in CDN $)

| Claim # | Claimant | Proofs of Claim Filed | Accepted Claims | Distributions To Date | Amount Reserved |
|---|---|---|---|---|---|
| 11-001 | Anadarko Canada Corp. | 55,444 | - | - | - |
| 11-004 | HSBC Bank USA, National Association | TBD | - | - | - |
| 11-002 | IHS Energy (Canada) Ltd | 2,177,603 | - | - | - |
| 11-005 | Wilmington Trust Company | TBD | - | - | - |
| **Subtotal** | **Third Party Claims** | **2,233,047** | **-** | **-** | **-** |
| CCEL | Calpine Canada Energy Ltd. | 2,617 | 2,617 | - | - |
| CCNG | Calpine Canada Natural Gas Partnership | 5,360,530 | 5,360,530 | - | - |
| **Subtotal** | **Cdn Debtors** | **5,363,147** | **5,363,147** | **-** | **-** |
| 11-003 | Calpine Group US | TBD | - | - | - |
| **Subtotal** | **US Debtors** | **-** | **-** | **-** | **-** |
| **Total Claims** | | **7,596,193** | **5,363,147** | **-** | **-** |

**CCNG - Detailed Claims Listing
(in CDN $)**

| Claim # | Claimant | Proofs of Claim Filed | Accepted Claims | Distributions To Date | Amount Reserved / Deferred |
|---------|----------|----------------------:|----------------:|----------------------:|---------------------------:|
| 12-022 | 4087844 Canada Inc. | 23,328 | 23,328 | 23,328 | - |
| 12-001 | Anadarko Canada Corp. | 8,055 | - | - | - |
| 12-002 | Anadarko Canada Corp. | 4,775 | - | - | - |
| 12-036 | Anadarko Canada Corp. | 2,698 | - | - | - |
| 12-027 | Apache Canada Ltd. | 233,066 | 98,147 | 98,147 | - |
| 12-003 | Arc Resources Ltd. | 184,519 | 124,927 | 124,927 | - |
| 12-004 | Bell Canada | 1,505 | - | - | - |
| 12-005 | Bonavista Petroleum | 62,529 | 47,972 | 47,972 | - |
| 12-042 | Burlington Resources Canada Ltd. | (54,008) | - | - | - |
| 12-043 | Burlington Resources Canada Ltd. | 21,487 | - | - | - |
| 12-037 | Canada Revenue Agency | 500,000 | - | - | - |
| 12-037A | Canada Revenue Agency (GST) | | 487,976 | - | 487,976 |
| 12-037A | Canada Revenue Agency (GST) [TRUST] | | 2,719,449 | - | 2,719,449 |
| 12-046 | Canadian Natural Resources / CNR Ltd | 812,845 | 863,566 | - | 863,566 |
| 12-T5-007 | Canpar Holdings Ltd. | | 57,720 | 57,720 | |
| 12-047 | Conaco Phillips Canada Limited | 2,549 | 100,773 | 100,773 | - |
| 12-038 | Conaco Phillips Canada Resources Corporation | 97,794 | 97,794 | 97,794 | - |
| 12-039 | Conaco Phillips Energy Partnerships | 112,028 | 112,028 | 112,028 | - |
| 12-040 | Conaco Phillips Western Canada Partnerships | 3,985 | 25,876 | 25,876 | - |
| 12-006 | Deep Resources Ltd | 12,584 | 12,584 | 12,584 | - |
| 12-023 | Devon Canada Corporation | 145,978 | 200,278 | 200,278 | - |
| 12-045 | Encana Corporation | 24,142 | 281,869 | 281,869 | - |
| 12-008 | Enermark Inc. | 19,794 | | | - |
| 12-007 | Enerplus Oil & Gas Ltd | 7,525 | 7,525 | 7,525 | - |
| 12-T5-011 | Enerplus Resources Company | | 162 | 162 | |
| 12-021 | CVI GVF (Lux) Master S.a.r.l | 49,279,000 | 3,050,840 | 3,050,840 | - |
| 12-010 | EOG Resources Canada Inc. | 1,127 | 605 | 605 | - |
| 12-T5-012 | EOG Resources Canada | | 3,588 | 3,588 | - |
| 12-009 | Esprit Exploration Ltd. | 6,413 | 6,413 | 6,413 | - |
| 12-031 | HSBC Bank USA, National Association | TBD | - | - | - |
| 12-T5-014 | Hunt Oil Company of Canada, Inc. | | 30,565 | 30,565 | |
| 12-050 | Liquidity Solutions | 68,737 | 14,105 | 14,105 | - |
| 12-011 | IHS Energy (Canada) Ltd | 2,177,603 | 700,000 | 700,000 | - |
| 12-014 | Iroquois Falls Power Corp. | 43,115,666 | 32,000,000 | 32,000,000 | - |
| 12-012 | Kestrel Data Limited | 8,940 | 8,940 | 8,940 | - |
| 12-013 | Keyera Energy Partnership - Revised | 30,042 | 665 | 665 | - |
| 12-032 | Minister of Energy | TBD | - | - | - |
| 12-T5-053 | Murphy Oil Company Ltd | | 129,154 | 129,154 | - |
| 12-024 | PCC Properties (Calgary) Ltd. | 4,377 | - | - | - |
| 12-044 | Pengrowth Corporation | 536,490 | - | - | - |
| 12-025 | Liquidity Solutions Inc. | 6,647 | 98,226 | 98,226 | - |

**CCNG – Detailed Claims Listing
(in CDN $)**

| Claim # | Claimant | Proofs of Claim Filed | Accepted Claims | Distributions To Date | Amount Reserved / Deferred |
|---------|----------|----------------------:|----------------:|----------------------:|---------------------------:|
| 12-015 | Liquidity Solutions Inc. | 38,635 | 200,103 | 200,103 | - |
| 12-016 | Plains Marketing Canada, L.P. | 876 | - | | - |
| 12-033 | Longacre Master Fund, Ltd. | 748,180 | 500,000 | 500,000 | - |
| 12-048 | Provident Acquisition LP | 278,030 | - | | - |
| 12-049 | Provident Energy Ltd. | 5,250 | 201,875 | 201,875 | - |
| 12-017 | Rife Resources Ltd. | 1,633 | 948 | 948 | - |
| 12-T5-050 | Shiningbank Energy Ltd | | 173,633 | 173,633 | - |
| 12-018 | Suncor Energy Inc. | 12,645 | 2,590 | 2,590 | - |
| 12-019 | Sutton Energy Ltd | 3,127 | 3,127 | 3,127 | - |
| 12-041 | Talisman Energy Inc. | 1,374,069 | 1,011,281 | 1,011,281 | - |
| 12-020 | TKE Energy Partnerships | 1,652 | 781 | 781 | - |
| 12-T5-026 | True Energy Inc. | | 12,992 | 12,992 | - |
| 12-T5-025 | True Energy, an Alberta Partnership | | 392 | 392 | - |
| 12-026 | Viking Holdings Inc. | 72,287 | 72,287 | 72,287 | - |
| 12-035 | Weir Hill Exploration Inc. | 6,892 | 6,892 | 6,892 | - |
| 12-T5-027 | Weyerhaeuser Company Limited | | 7,575 | 7,575 | - |
| | AltaGas Ltd. | 31,283 | 31,283 | 31,283 | - |
| | Baytex Energy | 35,591 | 35,591 | 35,591 | - |
| | Oracle Corporation | 19,455 | 19,455 | 19,455 | - |
| | Zapata Energy | 5,234 | 5,234 | 5,234 | - |
| **Subtotal** | **Third Party claims** | **100,097,061** | **43,591,114** | **39,520,123** | **4,070,991** |
| 12-034 | Wilmington Trust Company | TBD | - | - | - |
| ULC1 | Calpine Canada Energy Finance ULC | 10,103 | 10,103 | 10,103 | - |
| CCRC | Calpine Canada Resources Company | 61,804,059 | 61,804,059 | 27,971,996 | - |
| ULC2 | Calpine Canada Energy Finance II | 9,164 | 9,164 | 9,164 | - |
| **Subtotal** | **Cdn Debtors** | **61,823,327** | **61,823,327** | **27,991,264** | **-** |
| 12-028 | Calpine Corporation | 4,551,332 | 1,762,406 | 1,762,406 | - |
| 12-029 | Calpine Energy Services LP | 1,968,482 | 1,943,790 | 1,943,790 | - |
| 12-030 | Calpine Group US | TBD | - | - | - |
| **Subtotal** | **US Debtors** | **6,519,814** | **3,706,196** | **3,706,196** | **-** |
| **Total Claims** | | **168,440,202** | **109,120,636** | **71,217,582** | **4,070,991** |

# EXHIBIT F

Action No. 0501-17864

**IN THE COURT OF QUEEN'S BENCH OF ALBERTA**
**JUDICIAL DISTRICT OF CALGARY**

**IN THE MATTER OF THE *COMPANIES' CREDITORS***
***ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF**

**CALPINE CANADA ENERGY LIMITED, CALPINE CANADA POWER LTD.,**
**CALPINE CANADA ENERGY FINANCE ULC, CALPINE ENERGY SERVICES**
**CANADA LTD., CALPINE CANADA RESOURCES COMPANY,**
**CALPINE CANADA POWER SERVICES LTD., CALPINE CANADA ENERGY**
**FINANCE II ULC, CALPINE NATURAL GAS SERVICES LIMITED,**
**AND 3094479 NOVA SCOTIA COMPANY**

**APPLICANTS**

| | | |
|---|---|---|
| BEFORE THE HONOURABLE | ) | AT THE COURTHOUSE, IN THE CITY |
| MADAM JUSTICE B.E.C. ROMAINE | ) | OF CALGARY, IN THE PROVINCE OF |
| | ) | ALBERTA, ON FRIDAY, THE 8TH |
| | ) | DAY OF FEBRUARY, 2008 |

I hereby certify this to be a true copy of
the original *Order*
Dated this 8 day of Feb. 2008
*[signature]*
for Clerk of the Court

**FINAL ORDER**

**UPON THE APPLICATION** of the CCAA Debtors as defined in the Austin Affidavit defined below; **AND UPON** having read (i) the Affidavit of Toby Austin sworn February 4, 2008 (the "Austin Affidavit"); and (ii) the Twenty-Ninth Report of the Monitor, Ernst & Young Inc., dated February 6, 2008 (the "Twenty-Ninth Report"), all filed; **AND UPON** hearing the submissions of counsel for the CCAA Debtors, the Monitor, the U.S. Debtors (as defined in the Austin Affidavit), HSBC Bank USA, National Association, as successor indenture trustee (the "ULC1 Indenture Trustee") and such other counsel as were present; **AND UPON** being satisfied that circumstances exist that make this Order appropriate; **IT IS HEREBY ORDERED THAT:**

- 2 -

**Service**

1.      Service of the Notice of Motion is hereby abridged so that the application is properly returnable today and, further, that any requirement for service of the Notice of Motion upon any party not served is hereby dispensed with.

**ULC1 Indenture Trustee and Cancellation of ULC1 Notes**

2.      All notes (the "ULC1 Notes") issued by Calpine Canada Energy Finance ULC ("ULC1") pursuant to the Amended and Restated Indenture dated as of October 16, 2001, between the ULC1 Indenture Trustee and ULC1 (the "ULC1 Indenture"), and the ULC1 Indenture were deemed automatically cancelled and discharged on the Effective Date (as defined in the U.S. Debtors' Plan of Reorganization (the "U.S. Plan")) (the "Cancellation Date"), provided, however, that the ULC1 Notes and the ULC1 Indenture shall continue in effect solely for the purposes set forth in the U.S. Plan and to allow ULC1 to pay the fees and expenses of the ULC1 Indenture Trustee (without the need for application to, or approval of, this Court).

3.      From and after the Cancellation Date, the ULC1 Indenture Trustee shall be released by all persons and entities, including, without limitation, all holders of the ULC1 Notes and other parties in interest, from any and all claims, causes of action and other assertions of liability arising out of the discharge of the powers and duties conferred upon the ULC1 Indenture Trustee by the ULC1 Indenture or the U.S. Plan or any Order of this Court, or applicable law, including, without limitation, the making of distributions to holders of the ULC1 Notes under the U.S. Plan.

4.      From and after the Cancellation Date, all persons and entities, including, without limitation, all holders of the ULC1 Notes and other parties in interest, to the fullest extent permissible under applicable law, as such law may be extended or interpreted subsequent to the Cancellation Date, shall be deemed to forever release, waive and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action and liabilities, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, or then existing or thereafter arising in law, equity or otherwise, that are based in whole or in part on any act, omission, transaction or other occurrence taking place on or prior to the Cancellation Date in any way relating to the ULC1 Indenture Trustee that such entity has, had or may have, against the ULC1 Indenture Trustee, its estates, all

*199472-371537*
*DOCS #37946 v. 1*

- 3 -

persons or entities claiming through them, and any of their respective present or former directors, officers, employees, agents, representatives, attorneys, accountants, underwriters, investment bankers or financial advisors and any of their respective successors or assigns.

**Compliance**

5.     The CCAA Debtors have acted in good faith and with due diligence, have complied with the *Companies' Creditors Arrangement Act*, and have adhered to and acted in accordance with, the Orders of this Court in these proceedings.

**Claims Procedure and Bar**

6.     The Claims Procedure Order of this Court dated April 10, 2006, as amended, (the "Claims Procedure Order") is hereby confirmed, including, without limitation, the Claims Bar Date, releases, injunctions and prohibitions provided for thereunder, and shall operate in addition to the provisions of this Order, provided, however, that for the purposes of resolving the Claims identified in the Twenty-Ninth Report that were filed but remain in dispute, the procedure set out in the Claims Procedure Order shall apply with "CCAA Debtors" replacing "Monitor" *mutatis mutandis*.

7.     Nothing in the previous paragraph shall act to bar Excepted Claims, as defined in the Claims Procedure Order.

**Distributions in Full and Final Satisfaction of Claims**

8.     All payments made by or on behalf of the CCAA Debtors in accordance with the Orders of this Court in these proceedings shall constitute full and final payment and satisfaction of the Claims in respect of which payments were made (the "Paid Claims") (including without limitation the payments made with respect to the ULC1 Notes under the U.S. Plan), save and except for inter-company claims.

9.     Without limiting anything in this Order, or anything in the Claims Procedure Order, all Persons (regardless of whether or not such Persons are Creditors), on their own behalf and on behalf of their respective present or former employees, agents, officers, directors, principals, spouses, dependents, heirs, attorneys, successors, assigns and legal representatives, are

- 4 -

permanently and forever barred, estopped, stayed and enjoined, on and after the date hereof, with respect to Paid Claims, from:

(a)    commencing, conducting or continuing in any manner, directly or indirectly, any action, suits, demands or other proceedings of any nature or kind whatsoever against the CCAA Debtors or any of them;

(b)    enforcing, levying, attaching, collecting or otherwise recovering or enforcing by any manner or means, directly or indirectly, any judgment, award, decree or order against the CCAA Debtors or any of them or the property of any of the CCAA Debtors;

(c)    commencing, conducting or continuing in any manner, directly or indirectly, any action, suits or demands, including without limitation, by way of contribution or indemnity or other relief, in common law, or in equity, or under the provisions of any statute or regulation, or other proceedings of any nature or kind whatsoever against any Person who makes such a claim or might reasonably be expected to make such a claim, in any manner or forum, against one or more of the CCAA Debtors; and

(d)    creating, perfecting, asserting or otherwise enforcing, directly or indirectly, any lien or encumbrance of any kind.

## Continuation of Agreements

10.    Except as specifically provided in this Order with respect to the ULC1 Notes and the ULC1 Indenture, all agreements to which one or more of the CCAA Debtors are a party as at the date hereof, and which have not been repudiated by the CCAA Debtors, shall remain in full force and effect, unamended, and no person or entity shall, after the date hereof, accelerate, terminate, rescind, refuse to perform or otherwise repudiate its obligations under, or assert, enforce or exercise any right, option or remedy or make any demand under or in respect of any such agreement, by reason of:

- 5 -

(a)     the CCAA Debtors having sought or obtained or become the subject of relief under the CCAA;

(b)     the CCAA Debtors having complied with any Orders made in these CCAA proceedings; or

(c)     the U.S. Debtors having sought or obtained relief in the United States Bankruptcy Honourable Court for the Southern District of New York under Chapter 11 of the *United States Bankruptcy Code*.

**<u>Discharge of the Monitor</u>**

11.     The actions, conduct and activities of the Monitor outlined in the Twenty-Ninth Report and in all previous Reports filed by the Monitor in these proceedings are hereby approved.

12.     Ernst & Young Inc. is hereby discharged from its duties as Monitor in these proceedings and shall hereafter have no further liabilities, obligations, responsibilities or duties under the Initial Order of this Honourable Court dated December 20, 2005, as amended and restated January 16, 2006 (the "Initial Order") or otherwise in respect of these proceedings.

13.     The Monitor, its affiliates, and their respective officers, directors, employees and agents, attorneys and solicitors for the Monitor, (collectively, the "Monitor Parties" and each a "Monitor Party") are hereby released and forever discharged from any and all claims, whether known or unknown, matured or unmatured, foreseen or unforeseen, existing or hereafter arising, based in whole or in part on any act or omission of a Monitor Party in any way relating to, arising out of or in respect of the performance or intended performance of the Monitor's mandate or any activity related thereto in these CCAA proceedings, save and except for any claim against a Monitor Party arising out of any gross negligence or wilful misconduct on the part of that Monitor Party.

14.     No action or other proceeding in any way arising from or related to the performance or intended performance of the Monitor's mandate or any activity in these CCAA proceedings shall be commenced against a Monitor Party except with prior leave of this Court and on prior written notice to the Monitor Party and upon further order securing, as security for costs, the solicitor and his own client costs of the Monitor in connection with any proposed action or proceeding.

- 6 -

### Dismissal of Bankruptcy Applications

15.    The Consolidated Applications for Bankruptcy Orders filed in respect of Calpine Canada Resources Company, Calpine Canada Energy Finance II ULC and Calpine Canada Energy Finance ULC, having estate file numbers BK01-092911, BK01-092912 and BK01-092913, shall be dismissed without costs and orders to that effect shall be entered by the Bankruptcy Court under each estate file number.

### CCAA Debtor Party Releases

16.    The former and present officers, directors, shareholders, employees, servants and agents of the CCAA Debtors, and the attorneys and solicitors for the CCAA Debtors, (collectively, the "CCAA Debtor Parties") are hereby fully, finally, irrevocably and unconditionally released and forever discharged from: (i) any and all Claims as defined in the Claims Procedure Order, and (ii) any and all claims, whether known or unknown, matured or unmatured, foreseen or unforeseen, existing or hereafter arising out of, or in any way related to, in whole or in part, directly or indirectly these CCAA proceedings.

17.    Without limiting anything in this Order, or anything in the Claims Procedure Order, all Persons (regardless of whether or not such Persons are Creditors), on their own behalf and on behalf of their respective present or former employees, agents, officers, directors, principals, spouses, dependents, heirs, attorneys, successors, assigns and legal representatives, are permanently and forever barred, estopped, stayed and enjoined, on and after the date hereof, with respect to Claims, from:

   (a)    commencing, conducting or continuing in any manner, directly or indirectly, any action, suits, demands or other proceedings of any nature or kind whatsoever against the CCAA Debtor Parties or any of them;

   (b)    enforcing, levying, attaching, collecting or otherwise recovering or enforcing by any manner or means, directly or indirectly, any judgment, award, decree or order against the CCAA Debtor Parties or any of them or the property of any of the CCAA Debtor Parties;

- 7 -

(c)     commencing, conducting or continuing in any manner, directly or indirectly, any action, suits or demands, including without limitation, by way of contribution or indemnity or other relief, in common law, or in equity, or under the provisions of any statute or regulation, or other proceedings of any nature or kind whatsoever against any Person who makes such a claim or might reasonably be expected to make such a claim, in any manner or forum, against one or more of the CCAA Debtor Parties; and

(d)     creating, perfecting, asserting or otherwise enforcing, directly or indirectly, any lien or encumbrance of any kind.

**Termination of These Proceedings**

18.     The Initial Order shall have no further force or effect from and after 11:59 p.m. on the date hereof.

19.     Without limiting the foregoing, the Charges provided for in the Initial Order and in any subsequent Order in these CCAA proceedings are fully and finally terminated, discharged and released as of the date hereof. Furthermore and without limiting the foregoing, the Key Employee Retention Plan approved by Order dated July 12, 2006 is declared completed and no longer in effect.

20.     These CCAA proceedings are declared completed and the Stay Period (under the Initial Order as extended) terminated as of 11:59 p.m. on the date hereof.

**Further Advice and Direction**

21.     Notwithstanding the foregoing, the CCAA Debtors are hereby granted leave to apply to this Court for such further advice, direction or assistance as may be necessary to give effect to the terms of this Order.

- 8 -

**General**

22.    The CCAA Debtors shall deliver by electronic mail to each party served with this motion hereto a copy of this Order.

23.    Notwithstanding:

     (a)    the pendency of these proceedings;

     (b)    a bankruptcy of any of the CCAA Debtors; and

     (c)    the provisions of any federal or provincial statute,

none of the transactions contemplated by this Order will be void or voidable at the instance of creditors and claimants and do not constitute nor shall they be deemed to be settlements, fraudulent preferences, assignments, fraudulent conveyances or other reviewable transactions under the *Bankruptcy and Insolvency Act* or any other applicable federal or provincial legislation, and they do not constitute conduct meriting an oppression remedy and shall be binding on a trustee in bankruptcy in respect of any of the CCAA Debtors.

24.    **THIS COURT REQUESTS** the aid, recognition and assistance of any court, tribunal, administrative body or registrar in any jurisdiction in Canada and/or the United States in connection with the implementation and carrying out of the terms of this Order and in connection with the authority granted hereunder to proceed with and conclude the matters contemplated by the terms of this Order.

_____
                    J.C.Q.B.A.

ENTERED this _____ 8th _____ day of February, 2008.

_____
V.A. BRANDT   *(COURT SEAL)*
Clerk of the Court

*199472-371537*
*DOCS #37946 v. 1*

No. 0501-17864                         A.D. 2005

IN THE COURT OF QUEEN'S BENCH OF ALBERTA
JUDICIAL DISTRICT OF CALGARY

**IN THE MATTER OF THE *COMPANIES'
CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c.
C-36, AS AMENDED**

**AND IN THE MATTER OF CALPINE CANADA
ENERGY LIMITED, CALPINE CANADA POWER
LTD., CALPINE CANADA ENERGY FINANCE
ULC, CALPINE ENERGY SERVICES CANADA
LTD., CALPINE CANADA RESOURCES
COMPANY, CALPINE CANADA POWER
SERVICES LTD., CALPINE CANADA ENERGY
FINANCE II ULC, CALPINE NATURAL GAS
SERVICES LIMITED, AND 3094479 NOVA SCOTIA
COMPANY**

Applicants

**ORDER**

**GOODMANS LLP**
Barristers & Solicitors
Suite 2400
250 Yonge Street
Toronto, Canada M5B 2M6

Jay A. Carfagnini
Fred Myers
Brian Empey
Tel: 416-979-2211
Fax: 416-979-1234

**McCARTHY TÉTRAULT LLP**
3300 – 421 7 Ave. S.W.
Calgary, AB  T2P 4K9

Larry Robinson Q.C.
Sean Collins
Tel: 403-260-3500
Fax: 403-260-3501

CLERK OF THE COURT

FEB - 8 2008

CALGARY, ALBERTA

\5542955.7

*199472-371537*
*DOCS #37946 v. 1*